**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC.,
1050 Techwood Drive
Atlanta, GA 30318;

MS NOW CABLE, LLC,
229 West 43rd Street
New York, NY 10036;

POLITICO LLC,
1000 Wilson Boulevard, 8th Floor
Arlington, VA 22209;

AKAYLA GARDNER,
400 North Capitol Street, N.W.
Washington, D.C. 20001;

CHEYENNE HASLETT,
1000 Wilson Boulevard, 8th Floor
Arlington, VA 22209;

BETSY KLEIN,
820 1st Street, N.E.
Washington, D.C. 20002;

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500;

STEVEN CHEUNG, in his official capacity as Assistant to the President for Communications,
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500;

SEAN M. CURRAN, in his official capacity as Director of the Secret Service,
245 Murray Lane, S.W., Building T-5
Washington, D.C. 20223;

SUSAN WILES, in her official capacity as White House Chief of Staff,
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500.

*Defendants*.

**Civil Case No. _________**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. On Friday, September 18, 2026, President Donald J. Trump announced that he was "banning" journalists with three news organizations—CNN, MS NOW, and POLITICO—from the White House "effective immediately" for one simple reason: He dislikes the content of their coverage of him and his administration. The President was expressly clear about his viewpoint-discriminatory motive for targeting CNN, MS NOW, and POLITICO. He called it the "result of their constant 'reporting' FAKE NEWS!"—a term he routinely applies not to reporting that is false, but to any reporting he dislikes. He then threatened there would be "[o]ther Fake News Media Outlets to follow." In an Oval Office press conference later that day, the President doubled down. He was clear there was no particular story that triggered this decision—saying "it's really just cumulative stories over the last two years"—and equally clear that the ban was motivated by his disdain for reporting he considers "one-sided" and "never good" because it "diminish[es]" him and his accomplishments. The President repeated his straightforward rationale for targeting these three news organizations, calling it "wrong" to "allow people to write purposely negative stories." The President complained about coverage he considers "one-sided" and "never good," and at one point even referred to his own unprecedented act as the "ban on the free press."[1]

2. This ban could not be a more direct assault on the First Amendment nor a more blatant violation of our most fundamental constitutional principles. Presidents from the earliest days of the Republic have disagreed with and complained about the tenor and content of press coverage of their administrations. But as the Supreme Court has recognized, the First Amendment,

---

[1] https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-healthcare-drug-prices-oval-office-september-18-2026/. The video of the President's remarks is available at https://www.whitehouse.gov/videos/president-trump-makes-an-announcement-on-healthcare-sep-18-2026/.

including its guarantee of a free press, reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). And the Constitution protects the liberty and property interests that news organizations and White House reporters have in their press credentials and the access those credentials afford them to cover the White House for the benefit of the public. No official can deprive Plaintiffs of those interests on a whim—with no notice, no process, and no warning—as the President did here. *See Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020); *Sherrill v. Knight*, 569 F.2d 124, 130–31 & n.22 (D.C. Cir. 1977).

3. President Trump and members of his administration implemented this ban immediately. As of today, journalists from three of the leading news organizations in the country are simply not permitted anywhere on the grounds of the White House complex. The credentials (or "hard passes") that journalists at CNN, MS NOW, and POLITICO use to access the White House grounds to report the news, ask questions of the President and administration officials, and videotape and photograph White House activities were apparently deactivated overnight. And the following morning, White House officials denied access and seized the credentials of journalists with those organizations when they attempted to enter the White House to do their jobs.

4. The President banned CNN, MS NOW, and POLITICO, and the individual reporters covering the news for those media organizations, in disregard of the most basic guarantees of the First Amendment and the Due Process Clause. He did so expressly for the improper purpose of retaliating against Plaintiffs for past news coverage because he deemed it "negative" and chilling future reporting about him and his administration's policies and actions. President Trump has said in no uncertain terms that he would prefer only to be covered by news

organizations and reporters who praise his administration. But the Constitution does not allow a president or any other government official to deprive the press of their First Amendment rights and liberty and property interests with no notice or process based solely on his dislike of the content of their reporting. The ban is unconstitutional and should be immediately restrained.

5. First, the ban violates the Due Process Clause. CNN, MS NOW, POLITICO, and their journalists have liberty and property interests in their press credentials and the access those credentials afford to the White House grounds to report on the President and his administration. The ban deprives them of those interests without meeting the bare minimum requirements of due process: advance notice based on clear standards and an opportunity to be heard. The President provided no notice that he would immediately deny news organizations whose reporting he disliked access to the White House grounds. Nor did he provide clear standards for his decision. And the President did not provide CNN, MS NOW, or POLITICO, or any of their journalists, any opportunity to be heard before he announced the ban in a social media post and before the White House terminated reporters' access and confiscated press credentials.

6. Second, the ban retaliates against protected newsgathering and speech in violation of the First Amendment. The President announced that the ban is a punishment for the content of past news coverage from CNN, MS NOW, and POLITICO. And the President's statements make clear he implemented the ban to coerce more favorable coverage of the administration from CNN, MS NOW, and POLITICO, and to deter other journalists and news organizations from reporting that the President might view as unfavorable. The President has made no attempt to hide that his ban punishes protected speech, stating expressly that he decided to ban CNN, MS NOW, and POLITICO for their "cumulative" coverage over the past two years of him and his

administration—coverage that in his view is "fake," "sick," "purposely negative," "one-sided," and "never good."

7. Third, the ban violates the First Amendment for the separate and independent reason that it bars CNN, MS NOW, and POLITICO from a nonpublic forum for unlawful reasons. A "nonpublic forum" is "government property" that the government has opened to speech for selected speakers. *Ateba v. Leavitt*, 133 F.4th 114, 121–22 (D.C. Cir. 2025). The D.C. Circuit has held that the "White House Press Area" is a nonpublic forum. *Id.* at 123. Government restrictions on access to a nonpublic forum may not discriminate based on viewpoint and must be reasonable in light of the purposes of the forum. The President's ban brazenly discriminates based on editorial viewpoint; it expressly excludes CNN, MS NOW, and POLITICO based on the content of their coverage. And the President's abrupt announcement that the press may be excluded from the White House grounds for reporting he dislikes is far too vague and arbitrary a standard to qualify as reasonable under the First Amendment and undermines the very purpose of press access to the White House, which is to facilitate fact-based reporting for the benefit of the public.

8. The ban is already severely impeding the ability of CNN, MS NOW, and POLITICO to cover the President and his administration. Every day, critically important news is breaking at the White House and in the press pool: President Trump is the commander in chief of a country at war; he is traveling to New York today to address the United Nations General Assembly tomorrow; he is meeting with China's President Xi Jinping at the White House on Thursday; and he is steering national policy on the ever-advancing technology of artificial intelligence. And the ban inflicts an injury on all news media organizations—who now risk a similar fate if they engage in reporting the President deems insufficiently favorable. And the public at large suffers for however long the unconstitutional ban restricts access to current and complete

information about their government. These irreparable harms should not be tolerated for a day longer. The Court should immediately enjoin enforcement of the ban.

## PARTIES

9. Plaintiff Cable News Network, Inc. (CNN) is a Delaware corporation with its principal place of business in Atlanta, Georgia. In 1980, CNN launched the first channel for 24-hour television news coverage.

10. Plaintiff MS NOW Cable, LLC (MS NOW) is a Delaware limited liability company with its principal place of business in New York, New York. MS NOW operates a cable news network and a digital news service. It launched in 1996 as MSNBC and adopted the name MS NOW in November 2025 in connection with its separation from NBCUniversal as part of Comcast's spin-off of Versant Media Group, Inc.

11. Plaintiff POLITICO LLC is a Delaware limited liability company with its principal place of business in Arlington, Virginia. POLITICO is a global news organization that has covered politics and policy since 2007.

12. Plaintiff Akayla Gardner is a White House reporter for MS NOW. She is based in Washington, D.C.

13. Plaintiff Cheyenne Haslett is a White House reporter for POLITICO. She is based in Arlington, Virginia.

14. Plaintiff Betsy Klein is a senior reporter and writer who covers the White House for CNN. She is based in Washington, D.C.

15. Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

16. Defendant Steven Cheung is the Assistant to the President for Communications, better known as the White House Communications Director. He is sued in his official capacity.

17. Defendant Sean M. Curran is the Director of the Secret Service. He is sued in his official capacity.

18. Defendant Susan Wiles is the White House Chief of Staff. She is sued in her official capacity.

19. President Trump unconstitutionally banned CNN, MS NOW, POLITICO, and their reporters from the White House grounds. The other Defendants (as well as officers who report to them or work in concert with them) are responsible for implementing the President's directives. Under the leadership of Chief of Staff Wiles, the Trump administration, working among others through the White House press office, led by Assistant to the President for Communications Cheung, and the United States Secret Service, led by Director Curran, along with others working at their direction, reporting to them, or working alongside them, have taken steps to identify reporters, deactivate hard passes, confiscate such passes, and otherwise implement the President's ban.

**JURISDICTION AND VENUE**

20. This Court has subject-matter jurisdiction because this action arises under the Constitution of the United States. 28 U.S.C. § 1331.

21. The Court is authorized to award the requested relief under 28 U.S.C. §§ 2201 and 2202 and pursuant to its inherent equitable powers. *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026).

22. Venue is proper in this District under 28 U.S.C. § 1391(b) and § 1391(e)(1) because a substantial part of the events giving rise to the claims occurred in the District of Columbia.

## BACKGROUND

### A. Journalists and news organizations, including Plaintiffs, have long covered the President and his administration from White House grounds.

23. Journalists have covered the President from the White House for more than a century. In 1902, President Theodore Roosevelt set aside a room in the new West Wing for the press. Today, the White House press facilities include the James S. Brady Press Briefing Room for daily press briefings, the East Room for press conferences and other events, the North Lawn where the media frequently reports live from the White House, and the South Lawn where Marine One arrives and departs.

24. Access to the White House is critical for the press. For White House correspondents, the White House—or wherever the President happens to be—is the workplace. CNN's Betsy Klein, MS NOW's Akayla Gardner, and POLITICO's Cheyenne Haslett report, write, and broadcast from the White House grounds themselves, working out of booths in the lower press area behind the James S. Brady Briefing Room. They also meet with press staff by appointment in the upper press area, just steps from the Oval Office and the Press Secretary's office. Their work regularly requires physical presence at the White House.

25. A "hard pass" is a press credential provided to reporters who regularly cover the White House, are based in the Washington area, are accredited by a press gallery in the Supreme Court, U.S. Senate, or U.S. House of Representatives, and clear a background check by the Secret Service. 31 C.F.R. § 409.1.

26. A hard pass is essential to a White House reporter because it provides unescorted access, on short notice and with minimal delay, to the areas of the White House complex designated for the press—the James S. Brady Press Briefing Room, the press workspaces in the lower press area of the West Wing, and the North Lawn—and to Air Force One and the secured

areas of the President's travel that the White House press corps routinely covers. The hard pass allows a reporter to react to fast-developing news. A hard pass allows reporters swift and easy access to key official sources, including the Press Secretary, Communications Director, as well as the President himself and his aides and advisors. Without a hard pass, a reporter may miss newsworthy events, particularly those that occur with little notice. A hard pass is therefore crucial to being a White House correspondent for a national news organization like CNN, MS NOW, or POLITICO.

27. The Secret Service's role in issuing hard passes is limited by regulation. In deciding whether to approve an applicant during a background check, Secret Service officials must "be guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges." 31 C.F.R. § 409.1. And the regulation prescribes the process that must precede any denial: written notice of the factual basis for the proposed denial, an opportunity for the applicant to respond in writing and to be heard, and a final written decision. *Id.* § 409.2. Nothing in the regulation (let alone the First Amendment) permits a pass to be denied, suspended, or revoked because of the content of a journalist's reporting.

28. Credentialed journalists with participating news organizations also make up the White House press corps. Because the Oval Office, Air Force One, Marine One, and many presidential events cannot accommodate the full White House press corps, a rotating group of credentialed journalists—the pool—accompanies the President and shares reporting, video, and photographs with the rest of the press corps and, through them, with the American public and the world. Each day, the pool includes representatives from different media channels, including television, print, radio, and digital outlets. The television component of the pool consists of two

slots: primary and secondary. The primary slot rotates among five news organizations that share broadcasting responsibility, including CNN.[2] The secondary slot rotates among a larger group of outlets, including MS NOW. POLITICO has also belonged to the print component of the pool.

29. CNN has covered every President since Jimmy Carter from inside the White House. Among other things, its correspondents attend the daily press briefing in the James S. Brady Press Briefing Room, cover events in the Oval Office and the East Room, report live from the North Lawn, cover the President's arrivals and departures from the South Lawn, and travel with the President. As of September 18, 2026, 40 CNN journalists held valid White House hard passes.

30. CNN participates in the five-network rotation for the primary television pool (also called the network pool) and absorbs 20% of the costs associated with such coverage. When CNN is the designated network pooler, CNN's crew supplies the video and audio of the events involving the President and other White House officials to the other four networks and, through them and through pool distribution arrangements, to news organizations and the public. Among the recipients of the pool material are the more than 1,000 local affiliate television stations across the United States that receive the pool feed through CNN. CNN was traveling with the Vice President on September 18, 2026, as the network pooler, the day the President announced the ban.

31. Before September 18, 2026, no President had barred CNN as an organization from the White House. But in November 2018, the White House suspended the hard pass of CNN correspondent Jim Acosta following an exchange between President Trump and Mr. Acosta at a news conference. CNN and Mr. Acosta filed suit in this Court to challenge the revocation of his

[2] The five news organizations who make up the primary television pool are Fox News, CNN, NBC, ABC, and CBS. They share the costs and rotate turns serving as the primary television news organization each day for any events and locations where there is limited physical space for journalists.

hard pass on constitutional grounds. The Court ordered that Mr. Acosta's credential be restored, and the White House reinstated it. *See Karem*, 960 F.3d at 661 (describing incident and litigation).

32. MS NOW has covered the White House continuously since it began broadcasting as MSNBC in 1996. Each day, MS NOW dispatches journalists to the White House grounds, working from the briefing room, the West Wing driveway, a basement press booth, and other areas of the grounds used for live reporting. While on the grounds, MS NOW journalists meet with White House staff, speak with administration officials, attend open-press events, and attend formal press briefings. As of September 18, 2026, 22 MS NOW journalists held valid White House hard passes.

33. MS NOW participates in the secondary slot of the television pool rotation. Its journalists were on the White House grounds on September 18, 2026, the day the President announced the ban. Before September 19, 2026, no President had barred either MS NOW as an organization, or its reporters, from the White House.

34. Since its founding in 2007, POLITICO has covered the White House, Congress, federal agencies and regulation, and its reporting is relied upon to track government decisions in real time. POLITICO has covered the White House from inside the White House complex since its launch in 2007, and it has belonged to the print component of the pool.

35. CNN, MS NOW, and POLITICO are widely read and watched news sources in the United States. Each employs journalists who are assigned to cover the President and the White House.

36. President Trump has frequently attacked CNN, MS NOW, and POLITICO, along with other media outlets, for the content of their news coverage. Mere weeks into his first term, for example, President Trump posted: "The FAKE NEWS media (failing @nytimes,

@NBCNews, @ABC, @CBS, @CNN) is not my enemy, it is the enemy of the American People!"[3] (At the time, MS NOW, then MSNBC, was part of the NBC News group.) The intensity of those attacks has only increased since President Trump returned to office in January 2025. Two days after his second inauguration, President Trump posted that MS NOW was "even worse than CNN," and that "[t]hey shouldn't even have a right to broadcast—Only in America!"[4] He posted two days later that "MSNBC IS CLOSE TO DEATH. CNN HAS REACHED THE BOTTOM. This is a good thing. They are the Enemy of the people."[5] He has since warned that "MSDNC, CNN, and all other Mainstream Media Liars, are ON NOTICE that the days of them being allowed to deceive the American People are OVER."[6] And last October, he declared that "Politico has gone bad," has "been so wrong about everything," and "is fake news."[7]

**B. The President bans reporters for CNN, MS NOW, and POLITICO from the White House because of their coverage of the administration.**

37. At 3:04 p.m. EDT on Friday, September 18, 2026, the President followed through on his longstanding criticism of coverage on CNN, MS NOW, and POLITICO by prohibiting their reporters from accessing the White House grounds.[8] The image below reflects the post:

---

[3] https://x.com/realDonaldTrump/status/832708293516632065.

[4] https://truthsocial.com/@realDonaldTrump/posts/113874735766176608.

[5] https://truthsocial.com/@realDonaldTrump/posts/113887487731381945.

[6] https://truthsocial.com/@realDonaldTrump/posts/114898229237459086.

[7] https://www.govinfo.gov/content/pkg/DCPD-202501004/pdf/DCPD-202501004.pdf.

[8] @realDonaldTrump, Truth Social (Sept. 18, 2026, 3:04 PM), https://truthsocial.com/@realDonaldTrump/posts/117293599348325006.



**Donald J. Trump**
@realDonaldTrump

I am proud to announce that, effective immediately, I am banning Fake News CNN, MSNOW (who recently changed their name from MSNBC due to lack of viewership and credibility!), and Politico (The recipients of an illegal and ridiculous $8 Million Dollar subscription, an All Time Record, directly from the United States Government, under Crooked Joe Biden, in order to keep them "alive." Seems like corruption to me!), from the White House as a result of their constant "reporting" FAKE NEWS! Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America. Other Fake News Media Outlets to follow. Thank you for your attention to this matter! President DONALD J. TRUMP

**13.4k** ReTruths **54.6k** Likes Sep 18, 2026, 3:04 PM

38. About an hour later, the President took questions from reporters at an Oval Office event. The President literally referred to the ban as "the ban on the free press."

39. In explaining the motive for the ban, President Trump claimed that "[t]here's something wrong with a country that can allow people to write purposely negative stories," and that "if they want to write them, that's fine, but I don't have to let them into my, into the people's house."

40. Asked whether there was "a particular reason" for the ban, the President answered: "No, just because—no, no, it's—it's really just cumulative stories over the last two years. . . . They purposely write negative news. And they do that because they want to try and diminish the Republicans and a Republican administration."

41. Asked whether he was trying to intimidate the press, the President answered: "No, no, I dislike dishonest press like you. I think you're terrible. But I dislike dishonest, I like to see honest press."

42. Asked whether he thought the ban would "survive a court challenge," the President answered: "Well, we'll see. . . . I think it's good to point it out whether it survives or doesn't. I mean, I don't think a court should allow, depends on the judge you get, to be honest with you."

43. The President also reiterated his claim about an "illegal" subscription to POLITICO, a categorically false and debunked claim which is clearly not the driver behind the President's actions—as he made clear when he again emphasized that, in his view, POLITICO "write[s] only negative" coverage.

44. Asked directly about the logistics of the ban—whether he was taking away the outlets' press badges, and whether he was removing them from the pool—the President did not answer the question, saying instead that he would take the ban as far as it could go.

45. CNN, MS NOW, and POLITICO received no prior notice of this ban. Neither the post nor the President's remarks identified any standard by which the three banned news organizations' coverage had been judged or would be judged in the future, any official responsible for applying that standard, any procedure by which CNN, MS NOW, or POLITICO could contest the ban, or any date on which the ban would end. As the D.C. Circuit put it when describing the previous Trump administration's suspension of a White House reporter's hard pass, the ban "effectuated an unpredictable break with prior policy and practice." *Karem*, 960 F.3d at 667.

46. The President also made clear that additional news media organizations would face the same punishment if he "dislike[d]" their coverage. He wrote in his Truth Social post: "Other Fake News Media Outlets to follow."

**C. The White House implements the President's ban.**

47. Following President Trump's announcement on Truth Social and statements at the news conference, the White House has taken multiple steps to bar CNN, MS NOW, and POLITICO from the White House.

48. On the night of Friday, September 18, the White House apparently deactivated hard passes for CNN, MS NOW, and POLITICO reporters.

49. Since the early morning of Saturday, September 19, CNN, MS NOW, and POLITICO reporters have been denied access to the White House.

50. Betsy Klein, a CNN reporter and hard-pass holder who has covered the White House since 2018 and whose current hard pass bore an expiration date of August 31, 2027, attempted to enter the White House complex on the morning of September 19. The Secret Service officer at the gate informed her that her hard pass had been deactivated, took her hard pass from her, and referred her to the White House Press Office for more information. She was not permitted to enter the White House complex.

51. Also on September 19, Akayla Gardner, an MS NOW reporter and hard-pass holder, was denied entry to the White House complex and informed that her hard pass had been disabled. When she asked why her hard pass had been disabled, the Secret Service officer told her such matters were "above" him. The Secret Service officer took Ms. Gardner's hard pass from her.

52. Also on September 19, Cheyenne Haslett, a POLITICO reporter and hard-pass holder, was denied entry to the White House complex. She arrived on Saturday to do her job as a POLITICO reporter. Upon arrival, Secret Service officers denied her entry to the White House complex and took her hard pass.

**D. The ban is causing irreparable harm to Plaintiffs.**

53. The ban prohibits Plaintiffs and their reporters from accessing the White House grounds to attend press events or gather information for their reporting.

54. CNN also was the assigned network pooler beginning Monday, September 21, 2026. That assignment was made before the President announced the ban on September 18, 2026,

and it is the first network pool rotation CNN is scheduled to perform since the ban was announced. As the assigned pooler, CNN was responsible for staffing the in-town pool on Monday. The in-town pool is scheduled to assemble at the White House at 9:00 a.m., or at the pool call time noticed on the White House's published schedule for the day, whichever is earlier. The White House generally publishes that schedule the day before. Once assembled, the in-town pool is responsible for covering any of the President's activities on the White House campus that day, none of which the White House has yet announced, and for covering the President's departure from the South Lawn aboard Marine One at approximately 2:00 p.m. Despite previously being assigned as the network pooler for September 21, the White House Office of Communications sent out its daily guidance and press schedule at 10:55 p.m. on September 20 removing CNN from the day's schedule.

55. Exclusion from the White House inflicts serious irreparable harm on Plaintiffs by substantially limiting their newsgathering and reporting. "[W]ithout access to the [White House]," reporters "effectively cannot perform the duties of a White House correspondent because [they] lack[] the ability to observe events firsthand and to ask questions of White House officials." *Karem v. Trump*, 404 F. Supp. 3d 203, 216 (D.D.C. 2019). White House reporters' "First Amendment interest depends on [their] ability to freely pursue journalistically productive conversations with White House officials"—and without access to the White House, reporters "lack[] the access to pursue those conversations—even as an eavesdropper." *Id.* at 216–17. Because "the news is time-sensitive and occurs spontaneously, that lack of access cannot be remedied retrospectively." *Id.* Without White House access, a reporter and the organization she works for may well miss the newsworthy events, particularly including the many notable events that occur with little notice. White House reporters like Ms. Gardner, Ms. Haslett, and Ms. Klein, along with other reporters

who work for CNN, MS NOW, and POLITICO, face serious impediments to doing their jobs and producing valuable reporting as members of the press as a result of the ban.

56. The exclusion of CNN's, MS NOW's, and POLITICO's reporters from the White House accordingly inflicts irreparable harm to these news organizations. The organizations, whose very purpose is to report national news, depend on individual reporters to gather information firsthand at the White House. As a result of the ban, they have lost the ability to perform essential newsgathering at the seat of the Executive Branch, where critically important newsworthy events occur every day. The ban irreparably curtails the organizations' speech—preventing them from being able to publish stories they otherwise would—each day it remains in effect. The ban also impermissibly chills the speech of *other* news organizations and journalists, who must now balance conducting their constitutionally protected and vitally important work of reporting on the White House against the risk that coverage the President "dislike[s]" will condemn them to the same fate.

57. Moreover, the ban unconstitutionally restricts the ability of the public to access current and complete reporting on the events in the White House at a time when domestically and globally significant events are unfolding by the minute. "Not only [reporters] and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual [reporters] not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129. This blatantly unconstitutional ban irreparably violates that principle. Each day it is allowed to stand injures Plaintiffs and the public in ways that can never be redressed. It must be restrained.

## CLAIMS FOR RELIEF

## COUNT ONE
## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

58. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

59. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

60. Members of the press have liberty and property interests in hard-pass press credentials and the access those credentials afford. As the D.C. Circuit has long held, the interest that members of the press have in their White House hard passes is "protected by the first amendment" and "undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment." *Sherrill*, 569 F.2d at 130–31; *see id.* at 131 n.22 (suggesting that reporters also have a property interest in their hard passes). Accordingly, the "loss of" those credentials and the "White House access" that accompanies them without due process is unconstitutional. *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020).

61. Defendants have deprived Plaintiffs and their reporters of their liberty and property interests in maintaining their hard passes and accessing White House grounds. Following President Trump's announcement of the ban, the White House, acting through and at the direction of the other Defendants, promptly and indefinitely deactivated hard passes that had been duly issued to Plaintiffs' journalists. The Secret Service, under the control of Director Curran, has since entirely denied White House access to journalists with CNN, MS NOW, and POLITICO who held active hard passes immediately before the ban and has physically seized hard passes from Plaintiffs.

62. Defendants did not provide Plaintiffs with due process of law before deactivating their reporters' hard passes, terminating their reporters' access to the White House, and physically seizing their hard passes.

63. The Due Process Clause "requires that explicit and meaningful standards" for accessing the White House grounds "be formally articulated or published" *before* the government excludes a member of the press. *Karem*, 960 F.3d at 666 (brackets and quotation marks omitted). Here, Plaintiffs received *zero* advance notice that the President would ban a news organization from the White House if he dislikes its coverage. Plaintiffs therefore lacked "fair notice" that their conduct would "subject [them] to punishment" and of the "magnitude of the sanction that the White House might impose." *Karem*, 960 F.3d at 665 (quotation marks and brackets omitted).

64. Even if Plaintiffs had been given such notice, the President's prohibition on so-called "FAKE NEWS" (meaning coverage that is not false but that the President dislikes) is not an explicit and meaningful standard, as required by the Due Process Clause. Because of the First Amendment implications of any suspension or revocation of press access to the White House, a "particularly 'stringent vagueness and fair-notice test'" applies. *Karem*, 960 F.3d at 665 (brackets omitted); *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254–55 (2012). Here, the President's "standardless" prohibition is unconstitutionally vague and allows "seriously discriminatory enforcement"—indeed, that is the entire point, as the President's own statements about the purpose of the ban show. *United States v. Williams*, 553 U.S. 285, 304 (2008).

65. The Due Process Clause further requires "an opportunity to present [one's] objections" to the deprivation of liberty. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Plaintiffs had no "avenue for a response" before President Trump announced the ban on Truth Social. *Cook*, 146 S. Ct. at 2255–56 (holding that another Truth Social post did not

provide an adequate opportunity to be heard). His administration implemented the ban by deactivating hard passes for Plaintiffs' reporters, barring their entry to the White House grounds, and seizing physical hard passes the following day.

66. Because Defendants denied Plaintiffs the "minimum prerequisite" of notice of an explicit and meaningful standard as well as an opportunity to be heard before revoking Plaintiffs' press credentials and terminating their access to the White House grounds to report on official governmental action, Defendants deprived Plaintiffs of protected liberty and property interests without due process of law. *Karem*, 960 F.3d at 667.

67. As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm. *Karem*, 960 F.3d at 667–68. The ban violates the Due Process Clause and should be enjoined and declared unlawful.

## COUNT TWO
## VIOLATION OF THE FIRST AMENDMENT—RETALIATION

68. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

69. The First Amendment "guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 184 (2026). To safeguard those rights, the Amendment also "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). Government officials have their own right to speak and to "do so forcefully," but they may not "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). If the rule were otherwise, the government, through retaliation for protected speech, could achieve the " 'self-censorship' of speech that could not be proscribed." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). Retaliation is particularly pernicious when

directed against the press, because "[w]ithout an unfettered press, citizens would be far less able to make informed political, social, and economic choices"; "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981).

70. To demonstrate that unlawful retaliation has occurred, a plaintiff must show that "'(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him.'" *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The ban readily establishes each element.

71. First, Plaintiffs' coverage of the President and his administration is core First Amendment activity. "The framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660–61 (2000)). And as reflected in the Press Clause of the First Amendment, "[t]he Constitution specifically selected the press . . . to play an important role in the discussion of public affairs." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). "Suppression" of the press "muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.* All told, speech about official action "is an essential mechanism of democracy" that "hold[s] officials accountable to the people." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010).

72. Second, banning Plaintiffs from the White House grounds is precisely the type of adverse action that would deter journalists and news organizations of ordinary firmness from

continuing to provide fact-based, independent coverage of the administration that the President dislikes. Indeed, that is the entire point of the ban: The President has admitted his hope that the ban will coerce positive coverage from Plaintiffs by offering that, if they "could straighten themselves out," then the President would "love it."[9] As the President well knows, access to the White House grounds is critical for covering the President and his administration. "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Even a one-month suspension from the White House grounds is "an eon in today's news business." *Karem*, 960 F.3d at 665. An indefinite ban has an even greater chilling effect on future coverage of the administration. And the President's express threat of "Other Fake News Media Outlets to follow" only exacerbates the chilling effect of the ban for all news organizations that retain access to the White House grounds. ¶ 46, *supra*. The ban undeniably "discourage[s] the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Counterman*, 600 U.S. at 78 (quoting *Sullivan*, 376 U.S. at 270).

73. Third, President Trump has made explicit the causal link between the ban and Plaintiffs' coverage of him and his administration. The President's Truth Social post declares that he has banned Plaintiffs from the White House grounds "*as a result* of their constant 'reporting' FAKE NEWS!" ¶ 37, *supra* (emphasis added). And he purported to justify the ban by asserting that "Media Outlets shouldn't be able to *constantly write or report FICTION and LIES* when they're covering the President of the United States, the Trump Administration, or the United States of America." ¶ 37, *supra* (emphasis added). But the President also made clear that what he meant by "lies" was really news that is "purposely . . . negative," "one-sided," "never good," or

[9] https://transcripts.cnn.com/show/acd/date/2026-09-18/segment/01.

"diminish[ing] the Republicans." He referred to "cumulative stories over the last two years" in which Plaintiffs "purposely write negative news" as the motivation for the ban.[10]

74. As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer constitutional harms. The "loss of" Plaintiffs' "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quotation marks omitted). The ban retaliates against Plaintiffs for past coverage of the Trump administration in violation of the First Amendment and should be enjoined and declared unlawful.

**COUNT THREE**
**VIOLATION OF THE FIRST AMENDMENT—VIEWPOINT DISCRIMINATION**

75. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

76. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187; *see also Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (viewpoint discrimination is a "'more blatant' and 'egregious form of content discrimination'" (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995))). The First Amendment's prohibition of viewpoint discrimination "limits the restrictions that the government may impose on speech, including speech on government property." *Ateba*, 133 F.4th at 119. In the words of the D.C. Circuit, "viewpoint discrimination is poison." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotation marks omitted). So "arbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Sherrill*, 569 F.2d at 129.

[10] https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-healthcare-drug-prices-oval-office-september-18-2026/.

77. A "nonpublic forum" is "government property" that the government has opened to speech for selected speakers. *Ateba*, 133 F.4th at 121–22. The D.C. Circuit has held that the "White House Press Area"—including "the briefing room, the press offices, and certain other locations in and around the White House"—"is a nonpublic forum" because the government "provides selective access for individual speakers." *Id.* at 117, 122 (quotation marks omitted). Accordingly, the First Amendment requires that any restrictions on access to those press areas be both viewpoint neutral and "reasonable in light of the purpose served by the forum." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (the "government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject").

78. The ban is neither viewpoint neutral nor reasonable.

79. President Trump has expressly targeted Plaintiffs based on their perceived editorial viewpoints—targeting the "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. The President has left no doubt that he has banned Plaintiffs from the White House because, in his view, he believes they "write negative news" and "want to try and diminish the Republicans and a Republican administration."[11] While Plaintiffs contest the President's characterizations, it is indisputable that the President has targeted Plaintiffs based on their perceived "motivating ideology or the opinion or perspective" and thus engaged in paradigmatic viewpoint discrimination. *Id.* This clear viewpoint discrimination means that the ban is flatly unconstitutional.

[11] https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-healthcare-drug-prices-oval-office-september-18-2026/.

80. Banning Plaintiffs from the White House also is unconstitutional because it is not reasonable in light of the purpose served by the White House press areas. The ban was imposed because of the President's view that Plaintiffs "write negative news" and "want to try and diminish the Republicans and a Republican administration." While certain speaker-based access restrictions may be reasonable to further the purposes of a forum, banning speakers based on the President's personal dislike for their perceived views does nothing to promote the purposes of the White House press areas. The White House press facilities are "made publicly available as a source of information for newsmen" and serve the interests of "the public at large" in receiving information "gathered out of a multitude of tongues." *Sherrill*, 569 F.2d at 129–30 (quotation marks omitted); *see Karem*, 960 F.3d at 665. Banning Plaintiffs, among the most prominent news organizations in the country, based on their perceived viewpoints frustrates those purposes. And the exclusion criteria here—that the President perceives a journalist's reporting as "fake" or "negative"—are so vague and arbitrary that they cannot count as a "sensible basis for distinguishing what may come in from what must stay out" and are thus unreasonable. *Mansky*, 585 U.S. at 16.

81. In addition, Defendants' claim to standardless discretion to ban White House access to credentialed news organizations and reporters is unreasonable. The D.C. Circuit has squarely "held that the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable." *Ateba*, 133 F.4th at 125; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). The President's ban is just such a raw exercise of unbridled discretion to exclude disfavored media organizations from the White House.

82. As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm. The ban constitutes viewpoint discrimination against Plaintiffs in a nonpublic forum in violation of the First Amendment and should be enjoined and declared unlawful.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs respectfully request an order:

83. Declaring that the ban of Plaintiffs from accessing the White House, the revocation and confiscation of hard passes belonging to Plaintiffs and their reporters, the exclusion of Plaintiffs and their reporters from the White House grounds, and all other actions undertaken by Defendants and those acting in concert with them to carry out the ban violate the First and Fifth Amendments;

84. Immediately enjoining implementation and enforcement of the President's ban pending consideration of a motion for a preliminary injunction;

85. Preliminarily and permanently enjoining Defendants and all those acting in concert with them from implementing or seeking to enforce the President's ban;

86. Preliminarily and permanently ordering Defendants to immediately restore the hard passes and White House access that Plaintiffs and their reporters held before September 18, 2026;

87. Entering judgment in favor of Plaintiffs;

88. Awarding Plaintiffs their reasonable costs and attorneys' fees in accordance with law; and

89. Issuing any other relief that the Court deems just and proper.

Dated: September 21, 2026

Respectfully submitted,

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
PFuster@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459
CSSullivan@gibsondunn.com

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
CMui@gibsondunn.com

*Counsel for Plaintiffs*

*Pro Hac Vice Application Forthcoming*