**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CABLE NEWS NETWORK, INC., MS NOW CABLE, LLC, POLITICO LLC, ET AL.,<br><br>*Plaintiffs*,<br><br>*v*.<br><br>DONALD J. TRUMP, ET AL.,<br><br>*Defendants*. | Case No. ________________ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiffs Cable News Network, Inc., MS NOW Cable, LLC, POLITICO LLC, Akayla Gardner, Cheyenne Haslett, and Betsy Klein*

**Pro Hac Vice Application Forthcoming*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

BACKGROUND ..... 6

A. Journalists and news organizations have long covered the President and his administration from White House grounds. ..... 6

B. CNN, MS NOW, and POLITICO are among the prominent news outlets that report from the White House. ..... 8

C. The President bans CNN, MS NOW, and POLITICO from the White House because of their coverage. ..... 11

D. The White House implements the ban. ..... 13

E. The ban immediately harms CNN, MS NOW, and POLITICO. ..... 15

LEGAL STANDARD ..... 16

ARGUMENT ..... 16

I. Plaintiffs are likely to establish that the press ban is unconstitutional. ..... 16

A. The ban violates the Due Process Clause. ..... 17

B. The ban retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment. ..... 20

C. The ban unconstitutionally restricts access to a nonpublic forum. ..... 23

II. Plaintiffs are suffering and will continue to suffer irreparable injury absent a temporary restraining order. ..... 26

III. The balance of hardships and public interest favor a temporary restraining order. ..... 27

IV. The Court should waive any bond requirement. ..... 28

CONCLUSION ..... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ... 21

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ... 16

*Am. First Legal Found. v. Becerra*,
2024 WL 3741402 (D.D.C. Aug. 9, 2024) ... 28

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ... 21

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025) ... 28

**Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) ... 4, 23, 24, 26

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ... 21

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ... 22

*Cable News Network, Inc. v. Am. Broad. Cos.*,
518 F. Supp. 1238 (N.D. Ga. 1981) ... 25, 28

*Cable News Network, Inc. v. Trump*,
2018 WL 9436958 (D.D.C.) ... 9

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ... 22

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ... 26

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ... 19

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ... 23

*Counterman v. Colorado*,
600 U.S. 66 (2023) ... 21, 22

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) ... 26

*Elrod v. Burns*,
427 U.S. 347 (1976)....................5, 26

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................18, 19

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
636 F.2d 755 (D.C. Cir. 1980)....................28

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026)....................20

*Frederick Douglass Found., Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023)....................24

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)....................26, 28

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022)....................20

*Karem v. Trump*,
404 F. Supp. 3d 203 (D.D.C. 2019)....................27

**Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)....................2, 3, 6, 9, 17–19, 22, 26–28

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................27

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................5, 26

*Media Matters for Am. v. FTC*,
808 F. Supp. 3d 105 (D.D.C. 2025)....................21

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)....................21, 28

*Mills v. Alabama*,
384 U.S. 214 (1966)....................22

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)....................26

**Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018)....................4, 23, 25

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................24

*Morgan Stanley DW Inc. v. Rothe*,
150 F. Supp. 2d 67 (D.D.C. 2001)....................16

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950) ..... 19

*Nat'l Pub. Radio, Inc. v. Trump*,
827 F. Supp. 3d 48 (D.D.C. 2026) ..... 25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ..... 20, 24

*New York Times Co. v. Dep't of Defense*,
824 F. Supp. 3d 27 (D.D.C. 2026) ..... 19, 28

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ..... 2, 22

*Nken v. Holder*,
556 U.S. 418 (2009) ..... 27

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ..... 24

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ..... 5, 26

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ..... 24, 25

**Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) ..... 2, 3, 17, 19, 25

*Trump v. Cook*,
146 S. Ct. 2234 (2026) ..... 20

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020) ..... 26

*United States v. Williams*,
553 U.S. 285 (2008) ..... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..... 16

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981) ..... 21

**Constitutional Provisions**

U.S. Const. amend. I ..... 1

U.S. Const. amend. V ..... 2, 17

**Regulations**

31 C.F.R. § 409.1 ..... 6, 7

31 C.F.R. § 409.2 .......... 7

**Other Authorities**

*White House Press Center*, White House Hist. Ass'n (Mar. 1, 2015), https://www.whitehousehistory.org/the-president-the-press-and-proximity .......... 6

## INTRODUCTION

On Friday, September 18, 2026, President Donald J. Trump announced that he and his administration were "banning" journalists with three news organizations—CNN, MS NOW, and POLITICO—from the White House "effective immediately" for one simple reason: He dislikes their coverage of him and his administration. In an Oval Office press conference later that day, the President doubled down. He expressed his antipathy toward the content and editorial choices of CNN, MS NOW, and POLITICO over and over again. He was clear there was no particular story that triggered this decision—saying "it's really just cumulative stories over the last two years"—and equally clear that the ban was motivated by his disdain for reporting he considers "one-sided" and "never good" because it "diminish[es]" him and his accomplishments. Oval Office Press Conference 26:47-28:00.[1] The President repeated his straightforward rationale for targeting these three news organizations, calling it "wrong" to "allow people to write purposely negative stories." At one point he even referred to his own unprecedented act as the "ban on the free press." *Id.* at 53:38-53:58. And the President threatened bans on other news outlets would "follow." *Id.* at 55:35-55:46.

There could not be a more direct assault on the First Amendment. Presidents from the earliest days of the Republic have disagreed with and complained about the tenor and content of press coverage of their administrations. But as the Supreme Court has recognized, the First Amendment, including its guarantee of a free press, reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and

---

[1] https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-healthcare-drug-prices-oval-office-september-18-2026/. The video of the President's remarks is available at https://www.whitehouse.gov/videos/president-trump-makes-an-announcement-on-healthcare-sep-18-2026/.

public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). And the Fifth Amendment protects the liberty and property interests that news organizations and White House reporters have in their press credentials and the access those credentials afford them to cover the White House for the benefit of the public. No official can deprive Plaintiffs of those interests with no notice, no process, and no warning, as the President did here. *See Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020); *Sherrill v. Knight*, 569 F.2d 124, 130–31 & n.22 (D.C. Cir. 1977).

President Trump and members of his administration implemented this ban immediately. As of today, journalists from three of the leading news organizations in the country are simply not permitted anywhere on the grounds of the White House complex. The credentials—or "hard passes"—that journalists at CNN, MS NOW, and POLITICO use to access the White House grounds to report the news, ask questions of the President and administration officials, and videotape and photograph White House activities were apparently deactivated overnight. And the following morning, White House officials denied access and seized the credentials of journalists with the three targeted news organizations when they attempted to enter the White House to do their jobs.

Defendants banned CNN, MS NOW, and POLITICO, and the individual reporters covering the news for those news media organizations, in disregard of the most basic guarantees of the First Amendment and the Due Process Clause. They did so expressly for the improper purpose of retaliating against Plaintiffs for past news coverage because they deemed it "negative" and chilling future reporting about the President and his administration's policies and actions. Oval Office Press Conference 27:08-27:17. President Trump has said in no uncertain terms that he disapproves of "negative" coverage that "diminish[es]" him and would prefer coverage that only praises him and his policies. *Id.* at 27:41-28:00. But the Constitution does not allow a president or any other

government official to deprive the press of their First Amendment rights and liberty and property interests with no notice or process based solely on that official's dislike of the content of their reporting. The ban is patently unconstitutional and should be immediately restrained.

First, the ban cannot be squared with binding circuit precedent addressing the demands of due process in the context of government-issued press credentials. As the D.C. Circuit has expressly recognized, "'the interest of a bona fide Washington correspondent in obtaining'" a press credential "is not only 'protected by the first amendment' but also 'undoubtedly qualifies as a liberty interest which may not be denied without due process of law under the fifth amendment.'" *Karem*, 960 F.3d at 660 (quoting *Sherrill*, 569 F.2d at 130–31) (brackets omitted). CNN, MS NOW, POLITICO, and their journalists have liberty and property interests in their press credentials and the access those credentials afford to the White House grounds to report on the President and his administration. The ban deprives them of those interests without anything remotely close to the bare minimum requirements of due process: advance notice based on clear standards and an opportunity to be heard. The President provided no notice that he would immediately deny news organizations whose reporting he dislikes access to the White House grounds. His standard for denying access is arbitrary and vague—indeed, it can hardly be called a standard at all. And he did not provide CNN, MS NOW, or POLITICO, or any of their journalists, any opportunity to be heard before he announced the ban and before the White House terminated reporters' access and confiscated press credentials.

Second, the ban retaliates against protected newsgathering and speech in violation of the First Amendment. The President announced that the ban is a punishment for "negative" news coverage from CNN, MS NOW, and POLITICO. And the President's statements make clear he implemented the ban to coerce more favorable coverage of the administration from CNN, MS

NOW, and POLITICO, and to deter other journalists and news organizations from newsgathering and speech with which the President disagrees. The President has made no attempt to hide that his ban punishes protected speech, stating expressly that he decided to ban CNN, MS NOW, and POLITICO for their "cumulative" coverage of him and his administration over the past two years—coverage that in his view is "purposely . . . negative," "one-sided," and "never good," and that "diminish[es]" him. Oval Office Press Conference 26:47-28:00. He even referred to it as a "ban on the free press." *Id.* at 53:38-53:58.

Third, the ban independently violates the First Amendment by eliminating access to and use of a nonpublic forum on viewpoint-discriminatory and unreasonable terms. The government "creates a 'nonpublic forum' when it provides 'selective access for individual speakers.'" *Ateba v. Leavitt*, 133 F.4th 114, 122 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 822 (2025). Under binding D.C. Circuit precedent, the White House's press areas are a nonpublic forum subject to the First Amendment's commands. *Id.* at 124–25. The First Amendment requires that any restrictions on access to those press areas be both viewpoint neutral and "'reasonable in light of the purpose served by the forum.'" *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018). They are neither. The ban is a brazen "'effort to suppress expression merely because public officials oppose the speaker's view,'" *id.* at 12—in this case, independent, fact-based journalism that Defendants dislike. And because the ban lacks any "objective, workable standards," and serves no permissible objective in view of the purpose of the forum—areas designated for journalists to gather and report newsworthy information for the benefit of the American public—it is patently unreasonable and thus unconstitutional. *Id.* at 21–22.

Plaintiffs also have suffered and will continue to suffer irreparable harm without a temporary restraining order. Violations of the Due Process Clause and "[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitute[ ] irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Every day, critically important news is breaking at the White House and in the press pool: President Trump is the commander in chief of a country at war; he is traveling to New York to address the United Nations General Assembly tomorrow (a trip for which CNN was the designated pool representative until the White House removed it from the schedule last night); he is meeting with China's President Xi Jinping at the White House on Thursday; and he is steering national policy on the ever-advancing technology of artificial intelligence. The ban inflicts an injury on all news media organizations—which now risk a similar fate if they engage in fact-based, independent reporting the President deems insufficiently favorable. And the public at large suffers for however long the unconstitutional ban restricts access to current and complete information about the government.

A temporary restraining order is warranted. These irreparable harms should not be tolerated for a day longer. And the balance of the equities and public interest merge and favor immediate injunctive relief, because enjoining unconstitutional action is always in the public interest. The Court should immediately enjoin enforcement of the ban.

## BACKGROUND

### A. Journalists and news organizations have long covered the President and his administration from White House grounds.

Almost 125 years ago, President Theodore Roosevelt set aside a room in the new West Wing for the press.[2] The press has been in the White House ever since. Today, the White House press facilities include the James S. Brady Press Briefing Room, where the Press Secretary holds briefings; the press workspaces in the "lower press" and "upper press" areas of the West Wing, just steps from the Oval Office and the offices of the Press Secretary and the Communications Director; the North Lawn and West Wing driveway, from which the networks report live; and the South Lawn, where Marine One arrives and departs. Klein Decl. ¶ 8; Vigilante Decl. ¶¶ 7, 12; Gardner Decl. ¶ 7; Reddy Decl. ¶ 6.

"For over fifty years, the White House Press Secretary has provided journalists on the White House beat with 'hard passes'—special press credentials that allow on-demand access to the White House complex." *Karem*, 960 F.3d at 659. A hard pass is available to journalists who regularly cover the White House, reside in the Washington area, are accredited by a press gallery of the Supreme Court, the U.S. Senate, or the U.S. House of Representatives, and clear a background check by the United States Secret Service. 31 C.F.R. § 409.1; Reddy Decl. ¶ 7; *see also* Klein Decl. ¶ 4; Vigilante Decl. ¶ 4. The Secret Service's role in that process is narrowly defined by regulation. In deciding whether to approve an applicant during a background check, Secret Service officials must "be guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious

[2] James A. Jacobs, *The President, the Press, and Proximity: The Creation of the White House Press Center*, White House Hist. Ass'n (Mar. 1, 2015), https://www.whitehousehistory.org/the-president-the-press-and-proximity.

as to justify his or her exclusion from White House press privileges." 31 C.F.R. § 409.1. The regulation prescribes the process that must precede any denial: written notice of the factual basis for the proposed denial, an opportunity for the applicant to respond in writing and to be heard, and a final written decision. *Id.* § 409.2. Nothing in the regulation permits a pass to be denied, suspended, or revoked because of the content of a journalist's reporting.

A hard pass is essential to a White House correspondent because it provides immediate, unescorted access to the areas of the White House complex designated for the press and, through the press pool, to Air Force One and the secured areas of the President's travel. Klein Decl. ¶¶ 5, 8; Gardner Decl. ¶¶ 4–5; Reddy Decl. ¶ 9. Every Secret Service officer on the complex recognizes the credential on sight. Klein Decl. ¶ 5; Gardner Decl. ¶ 4. For White House correspondents, the White House—or wherever the President happens to be—is the workplace. Much of what happens at the White House happens with little or no notice: A briefing is called, often no more than half an hour in advance; the President takes questions at an event; a visiting head of state arrives; a statement is issued and reporters are summoned to the Briefing Room. Klein Decl. ¶¶ 5, 9; Gardner Decl. ¶ 8. A reporter who is not on the grounds when that happens simply misses it, and an event a reporter could not attend cannot be covered after the fact. Klein Decl. ¶ 9; Gardner Decl. ¶ 8. CNN's Betsy Klein, MS NOW's Akayla Gardner, and POLITICO's Cheyenne Haslett report, write, and broadcast from the White House grounds themselves, working out of their networks' booths in the lower press area and workspaces steps from the Oval Office and the Press Secretary's office. Klein Decl. ¶ 8; Gardner Decl. ¶¶ 7, 13; Haslett Decl. ¶ 2.

The White House press pool, which includes a subset of the credentialed journalists in the White House press corps, accompanies the President and shares reporting, video, audio, and photographs with the rest of the press corps and, through them, with the American public and the

world. Vigilante Decl. ¶ 9; Reddy Decl. ¶ 10. For most of what the President does each day, the pool is the only source of independent reporting, video, and photographs available to the press and the public. Vigilante Decl. ¶ 9. Each day the pool includes representatives of television, print, radio, and digital outlets. Vigilante Decl. ¶ 9; Reddy Decl. ¶ 11. The television component of the pool consists of two slots, a primary and a secondary. The primary slot rotates among five networks—ABC, CBS, CNN, Fox News, and NBC—each of which absorbs 20% of the operating costs. When on duty, CNN supplies video and audio of the President's events to the other four and, through pool distribution arrangements, to news organizations and the public, with more than 1,000 affiliated stations that receive the pool feed through CNN. Vigilante Decl. ¶¶ 10, 14; Reddy Decl. ¶ 11. The secondary slot rotates among a larger group of outlets that includes MS NOW. Reddy Decl. ¶ 11. POLITICO has also belonged to the print component of the pool. Marsh Decl. ¶ 3.

### B. CNN, MS NOW, and POLITICO are among the prominent news outlets that report from the White House.

CNN launched in 1980 as the first 24-hour cable news network and has covered every President since Jimmy Carter from inside the White House complex. Vigilante Decl. ¶ 3. CNN's correspondents attend the daily press briefing, cover events in the Oval Office and the East Room, and elsewhere on the grounds, report live from CNN's standing broadcast position on the North Lawn, and cover the President's arrivals and departures on the South Lawn; CNN maintains a booth adjoining the Briefing Room, together with broadcast and transmission equipment installed on the grounds. *Id.* ¶¶ 7, 15; Klein Decl. ¶¶ 7–8. As of September 18, 2026, 40 CNN journalists, including Ms. Klein, held valid White House hard passes. Vigilante Decl. ¶ 5; Klein Decl. ¶ 4. CNN journalists have held White House hard passes continuously since 1980, and CNN has been part of the White House television pool for 25 years. Vigilante Decl. ¶¶ 6, 10.

Before September 18, 2026, no President had barred CNN as an organization from the White House. Vigilante Decl. ¶ 6. The only prior attempt to strip a CNN journalist of his hard pass because of his reporting did not survive judicial review. In November 2018, hours after President Trump told CNN's then-chief White House correspondent, Jim Acosta, that he was "a rude, terrible person" who "shouldn't be working for CNN," the Secret Service took Mr. Acosta's hard pass at the White House gate. Compl. ¶¶ 35, 41, *Cable News Network, Inc. v. Trump*, No. 1:18-cv-02610 (D.D.C. Nov. 13, 2018), ECF No. 1. CNN and Mr. Acosta sued in this Court, and on November 16, 2018, the Court (Kelly, J.) entered a temporary restraining order requiring the White House to restore the pass, finding that it likely had been revoked without the process the Fifth Amendment requires. *Cable News Network, Inc. v. Trump*, 2018 WL 9436958 (D.D.C.); *see also Karem*, 960 F.3d at 661 (describing incident and litigation). The White House restored the pass three days later.

MS NOW operates a cable news network and a digital news service. It launched in 1996 as MSNBC and adopted the name MS NOW in November 2025 in connection with its separation from NBCUniversal as part of Comcast's spin-off of Versant Media Group. Reddy Decl. ¶ 3. MS NOW has covered every Presidency since the Clinton administration and assigns approximately ten journalists full time to the White House, and approximately fifteen MS NOW journalists regularly cover it. *Id.* ¶ 5. As of September 18, 2026, 22 MS NOW journalists held valid White House hard passes. *Id.* ¶ 8. MS NOW participates in the secondary slot of the television pool and served in the pool approximately ten times in the eight months preceding the ban, and MS NOW journalists were on the White House grounds on September 18, 2026, when the President announced it. *Id.* ¶¶ 11, 13, 17. Before that date, to the knowledge of Sudeep Reddy, MS NOW's

Washington Bureau Chief, no President had barred MS NOW, or any of its reporters, from the White House. *Id.* ¶ 8.

Since its launch in 2007, POLITICO has covered the White House from inside the White House complex. POLITICO publishes news at politico.com and in newsletters, including West Wing Playbook, a daily newsletter devoted to coverage of the White House, and provides policy news and analysis to subscribers through POLITICO Pro. Marsh Decl. ¶ 2. POLITICO assigns approximately 16 journalists to cover the White House, and as of September 18, 2026, all 16 held White House hard passes. To the knowledge of Julia Marsh, POLITICO's Executive Editor, Washington, no POLITICO journalist had ever had a hard pass denied, suspended, or revoked before September 19, 2026. *Id.* ¶ 3.

President Trump has long attacked CNN, MS NOW, and POLITICO, along with other news outlets, for the content of their coverage. Weeks into his first term, for example, he posted that "[t]he FAKE NEWS media (failing @nytimes, @NBCNews, @ABC, @CBS, @CNN) is not my enemy, it is the enemy of the American People!"[3] (MS NOW, then MSNBC, was then part of the NBC News group.) The attacks intensified after he returned to office. Two days after his second inauguration, he posted that MS NOW was "even worse than CNN" and that "[t]hey shouldn't even have a right to broadcast—Only in America!"[4] Two days after that: "MSNBC IS CLOSE TO DEATH. CNN HAS REACHED THE BOTTOM. This is a good thing. They are

---

[3] @realDonaldTrump, X (Feb. 17, 2017), https://x.com/realDonaldTrump/status/832708293516632065.

[4] @realDonaldTrump, Truth Social (Jan. 22, 2025), https://truthsocial.com/@realDonaldTrump/posts/113874735766176608.

the Enemy of the people."[5] He has since warned that "MSDNC, CNN, and all other Mainstream Media Liars, are ON NOTICE that the days of them being allowed to deceive the American People are OVER."[6] And in October 2025, he declared that "Politico has gone bad" and has "been so wrong about everything."[7]

### C. The President bans CNN, MS NOW, and POLITICO from the White House because of their coverage.

At 3:04 p.m. on Friday, September 18, 2026, the President announced on Truth Social that he was barring Plaintiffs' reporters from the White House, effective immediately, because of the content of their reporting.[8]

---

[5] @realDonaldTrump, Truth Social (Jan. 24, 2025), https://truthsocial.com/@realDonaldTrump/posts/113887487731381945.

[6] @realDonaldTrump, Truth Social (July 22, 2025), https://truthsocial.com/@realDonaldTrump/posts/114898229237459086.

[7] Remarks by President Trump (Oct. 12, 2025), https://www.govinfo.gov/content/pkg/DCPD-202501004/pdf/DCPD-202501004.pdf.

[8] @realDonaldTrump, Truth Social (Sept. 18, 2026, 3:04 p.m.), https://truthsocial.com/@realDonaldTrump/posts/117293599348325006.

**Donald J. Trump**
@realDonaldTrump

I am proud to announce that, effective immediately, I am banning Fake News CNN, MSNOW (who recently changed their name from MSNBC due to lack of viewership and credibility!), and Politico (The recipients of an illegal and ridiculous $8 Million Dollar subscription, an All Time Record, directly from the United States Government, under Crooked Joe Biden, in order to keep them "alive." Seems like corruption to me!), from the White House as a result of their constant "reporting" FAKE NEWS! Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America. Other Fake News Media Outlets to follow. Thank you for your attention to this matter! President DONALD J. TRUMP

**13.4k** ReTruths **54.6k** Likes Sep 18, 2026, 3:04 PM

About an hour later, the President took questions from reporters at an Oval Office event. Asked whether there was "a particular reason" for the ban, he answered: "No, just because—no, no, it's—it's really just cumulative stories over the last two years. . . . They purposely write negative news. And they do that because they want to try and diminish the Republicans and a Republican administration." Oval Office Press Conference 27:17-28:00. He explained that "[t]here's something wrong with a country that can allow people to write purposely negative stories," and that "if they want to write them, that's fine, but I don't have to let them into my—into the people's house." *Id.* at 38:25-38:51. Asked whether he was trying to intimidate the press, the President answered: "No, no, I dislike dishonest press like you. I think you're terrible. But I dislike dishonest, I like to see honest press." *Id.* at 35:14-35:27. He added that the ban could be lifted if the banned outlets "could straighten themselves out," and that "[i]f they could straighten themselves out, I'd love it." *Id.* at 53:38-53:58. And he literally called his action "the ban on the free press." *Id.*

Asked whether he thought the ban would "survive a court challenge," and reminded that a court had blocked a similar effort against CNN in 2018, the President answered: "Well, we'll see. . . . I think it's good to point it out whether it survives or doesn't. I mean, I don't think a court should allow, depends on the judge you get, to be honest with you." Oval Office Press Conference 35:27-35:55. Asked about the logistics of the ban—whether he was taking away the outlets' press badges and whether he was removing them from the pool—the President said he would take the ban "as far as you can." *Id.* at 53:35-53:58.

The President also made clear that other news organizations face the same treatment if he dislikes their coverage. His post promised "Other Fake News Media Outlets to follow," *see supra*, at 12, and in the Oval Office he said that "there may be others to join them," naming The New York Times and The Washington Post, Oval Office Press Conference 55:35-55:46; *see id.* at 45:37-46:09.

Neither the post nor the President's remarks identified any standard by which the three organizations' coverage had been judged or would be judged in the future, any official responsible for applying that standard, any procedure by which Plaintiffs could contest the ban, or any date on which the ban would end. Vigilante Decl. ¶¶ 16–17; Reddy Decl. ¶ 15; Marsh Decl. ¶ 4. White House staff—including members of the White House press office—were themselves given no advance notice of the President's post and were left scrambling to learn how the ban would be carried out. Klein Decl. ¶ 11; *see also* Reddy Decl. ¶ 17.

### D. The White House implements the ban.

The White House nonetheless moved immediately to carry out the President's directive at the instruction and under the supervision of Assistant to the President for Communications Steven Cheung, Director of the Secret Service Sean M. Curran, and White House Chief of Staff Susan Wiles. Plaintiffs received no written notice of the ban from the President, the White House Press

Office, the Office of Communications, the Secret Service, or any other White House official, and no one has advised them of the scope or duration of the ban or of any process by which they may respond to or contest it. Vigilante Decl. ¶ 17; Reddy Decl. ¶ 17; Marsh Decl. ¶ 4; *see also* Klein Decl. ¶ 13; Gardner Decl. ¶ 12; Haslett Decl. ¶ 3. MS NOW journalists remained on the White House grounds through that evening; no White House official contacted MS NOW that night to say whether, when, or how the ban would be enforced, and MS NOW was even included that evening in a White House press call previewing the President's schedule for the coming week. Reddy Decl. ¶ 17.

Secret Service officers refused to admit Plaintiffs' reporters the next day. At approximately 8:00 a.m. on Saturday, September 19, Ms. Gardner attempted to enter the White House as usual to work for MS NOW but was informed that her hard pass had "been disabled." Gardner Decl. ¶ 10; Reddy Decl. ¶ 18. An MS NOW photographer who arrived earlier that morning was likewise turned away and his hard pass taken, while the MS NOW producer who accompanied Ms. Gardner scanned her pass and was admitted. Gardner Decl. ¶ 10; Reddy Decl. ¶ 18. Approximately an hour later, Ms. Klein, a CNN reporter who has covered the White House since 2015 and has held a hard pass continuously since February 2018, also went to the White House to work, as she does whenever she is assigned to cover it. Klein Decl. ¶¶ 2, 4, 12. When she submitted her hard pass, a Secret Service officer told her it had been deactivated, he had no further information, and referred her to the White House Press Office. *Id.* ¶ 12. No one gave Ms. Klein advance notice that her pass would be deactivated, and no one has since explained why it was or offered her any opportunity to respond. *Id.* ¶¶ 12–13. That same morning, Ms. Haslett went to the White House to do her job for POLITICO, but a Secret Service officer at the gate denied her entry, took her hard pass, and gave no reason when she asked why. Haslett Decl. ¶ 4; Marsh Decl. ¶ 5. None of these

journalists received a written statement of the reason for the denial, an opportunity to respond, or any information about the duration of the ban or how access might be restored; the only instruction any of them received was to direct questions to the White House Press Office. Gardner Decl. ¶ 12; Haslett Decl. ¶ 4; Klein Decl. ¶ 13.

**E. The ban immediately harms CNN, MS NOW, and POLITICO.**

Since the morning of September 19, Plaintiffs' reporters have been unable to enter the White House complex to attend briefings or events, work from their booths and workspaces, report from their broadcast positions, speak in person with the White House officials and staff who are their sources, serve in the press pool, or travel with the President. Klein Decl. ¶ 14; Gardner Decl. ¶ 13; Haslett Decl. ¶ 5; Vigilante Decl. ¶ 20; Reddy Decl. ¶ 23; Marsh Decl. ¶ 6. Plaintiffs' workspaces, broadcast positions, cameras, and transmission equipment remain inside the White House complex, and neither CNN has received no assurance that its personnel will be permitted to enter to operate, maintain, or retrieve them. Vigilante Decl. ¶ 19; Reddy Decl. ¶ 21.

The harm is already compounding. CNN was the assigned primary television pooler beginning today, Monday, September 21, 2026—an assignment made before the President announced the ban. Vigilante Decl. ¶ 12. As the assigned pooler, CNN is responsible for staffing the in-town pool, which covers any of the President's activities on the White House campus that day, as well as his departure from the South Lawn aboard Marine One at approximately 2:00 p.m. *Id.* CNN also had pool responsibility for the President's travel today to and speech tomorrow at the United Nations General Assembly. *Id.* But at 10:55 p.m. last night, the White House Office of Communications issued its daily guidance and press schedule for that stripped CNN of its pool assignment *Id.* ¶ 13.

These losses cannot be repaired after the fact. A briefing Plaintiffs cannot attend is a briefing at which they cannot ask a question; an event they cannot cover is an event they cannot

report to their audiences. Vigilante Decl. ¶ 21; Reddy Decl. ¶¶ 23, 25. The ban deprives Plaintiffs of the ability to gather news firsthand at the seat of the Executive Branch, and it chills the administration sources on whom their White House teams depend, who now know that the President is prepared to punish the organizations that report what they say. Vigilante Decl. ¶ 22; *see also* Reddy Decl. ¶ 25; Marsh Decl. ¶ 6. Because of the ongoing and irreparable violation of their constitutional rights, CNN, Ms. Klein, MS NOW, Ms. Gardner, POLITICO LLC, and Ms. Haslett were forced to file this case against President Trump, Assistant to the President for Communications Cheung, Director Curran, and Chief of Staff Wiles.

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order must demonstrate: (1) a likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable injury in the absence of such relief; and (3) that the balance of the equities and (4) the public interest favor an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."). Here, all four elements are readily satisfied: Defendants' conduct is blatantly unconstitutional; Plaintiffs are suffering irreparable injury through the loss of their First Amendment freedoms each moment the President's ban remains in effect; and the balance of equities and public interest overwhelmingly favor Plaintiffs.

## ARGUMENT

### I. Plaintiffs are likely to establish that the press ban is unconstitutional.

The "first and most important factor" is "likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). Plaintiffs are likely to succeed on the merits because the ban blatantly denied them due process, retaliates against their protected newsgathering

and speech, and imposes viewpoint-discriminatory and unreasonable restrictions on their access to a forum designed to facilitate activity protected by the First Amendment.

**A. The ban violates the Due Process Clause.**

The Fifth Amendment forbids the government from depriving any person of "life, liberty, or property without due process of law." U.S. Const. amend. V. Members of the press have liberty and property interests in hard-pass press credentials and the access those credentials afford. Yet the ban disregarded every fundamental prerequisite of due process.

Nearly 50 years ago, the D.C. Circuit recognized that "the interest of a bona fide Washington correspondent" in obtaining or retaining a press credential is not only "protected by the first amendment," but also "undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." *Sherrill*, 569 F.2d at 130–31; *see also id.* at 131 n.22 (suggesting that a press credential is also a protected property interest). *Sherrill* establishes that, when the government "has voluntarily decided to establish press facilities for correspondents who need to report therefrom," important First Amendment rights are implicated, and access cannot be denied "arbitrarily or for less than compelling reasons." *Id.* at 129–30; *see also id.* at 129 ("[A]rbitrary or content-based criteria for press pass issuance are prohibited" by the First Amendment). In addressing a challenge by a Washington correspondent for *The Nation*, the D.C. Circuit in *Sherrill* held that the White House's failure "to articulate and publish an explicit and meaningful standard governing denial" of press passes "for security reasons," and to afford procedural protections—namely, notice of the factual bases for denial, an opportunity for the applicant to respond, and a final written statement of the reasons for denial—to those denied passes violated the Due Process Clause. *Id.* at 130–31.

The D.C. Circuit reaffirmed and expanded on that holding decades later in *Karem*. 960 F.3d at 660. Considering a journalist's challenge to a one-month suspension of his White House

"hard pass" based on his purportedly "unprofessional conduct" at a Rose Garden event, the court held that a "duly issued hard pass may not be suspended without due process," which requires "fair notice" ahead of time "of conduct that is forbidden or required." *Id.* at 664 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). And because the suspension of a hard pass "implicates important first amendment rights," any suspension must be analyzed "under a particularly stringent vagueness and fair-notice test." *Id.* at 665 (brackets and quotation marks omitted). Due process thus "requires that explicit and meaningful standards" for accessing the White House grounds "be formally articulated or published" *before* the government excludes a member of the press. *Id.* at 666. In *Karem*, the D.C. Circuit held that the White House had failed to give notice that the journalist's conduct might trigger any sanction, and in particular failed to give notice of the "severity" of the penalty that might be imposed. *Id.* at 666–67. For those reasons, the D.C. Circuit held that the suspension of his hard pass likely violated due process and affirmed the district court's preliminary injunction ordering that the White House restore the reporter's hard pass.

The ban is squarely unconstitutional under *Sherrill* and *Karem* three times over.

First, Plaintiffs received zero advance notice that the President would ban a news organization from the White House if its coverage "diminish[es]" the President. Oval Office Press Conference 27:41-28:00. Even if the First Amendment permitted a viewpoint-based standard for access to the White House (and it does not), no standard was "formally articulated or published" before the President announced an immediate ban on entry to the White House grounds. *Karem*, 960 F.3d at 666. Plaintiffs lacked "fair notice" that their reporting on the President and his administration would "subject [them] to punishment." *Karem*, 960 F.3d at 665. And nothing "put [them] on notice of the 'magnitude of the sanction that the White House might impose,'" *id.*

(brackets and quotation marks omitted). *Karem* found that true where the "magnitude of the sanction" was a one-month suspension of a hard pass and corresponding temporary loss of ability to access the White House grounds. Here, the sanction—a purportedly complete and indefinite ban—is dramatically more severe. The ban violates the Due Process Clause.

Second, notice could not save the ban because the "standard" that was applied to revoke Plaintiffs' press credentials and exclude them from the White House—that the President dislikes their reporting and considers it "negative"—is (at risk of understatement) completely impermissible. Oval Office Press Conference 37:02-38:51. Any standard for regulating access to the White House must be "explicit and meaningful." *Karem*, 960 F.3d at 666 (quoting *Sherrill*, 569 F.2d at 130–31). Because of the First Amendment implications of any suspension or revocation of press access to the White House, a "particularly 'stringent vagueness and fair-notice test'" applies. *Id.* at 665 (brackets omitted); *see Fox*, 567 U.S. at 254–55. "[A]rbitrary or content-based criteria" necessarily flunk this test. *Sherrill*, 569 F.2d at 129. And it would be hard to invent a more arbitrary or content-based standard than whatever the President decides is too "negative." The President's "standardless" prohibition is unconstitutionally vague and allows "seriously discriminatory enforcement"—indeed, that is the entire point, as the President's own statements about the purpose of the ban show. *United States v. Williams*, 553 U.S. 285, 304 (2008); *accord New York Times Co. v. Dep't of Defense*, 824 F. Supp. 3d 27, 46 (D.D.C. 2026).

Third, Defendants denied Plaintiffs any opportunity to be heard before announcing and implementing an immediate ban. The "root requirement" of due process is an "opportunity for a hearing *before* [one] is deprived" of liberty or property. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). The Due Process Clause thus requires "an opportunity to present [one's] objections" to the deprivation of liberty. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306,

314 (1950). Plaintiffs had no "avenue for a response" here. *Trump v. Cook*, 146 S. Ct. 2234, 2255 (2026). The administration immediately implemented the ban by deactivating hard passes for Plaintiffs' reporters, barring their entry to the White House grounds, and seizing physical hard passes the following day. *See supra*, at 14–15. As the Supreme Court held earlier this year in response to another of the President's posts on Truth Social, "[t]hat will not do" when a person has a right to be heard *before* a final decision. *Cook*, 146 S. Ct. at 2255.

Each of these infirmities alone (the lack of notice, the arbitrary standard, and the denial of an opportunity to be heard) establishes a violation of the Due Process Clause. Together, they reflect a fundamental rupture in the process for determining access to the White House grounds to report on the President and his administration.

**B. The ban retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment.**

Plaintiffs are also likely to prevail on the ground that the ban retaliates against them for engaging in speech, publication, and newsgathering activities that the First Amendment protects but the administration disfavors. The First Amendment "guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 184 (2026). To safeguard those rights, the First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). Government officials have their own right to speak and may "do so forcefully," but they may not "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). If the rule were otherwise, the government, through retaliation for protected speech, could achieve the "'self-

censorship' of speech that could not be proscribed." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023).

Retaliation is particularly pernicious when directed against the press. "Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices"; "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). "It should alarm all Americans when the Government retaliates against individuals or organizations for engaging in constitutionally protected public debate," and "that alarm should ring even louder when the Government retaliates against those engaged in newsgathering and reporting." *Media Matters for Am. v. FTC*, 808 F. Supp. 3d 105, 111 (D.D.C. 2025), *stay denied*, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025).

To demonstrate that unlawful retaliation has occurred, a plaintiff must show that "'(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action.'" *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The ban readily establishes each element.

First, Plaintiffs "are obviously engaged in conduct protected under the First Amendment" when covering the President and his administration, including Plaintiffs' newsgathering and reporting. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025). "The Framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660–61 (2000)). And as reflected in the Press Clause of the First Amendment, "[t]he Constitution specifically selected the press . . . to play an important

role in the discussion of public affairs." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). "Suppression" of the press "muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.* All told, speech about official action "is an essential mechanism of democracy" that "hold[s] officials accountable to the people." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010).

Second, banning Plaintiffs from the White House grounds is precisely the type of adverse action that would deter journalists and news organizations of ordinary firmness from continuing to provide fact-based, independent coverage of the administration that the President dislikes. Indeed, that is the entire point of the ban: The President has admitted his hope that the ban will coerce positive coverage from Plaintiffs by offering that, if they "could straighten themselves out," then he would "love it." Oval Office Press Conference 53:38-53:58. As the President well knows, access to the White House grounds is critical for covering the President and his administration. "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Even a one-month suspension from the White House grounds is "an eon in today's news business." *Karem*, 960 F.3d at 665. An indefinite ban has an even greater chilling effect on future coverage of the administration. And the President's threat of "Other Fake News Media Outlets to follow" only exacerbates the chilling effect of the ban for all journalists and news organizations that retain access to the White House grounds. *See supra*, at 12. The ban undeniably "discourage[s] the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Counterman*, 600 U.S. at 78 (quoting *Sullivan*, 376 U.S. at 270).

Third, President Trump has made explicit the causal link between the ban and Plaintiffs' coverage of him and his administration. The President's Truth Social post announcing the ban

declares that he has barred Plaintiffs from the White House grounds "*as a result* of their constant 'reporting' FAKE NEWS!"—meaning coverage that, regardless of accuracy, the President dislikes. *See supra*, at 12 (emphasis added). The President later attributed the ban to "cumulative stories over the last two years," and his belief that Plaintiffs "purposely write negative news." Oval Office Press Conference 27:22-28:00. And he even referred to his own unprecedented act as the "ban on the free press." *Id.* at 53:38-53:58.

The President's own words leave no doubt that banning Plaintiffs from the White House is retaliation for their protected newsgathering and speech—retaliation that is intended to cow them into changing their reporting and threaten other journalists lest they suffer the same fate. That is a paradigmatic First Amendment violation.

**C. The ban unconstitutionally restricts access to a nonpublic forum.**

Even setting aside that the ban is unconstitutional retaliation, it also violates the First Amendment because it is an unreasonable and viewpoint-discriminatory restriction on access to a nonpublic forum. Indeed, far more than a restriction, it is a *total* ban on access to *all* areas of the White House.

A "nonpublic forum" is "government property" that the government has opened to speech for selected speakers. *Ateba*, 133 F.4th at 121–22. The D.C. Circuit has held that the "White House Press Area"—including "the briefing room, the press offices, and certain other locations in and around the White House"—"is a nonpublic forum," because the government "provides selective access for individual speakers." *Id.* at 117, 122 (quotation marks omitted). Accordingly, the First Amendment requires that any restrictions on access to those press areas be both viewpoint neutral and "'reasonable in light of the purpose served by the forum.'" *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (the "government violates the First Amendment when it denies access

to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). The ban meets neither requirement. It is expressly viewpoint discriminatory and patently unreasonable in light of the purpose of the forum.

Viewpoint discrimination is anathema to the First Amendment. The "recognition that viewpoint discrimination is uniquely harmful to a free and democratic society" resides at "the heart of the First Amendment's Free Speech Clause." *Vullo*, 602 U.S. at 187; *see also Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (viewpoint discrimination is a "'more blatant' and 'egregious form of content discrimination'" (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995))). In the words of the D.C. Circuit, "viewpoint discrimination is poison." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotation marks omitted). That does not change when the government claims to discriminate in order to make speech more "fair" or "balanced": "[I]t is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences." *Moody v. NetChoice, LLC*, 603 U.S. 707, 718–19 (2024).

The First Amendment's prohibition of viewpoint discrimination "limits the restrictions that the government may impose on speech, including speech on government property." *Ateba*, 133 F.4th at 119. Here, President Trump has expressly targeted Plaintiffs based on their perceived editorial viewpoints—targeting the "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. The President has left no doubt that he has banned Plaintiffs from the White House because, in his view, their coverage is not "fair" and "honest." Oval Office Press Conference 26:47-27:08. The President explained that he was banning Plaintiffs because he believes they "write negative news" and "want to try and diminish the Republicans and a

Republican administration." *Id.* at 27:41-28:00. While Plaintiffs contest the President's characterizations of their journalism, it is indisputable that the President has targeted Plaintiffs based on what he perceives to be their "motivating ideology or the opinion or perspective" and thus engaged in paradigmatic viewpoint discrimination. *Rosenberger*, 515 U.S. at 829; *accord Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 88 (D.D.C. 2026) ("It is difficult to conceive of clearer evidence that a government action is targeted at viewpoints that the President does not like and seeks to squelch."). This clear viewpoint discrimination means that the ban is flatly unconstitutional.

Banning Plaintiffs from the White House also is unconstitutional because it is not reasonable in light of the purpose served by the White House press areas. Banning speakers based on the President's personal dislike of their journalism does nothing to promote the purpose of the White House press areas. The White House press facilities are "made publicly available as a source of information for newsmen" and serve the interests of "the public at large" in receiving information "gathered out of a multitude of tongues." *Sherrill*, 569 F.2d at 129–30 (quotation marks omitted); *see Cable News Network, Inc. v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1244 (N.D. Ga. 1981) (describing the "'enduring and vital tradition of public entree' (through the press as agents) to the presidential activities covered by press pools"). Barring Plaintiffs, among the most prominent news organizations in the country, based on their perceived editorial viewpoints frustrates those purposes. And the exclusion criterion here—that the President has deemed their reporting not favorable enough to him and his administration—is so vague and arbitrary that it cannot count as a "sensible basis for distinguishing what may come in from what must stay out" and is thus unreasonable. *Mansky*, 585 U.S. at 16.

Defendants' standardless, viewpoint-based discretion to deny White House access to credentialed news organizations and reporters is unreasonable for another reason: The D.C. Circuit has squarely "held that the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable." *Ateba*, 133 F.4th at 125; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). The President's ban is just such a raw exercise of unbridled discretion to exclude disfavored media organizations from the White House.

In sum, the ban violates the First Amendment for the independent reason that it excludes Plaintiffs from a nonpublic forum based on their perceived editorial viewpoints and, far from being reasonable in light of the purpose of the forum, that exclusion undermines the purpose of the White House press areas.

## II. Plaintiffs are suffering and will continue to suffer irreparable injury absent a temporary restraining order.

The ban is inflicting irreparable injury on Plaintiffs every moment it remains in effect. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*, 427 U.S. at 373). That principle has special force for "the loss of First Amendment freedoms." *Mahmoud*, 606 U.S. at 569 (quoting *Roman Cath. Diocese*, 592 U.S. at 19); *see Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020) (explaining that "chilling of First Amendment expression" is "irreparable harm"). And the denial of access to the White House without due process of law likewise is an irreparable injury. *Karem*, 960 F.3d at 668; *see Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (due-process violations generally cause irreparable harm). And "there is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (cleaned up). Because Plaintiffs are suffering

ongoing violations of their First Amendment and due process rights—including ongoing impairment to their ability to gather and report news from the White House—they are suffering irreparable injury every day the ban remains in effect.

Moreover, CNN, MS NOW, and POLITICO will be harmed in their ability to carry out their journalistic missions absent relief from this Court. An organization is irreparably harmed if (1) the actions taken by the defendant "perceptibly impair[ ] the organization's programs," and (2) the defendant's actions "directly conflict with the organization's mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (brackets and quotation marks omitted). That standard is easily met here. As a court in this District has recognized, "without access to" the White House, reporters "lack[ ] the ability to observe events firsthand and to ask questions of White House officials." *Karem v. Trump*, 404 F. Supp. 3d 203, 216 (D.D.C. 2019). CNN, MS NOW, and POLITICO are organizations whose very purpose is to report national news, for which they depend on individual reporters to gather information firsthand at the White House. As a result of the ban, they have lost the ability to perform essential newsgathering where critically important newsworthy events occur every day. The loss of this access for even a short period of time may constitute "an eon in today's news business." *Karem*, 960 F.3d at 665 (describing "a month-long loss" of White House access). And once the organizations miss out on the opportunity to report on a story, that opportunity is gone forever. Their newsgathering, speech, and the journalistic mission they serve will continue to suffer irreparable harm unless and until this Court enters a temporary restraining order.

**III. The balance of hardships and public interest favor a temporary restraining order.**

The last two factors support Plaintiffs, too. The "balance of equities" and "public interest" factors "'merge'" because Defendants are governmental officials. *Karem*, 960 F.3d at 668 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, these factors weigh decisively in favor

of a temporary restraining order against the flagrantly unconstitutional ban on Plaintiffs' access to the White House grounds. There is "'always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action." *Media Matters for Am. v. Paxton*, 138 F.4th at 585. The public interest also favors access because a "public awareness and understanding of the President's behavior facilitates his effectiveness as President" and permits "a determination by the public of the adequacy of the President's performance." *Cable News Network v. Am. Broad. Cos.*, 518 F. Supp. at 1244; *see New York Times v. Dep't of Defense*, 824 F. Supp. 3d at 53 (observing that the "constitutional interests at stake" in access to the government for reporting "are hard to overstate"). On the other side of the ledger, Defendants have no legitimate interest in enforcing the ban because "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668 (quoting *Gordon*, 721 F.3d at 653).

**IV. The Court should waive any bond requirement.**

The Court should exercise its discretion "to dispense with any security requirement whatsoever." *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 60 (D.D.C. 2025) (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)), *stayed in part pending appeal*, 2025 WL 1649265 (D.C. Cir. June 6, 2025). The Court has "wide discretion" not to require a bond. *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024). No security requirement is necessary because there is no risk that a temporary restraining order will cause "material damage." *Associated Press*, 780 F. Supp. 3d at 60. And requiring Plaintiffs to post a bond to regain equal access to report on the President and his administration would be at odds with the country's tradition of free speech and a free press. Forcing Plaintiffs to bear a financial cost simply to stand on the same footing as their journalistic peers who were not the target of government retaliation and viewpoint discrimination would compound Plaintiffs' First Amendment injury.

## CONCLUSION

This Court should issue a temporary order restraining Defendants (save the President) and those acting in concert with them from taking any action to enforce the White House ban against Plaintiffs and order Defendants (save the President) to restore to Plaintiffs their hard passes and the White House access those credentials afforded them prior to September 18, 2026.

Dated: September 21, 2026

Respectfully submitted,

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
PFuster@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459
CSSullivan@gibsondunn.com

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
CMui@gibsondunn.com

*Counsel for Plaintiffs*

**Pro Hac Vice Application Forthcoming*