**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC. et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP et al.,

*Defendants*.

Civil Action No. 26-3287 (TJK)

**TEMPORARY RESTRAINING ORDER**

On the afternoon of September 18, 2026, President Trump announced in a social media post that, "effective immediately," he was "banning" the news organizations CNN, MS NOW, and POLITICO "from the White House."[1] And those news organizations allege that over the weekend their reporters were denied access to the White House and had their "hard pass" press credentials deactivated. *See* ECF No. 2-2 ¶ 6; ECF No. 2-3 ¶¶ 5–6, 12; ECF No. 2-4 ¶ 4; ECF No. 2-7 ¶ 18. Plaintiffs—the three news organizations and three individual reporters—sue the President and several White House officials and move for a temporary restraining order, asking the Court to order the immediate reinstatement of their hard passes pending further proceedings. ECF Nos. 1, 2. The Court's resolution of their Motion is dictated by the application of well-known D.C. Circuit precedent that this Court must faithfully apply. For the reasons explained below, the Court will grant the Motion.

To obtain a temporary restraining order, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

[1] *See* @realDonaldTrump, Truth Social (Sept. 18, 2026, 3:04 p.m.), https://truthsocial.com/@realDonaldTrump/posts/117293599348325006.

the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 20 (2008); *see also Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025) ("The standard for obtaining either a TRO or a preliminary injunction is identical."). This is a high bar, but Plaintiffs have met it.

First, Plaintiffs have shown a likelihood of success, at least on their Fifth Amendment procedural due process claim. The merits of this claim are assessed in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted). Plaintiffs have shown they are likely to succeed at both steps. As for the first, the D.C. Circuit held in *Sherrill v. Knight* that "the interest of a bona fide Washington correspondent in obtaining a White House press pass . . . undoubtedly qualifies as [a] liberty [interest] which may not be denied without due process of law under the fifth amendment." 569 F.2d 124, 130–31 (D.C. Cir. 1977). And if there were any doubt about what *Sherill* meant, the D.C. Circuit more recently reaffirmed this conclusion in *Karem v. Trump*, holding that "a duly issued hard pass may not be suspended without due process." 960 F.3d 656, 665 (D.C. Cir. 2020).

Plaintiffs are also likely to succeed in showing that their hard passes were revoked without constitutionally adequate due process. The "general rule" is that "individuals must receive notice and an opportunity to be heard before the Government deprives them" of a constitutionally protected interest. *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs. of the Univ. of D.C.*, 56 F.3d 1469, 1472 (D.C. Cir. 1995) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993)). Indeed, the Supreme Court has "described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before*

he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted). *Karem* also holds that, because of the substantial interests at stake, before the Government can revoke the White House-issued hard pass of a reporter it must promulgate rules or standards governing the conduct that would lead to such revocation. *See* 960 F.3d at 665. And the reporter must "receive fair notice not only of the conduct that would subject him to punishment, but also of the magnitude of the sanction that the White House might impose." *Id.* (cleaned up).

Defendants do not dispute that Plaintiffs did not receive notice and an opportunity to be heard before their hard passes were revoked. And, as in *Karem*, the record is bereft of any relevant "formally articulated standards" in place *before* any of the conduct for which Defendants revoked their hard passes. *Karem*, 960 F.3d at 665. One standard Defendants appear to offer—reflected in letters they sent to Plaintiffs on September 22, 2026, identifying their objectionable reporting—is so vague it hardly does the trick. *See, e.g.*, ECF No. 16-1 ("[Y]our organization has exhibited behavior in violation of the standards of professionalism and decorum expected of those given access to the White House Complex."). Moreover, Defendants renewed Plaintiff Betsy Klein's hard pass several months *after* she published some of the identified reporting, undercutting any argument that she or her employer, for example, had the requisite notice that the conduct at issue violated a relevant standard. *See* ECF No. 2-3 ¶ 4; ECF No. 16-1. Finally, nothing put Plaintiffs on notice of the magnitude of the sanction Defendants imposed. *Karem*, 960 F.3d at 665.

None of Defendants' arguments convince the Court that Plaintiffs are *not* likely to succeed on their due process claim. Defendants say that *Sherrill* and *Karem* were wrongly decided. ECF No. 16 at 12. Maybe—but this Court is bound by D.C. Circuit precedent, full stop. Defendants also point to the letters referenced above, which they assert afford Plaintiffs post-deprivation notice

of the revocations and an opportunity to be heard. *Id.* at 13; *see* ECF Nos. 16-1, 16-2, 16-3. And Defendants cite cases that suggest that such a post-deprivation process suffices in "extraordinary circumstances." ECF No. 16 at 13 (citing *Zevallos v. Obama*, 793 F.3d 106 (D.C. Cir. 2015)). These are such circumstances, Defendants argue, because Plaintiffs have endangered national security through their reporting. *E.g.*, ECF No. 16-1.

But the circumstances here are not so "extraordinary" as to permit deviation from the "essential principle of due process" that a deprivation of liberty "be *preceded* by notice and opportunity for hearing." *Cleveland Bd. of Educ.*, 470 U.S. at 542 (emphasis added). *Zevallos* holds that post-deprivation due process may suffice in unusual situations, such as when "providing notice before blocking the assets of international narcotics traffickers would create a substantial risk of asset flight." 793 F.3d at 116. But nothing in the record suggests the need for such urgency here. Indeed, some of the reporting identified by Defendants in the letters to Plaintiffs stretches back months or years. *See* ECF Nos. 16-1, 16-2, 16-3. The sorts of stories Defendants identify in the letters to Plaintiffs are routine. And as discussed further below, the Court is skeptical—at least on this record—that Defendants' interest in safeguarding national security is the actual motivation for, or is even advanced by, the revocation of Plaintiffs' hard passes. Finally, even if the circumstances here allowed for post-deprivation process, Defendants are still left with the problem that, before the reporting at issue, Plaintiffs still did not "receive fair notice" of either the "conduct" that would lead to a sanction or of "the magnitude of the sanction that the White House might impose." *Karem,* 960 F.3d at 665 (cleaned up).[2]

[2] At the hearing on the Motion, Defendants argued that an adequate standard relating to the revocation of Plaintiffs' hard passes had been promulgated because the public is generally on notice that disclosure of classified information is unlawful. The Court is doubtful that the laws governing the retention, sharing, or mishandling of classified information provided Plaintiffs the sort

Second, Plaintiffs have shown that they are likely to suffer irreparable harm absent a temporary restraining order. In the D.C. Circuit, it "has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citation omitted). When constitutional harm is the basis for irreparable harm, the likelihood of success on the merits overlaps heavily with the irreparable harm inquiry. *See id.* Thus, because Plaintiffs have shown a likelihood of success on at least one of their constitutional claims, they have also met the irreparable harm requirement.

The final two factors, the balance of the equities and the public interest, also favor Plaintiffs. These two factors "merge when the Government is the opposing party." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation omitted). As the Court has concluded, the revocation of Plaintiffs' hard passes likely violated their constitutional due process rights, and "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668 (citation omitted). Moreover, Plaintiffs—and the public—have an abiding interest in maintaining the status quo ante given the importance of the free press, which "stands as one of the great interpreters between the government and the people." *Grosjean v. Am. Press. Co.*, 297 U.S. 233, 250 (1936).

On the other side, Defendants argue that revoking Plaintiffs' hard passes and excluding them from the White House serves an important national security purpose, citing Defendants'

---

of notice that satisfies *Karem* for several reasons, but especially given the lack of precedent for applying those laws to reporters. Moreover, just as the record lacks factual support for Defendants' contention that the revocation of Plaintiffs' hard passes will in fact protect national security (as discussed below), the record also lacks factual support for Defendants' contention that Plaintiffs violated these statutes, at least at this stage.

interest in "protecting classified and sensitive national security information." ECF No. 16 at 14. No doubt, protection of the national security is a weighty interest on the Executive's part. And true, "[c]ourts have limited competence in the area of national security," and so review of the Executive's related factual determinations should be "highly deferential." *Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023). Still, on this record, Defendants offer little to back up their asserted national security interest to justify revocation of Plaintiffs' hard passes. So this interest does not tilt these factors in their favor, especially given that Plaintiffs have shown a likelihood of success on the merits.

For one thing, nothing in the record that predates this suit suggests that the revocation of Plaintiffs' hard passes was motivated by national security concerns. Certainly, that is not what President Trump said when he announced that he was "banning" Plaintiffs from the White House—instead, he focused on the alleged lack of truthfulness and negativity of Plaintiffs' reporting.[3] And even the justifications provided to Plaintiffs after this case was filed are ambiguous about the true purpose of the revocations: while Defendants' letters to Plaintiffs mention national security concerns, they purport to identify reporting that "threatened national security and/or spread falsehoods," leaving open the possibility that all the stories fall into the later bucket, rather than the former. *See, e.g.*, ECF No. 16-1.

For another—and simply put—the record lacks factual support for Defendants' contention that the revocation of Plaintiffs' hard passes will in fact protect national security or that national security will be endangered if the Court orders their passes reinstated while this litigation proceeds. Defendants offer no declarations or other support—classified or unclassified—explaining how any

[3] *See* @realDonaldTrump, Truth Social (Sept. 18, 2026, 3:04 p.m.), https://truthsocial.com/@realDonaldTrump/posts/117293599348325006.

of the reporting they identified in their letters to Plaintiffs damaged the national security. The declarations they *do* provide include general background about classified information, but the declarants are senior officials in the Department of Defense who have no direct knowledge of how reporters operate in the White House, or about any of the facts at issue here. *See* ECF Nos. 16-4, 16-5. And supplemental declarations filed by Plaintiffs show that, in most cases, the reporters who authored the stories Defendants identify in their letters *did not even hold hard passes*. ECF Nos. 21, 22. In the remaining cases, Defendants afford no reason to believe that the reporter's possession of the hard pass was integral to the stories identified.

For these reasons, Plaintiffs have satisfied the four *Winter* factors and shown they are entitled to a temporary restraining order.

Two final points. First, the Court declines to stay this Temporary Restraining Order's entry or effective date, as Defendants request. Doing so runs against the purpose of such an order, which is to immediately—but temporarily—preserve the last uncontested status quo while the litigation proceeds. *Pippenger v. U.S. Doge Serv.*, No. 25-cv-1090 (BAH), 2025 WL 1148345, at *2 (D.D.C. Apr. 17, 2025). And in any event, temporary restraining orders are generally unappealable. *See Dellinger*, 2025 WL 559669, at *1. This Temporary Restraining Order shall remain in effect for fourteen days, and the Court will set a schedule for expedited briefing on a motion for a preliminary injunction during that time. The Court will then be able to consider such a motion with additional time and on a fuller record.

Second, Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The D.C. Circuit has observed the "widely recognized

discretion" of a district court "not only to set the amount of security but to dispense with any security requirement whatsoever." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980). So given the lack of representation from Defendants that they will sustain any economic injury from an injunction and the important rights Plaintiffs seek to vindicate, the Court will impose a nominal bond of $1.00. *See N. Am.'s Bldg. Trades Unions v. DOD*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (finding that the defendants had "not sufficiently demonstrated any likelihood of suffering costs or damages if they are later found to have been wrongfully enjoined").

For all these reasons, it is hereby **ORDERED** that:

1. Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 2, is **GRANTED**.
2. It is further **ORDERED** that Defendants (except for President Trump) and their agents, representatives, and all persons or entities acting in concert with them shall immediately return, reinstate, and restore the White House "hard pass" press credentials held by employees of CNN, MS NOW, and POLITICO that were revoked on or about September 18, 2026, until further Order of the Court or the expiration of this Temporary Restraining Order.
3. It is further **ORDERED** that this Temporary Restraining Order shall remain in effect for 14 days.
4. It is further **ORDERED** that Plaintiffs shall post a $1.00 bond in accordance with Federal Rule of Civil Procedure 65(c) by October 1, 2026.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 24, 2026