**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CABLE NEWS NETWORK, INC., MS NOW Cable, LLC, POLITICO LLC, *et al.*,<br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br>Defendants. | Case No. 1:26-cv-03287-TJK |

# BRIEF OF THE SOCIETY FOR THE RULE OF LAW AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Deborah B. Baum (D.C. Bar No. 393019)
Todd Kim (D.C. Bar No. 501200)
(application for admission to this Court pending)
Ya'ara Barnoon (D.C. Bar No. 1023972)
(*pro hac vice* forthcoming)
PILLSBURY WINTHROP
SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
T: 202.663.8000/F: 202.663.8007
E: deborah.baum@pillsburylaw.com
todd.kim@pillsburylaw.com
yaara.barnoon@pillsburylaw.com

Anne M. Voigts (*pro hac vice* forthcoming)
PILLSBURY WINTHROP
SHAW PITTMAN LLP
2400 Hanover Street
Palo Alto, California 94304-1113
T: 650.233.4500/F: 650.233.4545
E: anne.voigts@pillsburylaw.com

Alexandra Elenowitz-Hess
PILLSBURY WINTHROP
SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
T: 212.858.1000/F: 212.858.1500
E: alex.elenowitz-hess@pillsburylaw.com

Attorneys for *Amicus Curiae* the Society for the Rule of Law

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), made applicable by Local Civil Rule 7(o)(5), the Society for the Rule of Law and Democracy, Inc. certifies that it is a nonprofit organization founded by lawyers and former public officials, whose general nature and purpose, insofar as relevant to this litigation, is to defend constitutional government, the integrity of the Nation's legal institutions, and the impartial administration of justice. The Society for the Rule of Law has no parent company and issues no stock, and no publicly held company has a 10% or greater ownership interest in it.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................ 1
PRELIMINARY STATEMENT ........................................ 2
SUMMARY OF ARGUMENT ........................................ 4
ARGUMENT ........................................ 5
AN UNREVIEWABLE MECHANISM TO DISFAVOR OR RETALIATE AGAINST PARTICULAR VIEWPOINTS IN THE PRESS IS IRRECONCILABLE WITH THE FIRST AMENDMENT ........................................ 5
I. The First Amendment Constrains the Government from Disfavoring or Retaliating Against Particular Viewpoints in the Press, Whatever Means the Government Adopts to Do So ........................................ 6
II. This Court Should Reject the Argument That Courts Cannot Consider Whether Retaliation Is Actionable Under the First Amendment ........................................ 10
III. Invoking National Security Does Not Insulate The Government's Decisions Excluding The Media From First Amendment Scrutiny. ........................................ 13
CONCLUSION ........................................ 19
CERTIFICATE OF COMPLIANCE ........................................ 21
CERTIFICATE OF SERVICE ........................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Sec. Council Ed. Found. v. F.C.C.*,
607 F.2d 438 (D.C. Cir. 1979) (Wright, J., concurring) ....................4

*Aptheker v. Sec'y of State*,
378 U.S. 500 (1964) ....................18

*Associated Press v. United States*,
326 U.S. 1 (1945) ....................8

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) ....................12

*Beckerman v. City of Tupelo, Miss.*,
664 F.2d 502 (5th Cir. 1981) ....................17

*Boumediene v. Bush*,
553 U.S. 723 (2008) ....................13, 14

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ....................2, 9, 10

*Brown v. Glines*,
444 U.S. 348 (1980) (Brennan, J., dissenting) ....................16

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ....................13

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) ....................9

*Dennis v. United States*,
341 U.S. 494 (1951) (Frankfurter, J., concurring) ....................14

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................4

*Detroit Free Press v. Ashcroft*,
303 F.3d 681 (6th Cir. 2002) ....................16

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) ....................10

*Frederick Douglass Found., Inc. v. D.C.*,
82 F.4th 1122 (D.C. Cir. 2023) .......... 4

*Glik v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) .......... 10

*Gravel v. United States*,
408 U.S. 606 (1972) (Douglas, J., dissenting) .......... 4, 15

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) .......... 8, 14

*Halperin v. Kissinger*,
606 F.2d 1192 (D.C. Cir. 1979) .......... 15, 17

*Hassan v. City of New York*,
804 F.3d 277 (3d Cir. 2015) .......... 17

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) (Stewart, J., concurring) .......... 6, 8

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .......... 9

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......... 13

*McGehee v. Casey*,
718 F.2d 1137 (D.C. Cir. 1983) .......... 15

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .......... 11

*Mills v. State of Ala.*,
384 U.S. 214 (1966) .......... 2, 3, 9

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*,
460 U.S. 575 (1983) .......... 11

*United States v. Morison*,
844 F.2d 1057 (4th Cir. 1988) (Wilkinson, J., concurring) .......... 19

*Nat'l Ass'n for Advancement of Colored People v. Button*,
371 U.S. 415 (1963) .......... 15

*Nation Mag. v. U.S. Dep't of Def.*,
762 F. Supp. 1558 (S.D.N.Y. 1991) .......... 12

*Near v. State of Minnesota ex rel. Olson*,
283 U.S. 697 (1931) ............ 7, 8

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ............ 7, 9

*New York Times Co. v. U.S. Dep't of Def.*,
No. 26-5253, 2026 WL 2168070 (D.C. Cir. July 16, 2026) (Garcia, J., dissenting) ............ 11

*New York Times Co. v. United States*,
403 U.S. 713 (1971) (per curiam) (Black, J., concurring) ............ 7, 10, 14, 18, 19

*Patrolmen's Benevolent Ass'n of City of New York v. City of New York*,
310 F.3d 43 (2d Cir. 2002) ............ 5

*Pell v. Procunier*,
417 U.S. 817 (1974) ............ 4, 9

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ............ 13

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) (plurality opinion) ............ 2, 9, 10, 13

*United States v. Robel*,
389 U.S. 258 (1967) ............ 16, 17, 18

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995) ............ 12

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) ............ 5, 12, 16

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ............ 12

*United States v. Sterling*,
732 F.3d 292 (4th Cir. 2013) ............ 19

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994) ............ 11

*Tobey v. Jones*,
706 F.3d 379 (4th Cir. 2013) ............ 17

*Toolasprashad v. Bureau of Prisons*,
286 F.3d 576 (D.C. Cir. 2002) ............ 11

*United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*,
407 U.S. 297 (1972)....................5, 16

*In re Washington Post Co.*,
807 F.2d 383 (4th Cir. 1986)....................17

*Worrell Newspapers of Indiana, Inc. v. Westhafer*,
739 F.2d 1219 (7th Cir. 1984)....................17

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) (Jackson, J., concurring)....................15

Constitutions

United States Constitution
First Amendment....................1–19

Other Authorities

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998)....................8

Akhil Reed Amar, *The Words That Made Us: America's Constitutional Conversation, 1760–1840* (2021)....................15

Benjamin Franklin, *On Freedom of Speech and The Press* (1737)....................3

Charles L. Black, Jr., *Structure and Relationship in Constitutional Law* (1969)....................8

Thomas Jefferson, *The Papers of Thomas Jefferson* 239-40 (Julian P. Boyd ed., 1954)....................2

*The Writings of James Madison* 103 (Gaillard Hunt ed., 1910)....................6

## INTEREST OF *AMICUS CURIAE*[1]

The Society for the Rule of Law is a nonprofit organization of conservative, libertarian, and right-of-center lawyers, former public officials, and scholars dedicated to defending the Constitution and the rule of law regardless of politics or party affiliation. The Society was originally founded under the name "Checks and Balances" in 2018 by lawyers who had served in or supported previous Republican administrations. Created to advocate for constitutional government, defend the integrity of this country's legal institutions, and argue for the impartial administration of justice, the Society relaunched in 2023 to defend and advance these principles.[2]

The Society believes that the press has a critically important, constitutionally protected role to play in our democracy's system of checks and balances, and that restricting press access based on viewpoint conflicts with the balance the Framers struck. Restricting that access because the government does not like a particular perspective goes to the very heart of the dangers the Framers feared when they conceived of the First Amendment. Consistent with those concerns, the Society submits this amicus brief because the government asks this court to adopt an interpretation of the First Amendment that runs contrary to the constitutional system of checks and balances for which the Society advocates. The government cannot disfavor or retaliate against particular viewpoints in the press (or the press full stop) and categorically escape First Amendment scrutiny. That

---

[1]Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), made applicable by Local Civil Rule 7(o)(5), amicus states that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than amicus, its members, and its counsel contributed money intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief. Plaintiffs have consented to the filing of this brief, and Defendants have consented to any timely filed amicus brief.

[2]Information about the Society's leadership may be found at https://societyfortheruleoflaw.org/leadership/. The views of the Society do not necessarily reflect all of its individual members.

remains so whether the government crafts an ostensibly neutral rule of general application, as in appeals currently pending before the D.C. Circuit as to the Pentagon, or insists that press access to the seat of government is a privilege it may grant and withdraw based on viewpoint, as it does here.[3] The government's argument that its exclusion of the press requires (indeed, allows) no inquiry into its actual motives is wrong, not to mention profoundly dangerous and fundamentally anti-constitutional.

Insulating such decisions against constitutional review would allow administrations of any political stripe to exclude those journalists who probe government officials, policies, and practices without fear, favor, or following the government's preferred story line. Plaintiffs ably explain how the government's position fails under current precedent. The Society provides additional context about how and why that position is inconsistent with the longer arc of constitutional experience, including of course the principle at stake here: preservation of the press's ability to gather news. That principle is critically important because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

## PRELIMINARY STATEMENT

As Thomas Jefferson explained, the nation's "liberty depends on the freedom of the press, and that cannot be limited without being lost." 9 Thomas Jefferson, *The Papers of Thomas Jefferson* 239–40 (Julian P. Boyd ed., 1954). Under the constitutional structure the Framers crafted, journalists serve as the "constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. State of Ala.*, 384 U.S. 214, 219 (1966). As "surrogates for the public," *Richmond Newspapers, Inc. v. Virginia*, 448

[3]The Society has filed substantially similar briefs as amicus curiae in those pending appeals, *New York Times Co. v. U.S. Department of Defense*, Nos. 26-5253 and 26-5113 (D.C. Cir.).

U.S. 555, 573 (1980) (plurality opinion), journalists are a necessary and "powerful antidote to any abuses of power by governmental officials." *Mills*, 384 U.S. at 219. Accordingly, the First Amendment protects the press as a matter of constitutional self-interest. As Benjamin Franklin recognized nearly three centuries ago, "to suppress inquiries into the administration is good policy in an arbitrary government; but a free constitution and freedom of speech have such reciprocal dependance on each other, that they cannot subsist without consisting together." Benjamin Franklin, *On Freedom of Speech and The Press* (1737), reprinted in *Memoirs of Benjamin Franklin; Written by Himself* 71–82 (Harper & Brothers eds., 1860).

The government nonetheless argues that the press exclusion at issue here is effectively insulated from constitutional scrutiny because access to the White House is "a privilege—not a right," "the White House may consider journalists' viewpoints when deciding whether to grant access," and the President has invoked national security. Defs.' Opp'n 2, 7–11, 14–16 (quoting *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *3 (D.C. Cir. June 6, 2025)). In the pending appeals related to Pentagon press actions, the government makes a similar categorical argument that generally applicable access restrictions can never constitute retaliation actionable under the First Amendment, no matter the motive behind them. Br. for Appellants ("*NYT* Appeal Br.") at 26, *New York Times Co. v. U.S. Dep't of Def.*, No. 26-5253 (D.C. Cir. Aug. 10, 2026).

The government's argument fails under either formulation: an unreviewable mechanism to disfavor or retaliate against particular viewpoints in the press is incompatible with the First Amendment, the government's profound interest in national security notwithstanding. While there can be tension between the need to protect national security and maintaining an open relationship between the government and the media, history illustrates how easily the broad concept of national

security can be invoked to justify a wide variety of repressive government actions. "[D]ifferent people rely on it and use it in different ways." *Am. Sec. Council Ed. Found. v. F.C.C.*, 607 F.2d 438, 456 (D.C. Cir. 1979) (Wright, J., concurring). As with the Pentagon Papers, "the Government usually suppresses damaging news but highlights favorable news." *Gravel v. United States*, 408 U.S. 606, 641-42 (1972) (Douglas, J., dissenting). In support of such efforts, "the secrecy stamp is the officials' tool of suppression … used to withhold information which in '99 1/2%' of the cases would present no danger to national security." *Id.* at 642. Neither the Constitution's text nor the Supreme Court's caselaw nor invoking national security concerns supports insulating such a decision from constitutional scrutiny. Accepting the government's argument would allow any administration on either side of the aisle to punish the press for failing to toe the proverbial party line, whatever it might be at that time, simply by invoking national security interests. As Chief Justice John Roberts oft reminds, "judges are not required to exhibit a naïveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

## SUMMARY OF ARGUMENT

The First Amendment establishes that "Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. amend. I. Its prohibitions "appl[y] equally to executive actions." *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1140 (D.C. Cir. 2023); *see also Pell v. Procunier*, 417 U.S. 817, 834 (1974) ("The First and Fourteenth Amendments bar government from interfering in any way with a free press."). The Framers adopted those protections because they recognized that an informed citizenry is a prerequisite for an open, well-functioning democratic society. Accordingly, as the history of the Free Press Clause demonstrates, the Clause protects the press and constrains the political branches if and when they overstep. Placing particular government decisions categorically beyond constitutional question would

violate that history and intent, particularly when those decisions are intended to (and do) retaliate against particular viewpoints.

Over the last century, the Supreme Court's jurisprudence has reaffirmed the critical role the press plays in American society and protected the press's ability to perform its role effectively. Where the rubber really hits the constitutional road, though, is where the government defends its proposed restrictions on national security grounds. But here too, federal courts at every level have routinely rejected the notion that the government can foreclose the exercise of First Amendment rights through the rote invocation of "national security." As those courts have recognized, the concept of "national security" is "so vague," *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 314 (1972), that unconditional deference to its invocation would endanger the democratic experiment. *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 53–54 (2d Cir. 2002).

For half a century, the White House itself has extended press credentials to reporters across American journalism under standards that turned on professional *bona fides*, not viewpoint. *See Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977). The government now not only abandons that practice but argues that its decision to exclude disfavored outlets is effectively unreviewable—because access is a privilege beyond the First Amendment's reach, because it may permissibly consider viewpoint as a gatekeeper, and because the government has claimed national security warrants the wholesale exclusion of those journalists who say something it does not like.

## ARGUMENT

### AN UNREVIEWABLE MECHANISM TO DISFAVOR OR RETALIATE AGAINST PARTICULAR VIEWPOINTS IN THE PRESS IS IRRECONCILABLE WITH THE FIRST AMENDMENT

Under settled law, the First Amendment and in particular the Free Press Clause prohibit the government from retaliating against particular viewpoints in the press. The government,

however, takes the remarkable position that its restrictions on press access cannot constitute retaliation or viewpoint discrimination actionable under the First Amendment— whether because the restriction is written in general terms, as it argues in the pending Pentagon appeals, or because access to the White House is a privilege the President may grant and withdraw with regard to viewpoint, as it argues here. That is dangerously wrong. To adopt the government's position would give it carte blanche to punish those who engage in unwelcome reporting, shield those who wish to be immune from public criticism, and immunize them from any inquiry into the motives behind a particular decision to preclude the press from playing its constitutionally appointed role. That is an invitation to unconstitutional mischief.

Nor do the alleged national security concerns warrant adopting the government's position—as courts have repeatedly recognized, if the government can cut short constitutional inquiry any time it chooses to invoke national security, it can effectively cut off press access when and where it may be needed most.

## I. The First Amendment Constrains the Government from Disfavoring or Retaliating Against Particular Viewpoints in the Press, Whatever Means the Government Adopts to Do So

The First Amendment, and in particular the Free Press Clause, ensure that the American people can get the information they choose, rather than the information the government would choose for them. Or, as James Madison, the First Amendment's principal architect, put it later: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 *The Writings of James Madison* 103 (Gaillard Hunt ed., 1910).

The press thus appears in the Constitution by name as "an acknowledgment of the critical role played by the press in American society." *Houchins v. KQED, Inc.*, 438 U.S. 1, 17 (1978) (Stewart, J., concurring). Indeed, the Continental Congress dubbed "freedom of the press" as one

of the "five great rights." *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 716–19 (1931). And ultimately, the First Amendment's Press Clause was ratified to give the press the protection required "to fulfill its essential role in our democracy" as "'one of the great bulwarks of liberty.'" *New York Times Co. v. United States* ("*NYT*"), 403 U.S. 713, 716 (1971) (per curiam) (Black, J., concurring) (quoting Madison's version of the speech and press clauses, introduced in the House of Representatives on June 8, 1789).

The Founders conceived of the "liberty" of the press as "a freedom in canvassing the merits and measures of public men of every description," *Near*, 283 U.S. at 718, and "of free communication among the people thereon," *New York Times Co. v. Sullivan*, 376 U.S. 254, 274 (1964) (quoting the Virginia Resolutions of 1798). Recognizing the critical importance of those freedoms, they upended the British system, abolishing the government's power to censor the press so that the press instead could censure the government. *See Sullivan*, 376 U.S. at 275 ("the censorial power is in the people over the Government, and not in the Government over the people") (quoting 4 *Annals of Cong.* 934 (1794)).

As the Supreme Court has recognized, "the right of free public discussion of the stewardship of public officials … was a fundamental principle of the American form of government." *Id.* The health of the United States as a democracy depends on a vigorous, independent press: just as "the right of electing the members of the government constitutes more particularly the essence of a free and responsible government," "[t]he value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and

demerits of the candidates respectively.'" *Id.* at 275 n.15 (quoting 4 *Elliot's Debates on the Federal Constitution*, 575 (1876)).[4]

True, for its first 150 years, the Court did not have occasion to opine on the Free Press Clause. But that was not because the Court deemed the Clause unimportant, but because of "almost an entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers." *Near*, 283 U.S. at 718. Over the last century, however, when the issue did arise, the Supreme Court affirmed time and again "the critical role played by the press in American society" and the "sensitivity" to the "special needs of the press in performing [its role] effectively" that the Constitution affirmatively protects. *Houchins*, 438 U.S. at 17 (Stewart, J., concurring).

That precedent reflects the founding principle that "a free press is a condition of a free society." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). Thus, in *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936), the Supreme Court struck down a state license tax on popular newspaper publications because the "predominant purpose" of the First Amendment's Free Press Clause is "to preserve an untrammeled press as a vital source of public information":

> The newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern. … A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves.

---

[4]The structural character of the guarantee is a settled theme of the scholarship. *See* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) (the First Amendment as a populist guarantee running to the people's capacity to monitor their agents); Charles L. Black, Jr., *Structure and Relationship in Constitutional Law* (1969) (constitutional meaning derives from the structures the document creates, not from clauses read in isolation).

*Id.* at 250. Similarly, in *Pell v. Procunier*, 417 U.S. 817 (1974), the Court reiterated that the constitutional guarantee of a free press "assures the maintenance of our political system and an open society, and secures the paramount public interest in a free flow of information to the people concerning public officials." *Id.* at 832 (citations omitted). And in *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975), the Court recognized that the press in particular is indispensable to an informed citizenry and an "open society":

> [I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. … Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally.

*Id.* at 491–92.

In such a constitutional system, the press plays a critical role as an indispensable means to a core, constitutional end: "keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills*, 384 U.S. at 219; *Richmond Newspapers*, 448 U.S. at 573.

To facilitate that "profound national commitment" to protecting the free discussion of governmental affairs, *Sullivan*, 376 U.S. at 270, the First Amendment thus protects the press's "special needs," including its rights to: (i) gather news, because "without some protection for seeking out the news, freedom of the press could be eviscerated," *Branzburg*, 408 U.S. at 681; *see also Richmond Newspapers*, 448 U.S. at 576–77 (same); (ii) "seek news from any source by means within the law," including "the use of confidential sources," *Branzburg*, 408 U.S. at 681–82; *see also Pell*, 417 U.S. at 834 ("a journalist is free to seek out sources of information not available to members of the general public"); (iii) "receive information and ideas," *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972); (iv) be protected from the government "disrupt[ing] a reporter's

relationship with his news sources … [with] no justification," *Branzburg*, 408 U.S. at 707–08; (v) be protected from the government "limiting the stock of information from which members of the public [or press] may draw," *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978); *see also Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) (applying the "interest in protecting the stock of public information" to the press); and (vi) receive protection from prior judicial restraints, *NYT*, 403 U.S. 713.

Whether in the Pentagon or at the White House, journalists serve as surrogates for American citizens. *Richmond Newspapers*, 448 U.S. at 573. As such, the First Amendment prevents the government from choosing journalists to favor (or disfavor) based on their viewpoints.

## II. This Court Should Reject the Argument That Courts Cannot Consider Whether Retaliation Is Actionable Under the First Amendment

In the pending Pentagon appeals, the government contends that the First Amendment provides no basis to invalidate a rule restricting press access even if the rule were adopted to retaliate against the press or discriminate against a particular viewpoint, so long as it is facially neutral and evenly applied. *NYT* Appeal Br. 26. Here, the government cuts to the chase, contending that the White House's press restrictions are not subject to *any* constitutional scrutiny even if implemented as retaliation for adopting certain viewpoints. Defs.' Opp'n 2. As demonstrated, though, the history and purpose of the Free Press Clause do not tolerate giving the government a ready-made mechanism for engaging in retaliation, and certainly not one that is unreviewable. It may not be an insubstantial burden for a challenger to show that a particular policy was in fact unconstitutionally retaliatory or viewpoint-discriminatory. It is not, however, an insuperable one.

Take the retaliation analysis: To succeed on a First Amendment retaliation claim, a plaintiff must demonstrate that it engaged in protected activity, that the government took "retaliatory action sufficient to deter a person of ordinary firmness in [plaintiff's] position from speaking," and that

there is a "causal link" between the protected activity and the adverse action. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (citation omitted). The government, however, takes the extraordinary position that a prospective and generally applicable rule can never constitute adverse action against the target of retaliation, no matter how clear the motive or how serious the burdens. *NYT* Appeal Br. 26. But as Judge Garcia noted in dissenting from the decision staying the district court's injunction in the Pentagon escort-requirement case, the adverse-action inquiry poses a relatively low bar. *Cf. Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) ("the First Amendment protects ... from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee'" (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990))). All it is intended to do is to screen out claims based on government actions so minor they would not "inhibit an ordinary person from speaking." *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002). As Judge Garcia noted, "if threatening to impose a requirement like the escort requirement on one journalist would (as the district court found) sufficiently chill his speech, it makes little sense to suggest that effect evaporates if the government threatens to impose the same requirement on all reporters. Indeed, the chilling effect on a speaker with any regard for his peers may be amplified." *New York Times Co. v. U.S. Dep't of Def.*, No. 26-5253, 2026 WL 2168070, at *3 (D.C. Cir. July 16, 2026) (Garcia, J., dissenting).

So too more generally for broader questions of viewpoint discrimination. The constitutional free pass the government requests would enable viewpoint discrimination by any administration whether it believes that the mainstream media is the enemy, or wants to shut down grassroots voices to control the narrative. "When the State singles out the press," it "undercut[s] the basic assumption of our political system that the press will often serve as an important restraint on government." *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 585

(1983); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573 (2011) (laws that target "a narrow class of disfavored speakers" frequently run afoul of the First Amendment). And denying access can become a tool in the hands of whatever administration holds power to disfavor probing inquiry by journalists, suppressing journalism that might challenge government officials, and preventing the public from understanding what their government is doing.

Once the government "has opened a limited forum," it "must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). For example, in 1966 the Secret Service denied a White House press pass to Robert Sherrill, the Washington correspondent of The Nation, on grounds of national security (grounds it declined to explain). *Sherrill*, 569 F.2d at 129. When the issue reached the D.C. Circuit, that court held that where the White House had "voluntarily decided to establish press facilities for correspondents who need to report therefrom," access could "not be denied arbitrarily or for less than compelling reasons" without violating the First Amendment. *Id.* In so holding, the court explained that "[n]ot only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Id.* at 129–30; *see also Nation Mag. v. U.S. Dep't of Def.*, 762 F. Supp. 1558, 1573 (S.D.N.Y. 1991) (where "the government chose to grant some access to the press for purposes of covering military activities in the Persian Gulf," the government "created a place for expressive activity" and "in essence, determined that the war theatre was a limited public forum" such that "the government is under an obligation to insure that access not be denied arbitrarily or for less than compelling reasons"); *cf. Ateba v. Leavitt*, 133 F.4th 114, 125 (D.C. Cir. 2025) ("the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable"). The government's

chief answer to a half-century of that settled law is that *Sherrill* "was wrongly decided" and should be overruled. Defs.' Opp'n 7, 12.

Even justifications that are facially reasonable and viewpoint-neutral "will not save a regulation that is in reality a facade for viewpoint-based discrimination," because such justifications "cannot save an exclusion that is, in fact, based on the desire to suppress a particular point of view." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811–12 (1985); *see also Richmond Newspapers*, 448 U.S. at 589 (Brennan, J., concurring) (under the First Amendment, "a tradition of accessibility implies the favorable judgment of experience"). To hold that a decision is beyond constitutional question because it is cast as facially neutral—or as the withdrawal of a mere privilege—would do just that.

Such an arbitrary rule would not expire with this policy or this administration. It would lie ready at hand for every administration to come, of every political persuasion, in controversies no one can now foresee. The Supreme Court has warned against precisely that danger: "The vice of content-based legislation … is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes." *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 743 (2000) (Scalia, J., dissenting)). Indeed, even "[i]nnocent motives do not eliminate the danger of censorship," because "future government officials may one day wield such statutes to suppress disfavored speech." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 167 (2015).

## III. Invoking National Security Does Not Insulate The Government's Decisions Excluding The Media From First Amendment Scrutiny

Our Constitution is "intended to endure for ages to come." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819). Present-day exigencies cannot circumvent fundamental constitutional guarantees because "[t]he laws and the Constitution are designed to survive, and remain in force, in extraordinary times." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008); *see also*

*Dennis v. United States*, 341 U.S. 494, 520 (1951) (Frankfurter, J., concurring) (The First Amendment " exacts obedience even during periods of war; it is applicable when war clouds are not figments of the imagination no less than when they are.").

At times, the First Amendment's "imperative of a free and unfettered press" collides with the effective exercise of certain "powers of the Executive." *NYT*, 403 U.S. at 748. In the Pentagon appeals, the government presents that "collision," *id.*, as one between "jeopardizing national security" and "First Amendment injury." *NYT* Appeal Br. 11, 20. Here too, it claims a "compelling" national security interest and urges that courts should "not lightly override" the Executive's judgments on such matters. Defs.' Opp'n 9–11, 14–16. But both the case law and the Constitution are clear: the First Amendment interest in informed popular debate does not vanish any time the government invokes national security interests. *See Boumediene*, 553 U.S. at 798 ("Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law."). In fact, liberty and security have not historically been at irreconcilable odds under the government's own historical practice; decades of comparatively liberal press access at the Pentagon and in the White House press room alike belie the government's contention that the former must categorically give way to the latter.

The Framers of the First Amendment, fully aware of both the need to defend a new nation and the abuses of the English and colonial governments, "sought to give this new society strength and security by providing that freedom of speech, press, religion, and assembly should not be abridged." *NYT*, 403 U.S. at 719 (Black, J., concurring); *see also Grosjean*, 297 U.S. at 245–51 (discussing the history of the British government's "persistent effort" to "prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government"). Jefferson, in a 1787 letter to

Madison, asked "'whether peace is best preserved by giving energy to the government, or information to the people,' and then answered, 'This last is the most certain, and the most legitimate engine of government.'" *Gravel*, 408 U.S. at 641 (Douglas, J., dissenting) (quoting 6 *Writings of Thomas Jefferson* 392 (Memorial ed. 1903)).

The men who wrote the Free Press Clause were not innocents in matters of national security. They had won independence from the world's preeminent military power and had no assurance of keeping it; they governed a republic that European empires bordered on three sides; they knew espionage, sedition, and the fragility of a new state as facts of daily governance, not remote abstractions. *See* Akhil Reed Amar, *The Words That Made Us: America's Constitutional Conversation, 1760–1840*, at 111–32, 140–44 (2021); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring) ("the forefathers … knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation"). Writing in that world, they might have qualified the press's freedom and reserved to the government some power over publication in times of danger, as every government they had ever known had claimed. They wrote instead a guarantee without proviso. The proposition the government advances—that the press's freedom bends to the government's bare assertion of present danger—has thus been squarely rejected by the generation with the strongest claim to make it and the most to lose by making it wrongly.

Both the Supreme Court and the D.C. Circuit have refused to find that the government can "foreclose the exercise of constitutional rights by mere labels." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963). As the D.C. Circuit has identified, "[t]he term 'national security' is inherently vague." *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983) (collecting cases); *see also Halperin v. Kissinger*, 606 F.2d 1192, 1200 (D.C. Cir. 1979) (same).

Similarly, in *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297 (1972), the Supreme Court held that "the danger" to the First Amendment is "acute" where the government "attempts to act under so vague a concept as the power to protect 'domestic security' … given the difficulty of defining the domestic security interest." *Id.* at 314; *see also*, *e.g.*, *United States v. Robel*, 389 U.S. 258, 263–64 (1967) (explaining that "the phrase 'war power' cannot be invoked as a talismanic incantation to support any exercise of congressional power which can be brought within its ambit" because "even the war power does not remove constitutional limitations safeguarding essential liberties"); *Sherrill*, 569 F.2d at 130 ("the phrase 'reasons of security' is unnecessarily vague and subject to ambiguous interpretation"). The government's invocation of national security cannot shield its decisions from First Amendment scrutiny.

Indeed, courts have recognized that the opposite is true. Invocations of national security concerns warrant skepticism, lest the government be able to create a First Amendment-free zone at will:

> There seems to be no limit to the Government's argument. The Government could use its "[security] intelligence" argument as a justification to close any public hearing completely and categorically. … The Government could operate in virtual secrecy in all matters dealing, even remotely, with "national security," resulting in a wholesale suspension of First Amendment rights. By the simple assertion of "national security," the Government seeks a process where it may, without review, designate certain classes of cases as "special interest cases" and, behind closed doors, adjudicate the merits of these cases. … This, we simply may not countenance. A government operating in the shadow of secrecy stands in complete opposition to the society envisioned by the Framers of our Constitution.

*Detroit Free Press v. Ashcroft*, 303 F.3d 681, 709–10 (6th Cir. 2002).[5] Accordingly, "[n]o matter how tempting it might be to do otherwise, we must apply the same rigorous standards even where

---

[5]*See also Brown v. Glines*, 444 U.S. 348, 369 (1980) (Brennan, J., dissenting) ("Because they invariably have the visage of overriding importance, there is always a temptation to invoke security 'necessities' to justify an encroachment upon civil liberties. For that reason, the military-security argument must be approached with a healthy skepticism: its very gravity counsels that courts be cautious when military necessity is invoked by the Government to justify a trespass on First

national security is at stake. We have learned from experience that it is often where the asserted interest appears most compelling that we must be most vigilant in protecting constitutional rights." *Hassan v. City of New York*, 804 F.3d 277, 306–07 (3d Cir. 2015); *Tobey v. Jones*, 706 F.3d 379, 393 (4th Cir. 2013) ("And while it is tempting to hold that First Amendment rights should acquiesce to national security … , our Forefather Benjamin Franklin warned against such a temptation by opining that those 'who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety.'"); *In re Washington Post Co.*, 807 F.2d 383, 391 (4th Cir. 1986) ("History teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions."); *Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 514 (5th Cir. 1981) ("The concept of 'security risks' takes on special significance in First Amendment context.").

In sum, the government cannot "bend[] constitutional principles" merely because an interest in national security is invoked. *Hassan*, 804 F.3d at 307 (citation omitted). To the contrary, even "the country's interest in national security must [at times] bend to the dictates of the First Amendment." *Worrell Newspapers of Indiana, Inc. v. Westhafer*, 739 F.2d 1219, 1223 (7th Cir. 1984).

Thus, in *United States v. Robel*, 389 U.S. 258 (1967), the Supreme Court invalidated a Cold War-era statute barring members of the Communist Party from working at a shipyard after the Secretary of Defense had designated it a "defense facility." The government claimed that statute was "an expression of the growing concern shown by the executive and legislative branches of government over the risks of internal subversion" by Communists in facilities "on which the

---

Amendment rights."); *Halperin*, 606 F.2d at 1200–01 ("The Court has not denied the reality of dangers from foreign or internal conflicts. Rather, it has recognized the need to respect constitutional requirements even in troubled times.").

national defense depends." *Id.* at 264 (citations omitted). Although the Supreme Court acknowledged that "[t]he Government's interest in such a prophylactic measure is not insubstantial," it held that the means chosen to implement that governmental purpose "cut deeply"—too deeply—into "the exercise of First Amendment rights." *Id.*

The Court explained that the "concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal." *Id.* ("Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart."). The Court went on, "[f]or almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties … which makes the defense of the Nation worthwhile." *Id.* Under *Robel*, even a "legitimate and substantial" governmental purpose cannot be pursued by means that "broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Aptheker v. Sec'y of State*, 378 U.S. 500, 508 (1964) (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

Similarly, in *New York Times Co. v. United States*, 403 U.S. 713 (1971), the United States famously sought to enjoin newspapers from publishing the contents of the Pentagon Papers, a classified historical study on Vietnam policy that revealed that the government had systematically lied to the public and Congress about the scope and prospects of the Vietnam War. The Supreme Court rejected the prior restraint, holding that the government had not met its heavy burden of justifying such an extraordinary imposition on constitutional rights. In his concurrence, Justice Black expressly rejected the government's national security rationale: "The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law

embodied in the First Amendment. The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic." *NYT*, 403 U.S. at 719 (Black, J., concurring); *see also id.* at 718 (rejecting "the bold and dangerously far-reaching contention that the courts should take it upon themselves to 'make' a law abridging freedom of the press in the name of equity, presidential power and national security, even when the representatives of the people in Congress have adhered to the command of the First Amendment and refused to make such a law"); *id.* at 724 ("Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors. Open debate and discussion of public issues are vital to our national health.") (Douglas, J., concurring).

The tension between national security and the freedom of the press "is not going to abate"; rather, "the question is how a responsible balance may be achieved." *United States v. Morison*, 844 F.2d 1057, 1081 (4th Cir. 1988) (Wilkinson, J., concurring); *see also United States v. Sterling*, 732 F.3d 292, 294 (4th Cir. 2013) ("[G]overnment at all levels, must meet its obligation to provide [the press] with the fullest possible information outside the narrowest limits of national security." (quoting President John F. Kennedy, The President and the Press, Address before the American Newspaper Publishers Association (April 27, 1961))). As the Fourth Circuit recognized in *Morison*, "[p]ublic security can … be compromised in two ways: by attempts to choke off the information needed for democracy to function, and by leaks that imperil the environment of physical security which a functioning democracy requires." 844 F.2d at 1081 ("National security is public security, not government security from informed criticism."). The government's proposed approach is the embodiment of the problem, not the answer to it.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: September 29, 2026

Respectfully submitted,

/s/ Deborah B. Baum
Deborah B. Baum (D.C. Bar No. 393019)
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Tel.: (202) 663-8000
deborah.baum@pillsburylaw.com

Todd Kim (D.C. Bar No. 501200)
(application for admission to this Court pending)
Ya'ara Barnoon (D.C. Bar No. 1023972)
(*pro hac vice* forthcoming)
Anne M. Voigts (*pro hac vice* forthcoming)
Alexandra Elenowitz-Hess

Counsel for *Amicus Curiae* the Society for the Rule of Law

**CERTIFICATE OF COMPLIANCE**

This amicus curiae brief complies with the type-volume limit of Local Civil Rule 7(o)(4) because it is 25 or fewer pages.

This amicus curiae brief complies with the typeface and type-style requirements of Local Civil Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font, double-spaced.

Dated: September 29, 2026

/s/ Deborah B. Baum
Deborah B. Baum

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2026, I caused the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all counsel of record, who are registered CM/ECF users.

/s/ Deborah B. Baum
Deborah B. Baum