**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC., et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants*.

Civil Action No. 1:26-cv-3287

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

LEGAL STANDARD ..... 7

ARGUMENT ..... 7

I. Plaintiffs Are Unlikely To Succeed On The Merits Of Their Claims ..... 7

A. Plaintiffs Are Unlikely To Succeed On Their Viewpoint Discrimination Claim ..... 7

1. The Government has a compelling interest in awarding hard passes to journalists satisfying minimum standards of professionalism ..... 11

2. The Government has a compelling interest in national security ..... 12

B. Plaintiffs Are Unlikely To Prevail On Their Retaliation Theory ..... 13

C. Plaintiffs Are Unlikely To Prevail On Their Due Process Claim ..... 15

II. Plaintiffs Cannot Show They Will Suffer Irreparable Harm ..... 18

III. The Public Interest And Balance Of The Equities Favor The Government ..... 19

IV. Any Remedy Should Be Narrowly Limited And Stayed Pending Any Appeal Authorized ..... 23

CONCLUSION ..... 24

CERTIFICATE OF SERVICE ..... 26

# TABLE OF AUTHORITIES

**Cases**

*Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024) ........ 18

*Anthropic PBC v. U.S. Dep't of War*,
No. 26-1049, 2026 WL 1042493 (D.C. Cir. Apr. 8, 2026) ........ 19, 20

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ........ 13

*Associated Press v. Budowich*,
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ........ *passim*

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) ........ 4, 8, 11

*Atkins v. Parker*,
472 U.S. 115 (1985) ........ 17

*Balt. Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) ........ *passim*

*Banks v. York*,
515 F. Supp. 2d 89 (D.D.C. 2007) ........ 13

*Boddie v. Connecticut*,
401 U.S. 371 (1971) ........ 17

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ........ 23

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ........ 8, 15

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*,
331 F.3d 918 (D.C. Cir. 2003) ........ 20

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ........ 12, 16, 17, 20

*Eaton v. Meneley*,
379 F.3d 949 (10th Cir. 2004) ........ 18

*Haig v. Agee*,
453 U.S. 280 (1981) ........ 20

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ........ 8

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ........ 4, 11, 16, 17

*Mahoney v. U.S. Capitol Police Bd.*,
is misplaced. No. 24-5207, 2026 WL 2836881 (D.C. Cir. Sept. 22, 2026) ........ 9, 10

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ........ 7

*Morrissey v. Brewer*,
408 U.S. 471 (1972) ........ 17

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ........ 14

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*,
No. 26A203, 2026 WL 2564318 (U.S. Aug. 31, 2026) ........ 12

*New York Times Co. v. U.S. Dep't of Def.*,
No. 26-5113, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) ........ 20

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 7, 24

*Pell v. Procunier*,
417 U.S. 817 (1974) ........ 16

*Reed v. Goertz*,
598 U.S. 230 (2023) ........ 15

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ........ 19

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) ........ *passim*

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) ........ 14

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........ 20

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936) ........ 20

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ........ 10

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 7

*Zemel v. Rusk*,
381 U.S. 1 (1965) ........ 7, 16

*Zevallos v. Obama*,
793 F.3d 106 (D.C. Cir. 2015) ........ 17

**Statutes**

3 U.S.C. § 102 ........ 3

18 U.S.C. § 798 ........ 17

**Other Authorities**

Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* (1982) ........ 3, 4

Harold Holzer, *The Presidents v. The Press: The Endless Battle Between the White House and the Media – from the Founding Fathers to Fake News* (2020) ........ 3

Kathleen Dalton, *Theodore Roosevelt: A Strenuous Life* (2002) ........ 3, 4

## INTRODUCTION

The White House is the home and workplace for the Nation's Commander-in-Chief. Plaintiffs CNN, MSNOW, and Politico have long been granted privileged access to White House grounds. But the President concluded that they have failed to maintain basic minimum "standards of professionalism and decorum expected of those given access to the White House Complex, including" by "publishing sensitive or classified information." ECF No. 16-1 Letter to CNN; ECF No. 16-2 Letter to MSNOW; ECF No. 16-3 Letter to Politico ("Letters"). In response, the President preliminarily revoked their continued access to White House grounds and provided Plaintiffs the opportunity to respond by end of business Friday, September 25, 2026. Letters at 1. Plaintiffs declined to submit any response, request any extension, or otherwise defend their conduct. Accordingly, at 5:00pm last Friday, the President's preliminary decision to revoke Plaintiffs' continued access to the White House, though temporarily enjoined from continuing in effect, became final. After all, access to the White House is a privilege—not a right.

Following this Court's issuance of a temporary restraining order, Plaintiffs now ask this Court to preliminarily enjoin the President to provide them further and expanded access to the White House complex, contrary to his personal judgment. But Plaintiffs are unlikely to succeed on the merits of all three theories they advance.

First, the President's actions are lawful under the First Amendment. While the D.C. Circuit has held that some areas of the White House grounds constitute a nonpublic forum, *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), that decision is wrong and should be overruled. But even under *Sherrill*, the President's actions must be sustained because the President has "compelling governmental interest[s]" in enforcing minimum standards for bona fide journalists and safeguarding national security information.

At the very least, the Government may control reporters' access to restricted presidential areas, such as the Oval Office, even for viewpoint-discriminatory reasons. *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ("*AP*"). That distinction is particularly relevant, because here—unlike in their temporary restraining order papers—Plaintiffs seek more than just their hard-passes: they demand full access to all areas of the White House, including those that under *AP* the D.C. Circuit has held that the President may consider viewpoint in addressing. There is no basis for an expansion of this Court's previous order, particularly one that would conflict with an on-point D.C. Circuit panel decision.

Second, the President's actions were not retaliatory because the mere denial of special access is not an adverse action that would objectively chill a reasonable reporter, as the Fourth Circuit has squarely held, *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), and because the Government would have taken the same action anyway, notwithstanding Plaintiffs' speech criticizing the President. Indeed, the President has not revoked access to other outlets that have equally criticized the President.

Third, Plaintiffs are unlikely to prevail on their due process claims because, even if they have a constitutional right to access the White House, they have received adequate notice of the relevant conduct before-hand and have now had the opportunity of post-deprivation process, including the chance to contest the President's factual findings. They have declined to participate in that process and forfeit any argument that they need additional time to justify their conduct. On the remaining factors, Plaintiffs cannot make the requisite showing of irreparable harm and both the public interest and balance of the equities favor the Government.

The Court should therefore deny Plaintiffs' motion for a preliminary injunction.

**BACKGROUND**

The White House is the official residence and workplace of the President. 3 U.S.C. § 102. Presidents have had a relationship with the press since the beginning. They have long decided which journalists should receive privileged access, which has varied substantially from administration to administration. For example, President Washington hand-picked which reporters would print his Farewell Address based on political considerations. *See* Harold Holzer, *The Presidents vs. The Press: The Endless Battle Between the White House and the Media—from the Founding Fathers to Fake News* 16 (2020) (explaining that President Washington selected a paper "never stained with the ribaldry and violence of party recriminations" (quotation marks omitted)). President Jefferson "encouraged the establishment of a new gazette ... that would remain reliably favorable to his administration"; its "reward would be first access to official news." *Id*. at 39.

In the early Twentieth Century, President Theodore Roosevelt began a practice of regularly inviting reporters into the Oval Office for off-the-record press conferences while he received his "regular midday shave." *Id.* at 93. He "picked and chose those he would allow to attend these sessions; he used the conference as an occasion for reward and punishment, screening out the reporters who were the least likely to be sympathetic to his policies." Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* 3 (1982). Indeed, President Roosevelt warned reporters that if they were to "violate a confidence or publish news that the President thought ought not to be published," then "he should be punished by having legitimate news withheld from him." Holzer, *supra*, at 100 (quotation marks omitted). As another historian recounts, "He expected confidential interviews to remain secret," and "[r]eporters who betrayed his trust were banished by the President to the Ananias Club, named after the biblical liar." Kathleen Dalton, *Theodore Roosevelt: A Strenuous Life* 212 (2002). "Once consigned to the

Ananias Club a reporter could no longer obtain White House news in person." *Id.* To take another example, "when Jesse Carmichael of the *Boston Herald* printed a story about the Roosevelt children chasing a Thanksgiving turkey all over the White House lawn and grabbing its feathers," President Roosevelt "banned the reporter and his newspaper from the White House." *Id.*

Decades later, President Kennedy sought to "court star correspondents" and thus gave certain reporters "special access" and "advance notice of administration announcements." Holzer, *supra*, at 213. President Johnson "tried to use personal interviews as a means of reward and punishment." Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* 18 (1982). Courts in this district have elsewhere summarized the comparatively recent history of press access, including hard passes, in notable cases: *AP*, 2025 WL 1649265, at *1-*3; *Ateba v. Leavitt*, 133 F.4th 114, 117-119 (D.C. Cir. 2025); *Karem v. Trump*, 960 F.3d 656, 660-61 (D.C. Cir. 2020); *Sherrill*, 569 F.2d at 126-27. A "hard pass" is "a special press credential" that the "White House issues" to certain reporters. *Ateba*, 133 F.4th at 116. It "allows its bearer to use an expedited security line and to enter the Press Area without an escort." *Id.* at 117. This is distinct from a "day pass," which the White House has historically provided to other journalists, who "must wait for an escort to take them from the White House gate to the Press Area[.]" *Id.*

Against this background, on Friday, September 18, the President issued a statement:

> I am proud to announce that, effective immediately, I am banning Fake News CNN, MSNOW (who recently changed their name from MSNBC due to lack of viewership and credibility!), and Politico (The recipients of an illegal and ridiculous $8 Million Dollar subscription, an All Time Record, directly from the United States Government, under Crooked Joe Biden, in order to keep them "alive." Seems like corruption to me!), from the White House as a result of their constant "reporting" FAKE NEWS! Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America. Other Fake News Media

> Outlets to follow. Thank you for your attention to this matter! President DONALD J. TRUMP

Compl. ¶ 37. On Monday, September 21, 2026, the President further explained that:

> The White House is not instituting an assault on the Free Press, something which I cherish. It is instituting an assault on the FAKE NEWS, something that has grown like Cancer in our beloved United States of America. It is corrupt, purposeful, pervasive, fully coordinated, and totally out of control. It is a threat to our National Security, and must be stopped, NOW! Thank you for your attention to this matter. President DONALD J. TRUMP

ECF No. 15-1 at 2. Later that day, Plaintiffs filed suit. Compl. In response, the President released another statement explaining, in part:

> Fake News people and publications that only write negatively, and who violate our National Security by writing false and defamatory stories with unknown "sources," shouldn't be allowed access to the most important Office anywhere in the World. It is called the Oval Office, and it should be treated with Decorum, Respect, and Dignity, not defiled by Third Rate Clowns, who purposefully distort, twist, and degrade with everything they write or publish. Virtually every story about me, or anything having to do with me, is negative, wrong and, in many cases, DANGEROUS for our Country!

ECF No. 15-2 at 2. On September 22, 2026, the White House issued letters to Plaintiffs providing "notice that the President has made the determination to revoke hard passes for members of your organization." Letters at 1. These letters explained that Plaintiffs "exhibited behavior in violation of the standards of professionalism and decorum expected of those given access to the White House Complex, including by trafficking in verifiable falsehoods about national security and other issues, and publishing sensitive or classified information." Letters at 1. Yet "[h]ard pass credentials are reserved for those who abide by standards of professional conduct, demonstrate a level of trustworthiness commensurate with the privilege of unfettered access to the White House Complex, and perform their duties in a way that does not interfere with the White House's daily operations." Letters at 1.

The letters also set out the factual basis for this preliminary decision. Each letter identified with specificity a "non-exhaustive list of reporting incidents, including those that have threatened national security and spread falsehoods." Letters at 1. For example, "CNN disclosed 'top-secret' construction details related to the East Wing bunker[.]" ECF No. 16-1 at 1; Wilson Decl. ¶ 22. "MS NOW reported on an alleged leak investigation," which, "if it existed, would be nonpublic sensitive law enforcement information." ECF No. 16-2 at 1; Wilson Decl. ¶ 24. "Politico published a document detailing funding for the White House ballroom containing intricate descriptions of how the Secret Service would invest in security improvements." ECF No. 16-3 at 1; Wilson Decl. ¶ 23. The letters elaborated that the "[p]ublication of sensitive security information, and misinformation about national security information, diverts White House resources and those of the national security team in particular, which must evaluate whether the leaked information is classified, the source of any leak, and the security implications of any such disclosure." Letters at 1-2. In the President's view, "[t]he spread of misinformation, especially relating to national security, is a threat that undermines the President's ability to safeguard the national security." Letters at 1-2.

The President gave each Plaintiff the opportunity "to contest this initial decision or the factual basis set forth" in each letter. Letters at 2. Plaintiffs could submit any response by 5:00 pm on Friday, September 25, 2026. Letters at 2. Otherwise, "this initial decision will be final." Letters at 2. The White House indicated it would "consider that response and any other materials you would like to submit." Letters at 2.

On September 24, 2026, this Court entered a temporary restraining order, directing the restoration of Plaintiffs' hard passes. ECF No. 24. Defendants complied with the Court's order. ECF No. 28.

At 5:00pm on September 25, 2026, Plaintiffs' deadline to respond to the White House letters lapsed. No Plaintiff chose to respond. Accordingly, the President's decision became final. The President continues to engage the press, including Plaintiffs,[1] but believes they should not have access to White House grounds in light of his national security concerns.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs Are Unlikely To Succeed On The Merits Of Their Claims

Plaintiffs raise a First Amendment viewpoint discrimination claim, a First Amendment retaliation claim, and a Due Process claim. All are unlikely to succeed, because all flow from the mistaken conclusion that there is a special property or legal interest in access to the White House. There is not.

#### A. Plaintiffs Are Unlikely To Succeed On Their Viewpoint Discrimination Claim

The Supreme Court has explained that no one has a right to gain "unauthorized entry into the White House." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Nor does "the First Amendment … mandat[e] a right of access to government information or sources of information within the

[1] *See, e.g.*, Brian Stelter, X (Sept. 22, 2026, 10:00 AM) https://perma.cc/EEZ8-Z9EB

government's control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978). Indeed, the D.C. Circuit just recently explained that the First Amendment does not apply to certain restricted presidential spaces, including the Oval Office and Air Force One. *AP*, 2025 WL 1649265, at *1 (staying preliminary injunction). Other areas of the White House have recently been treated as "a nonpublic forum." *Ateba*, 133 F.4th at 122. The White House may restrict press access to these areas "'as long as the restrictions are' viewpoint neutral and reasonable." *Id.* at 123 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

Several of these cases trace in part back to *Sherrill v. Knight*, which stated that because "White House press facilities hav[e] been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, requires that this access not be denied arbitrarily or for less than compelling reasons." 569 F.2d at 129 (citations omitted). While Defendants acknowledge the D.C. Circuit's decision in *Sherrill*, that case was wrongly decided, and Defendants expressly reserve their right to argue so on appeal.

That is so because access to the White House is a privilege, not a right. In *Sherrill*, the D.C. Circuit emphasized that "[t]hese press facilities [were] perceived as being open to all bona fide Washington-based journalists[.]" *Id.* The reality is much better described by the D.C. Circuit's more recent decision in *AP*. 2025 WL 1649265. There, the court acknowledged that there are more journalists who wish to interview the President than he can accommodate; "[i]n deciding which journalists to speak with, the President may of course take into account their viewpoint." *Id.* at *6; *accord Ehrlich*, 437 F.3d at 413 (upholding State Governor's press directive that "no one in the Executive Department or Agencies" should speak with two named reporters because the "Governor's Press Office feels that currently both are failing to objectively report on any issue

dealing with" that administration). As a result, the court concluded that at least for certain spaces, "the White House may consider journalists' viewpoints when deciding whether to grant access." *AP,* 2025 WL 1649265 at *4. The same logic and standard should apply to access to White House grounds more generally. "Opening" the "White House" to some journalists should not "transform these spaces into nonpublic fora to which access must be granted on a viewpoint neutral basis." *Id.* at *10. Indeed, there is finite space, and so the White House briefing room and West Wing facilities can accommodate only a limited number of reporters. Under the *AP* decision, this counsels against the conclusion that the White House is a nonpublic forum. *See id.* at *9 ("These spaces should not be classified as nonpublic fora because access to them is tightly controlled and highly selective…. When access to government property is very limited, considerations of viewpoint may be permissible.").

Indeed, it is not even clear that the White House press complex is best understood as a "forum" at all. As the D.C. Circuit noted, "[s]ince Roman times, a forum has been emblematic of a space for citizens to participate in public discussion and dialogue, to exchange ideas, and to engage in political debate." *Id.* at *8. But a press conference is not comparable to the Roman Forum; the White House has no obligation to call on reporters, *id.* at *6, or to "engage in political debate." *See id.* at *8. "When a small number of press observe presidential events, they are not using the Oval Office as the location or means of communication"; "when the White House opens events in the Oval Office to a select group of journalists for observational newsgathering, the journalists generally are not speaking with the President or other officials, nor are they engaged in dialogue with each other." *Id.*

For similar reasons, Plaintiffs' reliance on *Mahoney v. U.S. Capitol Police Bd.* is misplaced. No. 24-5207, 2026 WL 2836881 (D.C. Cir. Sept. 22, 2026). There, the D.C. Circuit

recognized that "[s]ome government property is not a forum at all, because it serves purposes incompatible with private communicative activity." *Id.* at *3 n.2. The White House is such a place. *Cf. AP,* 2025 WL 1649265 at *8. At the White House, it is the United States "speaking on its own behalf," and as such, "the First Amendment strictures that attend the various types of government-established forums do not apply." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015). The fact that Plaintiffs witness or "take part in" the "propagation" of the White House's messaging does not "transform the government's role into that of a mere forum-provider." *Id.* at 217. In contrast, in *Mahoney*, the Eastern Steps of the Capitol were used to organize and sponsor protests with the public. 2026 WL 2836881 at *2. Here the White House is not creating a forum for any speaker: it is the only speaker.

In short, there is no principled way of easily distinguishing between rooms that are a nonpublic forum and those that are no forum at all. This is particularly so where, as here, the White House is not obligated to respond to any questions from reporters in the first place. *See id.* at *8 ("The AP's reporting on presidential events through electronic dissemination of news to editors or the public outside the White House is the only communicative activity at issue. But this activity could occur anywhere and therefore lacks the essential connection to the government space required to create even a nonpublic forum."). The reasoning of *AP* should properly control as to all parts of the White House complex. At the very least, *AP* directly controls for the areas at issue there, such as the Oval Office, and thus squarely forecloses Plaintiffs' attempt to expand their requested relief beyond restoration of their hard passes.

Yet even under *Sherrill*, Defendants' decision to deny Plaintiffs continued access to White House grounds complies with the First Amendment because they have at least two "compelling

reasons[,]" 569 F.2d at 129, namely, enforcing minimum standards of professionalism for journalists and protecting classified information. Letters at 1.

**1. The Government has a compelling interest in awarding hard passes to journalists satisfying minimum standards of professionalism**

First, Defendants may lawfully deny access to Plaintiffs because the President has concluded they fail to satisfy the minimum requirements of professionalism. Indeed, the D.C. Circuit has acknowledged that the White House can set standards governing qualifications for journalistic access. *Ateba*, 133 F.4th at 127. Nothing about *Sherrill* is inconsistent with the President's judgment that reporters who publish classified and sensitive information fail to meet the *Sherrill* standard. Nor does *Sherrill* prevent the President from concluding that bona fide journalists would identify sources instead of relying on anonymous sources, commit to factual accuracy, and provide the White House an opportunity to comment, rather than "perform their duties in a way that … interfere[s] with the White House's daily operations." Letters at 1; *cf. Sherrill*, 569 F.2d at 128-130 (five times limiting ruling to "bona fide" journalists"). At a bare minimum, it is a significant violation of decorum to publish classified and sensitive national security information

To be sure, the D.C. Circuit in *Sherrill* and *Karem* has held that advanced notice of prohibited conduct and of the consequences of noncompliance are required before a hard pass can be revoked. 960 F.3d at 667. Defendants submit those holdings should be overruled, but in any event, the White House has satisfied those requirements by providing an explanation of the relevant standards, both generally and with respect to Plaintiffs conduct specifically. Here, the President's letters set out with specificity what is required and how Plaintiffs have failed to adhere to these standards. Letters at 1. The letters identify specific examples of Plaintiffs' conduct that he

determined fell below these standards. Letters at 1-2. The letters also provide Plaintiffs with an opportunity to respond to these concerns and submit materials for the President's reconsideration.

Significantly, Plaintiffs have declined to submit any response to these concerns. They do not defend their conduct. At the very least, the White House has a compelling interest in excluding reporters who fail to meet minimum journalistic standards, have been notified of their failures, and do not contest these determinations.

**2. The Government has a compelling interest in national security**

Second, the President has a compelling interest in protecting national security information. Indeed, the Supreme Court has recognized that the Constitution vests the President with the "authority to classify and control access to information bearing on national security." *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). Ultimately, the responsibility and "authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief." *Id.* at 527.

Here, the President has determined that Plaintiffs have reported classified or sensitive information bearing on national security. Letters at 1-2. Indeed, multiple examples concern reports about the White House complex currently under construction. ECF No. 16-1 at 1; ECF No. 16-3 at 1; *cf. Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*, No. 26A203, 2026 WL 2564318, at *3 (U.S. Aug. 31, 2026) (weighing increased "risk of foreign actors 'gathering intelligence on' the project" (citing JA)). Such reporting directly raises national security concerns. Brown Decl. ¶¶ 11, 15. Indeed, "[t]he release of such information is exactly the type of release that can cause harm to the national security." Wilson Decl. ¶ 22. Furthermore, such reporting incidents also divert resources of national security and other personnel. Brown Decl. ¶ 15. The "[p]ublication of sensitive security information" and even "misinformation about national security information"

requires Defendants to "evaluate whether the leaked information is classified, the source of any leak, and the security implications of any such disclosure." Letters at 1-2; Wilson Decl. ¶¶ 7-8. The President therefore has a compelling interest in excluding from White House grounds organizations that pose such a risk to national security. Brown Decl. ¶ 12; Wilson Decl. ¶ 20. Defendants "believe that the President's determination to revoke credentials for news outlets and reporters that have caused such interference with government functions would be effective in reducing the amount of information that is published that undermines national security." Wilson Decl. ¶ 21. That alone is a compelling interest.

**B. Plaintiffs Are Unlikely To Prevail On Their Retaliation Theory**

The President's actions were not retaliatory because the mere denial of special access is not an adverse action that would objectively chill a reasonable reporter, and because the Government would have taken the same action anyway, notwithstanding Plaintiffs' speech criticizing the President. To properly make out a retaliation claim under the First Amendment, a plaintiff must demonstrate that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)). Here, even granting that Plaintiffs engage in conduct protected by the First Amendment, Plaintiffs cannot satisfy the second or third elements—namely, deterrence and causation.

First, the President's decision to deny special, privileged access to the press pool or to the White House complex would not deter a reasonable reporter. The Fourth Circuit in *Ehrlich* considered an Executive-wide policy prohibiting all those government employees from speaking with two named reporters; the court ultimately "conclude[d] that the adverse impact of such

conduct is objectively *de minimis*." 437 F.3d at 419. Nor did the reporters themselves say they were in any way chilled in their reporting. *Id.* at 419 & n.1. The policy at issue in *Ehrlich* is much stronger medicine than the policy challenged here, which applies only to access to the White House. Nor do Plaintiffs allege that they have been chilled in their speech criticizing the President.

Second, as for causation, the Government can prevail if it can show that it "would have reached the same decision … even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Here, "[t]he record … adequately supports the conclusion" that the Government would have taken the same action based on a neutral "justification alone." *TikTok Inc. v. Garland*, 604 U.S. 56, 79 (2025). The President determined that Plaintiffs have failed to maintain minimum professional journalistic standards by publishing classified and national security information. Letters at 1. This is an adequate, alternative ground to support the Government's actions here. Plaintiffs therefore cannot bear their burden of showing that the Government would not have taken adverse action against them, but-for their protected speech. Moreover, "the adverse impact" of being denied privileged access to government officials "is objectively *de minimis*[,]" as the Fourth Circuit found in *Ehrlich*. 437 F.3d at 419. Again, the policy at issue in *Ehrlich* was far more burdensome than the policy at issue here: that case concerned a ban prohibiting all executive branch employees from talking to the identified reporters. That is far more than what is at issue here, which is simply on-demand access to the White House complex without an escort.

Plaintiffs now argue that Defendants are chilling speech by acting "unpredicatabl[y]" and engaging in "adverse treatment" of Plaintiffs after the temporary restraining order by "denying access to [the] state dinner and interfering with CNN's assigned pool duties." Mot. for PI at 32. But as this Court recognized, "whether the President decides, as you say, to exclude people from

some further sort of smaller part of the White House based on that authority you mentioned, that's a different thing." Hearing Tr. at 22:21-24. *AP* is clear that the President has the discretion to limit reporters, on any grounds—including viewpoint—from other areas of the White House, which includes state dinners and pool responsibilities. *AP*, 2025 WL 1649265, at *1. Significantly, *AP* expressly addressed an outlet's exclusion from "the press pool," which the D.C. Circuit explained "is an historically privileged group of reporters that is at times given access to spaces like the Oval Office." *Id.* at *5. This "selected" group of journalists "may travel with the President aboard Air Force One and attend small press events at the President's home in Mar-a-Lago, usually to observe presidential speeches." *Id.* at *2. AP sued only after the White House "informed the AP that it would not be permitted in the Oval Office or press pool unless it revised its Stylebook to refer to the Gulf of America[.]" *Id.* at *2. Of note, the D.C. Circuit found that while "[r]eporters and photographers within the pool gather news and speak to the public about what they have seen and heard," the press "pool is not an 'instrumentality used for communication'" but rather "simply a mechanism for granting a select group of reporters access" to watch the President convey his preferred message. *Id.* at *5 (quoting *Cornelius*, 473 U.S. at 803). To the extent Plaintiffs now seek access to the press pool, their request is squarely foreclosed by *AP*.

**C. Plaintiffs Are Unlikely To Prevail On Their Due Process Claim**

Plaintiffs are unlikely to succeed on their due process claim, because they lack any constitutionally protected liberty or property interest in accessing the White House and they have received adequate process. "A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). *Sherrill* held that "the interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the first amendment" and "qualifies as liberty which may not be denied without due process of law under

the [F]ifth [A]mendment." 569 F.2d at 130-31; *see also* id. at 131 n.22 (declining to recognize property interest); *Karem*, 960 F.3d at 665. While Defendants acknowledge *Sherrill*'s holding that White House reporters have protectable due process rights in their hard passes, Defendants respectfully submit that *Sherrill* was wrongly decided and expressly reserve their right to argue this on appeal.

In fact, individuals do not have a constitutionally protected liberty interest in access to the White House complex given that the public has no First Amendment right of "entry into the White House," *Zemel*, 381 U.S. at 17, and the Constitution does not "require government to accord the press special access to information not shared by members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834 (1974). Just as "[i]t should be obvious that no one has a 'right' to a security clearance[,]" because "[t]he grant of a clearance requires an affirmative act of discretion on the part of the granting official[,]" *Egan*, 484 U.S. at 528, so does no one have a right to access the White House, which requires an affirmative invitation from the President to access his home.

*Karem* has recognized two due process issues relating to White House hard passes. The first is to have knowledge of the substantive standards and the consequences of violation before a person engages in conduct for which they are punished. 960 F.3d at 666. Here, the President has repeatedly and publicly stated his expectations of the press and criticized Plaintiffs as fake news. *See, e.g.*, White House Press Office, X (Jan. 14, 2026 at 10:31 AM) ("Leaking classified information puts America's national security and the safety of our military heroes in serious jeopardy. President Trump has zero tolerance for it and will continue to aggressively crack down on these illegal acts moving forward.").[2] Furthermore, as regards the publication of national security information, Federal law prohibits "knowingly and willfully … publish[ing] … any

[2] https://perma.cc/QV9F-W2G2

classified information." 18 U.S.C. § 798; *cf. Atkins v. Parker*, 472 U.S. 115, 130 (1985) ("All citizens are presumptively charged with knowledge of the law").

The second requirement is notice and an opportunity to be heard after a specific violation. *Karem*, 960 F.3d at 668. Here Plaintiffs are unlikely to succeed on their due process claim because Defendants have provided Plaintiffs with sufficient post-deprivation process. "Though the Due Process Clause generally requires the Government to afford individuals notice and an opportunity to be heard before depriving them of their property, there are 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)); *cf. Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (explaining that "due process is flexible and calls for such procedural protections as the particular situation demands"). Protecting sensitive information is just such an appropriate justification. *See Egan*, 484 U.S. at 527 (collecting cases); Wilson Decl. ¶¶ 16, 20.

The President has provided notice in writing to all Plaintiffs about the principles of decorum expected and required of reporters who have the privilege to cover the White House. Letters at 1-2. The letters explain that "[h]ard pass credentials are reserved for" outlets that engage in fact-based reporting satisfying minimum "standards of professional conduct" and otherwise "perform their duties in a way that does not interfere with the White House's daily operations." Letters at 1. The letters set out with specificity the factual bases for these decisions, including identifying with particularity a non-exhaustive list of reporting incidents where Plaintiffs' actions have threatened national security. Letters at 1-2. The White House provided Plaintiffs with process to contest these factual findings by end of business Friday September 25, 2026. Plaintiffs declined to submit any response or otherwise explain their conduct. Nor have they requested an extension,

argued that they need more time to respond, or demonstrated any interest in engaging with the White House on these concerns. The immediate suspension and opportunity to contest this initial decision was consistent with the Government's interest in protecting national security information. The fact that Plaintiffs did not avail themselves of the process that was provided does not render the process inadequate; it means that the opportunity to be heard was declined. This is a meaningful distinction between the motion for a temporary restraining order (which was adjudicated before Plaintiffs' opportunity to respond had expired) and this motion for a preliminary injunction (which was filed after Plaintiffs declined their opportunity to respond).

Plaintiffs are therefore unlikely to prevail on their due process claim.

## II. Plaintiffs Cannot Show They Will Suffer Irreparable Harm

Plaintiffs cannot make the requisite showing of irreparable harm. To do so, they must clear a high bar and show harm that "is both certain and great." *Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1332 (D.C. Cir. 2024). Plaintiffs may continue to publish whatever content or editorials they wish. Plaintiffs may continue to show footage from the White House; in fact, media outlets already agree to pool such footage given the impracticality of having duplicative camera sets around the White House. And the White House's website broadcasts much of the President's remarks. Even if Plaintiffs could show that their lack of access to White House grounds limited their ability to convey their preferred message, it is at most a de minimis harm and certainly not irreparable. *Ehrlich*. 437 F.3d at 419. Furthermore, the "law recognizes that the nature of political debate is rough and tumble." *Eaton v. Meneley,* 379 F.3d 949, 956 (10th Cir. 2004). "It would be inconsistent with the journalist's accepted role in the 'rough and tumble' political arena to accept that a reporter of ordinary firmness can be chilled by a politician's refusal to comment or answer questions on account of the reporter's previous reporting." *Ehrlich*, 437 F.3d at 419. Any such harm is not irreparable.

Plaintiffs' ability to show irreparable harm is also undercut by their refusal to engage with the process provided by the White House. The President afforded each Plaintiff with notice and an opportunity to respond in writing by September 25, but Plaintiffs did not respond. They did not request any extension. They did not defend their conduct. In other words, Plaintiffs received process and refused to participate, thus minimizing their claims of a procedural injury

Nor have Plaintiffs shown irreparable harm from "disrupting CNN's ability to fulfill its primary television network pool duties[.]" Mot. for PI at 38-39. Plaintiffs simply do not have any constitutional right or interest in participating in the primary network pool and can only gesture weakly at constitutional interests in attending criminal trials. *Id.* (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)). Plaintiffs do not, and cannot, explain how the right to attend trial is equivalent to a private network participating in pool duties. That is true when the entire point of a pool is that all participants receive the information provided equally. To the extent those other outlets are harmed, they are not parties and their harm is self-inflicted; to the extent CNN alleges any harm, they are no worse off than other outlets. Even to the extent they are concerned that this may limit their viewership relative to other outlets, such harm would ultimately be "financial in nature" and thus not irreparable. *Anthropic PBC v. U.S. Dep't of War*, No. 26-1049, 2026 WL 1042493, at *3 (D.C. Cir. Apr. 8, 2026). Nor, as explained above in Part I.B, do they have any right to pool access under *AP*.

## III. The Public Interest And Balance Of The Equities Favor The Government

The public interests in protecting classified and sensitive national security information strongly outweigh any countervailing interests Plaintiffs can identify. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (identifying President's interest in maintaining "[s]ecrecy" over classified

"information" and preventing its "premature disclosure"). More specifically, the Supreme "Court has recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business." *Egan*, 484 U.S. at 527 (collecting cases).

The D.C. Circuit recently recognized these harms in upholding a government policy limiting media access at the Pentagon, because it "furthers important national security interests." *New York Times Co. v. U.S. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *2 (D.C. Cir. Apr. 27, 2026) ("*NYT*"). There, the Court accepted a government "declaration explaining that prior to the 2025 PFAC Policy, journalists obtained 'sensitive or classified' information 'often monthly, and sometimes multiple times per month,' including information concerning 'operational plans' and 'intelligence assessments.'" *Id.* at *2 (quoting declaration). The court further accepted that "[u]nescorted access to the Pentagon was … 'a significant contributing factor' to that pattern because it enabled reporters to 'observe activity patterns' and identify potential sources of sensitive information." *Id.* (quoting declaration). On this basis, the court found that the Government had "supported its claim that this aspect of its policy furthers important national security interests." *Id.* at *2 (citing *Haig*, 453 U.S. at 307); *see also* Wilson Decl. ¶¶ 9-20.

Here, Defendants' letters and declarations similarly set forth the harms to national security. Letters at 1-2; Brown Decl.; Wilson Decl. This court should "not lightly override the [Government's] judgments on matters involving national security." *Anthropic*, 2026 WL 1042493, at *3 (citing *Trump v. Hawaii*, 585 U.S. 667, 704 (2018); *see also Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003) ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."). That is especially true where that judgment was made by the President himself.

Defendants recognize that *Sherrill* rejected the proposition that concerns about the physical security of the President outside a Secret Service process could justify termination of a press pass. 569 F.2d at 130. Defendants, however, argue this precedent is wrongly decided and should be overruled because there is no such due process or First Amendment right attaching to these credentials. *Sherrill* also did not address threats to national security outside the physical security of the White House complex. Nor did *Sherrill* concern access determinations made personally by the President concerning reporters and outlets that had previously been afforded access to the White House and abused this privilege.

In this Court's opinion granting a temporary restraining order, the Court noted that the stories relied upon by the White House in justifying removing the individual reporter's hard passes were not published by the affected reporters. ECF No. 24 at 7. But that is of no moment. As a threshold matter, the policy identified and excluded news networks, not individual reporters, and so any analysis should turn on whether the President appropriately determined that such outlets should no longer be afforded continued access. Further, as a factual matter, the President determined that Plaintiff news networks had published stories that adversely affect national security, including publishing possibly classified or sensitive information. Wilson Decl. ¶¶ 21-24. In doing so, these outlets each demonstrated their willingness to publish information that undermines national security. *Id.* Restricting access to the White House removes one avenue for these outlets to obtain such harmful information.

The Court also stated that Defendants did not identify how the reporting identified in the letters damaged national security. ECF No. 24 at 7. Not so. The Director for Defense Intelligence, Counterintelligence, Law Enforcement & Security explained generally that publication of purported national security information can "signal intentions to adversaries, create potentially

catastrophic consequences for sensitive mission coordination, and undermine critical national security objectives" as well as "distract United States government personnel from their official duties by considering whether and how to respond, undermine the national security strategy of the United States by misleading and influencing the public and adversaries out of alignment with the national security strategy, and create complicated decision-making relating to adjustment or response to such information." Brown Decl. ¶ 15. The letters reiterated this point. Letters at 1-3. And Defendants provided a declaration that tied at least one story published by each outlet to a specific national security concern. Wilson Decl. ¶¶ 22-24.

Nor do Defendants need to show that the reporters or outlets actually published classified information. As each letter explained, the stories reported by each outlet diverted "White House resources and those of the national security team in particular, which must evaluate whether the leaked information is classified, the source of any leak, and the security implications of any such disclosure." Letters at 1. And their "spread of misinformation, especially relating to national security, is a threat that undermines the President's ability to safeguard the national security." *Id.* Nor would it be appropriate, administrable, or constitutionally necessary for the President to prove beyond a reasonable doubt or by a preponderance of the evidence that specific information harmed national security before limiting access to the White House complex.

On the other side of the ledger, Plaintiffs seek only to maintain continued access to White House grounds to marginally improve their existing coverage of national affairs. Significantly, Plaintiffs may still publish whatever content they choose, including any opinions or editorials criticizing the President or his policies. Rather, Plaintiffs argue that they require immediate continued physical access to White House grounds so that they can have "the ability to observe events firsthand and to ask questions of White House officials." Mot. for PI. at 38. But as the *NYT*

litigation illustrates, it can be this very access that gives rise to the publication of classified or sensitive national security information. Wilson Decl. ¶¶ 16, 20. Furthermore, Plaintiffs had a process open to them to contest the President's factual findings and declined to participate. The President has also continued to engage with members of the media, including Plaintiffs.

The public interest and balance of the equities therefore counsel against issuing a preliminary injunction requiring the President to grant Plaintiffs continued access to White House grounds, over his personal judgment of national security considerations. Such an extraordinary injunction would raise serious separation of powers concerns and set this Court on "a collision course" with the President. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004).

## IV. Any Remedy Should Be Narrowly Limited And Stayed Pending Any Appeal Authorized

Unlike in their motion for a temporary restraining order, Plaintiffs now specifically request the Court enjoin Defendants from "depriving Plaintiffs and their reporters of the White House access they had before September 18, 2026[.]" ECF No. 32-23; *cf.* Hearing Tr. at 22:19-21 (The Court: "the temporary restraining order that is being requested here is only … to restore the hard passes"). As Plaintiffs explain, they previously had access beyond the designated press area on the White House grounds as part as the designated pool and had been invited to Air Force One or the Oval Office. Mot. for PI at 6-7. But this Court cannot enjoin Defendants to provide Plaintiffs with access to presidentially restricted areas, such as the Oval Office and Air Force One. Just last year, the D.C. Circuit stayed "a preliminary injunction prohibiting White House officials from denying, on the basis of viewpoint, access to press events held in the Oval Office, on Air Force One, and at the President's home in Mar-a-Lago." *AP*, 2025 WL 1649265, at *1. The D.C. Circuit made clear that "The White House therefore retains discretion to determine, including on the basis of viewpoint, which journalists will be admitted" to at least these areas. *Id.* That requires this Court

at the very least to uphold a lesser-included policy restricting Plaintiffs' access to these areas, including as members of the designated press pool. Plaintiffs have shown no liberty interest or First Amendment right to these areas, and thus any injunction that forced Defendants to provide this access would be overbroad.

Finally, if for any reason this Court should grant any part of Plaintiffs' motion for a preliminary injunction, the Court should stay any injunction pending any appeal authorized by the Solicitor General. For the same reasons Plaintiffs' motion fails, Defendants also satisfy the *Nken*, 556 U.S. 418, standard for a stay pending appeal.

**CONCLUSION**

This Court should deny Plaintiffs' motion for a preliminary injunction. If it grants Plaintiffs' motion, it should stay the injunction pending appeal.

Dated: October 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director

JOSEPH E. BORSON
Assistant Branch Director

/S/*Michael K. Velchik*
MICHAEL K. VELCHIK (DC Bar 187249)
Senior Counsel, Civil Division
United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 860-8388
E-mail: michael.velchik@usdoj.gov

MICHAEL BRUNS
Trial Attorney

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on October 2, 2026.

/s/Michael K. Velchik
MICHAEL K. VELCHIK