**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC.,
1050 Techwood Drive
Atlanta, GA 30318;

MS NOW CABLE, LLC,
229 West 43rd Street
New York, NY 10036;

POLITICO LLC,
1000 Wilson Boulevard, 8th Floor
Arlington, VA 22209;

AKAYLA GARDNER,
400 North Capitol Street, N.W.
Washington, D.C. 20001;

CHEYENNE HASLETT,
1000 Wilson Boulevard, 8th Floor
Arlington, VA 22209;

BETSY KLEIN,
820 1st Street, N.E.
Washington, D.C. 20002;

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500;

STEVEN CHEUNG, in his official capacity as Assistant to the President for Communications,
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500;

SEAN M. CURRAN, in his official capacity as Director of the Secret Service,
245 Murray Lane, S.W., Building T-5
Washington, D.C. 20223;

SUSAN WILES, in her official capacity as White House Chief of Staff,
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500.

*Defendants.*

**Civil Case No. 1:26-cv-03287**

**AMENDED COMPLAINT**

## INTRODUCTION

1. On Friday, September 18, 2026, President Donald J. Trump announced that he was "banning" journalists with three news organizations—CNN, MS NOW, and POLITICO—from the White House "effective immediately" for one simple reason: He dislikes the content of their coverage of him and his administration. The President made expressly clear his retaliatory and viewpoint-discriminatory motive for targeting CNN, MS NOW, and POLITICO. He called it the "result of their constant 'reporting' FAKE NEWS!"—a term the President routinely applies not to reporting that is false, but to any reporting he dislikes. He then threatened there would be "[o]ther Fake News Media Outlets to follow." In an Oval Office press conference later that day, the President doubled down. He was clear there was no particular story that triggered this decision—saying "it's really just cumulative stories over the last two years"—and equally clear that the ban was motivated by his disdain for reporting he considers "one-sided" and "never good" because it "diminish[es]" him and his accomplishments. The President repeated his straightforward rationale for targeting these three news organizations, calling it "wrong" to "allow people to write purposely negative stories." The President complained about coverage he considers "one-sided" and "never good," and at one point even referred to his own unprecedented act as the "ban on the free press."[1]

2. This ban is a direct assault on the First Amendment and a blatant violation of our most fundamental constitutional principles. Presidents from the earliest days of the Republic have disagreed with and complained about the tenor and content of press coverage of their administrations. But the First Amendment prevents them from retaliating against the press for its speech. And when the President creates a forum for members of the press to gather news and

---

[1] https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-healthcare-drug-prices-oval-office-september-18-2026/. The video of the President's remarks is available at https://www.whitehouse.gov/videos/president-trump-makes-an-announcement-on-healthcare-sep-18-2026/.

report, he may not then exclude certain news outlets or journalists based on his disfavor for the content of their speech. As the Supreme Court has recognized, the First Amendment, including its guarantee of a free press, reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Moreover, the Constitution protects the liberty and property interests that news organizations and White House reporters have in their press credentials and the access those credentials afford them to cover the White House for the benefit of the public. No official can deprive Plaintiffs of those interests on a whim—with no notice, no process, and no warning—as the President did here. *See Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020); *Sherrill v. Knight*, 569 F.2d 124, 130–31 & n.22 (D.C. Cir. 1977).

3. President Trump and members of his administration implemented this ban immediately. The credentials (or "hard passes") that journalists at CNN, MS NOW, and POLITICO use to access the White House grounds to report the news, ask questions of the President and administration officials, and videotape and photograph White House activities were apparently deactivated overnight. The following morning, September 19, 2026, White House officials denied access and seized the credentials of journalists with those organizations when they attempted to enter the White House to do their jobs. Those credentials were not returned until September 24, 2026, following the entry of a temporary restraining order in the above-captioned case.

4. The President banned CNN, MS NOW, and POLITICO, and the individual reporters covering the news for those media organizations, in disregard of the most basic guarantees of the First Amendment and the Due Process Clause. He did so expressly for the improper purpose of retaliating against Plaintiffs for past news coverage because he deemed it "negative." And he has made no secret of his aim to chill any future reporting critical of him and his administration's

policies and actions and to coerce favorable coverage, whether by Plaintiffs or other press outlets who want to retain White House access. President Trump has said in no uncertain terms that he would prefer only to be covered by news organizations and reporters who praise his administration. And he has said that he would maintain the ban until Plaintiffs "straighten themselves out." But the President, no less than any other government official, cannot trample the First Amendment and punish the press for its protected speech. And he cannot deprive the press of its liberty and property interests with no notice or process based solely on his dislike of the content of their reporting. The ban is unconstitutional and should be permanently enjoined.

5. Plaintiffs initiated the above-captioned action on September 21, 2026, and sought emergency relief from the President's ban. Three days later, the Court granted Plaintiffs' motion for a temporary restraining order and directed Defendants to "immediately return, reinstate, and restore" Plaintiffs' hard passes. The Court extended that relief on October 13, 2026, by granting Plaintiffs' motion for a preliminary injunction. In doing so, the Court held that Plaintiffs were likely to succeed on both their due process claim and First Amendment claims, reasoning that the President's comments were "more than enough to show a likely causal link between Plaintiffs' protected First Amendment speech and his revocation of their hard passes."

6. Although Defendants eventually restored Plaintiffs' hard passes after being ordered to do so, they have continued to bar Plaintiffs from specific White House press areas. Since the ban was announced on September 18, 2026, the White House has repeatedly barred CNN from fulfilling its duties as designated television network pooler aboard Air Force One—a role CNN has fulfilled for more than four decades. MS NOW has not participated in the secondary television pool since September 18, and Defendants barred POLITICO from two scheduled out-of-town print pool assignments aboard Air Force One.

7. Defendants have offered no official explanation for any of these exclusions. Even when Plaintiffs wrote Defendants a letter asking them to state clearly what the justification was

for these exclusions, Defendants never answered. On information and belief, these exclusions reflect an unstated policy to carry out the President's directive to take his viewpoint-discriminatory and retaliatory ban "as far as you can." Indeed, the President has been explicit that he intends to limit access to the Oval Office to news organizations that cover him favorably, declaring hours after this action was filed that "publications that only write negatively . . . shouldn't be allowed access to the most important Office anywhere in the World." And in the wake of this Court's preliminary injunction ruling, on October 14, the White House issued a statement declaring that what it deems the "Fake News" has "no place demanding a spot in the President's Oval Office."

8. Plaintiffs now amend their Complaint to fully allege and seek relief from Defendants' continued retaliatory and viewpoint-discriminatory deprivation of CNN's, MS NOW's, and POLITICO's access to certain White House press areas and other adverse actions taken by the White House in retaliation for Plaintiffs' exercise of their First Amendment rights. This Court should grant declaratory and injunctive relief in Plaintiffs' favor for each of the following reasons.

9. First, the ban violates the Due Process Clause. CNN, MS NOW, POLITICO, and their journalists have liberty and property interests in their press credentials and the access those credentials afford to the White House grounds to report on the President and his administration. That access has long extended to the Oval Office, Air Force One, and other fora that the White House has opened to the press for pool coverage. The ban, and Defendants' continued exclusion of Plaintiffs from certain White House press areas, deprives Plaintiffs of those interests without meeting the bare minimum requirements of due process: advance notice based on clear standards and an opportunity to be heard. The President provided no notice that he would immediately deny news organizations whose reporting he disliked access to the White House grounds. Nor did he provide clear standards for his decision. And the President did not provide CNN, MS NOW, or POLITICO, or any of their journalists, any opportunity to be heard before he announced the ban

in a social media post and before the White House terminated reporters' access and confiscated press credentials.

10. Second, Defendants' interference with the ability of CNN to perform its primary television network pool duties independently violates the Due Process Clause. For 45 years, CNN has been one of five networks that staff, equip, and bear the costs associated with the primary television network pool upon which the American public (and the White House itself) relies for real-time television coverage of the President in the Oval Office, aboard Air Force One, and at the many other presidential events that due to size and other constraints simply cannot accommodate all members of the press corps. CNN bears 20 percent of the primary television network pool's shared costs, pays for its own crews, equipment, and staffing, and pays its own travel costs when it covers the President outside of Washington, D.C. These substantial investments—which were made in reliance on the White House's longstanding practice of honoring pool assignments—entitle CNN to continue to fully perform its pool duties when designated. Defendants have deprived CNN of its liberty and property interests by interfering with CNN's ability to perform those duties with no notice, no standards, and no opportunity to be heard. Indeed, on October 19, 2026, counsel for CNN wrote counsel for Defendants, asking for confirmation that they would end their apparent policy of excluding CNN from these spaces. Defendants did not even respond.

11. Third, the President's ban and the White House's continued exclusion of Plaintiffs from certain fora are unlawful retaliation for protected First Amendment activity. The President announced that the ban is a punishment for the content of past news coverage from CNN, MS NOW, and POLITICO. And the President's statements make clear he implemented the ban to coerce more favorable coverage of the administration from CNN, MS NOW, and POLITICO, and to deter other journalists and news organizations from reporting that the President might view as unfavorable. The President has made no attempt to hide that his ban punishes protected speech, stating expressly that he decided to ban CNN, MS NOW, and POLITICO for their "cumulative"

coverage over the past two years of him and his administration—coverage that in his view is "fake," "sick," "purposely negative," "one-sided," and "never good." Even after the Court's temporary restraining order, the President doubled down on the rationale underlying the ban by, among other things, telling TIME that he "ha[dn't] had a good story on CNN for years." And even after the ban was preliminarily enjoined, Defendants have continued to retaliate against Plaintiffs for their protected First Amendment activity by continuing to exclude Plaintiffs from certain White House press areas.

12. Fourth, both the ban and the White House's continued exclusion of Plaintiffs from certain White House press areas violate the First Amendment for the separate and independent reason that they bar CNN, MS NOW, and POLITICO from nonpublic fora for unlawful reasons. A "nonpublic forum" is "government property" that the government has opened to speech for selected speakers. *Ateba v. Leavitt*, 133 F.4th 114, 121–22 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 822 (2025). While the government may impose certain restrictions on a nonpublic forum, it may not discriminate based on viewpoint in granting or denying access to the forum. The D.C. Circuit has held that the "White House Press Area" is a nonpublic forum. *Id.* at 123. That includes the Oval Office and Air Force One—government property to which the White House has long provided selective access to members of the press for the purpose of newsgathering and reporting, and where the President has increasingly addressed the press and taken reporters' questions. Air Force One, for example, has for decades been open to a small group of credentialed journalists pursuant to established press-pool practices. As in *Ateba*, where the D.C. Circuit relied on the government's practice of providing selective press access to the White House, the White House's longstanding and systematic practice of granting press access to Air Force One to facilitate newsgathering and reporting renders it a nonpublic forum. *See id.* Indeed, the Trump administration has extensively opened up Air Force One and the Oval Office for the purpose of briefing and taking questions from members of the press. Since his second term began, President

Trump has held 121 press events aboard Air Force One or on the tarmac and 138 in the Oval Office, during which he fielded no fewer than 4,700 questions from reporters—creating ongoing, extensive opportunities for journalists to interact with officials, conduct newsgathering, and publish reporting from those spaces. To be clear, Plaintiffs do not claim an unrestricted right to enter the Oval Office or travel aboard Air Force One. But once the White House opens those spaces to selected journalists for newsgathering and reporting, the White House may not exclude Plaintiffs because it dislikes their coverage.

13. Government restrictions on access to a nonpublic forum may not discriminate based on viewpoint and must be reasonable in light of the purposes of the forum. The President's ban and the White House's subsequent barring of Plaintiffs from certain White House press areas brazenly discriminate against Plaintiffs based on their perceived editorial viewpoint; the White House is expressly excluding CNN, MS NOW, and POLITICO because the President dislikes the content of their coverage. As the President explained, in his September 28 interview with TIME, "I don't think anybody should be forced to bear fake news, constantly bad stories, because I've done great things." The President's abrupt announcement that the press may be banned from the White House grounds—indeed, may be barred from any forum for newsgathering established by the White House—for reporting that the President dislikes is far too vague and arbitrary a standard to qualify as reasonable under the First Amendment. And that vague and arbitrary standard also undermines the very purpose of opening up the White House, the Oval Office, and Air Force One to the press in the first place: to facilitate fact-based reporting for the benefit of the public.

14. The ban and the White House's continued exclusion of Plaintiffs from certain White House press areas have harmed the ability of CNN, MS NOW, and POLITICO to cover the President and his administration. For more than five days, at least 78 journalists at three of the country's leading news organizations were locked out of the White House completely, unable to attend briefings, report from their broadcast positions, question officials, or perform their pool

assignments, at a moment when the President was commanding a country at war, addressing the United Nations General Assembly, and preparing to host China's President at the White House. Those lost days of coverage cannot be recovered. And although this Court's temporary restraining order and subsequent preliminary injunction order forced Defendants to return Plaintiffs' hard passes, the White House has continued to bar Plaintiffs from specific fora it has opened up to the press—targeting precisely the settings in which journalists regularly gather news and publish reporting about and interact with President Trump.

15. Defendants have made clear that they will follow the President's directive to take the ban "as far as [they] can." Hours after Plaintiffs filed this action, the President asserted that the Oval Office should "not [be] defiled by Third Rate Clowns," and vowed to "do whatever is necessary." The President has also said that he would maintain the ban until Plaintiffs "straighten themselves out." The resulting harm from the White House's actions extends far beyond Plaintiffs. Every news organization now faces the risk of similar punishment for coverage the President deems insufficiently favorable, and the public is deprived of current and complete information about its government.

16. The Court should declare unlawful the President's ban of Plaintiffs and the White House's further unconstitutional actions, including its continued exclusions of Plaintiffs from specific White House press areas for retaliatory and viewpoint-discriminatory reasons, and enter permanent injunctive relief in favor of CNN, MS NOW, and POLITICO.

**PARTIES**

17. Plaintiff Cable News Network, Inc. (CNN) is a Delaware corporation with its principal place of business in Atlanta, Georgia. In 1980, CNN launched the first channel for 24-hour television news coverage.

18. Plaintiff MS NOW Cable, LLC (MS NOW) is a Delaware limited liability company with its principal place of business in New York, New York. MS NOW operates a cable news

network and a digital news service. It launched in 1996 as MSNBC and adopted the name MS NOW in November 2025 in connection with its separation from NBCUniversal as part of Comcast's spin-off of Versant Media Group, Inc.

19. Plaintiff POLITICO LLC is a Delaware limited liability company with its principal place of business in Arlington, Virginia. POLITICO is a global news organization that has covered politics and policy since 2007.

20. Plaintiff Akayla Gardner is a White House reporter for MS NOW. She is based in Washington, D.C.

21. Plaintiff Cheyenne Haslett is a White House reporter for POLITICO. She is based in Arlington, Virginia.

22. Plaintiff Betsy Klein is a senior reporter and writer who covers the White House for CNN. She is based in Washington, D.C.

23. Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

24. Defendant Steven Cheung is the Assistant to the President for Communications, better known as the White House Communications Director. He is sued in his official capacity.

25. Defendant Sean M. Curran is the Director of the Secret Service. He is sued in his official capacity.

26. Defendant Susan Wiles is the White House Chief of Staff. She is sued in her official capacity.

27. On September 18, 2026, President Trump announced an unconstitutional ban of CNN, MS NOW, POLITICO, and their reporters from the White House grounds. The other Defendants (as well as officers who report to them or work in concert with them) are responsible for implementing the President's directives. Under the leadership of Chief of Staff Wiles, the Trump administration, working among others through the White House press office, led by

Assistant to the President for Communications Cheung, and the United States Secret Service, led by Director Curran, along with others working at their direction, reporting to them, or working alongside them, have taken steps to implement the President's ban, including by confiscating Plaintiffs' hard passes and preventing Plaintiffs from fulfilling their pool duties by excluding them from the Oval Office and Air Force One.

## JURISDICTION AND VENUE

28. This Court has subject-matter jurisdiction because this action arises under the Constitution of the United States. 28 U.S.C. § 1331.

29. The Court is authorized to award the requested relief under 28 U.S.C. §§ 2201 and 2202 and pursuant to its inherent equitable powers. *Trump v. Cook*, 609 U.S. 528, 549 n.2 (2026).

30. Venue is proper in this District under 28 U.S.C. § 1391(b) and § 1391(e)(1) because a substantial part of the events giving rise to the claims occurred in the District of Columbia.

## BACKGROUND

### A. Journalists and news organizations, including Plaintiffs, have long covered the President and his administration from White House grounds.

31. Journalists have covered the President from the White House for more than a century. In 1902, President Theodore Roosevelt set aside a room in the new West Wing for the press. Today, the White House press facilities include the James S. Brady Press Briefing Room for daily press briefings, the East Room for press conferences and other events, the North Lawn where the media frequently reports live from the White House, and the South Lawn where Marine One arrives and departs.

32. Access to the White House is critical for the press. For White House correspondents, the White House—or wherever the President happens to be—is the workplace. CNN's Betsy Klein, MS NOW's Akayla Gardner, and POLITICO's Cheyenne Haslett report, write, and broadcast from the White House grounds themselves, working out of booths in the lower press

area behind the James S. Brady Press Briefing Room. They also meet with press staff by appointment in the upper press area, just steps from the Oval Office and the Press Secretary's office. Their work regularly requires physical presence at the White House.

33. A "hard pass" is a press credential provided to reporters who regularly cover the White House, are based in the Washington area, are accredited by a press gallery in the Supreme Court, U.S. Senate, or U.S. House of Representatives, and clear a background check by the Secret Service. 31 C.F.R. § 409.1.

34. A hard pass is essential to a White House reporter because it provides unescorted access, on short notice and with minimal delay, to the areas of the White House complex designated for the press—the James S. Brady Press Briefing Room, the press workspaces in the lower press area of the West Wing, and the North Lawn—and to Air Force One and the secured areas of the President's travel that the White House press corps routinely covers. The hard pass allows a reporter to react to fast-developing news. A hard pass allows reporters swift and easy access to key official sources, including the Press Secretary, Communications Director, as well as the President himself and his aides and advisors. Without a hard pass, a reporter may miss newsworthy events, particularly those that occur with little notice. A hard pass is therefore crucial to being a White House correspondent for a national news organization like CNN, MS NOW, or POLITICO.

35. The Secret Service's role in issuing hard passes is limited by regulation. In deciding whether to approve an applicant during a background check, Secret Service officials must "be guided solely by the principle of whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges." 31 C.F.R. § 409.1. And the regulation prescribes the process that must precede any denial: written notice of the factual basis for the proposed denial, an opportunity for the applicant to respond in writing and to be heard, and a final written decision.

*Id.* § 409.2. Nothing in the regulation (let alone the First Amendment) permits a pass to be denied, suspended, or revoked because of the content of a journalist's reporting.

36. Credentialed journalists with participating news organizations also make up the White House press corps. Because the Oval Office, Air Force One, Marine One, and many presidential events cannot accommodate the full White House press corps, a rotating group of credentialed journalists—the pool—accompanies the President and shares reporting, video, and photographs with the rest of the press corps and, through them, with the American public and the world. Each day, the pool includes representatives from different media channels, including television, print, radio, and digital outlets. The television component of the pool consists of two slots: primary and secondary. The primary slot rotates among five news organizations that share broadcasting responsibility, including CNN. The secondary slot rotates among a larger group of outlets, including MS NOW. POLITICO has also belonged to the print component of the pool.[2]

37. CNN has covered every President since Jimmy Carter from inside the White House. Among other things, its correspondents attend the daily press briefing in the James S. Brady Press Briefing Room, cover events in the Oval Office and the East Room, report live from the North Lawn, cover the President's arrivals and departures from the South Lawn, and travel with the President. As of September 18, 2026, 40 CNN journalists held valid White House hard passes.

38. CNN participates in the five-network rotation for the primary television pool (also called the network pool) and absorbs 20% of the costs associated with such coverage. When CNN is the designated network pooler, CNN's crew supplies the video and audio of the events involving the President and other White House officials to the other four networks and, through them and

[2] The five news organizations who make up the primary television pool are Fox News, CNN, NBC, ABC, and CBS. They share the costs and rotate turns serving as the primary television news organization each day for any events and locations where there is limited physical space for journalists.

through pool distribution arrangements, to news organizations and the public. Among the recipients of the pool material are the more than 1,000 local affiliate television stations across the United States that receive the pool feed through CNN. CNN was traveling with the Vice President on September 18, 2026, as the network pooler, the day the President announced the ban.

39. Before September 18, 2026, no President had barred CNN as an organization from the White House. But in November 2018, the White House suspended the hard pass of CNN correspondent Jim Acosta following an exchange between President Trump and Mr. Acosta at a news conference. CNN and Mr. Acosta filed suit in this Court to challenge the revocation of Mr. Acosta's hard pass on constitutional grounds. The Court ordered that Mr. Acosta's credential be restored, and the White House reinstated it. *See Karem*, 960 F.3d at 661 (describing incident and litigation).

40. MS NOW has covered the White House continuously since it began broadcasting as MSNBC in 1996. Each day, MS NOW dispatches journalists to the White House grounds, working from the briefing room, the West Wing driveway, a basement press booth, and other areas of the grounds used for live reporting. While on the grounds, MS NOW journalists meet with White House staff, speak with administration officials, attend open-press events, and attend formal press briefings. As of September 18, 2026, 22 MS NOW journalists held valid White House hard passes.

41. MS NOW participates in the secondary slot of the television pool rotation. Its journalists were on the White House grounds on September 18, 2026, the day the President announced the ban. Before September 19, 2026, no President had barred either MS NOW as an organization, or its reporters, from the White House.

42. Since its founding in 2007, POLITICO has covered the White House, Congress, federal agencies and regulation, and its reporting is relied upon to track government decisions in

real time. POLITICO has covered the White House from inside the White House complex since its launch in 2007, and it has belonged to the print component of the pool.

43. CNN, MS NOW, and POLITICO are widely read and watched news sources in the United States. Each employs journalists who are assigned to cover the President and the White House.

**B. Journalists and news organizations, including Plaintiffs, have long covered the presidency in spaces designated for the press beyond the White House Briefing Room.**

44. For decades, television and print press pools have covered the President in locations that—due to space and other constraints—cannot accommodate the full White House press corps. Indeed, for most of the President's daily activities, the press pool is the only source of independent reporting, video, audio, and photographs available to other news organizations and to the public. The system also benefits presidents and their administrations. With the pool nearby, White House staff can quickly gather and brief, in effect, the entire press corps and the American people.

45. The press pool has been a longstanding feature of presidential travel. The White House Correspondents' Association, founded in 1914, traces the pool system to the administration of Franklin D. Roosevelt, when a small group of wire reporters accompanied President Roosevelt on personal and official travel during World War II. By 1946, the out-of-town pool included wire, print, radio, photo, and newsreel reporters, who followed President Truman and received daily briefings from the Press Secretary. As early as December 1959, traveling aboard Air Force One with the president had become a routine part of the duties of press pool members.

46. The pool's continuous presence on Air Force One has allowed journalists to document pivotal moments in American history. For example, pool reporters covered President John F. Kennedy's assassination and witnessed President Johnson's swearing-in aboard Air Force One, and they accompanied President George W. Bush on Air Force One during the September 11 attacks.

47. Presidents of both parties have used Air Force One as a forum for press briefings and taking questions from reporters. In the first year of the Biden administration alone, the Press Secretary or her deputy briefed reporters aboard Air Force One approximately 46 times. And under President Trump, Air Force One and the Oval Office have become two of the primary spaces for journalists to interact with, gather news about, and publish reporting on President Trump and other officials.

48. In 2025, President Trump made two appearances in the James S. Brady Press Briefing Room where he fielded a total of approximately 51 questions. By contrast, he held 95 press events in the Oval Office where he fielded no fewer than 1,991 questions. On Air Force One and on the tarmac, the President made himself available to the press 70 times and fielded no fewer than 1,186 questions. This trend has continued in 2026. Through September, the President has appeared in the James S. Brady Press Briefing Room four times and taken approximately 96 questions there. During the same time period, he has held 43 press events in the Oval Office where he fielded at least 741 questions. Aboard Air Force One and on the tarmac, President Trump has made himself available to the press 51 times and fielded no fewer than 865 questions. While the James S. Brady Press Briefing Room remains a critical forum for reporters to gather and report the news, of the nearly 5,000 questions the President has entertained from reporters in these traditional areas, 97% were either in the Oval Office or in connection with his travel aboard Air Force One.

49. According to the White House Correspondents' Association, the press pool that travels with the President aboard Air Force One has traditionally consisted of thirteen journalists: three wire reporters, four still photographers, two print reporters, a radio correspondent, and a three-member crew from the designated television network pooler.

50. The journalists admitted to the Oval Office and Air Force One as members of the pool do not simply observe. They interact with the President and others present. They report from inside those spaces, in real time, to the rest of the press corps and to the public. Print and wire

poolers draft and file pool reports from inside the Oval Office and from the press cabin of Air Force One that are distributed within minutes to hundreds of news organizations. Reporters text and message their editors and colleagues from inside these spaces as events unfold, post live updates, and draft the breaking news alerts and stories that their organizations publish while the event is still underway. Photographers and videographers make split-second decisions about what still photos and video to capture and then transmit those images from their cameras to their photo desks and studios within seconds of taking them.

### C. CNN has participated in the primary television network pool for more than four decades.

51. CNN has participated in the White House television pool for 45 years, and journalists from CNN have held White House hard passes continuously since 1980. The five networks that make up the primary television network pool share the cost of maintaining it; CNN bears 20 percent of that shared cost. In addition to its share of the costs of the pool, CNN also pays the full cost of its own coverage when it serves as the designated television network pooler—including crews, cameras, transmission and editing equipment, and staffing—and it pays for all travel required to cover the President when he is traveling across the country and across the globe. CNN's annual costs for these operations regularly average $2,500,000. These are recurring financial and operational commitments necessary to maintain the primary television network pool, and they are not fully offset by subscriber fees, which typically offset only about half of these costs.

52. The primary television network pool operates under long-established rules and customs that the White House and the participating networks alike have observed for decades. When CNN serves as the designated television network pooler, it serves as a proxy for all media, not merely on its own behalf. Pool rules prohibit the designated pooler from engaging in unilateral newsgathering while performing its pool function. If CNN wishes to conduct its own separate

newsgathering at a pool event, it must supply a separate crew apart from the crew supporting the pool.

53. When CNN is the designated television network pooler, CNN's crew supplies the video, audio, and editorial information to the other four networks and, through pool distribution arrangements, to news organizations across the country. More than 1,000 local affiliate television stations across the United States receive the pool feed through CNN, including raw footage that the affiliates may use for their own reporting. When another network serves as the designated pooler, it in turn supplies the pool material to CNN.

54. The White House has long recognized and assisted in coordinating pool coverage. It identifies the designated television network pooler in its daily guidance and press schedule, sets pool call times, coordinates logistics with the designated network, solicits travel manifests, and admits the designated crew to Air Force One and other presidential events. The White House bills CNN and other pool members for seats that its reporters use on Air Force One, meals, ground transportation, and travel workspaces, among other expenses. Members of the primary television network pool also work with the White House to address security-related issues. For example, during the current administration, the primary television network pool, working with the White House, agreed on a method for securely broadcasting live the President's remarks before the departure of Marine One, to help ensure the safety and security of the President and others on board.

55. Before September 18, 2026, to CNN's knowledge, no President or White House official had ever removed a primary television network pooler from a scheduled rotation, barred the designated pooler from the Oval Office or Air Force One, or excluded a network from the primary television network pool because it disliked the content of its coverage. Nor has the White House ever articulated any standard under which a member of the primary television network pool may be removed from its scheduled rotation or excluded from pool events.

56. In reliance on that settled practice, CNN has made substantial, long-term investments in its White House presence and structured its Washington operations around fulfilling its pool obligations. CNN maintains a booth adjacent to the James S. Brady Press Briefing Room, two standing broadcast positions on the North Lawn, and broadcast and transmission equipment throughout the White House, all at its own expense. CNN commits substantial other resources to ensure broadcast quality transmission is possible from the White House complex. Those investments include not only production equipment, but also the installation of fiber optic cable (at the expense of CNN and other members of the pool) throughout the facility. The four other members of the primary television network pool, CNN's affiliates, and the public depend on CNN to perform its assigned rotations as designated television network pooler, just as CNN depends on the other networks to perform theirs.

57. MS NOW and POLITICO likewise participate in, and bear the costs of their participation in, the White House press pool. MS NOW participates in the secondary television pool and, in the seven months preceding the ban, served as the designated secondary television pooler roughly every two to three weeks—on March 2, March 9, April 3, May 1, May 13, May 28, June 30, July 22, August 15, and August 30, 2026. MS NOW has made substantial investments to report from the White House, including journalist staffing, engineering support, and equipment costs, and it staffs the secondary pool by reassigning members of its regular White House team. POLITICO has been a member of the White House print press pool rotation since 2007 and, before the ban, received and performed its print pool assignments in the ordinary course.

### D. The President bans reporters for CNN, MS NOW, and POLITICO from the White House because of their coverage of the administration.

58. For years, the President has attacked CNN, MS NOW, and POLITICO for the content of their coverage. Since at least 2017, President Trump has repeatedly referred to the outlets as "Fake News" and "enem[ies] of the American People," and claimed that "[t]hey shouldn't even

have a right to broadcast." At 3:04 p.m. EDT on Friday, September 18, 2026, the President went beyond mere criticism of CNN, MS NOW, and POLITICO and took action to retaliate for the coverage he has long disliked by prohibiting their reporters from accessing the White House grounds. The image below reflects the post:[3]

> **Donald J. Trump**
> @realDonaldTrump
>
> I am proud to announce that, effective immediately, I am banning Fake News CNN, MSNOW (who recently changed their name from MSNBC due to lack of viewership and credibility!), and Politico (The recipients of an illegal and ridiculous $8 Million Dollar subscription, an All Time Record, directly from the United States Government, under Crooked Joe Biden, in order to keep them "alive." Seems like corruption to me!), from the White House as a result of their constant "reporting" FAKE NEWS! Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America. Other Fake News Media Outlets to follow. Thank you for your attention to this matter! President DONALD J. TRUMP
>
> **13.4k** ReTruths **54.6k** Likes Sep 18, 2026, 3:04 PM

59. CNN, MS NOW, and POLITICO received no prior notice of this ban. Neither the post nor the President's remarks identified any standard by which the three banned news organizations' coverage had been judged or would be judged in the future, any official responsible for applying that standard, any procedure by which CNN, MS NOW, or POLITICO could contest the ban, or any date on which the ban would end. As the D.C. Circuit put it when describing the previous Trump administration's suspension of a White House reporter's hard pass, the ban "effectuated an unpredictable break with prior policy and practice." *Karem*, 960 F.3d at 667 (quotation marks, brackets, and citation omitted).

---

[3] @realDonaldTrump, Truth Social (Sept. 18, 2026, 3:04 PM), https://truthsocial.com/@realDonaldTrump/posts/117293599348325006.

### E. The President and his administration made their viewpoint discrimination clear.

60. The President made no secret of why he banned CNN, MS NOW, and POLITICO, whose coverage he has attacked for years. When he announced the ban—and repeatedly in the weeks that followed—he and his senior officials made clear that it was intended to punish reporting he considers "negative," "one-sided," and "diminish[ing] the Republicans." On September 18, 2026, about an hour after announcing the ban, the President took questions from reporters at an Oval Office event and referred to his own action as "the ban on the free press."

61. While the President has claimed he objects to the reporting of "FAKE NEWS!" and media outlets that publish "FICTION and LIES," he has made plain that he considers "fake news" to be interchangeable with negative news stories he does not like. In explaining the ban, he has complained that "[t]here's something wrong with a country that can allow people to write purposely negative stories," and that "if they want to write them, that's fine, but I don't have to let them into my, into the people's house." On September 21, 2026, hours after Plaintiffs filed this action, the President posted that "Fake News people and publications that only write negatively . . . shouldn't be allowed access to the most important Office anywhere in the World." He asked, "Why should I have to give 'access' to such people?" And he vowed that he "will do whatever is necessary."

62. The President reiterated that rationale in a September 28, 2026, interview with TIME, published on October 1. Asked why Americans should believe he respects the free press while restricting journalists' White House access, he complained, "I haven't had a good story on CNN for years," and added: "If I do the finest thing, if I found the cure to cancer, they would say, 'Why didn't he move quicker?'" Asked why he imposed the ban at that time, he answered: "Well, it's just bad story after bad story."

63. The White House maintained that position after the Court entered its preliminary injunction. On October 14, 2026, the day after the ruling, it issued a statement saying: "The Fake News has no place demanding a spot in the President's Oval Office." And on October 20, the White House again defended the exclusions, asserting that journalists have no constitutional right to access the Oval Office or Air Force One, adding: "When publications lie, fabricate, and ignore the truth, proximity matters less and they can write their fiction from outside of these secure facilities."

**F. The White House implements the President's ban.**

64. Following President Trump's announcement on Truth Social and statements at the Oval Office press conference, the White House has taken multiple steps to bar CNN, MS NOW, and POLITICO from the White House.

65. On the night of Friday, September 18, the White House apparently deactivated hard passes for CNN, MS NOW, and POLITICO reporters.

66. From the early morning of Saturday, September 19 through approximately noon on September 24, 2026, CNN, MS NOW, and POLITICO reporters were denied access to the White House.

67. Betsy Klein, a CNN reporter and hard-pass holder who has covered the White House since 2018 and whose current hard pass bore an expiration date of August 31, 2027, attempted to enter the White House complex on the morning of September 19. The Secret Service officer at the gate informed her that her hard pass had been deactivated, took her hard pass from her, and referred her to the White House Press Office for more information. She was not permitted to enter the White House complex.

68. Also on September 19, Akayla Gardner, an MS NOW reporter and hard-pass holder, was denied entry to the White House complex and informed that her hard pass had been disabled.

When she asked why her hard pass had been disabled, the Secret Service officer told her such matters were "above" him. The Secret Service officer took Ms. Gardner's hard pass from her.

69. Also on September 19, Cheyenne Haslett, a POLITICO reporter and hard-pass holder, was denied entry to the White House complex. She arrived on Saturday to do her job as a POLITICO reporter. Upon arrival, Secret Service officers denied her entry to the White House complex and took her hard pass.

70. Plaintiffs filed this action and moved for a temporary restraining order on September 21, 2026. ECF No. 1. That day, CNN had been scheduled to begin its first primary television network pool rotation since the President announced the ban. The assignment, made before the ban, called for CNN to serve as the designated television network pooler on September 21 and 22, 2026, to cover the President's travel to New York City and his address to the United Nations General Assembly. CNN was responsible for staffing the in-town pool at the White House, the pool at Joint Base Andrews, and the out-of-town pool traveling with the President. At several events on the President's schedule that day, CNN's pool camera was expected to be the only television camera present.

71. At 10:55 p.m. on September 20, 2026, the night before CNN's assigned rotation, the White House Office of Communications sent out its daily guidance and press schedule for September 21 with CNN removed from the day's schedule. CNN did not serve as the designated pooler on September 21 or September 22, 2026, and no other network took CNN's place. The White House's schedule listed no network as the primary television pooler, and the chair of the primary television network pool advised pool subscribers that the TV pool would no longer cover events designated as pool coverage of the President and there would be no replacement pool put in place. The five network members of the primary television network pool also issued a joint statement explaining that "[t]he public has a vital interest in receiving accurate, independent information about its government" and that "[n]o administration should restrict a news

organization because it objects to its reporting." There was no television network pool coverage of the President's events on September 21, 2026. The only video of his first event that day—a ribbon-cutting for a new helipad—was a White House livestream on which his remarks were largely inaudible.

72. On September 21, 2026, the White House issued a press release entitled "White House Access Is a Privilege — Not a Right." The release stated that the President had "removed CNN, MS NOW, and Politico from the White House grounds after years of false reporting," and further stated that the First Amendment "does not entitle them to a hard pass, briefing room seat, or place in the press pool." That same day, hours after Plaintiffs filed this action, the President posted on Truth Social that "Fake News CNN, Politico . . . and MSNOW (formerly known as MSDNC!), have brought suit to gain access to the White House, and your President, ME!" He claimed that "Fake News people and publications that only write negatively . . . shouldn't be allowed access to the most important Office anywhere in the World," the Oval Office, which "should be treated with Decorum, Respect, and Dignity, not defiled by Third Rate Clowns, who purposefully distort, twist, and degrade with everything they write or publish." The President complained that "[v]irtually every story about me, or anything having to do with me, is negative," that "it is reported that I get 94% bad publicity," and that "[n]o matter how GREAT my Achievements, they trivialize and demean." He then asked, "Why should I have to give 'access' to such people?" and vowed that he "will do whatever is necessary."

73. At approximately 10:30 p.m. on September 22, 2026—four days after the ban took effect and the night before the hearing on Plaintiffs' motion for a temporary restraining order—the White House Press Office sent letters by email to CNN, MS NOW, and POLITICO. The letters asserted that each organization had "exhibited behavior in violation of the standards of professionalism and decorum expected of those given access to the White House Complex," and each set out a "non-exhaustive list of reporting incidents." The letters did not identify any written

policy, regulation, or rule that Plaintiffs had violated, or any prior occasion on which the purported standards had been communicated to them. Nor did they identify any specific falsehood or item of classified information in the cited articles.

74. Less than ninety minutes after the White House Press Office emailed the letters, the President posted on Truth Social that "[a]ll of the SLEAZEBAGS, like Third Rate 'Reporter,' Kaitlan Collins, of Fake News CNN, a truly unhappy person, said they weren't going to be covering me." He then declared that "[s]he's got a 'TRUMP' addiction, and so does CNN and MSDNC." The post said nothing about professionalism, decorum, sensitive information, or any of the articles cited in the letters.

75. Most of the reporting identified in the letters was not the work of journalists with White House hard passes. Only one of the four CNN articles cited was written by a hard-pass holder—Plaintiff Betsy Klein—and the White House accepted Ms. Klein's hard-pass renewal in June 2026, approximately five months after that article was published. Only one of the three MS NOW articles cited was written by a hard-pass holder, and the White House renewed that journalist's hard pass after the cited article was published. Only two of the six POLITICO articles cited were written by hard-pass holders. Between the publication of the earliest cited article and September 18, 2026, Plaintiffs' journalists had continued to enter the White House, attend briefings, and perform pool assignments in the ordinary course. No White House official suggested that the reporting violated any rule or could result in the loss of access.

76. Defendants' own filings in this action confirm that the "standards" invoked in the letters amount to nothing more than the President's disagreement with reporting he dislikes. On the morning of September 23, 2026, MS NOW published an article reporting that administration officials were circulating a list of federal sites that could carry the President's name and that Ford's Theatre, where President Lincoln was assassinated, had come up in those discussions. That evening, the President posted on Truth Social that the story "is a ridiculous lie," "FAKE NEWS!,"

and a "Hoax," and described those responsible as "Degenerates and Losers who make up lie after lie." Later that night, Defendants filed a "supplemental notice" in this action attaching the MS NOW article and the President's post and representing to the Court that they "support Defendants' conclusions that Plaintiffs have exhibited behavior in violation of the standards of professionalism and decorum expected of those given access to the White House Complex."

77. The President's own statements further confirm that the ban was motivated by his dissatisfaction with Plaintiffs' coverage. A few days later, in his September 28, 2026, interview with TIME, he complained, "I haven't had a good story on CNN for years . . . . Same thing on MS NOW . . . . If I do the finest thing, if I found the cure to cancer, they would say, 'Why didn't he move quicker?'" Asked why he imposed the ban at that time, he answered, "Well, it's just bad story after bad story," and explained, "I don't think anybody should be forced to bear fake news, constantly bad stories, because I've done great things." And when asked whether he believed that "the press is supposed to hold government and those in power accountable," he responded: "It is, but they got to treat you fairly."

### G. Defendants continue to bar Plaintiffs from the Oval Office, Air Force One, and other presidential events.

78. On September 24, 2026, this Court granted Plaintiffs' motion for a temporary restraining order. The Court held that Plaintiffs were likely to succeed on their due process claim and ordered Defendants (except for the President) and all persons acting in concert with them to "immediately return, reinstate, and restore" the hard passes held by employees of CNN, MS NOW, and POLITICO.

79. Defendants did not immediately comply with the Court's order. Throughout the morning of September 24, Secret Service officers continued to turn Plaintiffs' journalists away and confiscate additional hard passes. The White House did not begin restoring Plaintiffs' hard

passes until approximately noon, roughly eleven hours after the Court's temporary restraining order was issued.

80. Even after restoring Plaintiffs' hard passes, Defendants continued to exclude Plaintiffs from presidential events. On the evening of September 24, 2026, the White House prevented Plaintiffs from attending and covering the arrival of Chinese President Xi Jinping to a state dinner. Although CNN had timely requested access for its reporters, producers, and camera crew, the White House informed CNN that only a photojournalist and an audio technician would be admitted, excluding CNN's editorial team. Other television networks were permitted to cover the arrival with reporters and producers present. CNN informed the White House that it wanted to cover the event with an editorial presence, but no CNN reporter or producer was permitted to attend. MS NOW likewise timely submitted a request for credentials to the event but received no response. Approximately 25 minutes before the event began, an MS NOW reporter was denied access. When she asked why she was being denied, a White House staffer told her to "talk to Steven," apparently referring to Defendant Cheung.

81. The exclusions extended to CNN's pool duties aboard Air Force One. On the evening of September 25, 2026, CNN learned that it would not be permitted to travel aboard Air Force One as the designated television network pooler for the President's trip to Knoxville, Tennessee the following day, even though CNN had been scheduled to serve as the designated television network pooler for that trip. The White House's schedule for September 26, 2026, did not identify any network to take CNN's place, and no television network pooler accompanied the President aboard Air Force One that day. CNN received no official communication from anyone at the White House providing any reason for its exclusion.

82. On September 27, 2026, the White House identified CNN as the television network pooler for the in-town press rotation on October 1, 2026. Being listed as the in-town television network pooler typically indicates that you are the designated television network pooler for the

full day, including any travel or out-of-town events. On September 29, 2026, consistent with the standard practice for upcoming presidential travel, CNN submitted a manifest for Air Force One in connection with the President's October 1 trip to Texas and Oklahoma. On the morning of September 30, 2026, however, CNN learned through the pool chair that it would not be permitted to travel aboard Air Force One as the designated television network pooler. As a result, CNN was again prevented from traveling aboard Air Force One and performing the totality of its assigned duties as the designated television network pooler. CNN received no official communication from anyone at the White House providing any reason for its exclusion.

83. On October 4, 2026, POLITICO learned from White House Press Office staff that it would not be permitted to serve as the print pooler for the President's October 5 trip to Nebraska, an assignment POLITICO had been scheduled to perform as part of the print pool rotation. POLITICO was therefore unable to perform its assigned print pool duties or to travel with the President. POLITICO received no explanation for its exclusion.

84. Defendants have provided no notice, articulated no standard, and offered no reason for any of these exclusions, and they have afforded Plaintiffs no opportunity to be heard before imposing them. The exclusions target precisely the settings—the Oval Office and Air Force One—in which this President most frequently briefs the press and takes questions from journalists. Plaintiffs' continued exclusion from these spaces confirms that Defendants are implementing the President's stated directive to take the ban "as far as you can."

### H. The Court grants Plaintiffs' motion for a preliminary injunction.

85. On October 13, 2026, the Court granted Plaintiffs' motion for a preliminary injunction, holding that Plaintiffs were likely to succeed not only on their due process claim but also on their First Amendment claims. The Court explained that the President's "own comments suggest" that he intended the ban to "alter their reporting on him" and that "President Trump likely banned Plaintiffs from the White House because he believes that their reporting is generally . . .

biased against him." The Court therefore continued the relief afforded by its temporary restraining order and denied Defendants' request for a stay pending appeal.

86. On October 14, 2026, the day after the Court's ruling, the White House issued a statement declaring: "The Fake News has no place demanding a spot in the President's Oval Office. The lies they smear are a disservice to the American public and tear at the very fabric of our Democracy. They're completely capable of reporting from directly outside. We intend to appeal this misguided decision."

87. Two days later, the White House again barred CNN from fulfilling its duties as designated television network pooler on Air Force One. CNN was scheduled to serve as the designated television network pooler on Friday, October 16, 2026, both for the in-town pool and as part of the out-of-town travel pool for the President's trip to Dalton, Georgia and Palm Beach, Florida. In connection with the trip, CNN timely submitted a manifest for Air Force One. On October 15, 2026, however, CNN learned that it had been excluded from the out-of-town travel pool and thus would be prevented from providing pool coverage of the President's trip. CNN received no official communication from anyone at the White House providing any reason for its exclusion.

88. On October 19, 2026, counsel for CNN wrote to counsel for Defendants demanding that the White House abandon any policy of excluding CNN from the Oval Office and Air Force One, refrain from preventing CNN from performing its assigned pool duties as it did before September 18, 2026, and confirm in writing by 5:00 p.m. Eastern Time on October 22, 2026, that it would do so.

89. The White House never responded to that letter. Instead, on October 20, 2026, the White House issued a public statement standing by the President's actions. The statement declared: "No person and no journalist have a constitutional right to access to the President's Oval Office, Air Force One, or other sensitive and private facilities. When publications lie, fabricate,

and ignore the truth, proximity matters less and they can write their fiction from outside of these secure facilities."

90. The next day, on October 21, 2026, the White House barred CNN from fulfilling its duties as the designated television network pooler on Air Force One. Although CNN submitted a manifest in connection with the President's trip to Clemson, South Carolina, the White House Press Office omitted CNN from the travel pool, preventing CNN from fulfilling its assigned out-of-town pool duties and leaving the trip without scheduled television pool coverage. CNN received no official communication from anyone at the White House providing any reason for its exclusion.

91. On October 26, 2026, the White House barred both CNN and POLITICO from traveling aboard Air Force One for the President's trip to Mississippi, despite their scheduled assignments as the designated television network pooler and print pooler, respectively. As with each prior exclusion, the White House provided CNN and POLITICO no notice and no explanation. In all, since September 18, 2026, CNN has been denied access to Air Force One each of the six times it has been scheduled to travel with the President as the designated television network pooler—on September 21, September 26, October 1, October 16, October 21, and October 26, 2026. CNN is next scheduled to serve as the designated television network pooler on October 31, November 5, 10, 15, 20, 25, and 30, 2026. Nothing in Defendants' words or conduct suggests they will honor those assignments in full.

92. MS NOW has not been designated to serve as the secondary television network pooler at any time since the President announced the ban, even though in the seven months before the ban, MS NOW had served in that role roughly every two to three weeks. By refusing to permit MS NOW to serve as the secondary television network pooler, the White House has prevented MS NOW's journalists from covering the presidential events that only pool members may attend.

93. Defendants have continued to target POLITICO on the basis of its reporting. On October 19, 2026, William O. Scharf, Counsel to the President, wrote to POLITICO's Global Editor-in-Chief concerning articles published between October 14 and 17 about Defendant Wiles. The letter characterized the articles as "demonstrably false and defamatory" and called on POLITICO to correct or retract them, publicly apologize to the President and Ms. Wiles, and remove the reporting from its digital archives. It stated that failure to comply or justify the publications within 48 hours would prompt "an immediate review of Politico's relationship with the White House" and "consideration of all other appropriate and available legal remedies." The letter identified no rule, regulation, or standard of "professionalism and decorum" that POLITICO had violated. Instead, it linked the proposed review of POLITICO's relationship with the White House to the content of its reporting.

94. On October 21, 2026, POLITICO responded to the letter, categorically rejecting accusations that it published "purposeful falsehoods designed to mislead the public," explaining that it reviewed all three articles identified, made a correction to one of the three articles, and stated that the letter was further evidence of the retaliatory and viewpoint-discriminatory motives underlying the President's ban. Promptly and transparently making corrections, as POLITICO did, is a hallmark of journalistic ethics and integrity, and of the very professionalism that the letter claimed POLITICO is lacking.

**I. The ban and Defendants' subsequent actions are causing irreparable harm to Plaintiffs.**

95. The ban prohibited Plaintiffs and their reporters from accessing the White House grounds for nearly a week, and the White House's continued retaliatory and viewpoint-discriminatory exclusion of Plaintiffs from certain White House fora continues to prevent Plaintiffs from performing their designated pool duties and newsgathering and reporting in the very settings in which this President most often engages the press.

96. Exclusion from these White House press areas is inflicting serious irreparable harm on Plaintiffs. "[W]ithout access to the [White House]," reporters "effectively cannot perform the duties of a White House correspondent because [they] lack[] the ability to observe events firsthand and to ask questions of White House officials." *Karem v. Trump*, 404 F. Supp. 3d 203, 216 (D.D.C. 2019). White House reporters' "First Amendment interest depends on [their] ability to freely pursue 'journalistically productive conversations' with White House officials"—and without access to the White House, reporters "lack[] the access to pursue those conversations—even as an eavesdropper." *Id.* at 216–17. Because "the news is time-sensitive and occurs spontaneously, that lack of access cannot be remedied retrospectively." *Id.* at 217. Without White House access, a reporter and the organization she works for may well miss the newsworthy events, particularly including the many notable events that occur with little notice. White House reporters like Ms. Gardner, Ms. Haslett, and Ms. Klein, along with other reporters who work for CNN, MS NOW, and POLITICO, face serious impediments to doing their jobs and producing valuable reporting as members of the press as a result of the ban.

97. The exclusion of CNN's, MS NOW's, and POLITICO's reporters from the White House, including the Oval Office, and Air Force One accordingly inflicts irreparable harm to these news organizations. The organizations, whose very purpose is to report national news, depend on individual reporters to gather information firsthand at the White House. As a result of the ban, Plaintiffs have lost the ability to perform essential newsgathering at the seat of the Executive Branch, where critically important newsworthy events occur every day. The ban irreparably curtails the organizations' speech—preventing them from being able to publish stories they otherwise would—each day it remains in effect. The ban and the White House's continued exclusion of Plaintiffs from certain White House press areas also impermissibly chill the speech of other news organizations and journalists, who must now balance conducting their

constitutionally protected and vitally important work of reporting on the White House against the risk that coverage the President "dislike[s]" will condemn them to the same fate.

98. Preventing CNN from performing its duties as designated television network pooler inflicts a distinct and irreparable harm. Each missed rotation means lost coverage of the President—often the only television coverage available. That loss affects not only CNN, but also the other four members of the primary television network pool, the more than 1,000 affiliates that receive the pool feed through CNN, and the public. CNN spends millions of dollars each year to fulfill its primary television network pool duties, and continues to pay 20 percent of its shared costs of participation in the pool, yet it is barred from performing the duties that investment supports.

99. Moreover, the ban and the White House's continued exclusion of Plaintiffs from certain White House press areas unconstitutionally restrict the ability of the public to access current and complete reporting on the events in the White House at a time when significant domestic and global events are unfolding by the minute. "Not only [reporters] and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual [reporters] not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129. The President's blatantly unconstitutional ban and Defendants' continued exclusion of the Plaintiffs from certain White House press areas violate that principle.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT
### (REVOCATION OF HARD PASSES)

100. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

101. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

102. Members of the press have liberty and property interests in hard-pass press credentials and the access those credentials afford. As the D.C. Circuit has long held, the interest that members of the press have in their White House hard passes is "protected by the first amendment" and "undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment." *Sherrill*, 569 F.2d at 130–31; *see id.* at 131 n.22 (suggesting that reporters also have a property interest in their hard passes). Accordingly, the "loss of" those credentials and the "White House access" that accompanies them without due process is unconstitutional. *Karem*, 960 F.3d at 665.

103. Defendants have deprived Plaintiffs and their reporters of their liberty and property interests in maintaining their hard passes and accessing White House grounds. Following President Trump's announcement of the ban, the White House, acting through and at the direction of the other Defendants, promptly and indefinitely deactivated hard passes that had been duly issued to Plaintiffs' journalists. The Secret Service, under the control of Director Curran, denied White House access to journalists with CNN, MS NOW, and POLITICO from September 19, 2026, until approximately noon on September 24, 2026, when Defendants began complying with the temporary restraining order.

104. Defendants did not provide Plaintiffs with due process of law before deactivating their reporters' hard passes, terminating their reporters' access to the White House, and physically seizing their hard passes.

105. The Due Process Clause "requires that explicit and meaningful standards" for accessing the White House grounds "be formally articulated or published" before the government excludes a member of the press. *Karem*, 960 F.3d at 666 (brackets and quotation marks omitted). Here, Plaintiffs received zero advance notice that the President would ban a news organization from the White House if he dislikes its coverage. Plaintiffs therefore lacked "fair notice" that their

conduct would "subject [them] to punishment" and of the "magnitude of the sanction that the White House might impose." *Id.* at 665 (quotation marks and brackets omitted).

106. Even if Plaintiffs had been given such notice, the President's prohibition on so-called "FAKE NEWS" (meaning coverage that is not false but that the President dislikes) is not an explicit and meaningful standard, as required by the Due Process Clause. Because of the First Amendment implications of any suspension or revocation of press access to the White House, a "particularly 'stringent vagueness and fair-notice test'" applies. *Karem*, 960 F.3d at 665 (brackets omitted); *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254–55 (2012). Here, the President's "standardless" prohibition is unconstitutionally vague and allows "seriously discriminatory enforcement"—indeed, that is the entire point, as the President's own statements about the purpose of the ban show. *United States v. Williams*, 553 U.S. 285, 304 (2008).

107. The Due Process Clause further requires "an opportunity to present [one's] objections" to the deprivation of liberty. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Plaintiffs had no "avenue for a response" before President Trump announced the ban on Truth Social. *Cook*, 609 U.S. at 557–58 (holding that another Truth Social post did not provide an adequate opportunity to be heard). His administration implemented the ban by deactivating hard passes for Plaintiffs' reporters, barring their entry to the White House grounds, and seizing physical hard passes the following day.

108. Because Defendants denied Plaintiffs the "minimum prerequisite" of notice of an explicit and meaningful standard as well as an opportunity to be heard before revoking Plaintiffs' press credentials and terminating their access to the White House grounds to report on official governmental action, Defendants deprived Plaintiffs of protected liberty and property interests without due process of law. *Karem*, 960 F.3d at 667.

109. As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm. *Karem*, 960 F.3d at 667–68. The ban violates the Due Process Clause and should be enjoined and declared unlawful.

**COUNT TWO**
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT—DEPRIVATION OF LIBERTY AND PROPERTY INTERESTS (AIR FORCE ONE AND OVAL OFFICE EXCLUSIONS)**

110. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

111. A protected property interest arises where a person has "a legitimate claim of entitlement" to a benefit, grounded in "existing rules or understandings that stem from an independent source," *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972), or in "mutually explicit understandings" with the government, *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). In *Sherrill*, the D.C. Circuit indicated that a journalist's entitlement to a White House press pass and the access that accompanies it may constitute a protected property interest. 569 F.2d at 131 n.22. The court explained that the "consistent, positive action of government officials" could create a "justifiable expectation" that a press pass would be denied only on grounds of presidential security, even without an express basis in the Constitution or federal law. *Id.* Given the First Amendment values implicated by that entitlement, the court observed, "it would be difficult not to infer constitutional recognition of this interest." *Id.*

112. CNN's entitlement to perform its duties as designated primary television network pooler rests on exactly that kind of consistent, positive action by government officials, sustained over four and a half decades. For 45 years, CNN has been a member of the primary television network pool, and the White House has honored CNN's scheduled rotations—including by admitting CNN's crew to the Oval Office, Air Force One, and other presidential events designated for pool coverage—as a matter of settled, mutually understood practice. In reliance on that practice, CNN bears 20 percent of the pool's shared costs, pays the full cost of its own crews,

equipment, staffing, and travel, and has structured its Washington operations around its pool obligations. CNN therefore has a legitimate claim of entitlement, and protected liberty and property interests, in fully performing its duties as the designated television network pooler when scheduled to do so. MS NOW and POLITICO have comparable interests in performing their scheduled assignments in the secondary television pool and the print pool, respectively.

113. Defendants have deprived Plaintiffs of those interests without due process. Since September 18, 2026, Defendants have barred CNN from Air Force One each of the six times it was scheduled to travel with the President as the designated television network pooler, have refused to permit MS NOW to serve as the secondary television pooler, and have barred POLITICO from two scheduled print pool assignments aboard Air Force One.

114. Defendants afforded no process at all. They have never articulated any standard under which a member of the press pool may be barred from performing a scheduled rotation or excluded from the Oval Office or Air Force One while on duty for the pool; they provided Plaintiffs no notice before each exclusion—in several instances leaving CNN to learn of its exclusion from the White House's daily guidance or from the pool chair; and they afforded Plaintiffs no opportunity to be heard. *See Karem*, 960 F.3d at 665–66.

115. As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable harm. Defendants' interference with Plaintiffs' ability to perform their press pool duties, and their exclusion of Plaintiffs from the Oval Office, Air Force One, and other presidential events designated for pool coverage, violate the Due Process Clause and should be enjoined and declared unlawful.

**COUNT THREE**
**VIOLATION OF THE FIRST AMENDMENT—RETALIATION**

116. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

117. The First Amendment "guarantees all Americans the rights to speak, worship, publish, assemble, and petition their government freely." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 184 (2026). To safeguard those rights, the Amendment also "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). Government officials have their own right to speak and to "do so forcefully," but they may not "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). If the rule were otherwise, the government, through retaliation for protected speech, could achieve the " 'self-censorship' of speech that could not be proscribed." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). Retaliation is particularly pernicious when directed against the press, because "[w]ithout an unfettered press, citizens would be far less able to make informed political, social, and economic choices"; "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981).

118. To demonstrate that unlawful retaliation has occurred, a plaintiff must show that " '(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him.' " *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The ban and Defendants' continued exclusion of Plaintiffs from certain White House fora readily establish each element.

119. First, Plaintiffs' news coverage of the President is core First Amendment activity. "The framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to think as you will and to speak as you think.' " *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660–61 (2000)). And as reflected in the

Press Clause of the First Amendment, "[t]he Constitution specifically selected the press . . . to play an important role in the discussion of public affairs." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). "Suppression" of the press "muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Id.* All told, speech about official action "is an essential mechanism of democracy" that "hold[s] officials accountable to the people." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010).

120. Second, banning Plaintiffs from the White House grounds and continuing to exclude them from certain White House press areas are precisely the type of adverse actions that would deter journalists and news organizations of ordinary firmness from continuing to provide fact-based, independent coverage of the administration that the President dislikes. Indeed, that is the entire point of the ban: The President has admitted his hope that the ban would coerce positive coverage from Plaintiffs by offering that, if they "could straighten themselves out," then the President would "love it." As the President well knows, access to the White House grounds, including the Oval Office, and Air Force One is critical for covering the President and his administration. "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). Even a one-month suspension from the White House grounds is "an eon in today's news business." *Karem*, 960 F.3d at 665. An indefinite ban or exclusion has an even greater chilling effect on future coverage of the administration. And the President's express threat of "Other Fake News Media Outlets to follow" only exacerbates the chilling effect of the ban for all news organizations that retain access to the White House grounds. The ban undeniably "discourage[s] the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Counterman*, 600 U.S. at 78 (quoting *Sullivan*, 376 U.S. at 270).

121. Third, President Trump has expressly linked both the ban and Defendants' continued exclusion of Plaintiffs from specific White House press areas to the content of Plaintiffs' coverage

of him and his administration. The President's Truth Social post declares that he banned Plaintiffs from the White House grounds "as a result of their constant 'reporting' FAKE NEWS!" ¶ 58, *supra* (emphasis added). And he purported to justify the ban by asserting that "Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America." *Id.* (emphasis added). But the President also made clear that what he meant by "lies" was really news that is "purposely . . . negative," "one-sided," "never good," or "diminish[ing] the Republicans." He referred to "cumulative stories over the last two years" in which Plaintiffs "purposely write negative news" as the motivation for the ban. And he has made expressly clear his desire to limit Oval Office access to only those news organizations who cover him and his administration, in his view, positively, stating that "publications that only write negatively . . . shouldn't be allowed access to the most important Office anywhere in the World. . . ." In the wake of this Court's preliminary injunction ruling, on October 14, the White House issued a statement declaring: "The Fake News has no place demanding a spot in the President's Oval Office. . . ."

122. Defendants' actual and threatened exclusion of Plaintiffs from the Oval Office, Air Force One, and other presidential events designated for pool coverage is retaliation for the same protected activity. This Court has twice found that Plaintiffs are likely to succeed on their claim that the ban violated their constitutional rights, and in its October 13, 2026, ruling the Court held that Plaintiffs are likely to succeed on their claim that the ban is unlawful retaliation for their First Amendment-protected reporting. Notwithstanding those rulings, the White House has persisted—on no fewer than six occasions as to CNN alone—in excluding Plaintiffs from the settings in which the President most often interacts with the press. On information and belief, the White House Press Office is implementing a policy of excluding CNN, MS NOW, and POLITICO from those settings as punishment for their reporting, in order to take the President's ban "as far as you can"

notwithstanding this Court's orders. That retaliatory policy violates the First Amendment for the same reasons underlying the Court's October 13 ruling.

123. As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer constitutional harms. The "loss of" Plaintiffs' "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quotation marks omitted). The ban and Defendants' continued exclusion of Plaintiffs from certain White House fora constitute retaliation in violation of the First Amendment and should be enjoined and declared unlawful.

**COUNT FOUR**
**VIOLATION OF THE FIRST AMENDMENT—VIEWPOINT DISCRIMINATION**

124. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

125. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187; *see also Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (viewpoint discrimination is a "'more blatant' and 'egregious form of content discrimination'" (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995))). The First Amendment's prohibition of viewpoint discrimination "limits the restrictions that the government may impose on speech, including speech on government property." *Ateba*, 133 F.4th at 119. In the words of the D.C. Circuit, "viewpoint discrimination is poison." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quotation marks omitted). So "arbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Sherrill*, 569 F.2d at 129.

126. A "nonpublic forum" is "government property" that the government has opened to speech for selected speakers. *Ateba*, 133 F.4th at 121–22. The D.C. Circuit has held that the "White House Press Area"—including "the briefing room, the press offices, and certain other

locations in and around the White House"—"is a nonpublic forum" because the government "provides selective access for individual speakers." *Id.* at 117, 122 (quotation marks omitted).

127. The Oval Office and Air Force One are White House press areas and accordingly nonpublic fora. For decades, the White House has granted selective access to those spaces to credentialed members of the press pool to engage in First Amendment-protected newsgathering and reporting. Under President Trump, the Oval Office and Air Force One have become the primary settings in which journalists gather news, report on, and interact with the President and other officials. The journalists admitted to those spaces engage in expressive activity from inside them—including broadcasting live, filing pool reports, publishing breaking news alerts, and transmitting photographs in real time.

128. The First Amendment requires that any restrictions on access to a nonpublic forum be both viewpoint neutral and "reasonable in light of the purpose served by the forum." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (the "government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). The ban and the White House's continued exclusion of Plaintiffs from other White House press areas are neither viewpoint neutral nor reasonable.

129. President Trump has expressly targeted Plaintiffs based on their perceived editorial viewpoints—targeting the "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. The President has left no doubt that he has banned Plaintiffs from the White House because, in his view, he believes they "write negative news" and "want to try and diminish the Republicans and a Republican administration." While Plaintiffs contest the President's characterizations, it is indisputable that the President has targeted Plaintiffs based on their perceived "motivating ideology or the opinion or perspective" and thus engaged in paradigmatic viewpoint discrimination. *Id.* The White House's own explanation for continuing to exclude

Plaintiffs from the Oval Office and Air Force One—that "[t]he Fake News has no place demanding a spot in the President's Oval Office"—is equally explicit. This clear viewpoint discrimination means that the ban is flatly unconstitutional.

130. Banning Plaintiffs from the White House also is unconstitutional because it is not reasonable in light of the purpose served by the White House press areas. The ban was imposed because of the President's view that Plaintiffs "write negative news" and "want to try and diminish the Republicans and a Republican administration." While certain speaker-based access restrictions may be reasonable to further the purposes of a forum, banning speakers based on the President's personal dislike for their perceived views does nothing to promote the purposes of the White House press areas. The White House press facilities are "made publicly available as a source of information for newsmen" and serve the interests of "the public at large" in receiving information "gathered out of a multitude of tongues." *Sherrill*, 569 F.2d at 129–30 (quotation marks omitted); *see Karem*, 960 F.3d at 665. Banning Plaintiffs, among the most prominent news organizations in the country, based on their perceived viewpoints frustrates those purposes. And the exclusion criteria here—that the President perceives a journalist's reporting as "fake" or "negative"—are so vague and arbitrary that they cannot count as a "sensible basis for distinguishing what may come in from what must stay out" and are thus unreasonable. *Mansky*, 585 U.S. at 16.

131. Defendants' continued exclusion of Plaintiffs from the Oval Office and Air Force One is likewise unreasonable in light of the purposes served by press access to those spaces. The White House has relied on the press pool to cover the President in settings that cannot accommodate the full press corps, including Air Force One and the Oval Office, for decades. Although the size and nature of these spaces may justify limits on the number of reporters who may enter, excluding Plaintiffs from the Oval Office and Air Force One during their assigned pool rotation—and thus, at times, leaving events without television pool coverage entirely—

undermines the purpose for which the White House opens those spaces to protected First Amendment activity.

132. In addition, Defendants' claim to standardless discretion to ban White House access to credentialed news organizations and reporters is unreasonable. The D.C. Circuit has squarely "held that the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable." *Ateba*, 133 F.4th at 125; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). The President's ban and the White House's continued exclusion of Plaintiffs from the Oval Office, Air Force One, and other presidential events designated for pool coverage are just such a raw exercise of unbridled discretion.

133. As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm. The ban and the White House's continued exclusion of Plaintiffs from certain White House press areas constitute viewpoint discrimination against Plaintiffs in a nonpublic forum in violation of the First Amendment and should be enjoined and declared unlawful.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs respectfully request an order:

134. Declaring that the ban of Plaintiffs from accessing the White House, the revocation and confiscation of hard passes belonging to Plaintiffs and their reporters, the exclusion of Plaintiffs and their reporters from the White House grounds, the exclusion of Plaintiffs from the Oval Office, Air Force One, and other presidential events designated for pool coverage while performing their press pool duties, and all other actions undertaken by Defendants and those acting in concert with them to carry out the ban violate the First and Fifth Amendments;

135. Preliminarily and permanently enjoining Defendants and all those acting in concert with them from implementing or seeking to enforce the President's ban;

136. Preliminarily and permanently ordering Defendants to restore CNN's participation in the primary television network pool rotation, including aboard Air Force One and at all other presidential events designated for pool coverage, and to restore MS NOW's and POLITICO's participation in the secondary television pool and print pool rotations, on the same terms that existed before September 18, 2026;

137. Entering judgment in favor of Plaintiffs;

138. Awarding Plaintiffs their reasonable costs and attorneys' fees in accordance with law; and

139. Issuing any other relief that the Court deems just and proper.

Dated: October 28, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
PFuster@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459
CSSullivan@gibsondunn.com

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
CMui@gibsondunn.com

*Counsel for Plaintiffs*

**Admitted Pro Hac Vice*