**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CABLE NEWS NETWORK, INC., MS NOW CABLE, LLC, POLITICO LLC, ET AL.,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DONALD J. TRUMP, ET AL.,<br><br>*Defendants*. | Case No. 1:26-cv-03287-TJK |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A FURTHER PRELIMINARY INJUNCTION**

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiffs Cable News Network, Inc., MS NOW Cable, LLC, POLITICO LLC, Akayla Gardner, Cheyenne Haslett, and Betsy Klein*

**Admitted Pro Hac Vice*

# TABLE OF CONTENTS

Page

INTRODUCTION ... 1

BACKGROUND ... 5

A. For decades, the White House has opened the Oval Office, Air Force One, and other presidential events to the press pool. ... 5

B. CNN, MS NOW, and POLITICO participate in and support the press pool. ... 9

C. Despite this Court's temporary restraining order and preliminary injunction barring enforcement of the President's ban, Defendants continue to exclude Plaintiffs from the Oval Office and Air Force One, and are preventing them from performing their pool functions. ... 12

D. The exclusions have deprived Plaintiffs and the public of coverage of the President. ... 19

LEGAL STANDARD ... 21

ARGUMENT ... 21

I. Plaintiffs are likely to establish that excluding them from the Oval Office, Air Force One, and other pool events is unconstitutional. ... 21

A. The exclusions unconstitutionally deny access to nonpublic fora. ... 21

B. The exclusion retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment. ... 30

C. The exclusions violate the Due Process Clause. ... 35

II. Plaintiffs will suffer irreparable injury absent a preliminary injunction. ... 42

III. The balance of equities and public interest favor a preliminary injunction. ... 43

IV. The Court should waive any bond requirement or require a nominal bond. ... 44

CONCLUSION ... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ....................21

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ....................29

*Am. First Legal Found. v. Becerra*,
2024 WL 3741402 (D.D.C. Aug. 9, 2024) ....................45

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ....................31, 32, 34

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ....................22

*Associated Press v. Budowich*,
2025 WL 1649265 (D.C. Cir. June 6, 2025) ....................8, 23, 25–27, 34

*Associated Press v. Budowich*,
2025 WL 2047025 (D.C. Cir. July 22, 2025) ....................25

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025) ....................8, 24, 25, 35, 39, 45

**Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) ....................2, 22–26

*Barton v. City of Ann Arbor*,
2024 WL 4193751 (E.D. Mich. Sept. 13, 2024) ....................37

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) ....................37

*Cable News Network, Inc. v. Am. Broad. Cos.*,
518 F. Supp. 1238 (N.D. Ga. 1981) ....................24, 30, 44

*Castle Rock v. Gonzales*,
545 U.S. 748 (2005) ....................37

**Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ....................22, 25, 28

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) ....................42

*Elrod v. Burns*,
427 U.S. 347 (1976) ....................42

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)....................................................................................................40

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
636 F.2d 755 (D.C. Cir. 1980)......................................................................................45

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978)....................................................................................................36

*Frederick Douglass Found., Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023).....................................................................................29

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)................................................................................42, 44

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936)....................................................................................................36

**Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992)..............................................................................................22, 25

**Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020).............................................................................4, 39–44

*Karem v. Trump*,
404 F. Supp. 3d 203 (D.D.C. 2019)................................................................................32

*Keeffe v. Library of Congress*,
777 F.2d 1573 (D.C. Cir. 1985).....................................................................................37

*Ky. Dep't of Corrections v. Thompson*,
490 U.S. 454 (1989)..............................................................................................36, 39

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................................................................................................42

*Mahoney v. U.S. Capitol Police Bd.*,
— F.4th —, 2026 WL 2836881 (D.C. Cir. Sept. 22, 2026)..............................2, 22, 24, 29, 30

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025).....................................................................................44

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009).....................................................................................42

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018).............................................................................................26, 28, 30

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................................................................................................31

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)..............................................................................................40, 41

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998)....29

*Nat'l Pub. Radio, Inc. v. Trump*,
827 F. Supp. 3d 48 (D.D.C. 2026)....31

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)....35

*New York Times Co. v. Dep't of Defense*,
824 F. Supp. 3d 27 (D.D.C. 2026)....26, 44

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)....31

*Nken v. Holder*,
556 U.S. 418 (2009)....43

*O'Hare Truck Serv., Inc. v. City of Northlake*,
518 U.S. 712 (1996)....33

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983)....26

**Perry v. Sindermann*,
408 U.S. 593 (1972)....37–39

*Propert v. District of Columbia*,
948 F.2d 1327 (D.C. Cir. 1991)....41

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980)....26

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)....42

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....29

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 (1990)....32, 34

**Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977)....3, 37–41

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994)....32

*Taylor v. Trump*,
823 F. Supp. 3d 17 (D.D.C. 2026)....43, 44

*Thompson v. N. Am. Stainless, LP*,
562 U.S. 170 (2011)....33

*Trump v. Cook*,
609 U.S. 528 (2026)....41

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020)....42

*United States v. Alvarez*,
567 U.S. 709 (2012)....31

*United States v. Nassif*,
97 F.4th 968 (D.C. Cir. 2024)....17

*United States v. Trump*,
88 F.4th 990 (D.C. Cir. 2023)....31

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....21

*Zerilli v. Smith*,
656 F.2d 705 (D.C. Cir. 1981)....27

**Constitutional Provisions**

U.S. Const. Amend. I....3

U.S. Const. Amend. V....3, 35

**Other Authorities**

Alexander Bickel, *The Morality of Consent* (1975)....26

Mary Jo Binker, *"A Journey into Nowhere": The Redirected Vacation of Harry S. Truman*, White House Hist. Ass'n (Fall 2010)....7

*Boeing VC-137C SAM 26000*, Nat'l Museum of the U.S. Air Force....7

*Covering the White House*, White House Correspondents' Ass'n....6–8

*Guide to the White House Beat*, White House Correspondents' Ass'n....6

James A. Jacobs, *The President, the Press, and Proximity: The Creation of the White House Press Center*, White House Hist. Ass'n (Mar. 1, 2015)....5

Martha Joynt Kumar, White House Transition Project, *Presidential Interactions with Reporters During Their First Full Year* (2022)....23

*The Press: Battle Orders*, TIME (Dec. 14, 1959)....7

## INTRODUCTION

On October 13, 2026, this Court preliminarily enjoined the President's "ban on the free press" that barred CNN, MS NOW, and POLITICO from the White House, holding that Plaintiffs are likely to prevail on each of their claims under the First and Fifth Amendments: that the ban denied them due process, that it discriminates against them based on viewpoint, and that it is retaliation for the content of reporting the President dislikes. ECF Nos. 49, 50. Notwithstanding that ruling, Defendants have continued to violate Plaintiffs' constitutional rights, making good on the President's promise to take the ban "as far as you can." ECF No. 32-4 at 53:38–53:58.

The morning after the Court entered its preliminary-injunction ruling, the White House announced that "[t]he Fake News has no place demanding a spot in the President's Oval Office." Boutrous Decl. Ex. E. Since then, Defendants have barred CNN from Air Force One three more times (for a total of six consecutive exclusions from its scheduled rotation as the designated television network pooler since September 18, 2026) and kept MS NOW and POLITICO out of their respective pool rotations. Indeed, presumably anticipating that his unconstitutional ban would not survive judicial review, the President had already begun to formulate a narrower version just hours after Plaintiffs filed this lawsuit, announcing that "Fake News people and publications that only write negatively . . . shouldn't be allowed access to the most important Office anywhere in the World." ECF No. 32-6. And when a reporter later asked whether the administration was ignoring this Court's temporary restraining order, Defendant Cheung described the administration's position: "The judge basically ordered them to renew their access back to the White House, but that's different than allowing the pool into the events in the Oval Office or on Air Force One." ECF No. 44-2 at 7.

The Oval Office and Air Force One are not Constitution-free zones. In fact, under this administration, they have become the President's preferred fora for interacting with the press.

President Trump appeared in the James S. Brady Press Briefing Room a mere six times from the beginning of 2025 through September 2026, fielding roughly 147 questions there. Vigilante Decl. ¶ 5. But he held 259 press events over the same period in the Oval Office, aboard Air Force One, and on the tarmac, fielding no fewer than 4,783 questions from reporters in those settings. Jennings Decl. ¶ 10; Vigilante Decl. ¶ 5. Defendants have opened these spaces during press-pool events so that credentialed journalists can gather news and question public officials. And as their public statements make undeniably clear, Defendants' reasons for excluding Plaintiffs are the very same viewpoint-discriminatory and retaliatory reasons the President has given since he first announced the ban on Plaintiffs on September 18: "bad story after bad story," ECF No. 44-2 at 7, and publications that purportedly "lie, fabricate, and ignore the truth" and "can write their fiction from outside of these secure facilities," Boutrous Decl. Ex. G. Plaintiffs are likely to prevail on their claims arising out of Defendants' exclusions of Plaintiffs from the Oval Office, Air Force One, and other fora opened for press-pool coverage for the same three reasons this Court has already identified.

First, the exclusions restrict access to and use of a nonpublic forum on viewpoint-discriminatory and unreasonable terms. The government creates a nonpublic forum whenever it "provides selective access for individual speakers," as the White House does for those spaces into which it invites the press. *Ateba v. Leavitt*, 133 F.4th 114, 117, 122 (D.C. Cir. 2025) (quotation marks omitted); *see Mahoney v. U.S. Capitol Police Bd.*, — F.4th —, 2026 WL 2836881, at *6 (D.C. Cir. Sept. 22, 2026). The Oval Office and Air Force One, when opened to the pool so that journalists may question and report on the President, are no different, as underscored by the nearly 5,000 questions reporters have asked the President in the Oval Office, aboard Air Force One, or on the tarmac in his second term. Vigilante Decl. ¶ 5. Because Defendants' exclusions of Plaintiffs

discriminate based on viewpoint for the same reasons that this Court has already found, ECF No. 50 at 20, and unreasonably restrict access to nonpublic fora through the exercise of standardless, unbridled discretion, Plaintiffs are likely to prevail under the First Amendment.

Second, excluding Plaintiffs and preventing them from performing their pool rotations is unconstitutional retaliation against Plaintiffs for their protected newsgathering and speech. This Court found the President's own statements "more than enough to show a likely causal link" between Plaintiffs' journalism and the revocation of their hard passes. ECF No. 50 at 16. And the evidence of retaliatory motive has only grown. The White House declared that the "Fake News has no place" in the Oval Office the day after this Court ruled in Plaintiffs' favor; it barred CNN from Air Force One two days after that; and it responded to CNN's demand that it abandon any policy of excluding CNN from the Oval Office and Air Force One with a public statement claiming that Plaintiffs "lie, fabricate, and ignore the truth." Boutrous Decl. Exs. E–G; Jennings Decl. ¶ 12. Even if the Oval Office and Air Force One were not nonpublic fora (they are), excluding Plaintiffs from those and other spaces during press-pool events would still be a materially adverse action that objectively chills news organizations and journalists from covering the administration in ways the President might deem too negative. It is textbook First Amendment retaliation.

Third, the exclusions violate the Due Process Clause. Plaintiffs have a liberty interest in accessing the locations in the White House for journalists "who need to report therefrom." *Sherrill v. Knight*, 569 F.2d 124, 129–31 (D.C. Cir. 1977). The Oval Office and Air Force One, when opened to the pool, are among such locations. Plaintiffs also have a protected property interest in performing their pool rotations grounded in significant investments made in reliance on decades of "consistent, positive action" by the White House. *Id.* at 131 n.22. Defendants have deprived Plaintiffs of those liberty and property interests without advance notice of the prohibited conduct

or the standard governing exclusion, without notice before excluding them, and without any opportunity to be heard.

The remaining equitable factors likewise favor relief, as this Court has already held. ECF No. 50 at 21–25. Each pool rotation Plaintiffs are prevented from performing is coverage lost for good. That loss falls not only on Plaintiffs but also on the broader press corps, the other four members of the primary television network pool, the more than 1,000 local stations that receive the pool feed through CNN, and the public. Jennings Decl. ¶¶ 16–18. The D.C. Circuit also has held that "enforcement of an unconstitutional law is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quotation marks omitted). And Defendants have identified no legitimate countervailing interest beyond their disdain for Plaintiffs' reporting.

Twice, this Court has held that Defendants may not punish Plaintiffs for their journalism by revoking their hard passes and excluding them from the White House grounds entirely. Defendants have responded by excluding Plaintiffs from those areas where the President most often engages with the press. These exclusions violate the Constitution. This Court should enter a preliminary injunction barring Defendants from continuing to retaliate and discriminate against Plaintiffs for the content of their reporting by interfering with their pool rotations and denying them the access to the Oval Office and Air Force One that they had before September 18, 2026.

## BACKGROUND

### A. For decades, the White House has opened the Oval Office, Air Force One, and other presidential events to the press pool.

Since President Theodore Roosevelt set aside a room in the new West Wing for the press almost 125 years ago,[1] the White House press areas have grown to include the James S. Brady Press Briefing Room, where the Press Secretary holds briefings; the North Lawn and West Wing driveway, from which the networks report live; the South Lawn, where Marine One arrives and departs; and the Oval Office, where the President regularly makes announcements and takes reporters' questions. ECF No. 32-18 ¶ 8; Jennings Decl. ¶¶ 3, 9; ECF No. 32-16 ¶ 7; Reddy Decl. ¶ 6. And press coverage of the presidency is not confined to the White House grounds. Jennings Decl. ¶ 5. Members of the press also accompany the President when he travels, gathering and reporting news from wherever the President happens to be—including from the press cabin of Air Force One and from the tarmac before and after the President travels on Air Force One. ECF No. 32-18 ¶ 8; ECF No. 32-20 ¶ 10; ECF No. 32-21 ¶ 13; Jennings Decl. ¶ 5.

Because the Oval Office, Air Force One, and many presidential events cannot accommodate every credentialed White House reporter, a rotating group of journalists—the press pool—accompanies the President and shares its reporting, video, audio, and photographs with the rest of the press corps and, through them, with the American public and the world. Jennings Decl. ¶¶ 4–5; Reddy Decl. ¶ 6; Marsh Decl. ¶ 3. For most of the President's daily activities, the pool is the only source of independent coverage available to the broader press corps and thus the public. Jennings Decl. ¶¶ 5, 17; ECF No. 32-21 ¶ 9. This arrangement benefits the White House too.

[1] James A. Jacobs, *The President, the Press, and Proximity: The Creation of the White House Press Center*, White House Hist. Ass'n (Mar. 1, 2015), https://www.whitehousehistory.org/the-president-the-press-and-proximity.

Jennings Decl. ¶ 4. With the pool nearby, White House staff can quickly gather and brief a representative group of journalists and, through them, communicate with the American people. *Id.*

The press pool includes representatives from television, print, radio, and digital outlets. ECF No. 32-21 ¶ 9; Reddy Decl. ¶ 5; Marsh Decl. ¶ 2. The television component of the pool consists of primary and secondary slots. Jennings Decl. ¶ 6; Reddy Decl. ¶¶ 4–5; ECF No. 32-20 ¶ 11. The primary slot rotates among five networks—ABC, CBS, CNN, Fox News, and NBC—each of which bears 20% of the shared cost of maintaining the primary television network pool. Jennings Decl. ¶ 8; ECF No. 32-20 ¶ 11. When performing its pool duties, CNN supplies video, audio, and editorial information of the President's events to the other four networks, and more than 1,000 local affiliate television stations across the United States receive the pool feed through CNN. Jennings Decl. ¶ 17; ECF No. 32-21 ¶ 10. The secondary slot rotates among a larger group of outlets that includes MS NOW. Reddy Decl. ¶ 5. POLITICO is a member of the print component of the pool. Marsh Decl. ¶ 2.

The traveling pool's composition reflects the limited space available and the different forms of reporting it provides. According to the White House Correspondents' Association, the pool aboard Air Force One has traditionally consisted of thirteen journalists: three wire reporters, four still photographers, two print reporters, a radio correspondent, and a three-member crew from the designated television network pooler, including a reporter.[2] Journalists performing their pool duties, including in the Oval Office and in connection with presidential travel aboard Air Force One, do not simply observe. They gather news, interacting directly with the President and others

[2] *Covering the White House*, White House Correspondents' Ass'n, https://whca.press/covering-the-white-house/ (last visited Nov. 2, 2026); *Guide to the White House Beat*, White House Correspondents' Ass'n (last updated May 2025), https://whca.press/wp-content/uploads/2025/05/WEBSITE2025-WELCOME-TO-THE-WHITE-HOUSE-BEAT-1.pdf.

present by asking questions and following up on those questions, often on issues and topics the President and his administration do not want to talk about; videographers make split-second decisions about what video to capture as events unfold. Jennings Decl. ¶ 5. Journalists report news from those spaces, in real time, for distribution through the pool to the rest of the press corps and then on to the public by filing dispatches and transmitting photographs and video. *Id.*; Reddy Decl. ¶ 6. Print and wire poolers draft and file pool reports that not only report on but also contextualize developments from inside spaces like the Oval Office and the press cabin of Air Force One for distribution within minutes to hundreds of news organizations. Marsh Decl. ¶ 3.

The press pool's physical access has been a feature of presidential travel for nearly a century. The White House Correspondents' Association traces the pool system to the administration of Franklin D. Roosevelt, when a small group of wire reporters accompanied the President on official and personal travel during World War II.[3] By 1946, the travel pool included wire, print, radio, photo, and newsreel reporters, who followed President Truman and received daily briefings from the Press Secretary.[4] And by December 1959, traveling aboard Air Force One had become a routine part of a pool member's duties.[5] That continuing presence has enabled the traveling press pool to document pivotal moments in American history. Pool reporters were in the motorcade when President Kennedy was assassinated and covered President Lyndon Johnson's subsequent swearing-in aboard Air Force One.[6] Four decades later, their successors accompanied

---

[3] *Covering the White House*, *supra*, note 2.

[4] Mary Jo Binker, *"A Journey into Nowhere": The Redirected Vacation of Harry S. Truman*, White House Hist. Ass'n (Fall 2010), https://www.whitehousehistory.org/a-journey-into-nowhere.

[5] *The Press: Battle Orders*, TIME (Dec. 14, 1959), https://time.com/archive/6829368/the-press-battle-orders/.

[6] *Covering the White House*, *supra*, note 2; *Boeing VC-137C SAM 26000*, Nat'l Museum of the U.S. Air Force, https://www.nationalmuseum.af.mil/Visit/Museum-Exhibits/Fact-Sheets/Display/Article/195807/boeing-vc-137c-sam-26000/ (last visited Nov. 2, 2026).

President George W. Bush to Sarasota, Florida, on September 11, 2001, enabling them to document his response aboard Air Force One as the aftermath of the terrorist attacks unfolded.[7]

For White House correspondents, the White House—or wherever the President happens to be—is the workplace. ECF No. 32-18 ¶ 8; ECF No. 32-16 ¶ 7. The President regularly opens the Oval Office for "press pool availabilities" that "involve a gaggle of reporters, all vying for space and information." *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 53 (D.D.C. 2025), *stayed in part pending appeal*, 2025 WL 1649265 (D.C. Cir. June 6, 2025). The White House itself touts these gaggles as a critical form of public access: "Asked about the pool exclusions, a White House official said that Trump 'is by far the most transparent President in history, as demonstrated by his many open press gaggles and long White House events this week.'" Boutrous Decl. Ex. I.

Presidential travel on Air Force One and press briefings in the Oval Office, in particular, have become primary settings for journalists to interact with, gather news about, and publish reporting on President Trump and other officials on behalf of the American people. Jennings Decl. ¶ 9; Vigilante Decl. ¶¶ 3–5. In 2025, President Trump made two appearances in the Brady Briefing Room, where he fielded a total of approximately 51 questions. Vigilante Decl. ¶ 4. By contrast, he held 95 press events in the Oval Office, where he fielded no fewer than 1,991 questions. *Id.* On Air Force One and on the tarmac, the President made himself available to the press 70 times and fielded no fewer than 1,186 questions. *Id.* This trend has continued in 2026. Through September, the President has appeared in the Brady Briefing Room four times and journalists asked him approximately 96 questions there. *Id.* During the same time period, he held 43 press events in the Oval Office where he fielded at least 741 questions. *Id.* Aboard Air Force One or on the tarmac, President Trump has made himself available to the press 51 times and fielded no fewer

[7] *Covering the White House*, *supra*, note 2.

than 865 questions. *Id.* While the Brady Briefing Room remains a critical forum for reporters to gather and report news, approximately 97% of the nearly 5,000 questions that the President has entertained from reporters during his second term were asked in the Oval Office or in connection with his travel aboard Air Force One. *Id.* ¶ 5. For journalists covering President Trump, briefings in the Oval Office, aboard Air Force One, or on the tarmac are frequently the only opportunity to ask him about his administration's policies and actions. ECF No. 32-18 ¶ 10; Reddy Decl. ¶ 10; Marsh Decl. ¶ 10.

**B. CNN, MS NOW, and POLITICO participate in and support the press pool.**

CNN launched in 1980 as the first 24-hour cable news network and has covered every President since Jimmy Carter from inside the White House complex. ECF No. 32-21 ¶ 3. CNN's correspondents attend the daily press briefing, cover events in the Oval Office, the East Room, and elsewhere on the grounds, report live from CNN's two standing broadcast positions on the North Lawn, and cover the President's arrivals and departures on the South Lawn. ECF No. 32-18 ¶ 7; Jennings Decl. ¶ 3. CNN journalists have held White House hard passes continuously since 1980. ECF No. 32-21 ¶ 6.

CNN has participated in the primary television network pool for 45 years. Jennings Decl. ¶ 7. When CNN serves as the designated television network pooler, it serves as a proxy for all media, not merely on its own behalf. ECF No. 32-21 ¶ 11. Pool rules prohibit the designated pooler from engaging in unilateral newsgathering while performing its pool function. *Id.* The five-network pool functions only if each network performs its rotations. If CNN is removed, the pool loses one-fifth of the crews, equipment, and financial resources on which it depends, and the public loses a source of independent video and audio of the President. Jennings Decl. ¶¶ 17–18.

CNN has made substantial, long-term investments and has structured its Washington operations around fulfilling its pool obligations. In addition to paying 20% of the pool's shared

costs, CNN pays the full cost of its own coverage when it serves as the designated television network pooler—including crews, cameras, transmission and editing equipment, and staffing—and it pays for all travel required to cover the President when he is traveling across the country and across the globe. Jennings Decl. ¶ 8. CNN maintains a booth adjacent to the Brady Briefing Room, two standing broadcast positions on the North Lawn, and broadcast and transmission equipment throughout the White House, all at its own expense. *Id.* ¶ 3. CNN commits substantial other resources to ensure broadcast-quality transmission is possible from the White House complex. *Id.* ¶ 8. Those investments include not only production equipment, but also the installation and maintenance of fiber-optic cable (at the expense of CNN and other members of the pool) throughout the facility. *Id.* CNN's annual costs for these operations regularly average $2,500,000. *Id.* These are recurring financial and operational commitments necessary to maintain the primary television network pool, and they are not fully offset by subscriber fees, which typically offset only about half of these costs. *Id.*

The White House has long recognized and helped coordinate pool coverage. Jennings Decl. ¶ 6. It identifies the designated television network pooler in its daily guidance and press schedule, sets pool call times, coordinates logistics with the designated network, solicits travel manifests, and admits the designated crew to Air Force One and other presidential events. *Id.* The White House also bills pool members for the seats their journalists occupy on Air Force One, as well as for meals, ground transportation, and travel workspaces. *Id.* Members of the primary television network pool also work with the White House to address security-related issues; during the current administration, for example, the pool and the White House agreed on a method for securely broadcasting live the President's remarks before the departure of Marine One, to help ensure the safety and security of the President and others on board. *Id.*

Before September 18, 2026, to the knowledge of CNN's Deputy Bureau Chief, no President or White House official had ever removed a primary television network pooler from a scheduled rotation, barred the designated pooler from the Oval Office or Air Force One, or excluded a network from the primary television network pool because it disliked the content of its coverage. Jennings Decl. ¶ 7. Nor has the White House ever articulated any standard under which a member of the primary television network pool may be removed from its scheduled rotation or excluded from pool events. *Id.*

MS NOW likewise commits resources to participate in the secondary television network pool. MS NOW operates a cable news network and a digital news service. Reddy Decl. ¶ 3. It launched in 1996 as MSNBC and adopted the name MS NOW in November 2025 in connection with its separation from NBCUniversal. *Id.* MS NOW has covered every presidency since the Clinton administration; it assigns approximately ten journalists to the White House full time, and approximately fifteen MS NOW journalists regularly cover it. *Id.* MS NOW independently joined the secondary television network pool in March 2026, soon after its separation from NBCUniversal. *Id.* ¶ 4. In the seven months preceding the ban, MS NOW was designated to serve as the secondary television pooler roughly every two to three weeks—on March 2, March 9, April 3, May 1, May 13, May 28, June 30, July 22, August 15, and August 30, 2026. *Id.* ¶ 5. MS NOW staffs the secondary pool by reassigning members of its regular White House team, and it has invested in the journalists, engineering support, and equipment required to report from the White House. ECF No. 32-20 ¶ 12. When MS NOW was designated as secondary television network pooler, White House staff coordinated pool call times and other logistics with MS NOW and admitted its journalists to the events designated for pool coverage. Reddy Decl. ¶ 7. Before

September 18, 2026, to the knowledge of MS NOW's Washington Bureau Chief, MS NOW had never been removed from its scheduled rotation or excluded from pool events. *Id.*

POLITICO has been a member of the print component of the pool since 2007 and, before the ban, received and performed its print-pool assignments in the ordinary course. Marsh Decl. ¶ 2. POLITICO publishes news at politico.com and in newsletters, including West Wing Playbook, a daily newsletter devoted to coverage of the White House, and provides policy news and analysis to subscribers through POLITICO Pro. ECF No. 32-19 ¶ 2. Before September 18, 2026, to the knowledge of POLITICO's Executive Editor, POLITICO had never been removed from its scheduled rotation or excluded from pool events. Marsh Decl. ¶ 4.

### C. Despite this Court's temporary restraining order and preliminary injunction barring enforcement of the President's ban, Defendants continue to exclude Plaintiffs from the Oval Office and Air Force One, and are preventing them from performing their pool functions.

At 3:04 p.m. on Friday, September 18, 2026, the President announced on Truth Social that he was banning Plaintiffs' journalists from the White House, effective immediately, because of the content of their reporting:



Donald J. Trump
@realDonaldTrump

I am proud to announce that, effective immediately, I am banning Fake News CNN, MSNOW (who recently changed their name from MSNBC due to lack of viewership and credibility!), and Politico (The recipients of an illegal and ridiculous $8 Million Dollar subscription, an All Time Record, directly from the United States Government, under Crooked Joe Biden, in order to keep them "alive." Seems like corruption to me!), from the White House as a result of their constant "reporting" FAKE NEWS! Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America. Other Fake News Media Outlets to follow. Thank you for your attention to this matter! President DONALD J. TRUMP

**13.4k** ReTruths **54.6k** Likes Sep 18, 2026, 3:04 PM

ECF No. 32-3.

About an hour later, while taking reporters' questions in the Oval Office, the President attributed the ban to "cumulative stories over the last two years" by outlets that "purposely write negative news." ECF No. 32-4 at 27:17–28:00. Asked about the logistics of the ban—whether he was taking away the outlets' press badges and whether he was removing them from the pool—the President said he would take the ban "as far as you can." *Id.* at 53:35–53:58. He referred to his action as "the ban on the free press" and said he would "love it" if the three news organizations targeted with the ban "could straighten themselves out." *Id.* at 53:38–53:58.

The President also made clear that other news organizations face the same treatment if he dislikes their coverage. His Truth Social post announcing the ban promised "Other Fake News Media Outlets to follow." ECF No. 32-3. And in the Oval Office, he said "there may be others to join [Plaintiffs]," specifically naming The New York Times and The Washington Post. ECF No. 32-4 at 26:06–26:28; *see id.* at 45:37–46:09.

The White House swiftly implemented the ban. Plaintiffs' hard passes were deactivated, and when Betsy Klein, Akayla Gardner, and Cheyenne Haslett reported for work on the morning of September 19, Secret Service officers turned them away and confiscated their hard passes. ECF No. 32-18 ¶ 13; ECF No. 32-16 ¶ 10; ECF No. 32-17 ¶ 4. The President's ban also immediately disrupted pool coverage. CNN had been assigned to serve as the designated television network pooler on September 21 and 22, to cover the President on his trip to New York to address the United Nations General Assembly. ECF No. 32-21 ¶ 13; Jennings Decl. ¶ 15. But at 10:55 p.m. on September 20, the White House Office of Communications issued its daily guidance and press schedule for the following day with CNN removed. ECF No. 32-21 ¶ 14. No network took CNN's place; the White House listed no primary television network pooler; and there was no television pool coverage of the President's events on September 21. *Id.* The only video of President Trump's first event that day—a ribbon-cutting for a new helipad—was a White House livestream on which his remarks were largely inaudible. *Id.*; Boutrous Decl. ¶ 24.

Plaintiffs filed this action and moved for a temporary restraining order on September 21. ECF Nos. 1, 2. Hours after Plaintiffs filed this action, the President already began turning his focus to the Oval Office, posting that "Fake News people and publications that only write negatively . . . shouldn't be allowed access to the most important Office anywhere in the World," the Oval Office, which "should be treated with Decorum, Respect, and Dignity, not defiled by Third Rate Clowns." ECF No. 32-6. He asked, "Why should I have to give 'access' to such people?" and vowed that he "will do whatever is necessary." *Id.* Shortly before 1:00 a.m. on September 24, this Court entered a temporary restraining order, holding that Plaintiffs were likely to establish that the ban violated the Due Process Clause and ordering Defendants to "immediately return, reinstate, and restore" Plaintiffs' hard passes. ECF No. 24 at 2–4, 8.

Defendants continued to interfere with Plaintiffs' ability to fulfill their pool rotations despite the temporary restraining order. On September 25, CNN learned that it would not be permitted to travel aboard Air Force One as the designated television network pooler for the President's trip to Knoxville, Tennessee—a rotation CNN had been scheduled to perform. ECF No. 32-21 ¶ 27. The White House's schedule for September 26 identified no network to take CNN's place, no television network pooler accompanied the President aboard Air Force One that day, and CNN received no official communication from anyone at the White House providing any reason for its exclusion. *Id.* That morning, MS NOW's Akayla Gardner asked the President whether he wanted only news outlets that support him in the press pool. He answered, "No, no, no. I want real news, not fake news—like you," and continued: "A group like CNN, few people watching, or MSDNC . . . . [T]hey're fake news. 100%. In two years, I doubt they did one good story." ECF No. 32-16 ¶ 18. In three Truth Social posts the same morning, the President asked "[w]hy should perpetrators of FAKE NEWS, like CNN and MSDNC, be allowed access to a very sacred place, the White House?" and declared that "FAKE NEWS SHOULD NOT BE ALLOWED IN THE WHITE HOUSE!!!" ECF Nos. 32-12 to 32-14.

The pattern continued the following week. On September 27, the White House identified CNN as the television network pooler for the in-town rotation on October 1. ECF No. 44-5 ¶ 3. CNN timely submitted a manifest for Air Force One for the President's October 1 trip to Texas and Oklahoma. *Id.* But on the morning of September 30, CNN learned through the pool chair that it would not be permitted aboard. *Id.* CNN was thus prevented, for the third time in ten days, from performing its duties as the designated television network pooler, and again it received no official communication from the White House providing any reason for its exclusion. *Id.*

MS NOW and POLITICO have been removed from their pool rotations as well. In the seven months before the ban, MS NOW served as the secondary television pooler roughly every two to three weeks. Reddy Decl. ¶ 5. It has not done so once since September 18, 2026, and the White House has provided MS NOW no explanation for its exclusion. *Id.* ¶¶ 8–9. Similarly, on October 4, POLITICO learned from White House Press Office staff that it would not be permitted to serve as the print pooler for the President's October 5 trip to Nebraska, an assignment POLITICO had been scheduled to perform as part of the print-pool rotation. Marsh Decl. ¶ 5. POLITICO was therefore unable to perform its print-pool duties or to travel with the President, and it received no explanation for its exclusion. *Id.*

Defendants' public statements make clear why they continue to exclude Plaintiffs. In an interview with TIME Magazine on September 28, the President was asked why Americans should believe he respects the free press while he restricts some journalists' access to the White House. He answered that "I haven't had a good story on CNN for years. They're incapable of being—they're fake news. Same thing on MS NOW." ECF No. 44-2 at 6. He added: "If I do the finest thing, if I found the cure to cancer, they would say, 'Why didn't he move quicker?'" *Id.* Asked "why now," he explained: "Well, it's just bad story after bad story." *Id.* at 7. He added that he did not "think anybody should be forced to bear fake news, constantly bad stories, because I've done great things," and, asked whether the press is supposed to hold those in power accountable, answered: "It is, but they got to treat you fairly." *Id.* at 7–8. And when the President was asked whether he was ignoring the Court's temporary restraining order, Defendant Cheung interjected: "The judge basically ordered them to renew their access back to the White House, but that's different than allowing the pool into the events in the Oval Office or on Air Force One." *Id.* at 7.

Plaintiffs filed a motion for a preliminary injunction against the President's ban on them

from the White House grounds on September 28. ECF No. 32. The Court granted the motion on October 13, holding that Plaintiffs were likely to succeed not only on their due process claim but also on both of their First Amendment claims. ECF Nos. 49, 50. As to due process, the Court found that Plaintiffs had received no fair notice of either the conduct that could result in revocation of their hard passes or the magnitude of that sanction. ECF No. 50 at 8–12. As to retaliation, the Court found the President's own comments "more than enough to show a likely causal link between Plaintiffs' protected First Amendment speech and his revocation of their hard passes." *Id.* at 16. The Court rejected Defendants' alternative, purported national-security rationale, explaining that the record suggested it "was merely a post-hoc justification for the decision." *Id.* at 17. And on viewpoint discrimination, the Court concluded that "it is likely that Plaintiffs were selected by President Trump for revocation of their access to the White House press area because he believes their coverage of him and his administration" is "biased—in other words, it was 'an effort to suppress the speaker's activity due to disagreement with the speaker's view.'" *Id.* at 20–21 (quoting *United States v. Nassif*, 97 F.4th 968, 975 (D.C. Cir. 2024)). The Court extended the relief afforded by the temporary restraining order and denied Defendants' request for a stay pending appeal. *Id.* at 25–26 & n.10.

Defendants did not change course after this Court entered its preliminary injunction. On October 14, the day after the Court's ruling, the White House declared that "[t]he Fake News has no place demanding a spot in the President's Oval Office," that "[t]he lies they smear are a disservice to the American public," that Plaintiffs are "completely capable of reporting from directly outside," and that it "intend[s] to appeal this misguided decision." Boutrous Decl. Ex. E.

Two days later, the White House again barred CNN from Air Force One. CNN was scheduled to serve as the designated television network pooler on Friday, October 16, both for the

in-town pool and as part of the out-of-town travel pool for the President's trip to Dalton, Georgia, and Palm Beach, Florida. Jennings Decl. ¶ 12. In connection with that trip, CNN timely submitted a manifest for Air Force One. *Id.* On October 15, however, CNN learned that it had been excluded from the out-of-town travel pool and would be unable to provide pool coverage of the trip. *Id.* CNN received no official communication from anyone at the White House providing any reason for its exclusion. *Id.*

On October 21, although CNN had submitted a manifest for the President's trip to Clemson, South Carolina, consistent with its standard practice, the White House Press Office omitted CNN from the travel pool, preventing CNN from fulfilling its assigned out-of-town pool duties and leaving the trip without scheduled television pool coverage. Jennings Decl. ¶ 13. And on October 26, the White House barred both CNN and POLITICO from traveling aboard Air Force One for the President's trip to Mississippi, despite their scheduled assignments as the designated television network pooler and print pooler, respectively. *Id.* ¶ 14; Marsh Decl. ¶ 6. The White House again provided no notice and no explanation for these exclusions. Jennings Decl. ¶ 14; Marsh Decl. ¶ 6. In all, since September 18, 2026, CNN has been denied access to Air Force One on each of the six occasions it was scheduled to travel with the President as the designated television network pooler: September 21, September 26, October 1, October 16, October 21, and October 26. Jennings Decl. ¶ 15.

On October 19, counsel for CNN wrote to counsel for Defendants demanding that the White House abandon any policy of excluding CNN from the Oval Office and Air Force One, cease preventing CNN from performing its assigned pool duties as it did before September 18, 2026, and confirm in writing by 5:00 p.m. on October 22 that it would do so. Boutrous Decl. Ex. F at 4. Rather than respond to CNN's letter, the next day the White House issued a public statement

standing by the exclusions: "No person and no journalist has a constitutional right to access to the President's Oval Office, Air Force One, or other sensitive and private facilities. When publications lie, fabricate, and ignore the truth, proximity matters less and they can write their fiction from outside of these secure facilities." Boutrous Decl. Ex. G.

At no point has the White House given Plaintiffs notice of any of these exclusions before imposing them, articulated any standard governing them, offered any reason for them beyond its objections to Plaintiffs' reporting, or afforded Plaintiffs any opportunity to be heard. Jennings Decl. ¶ 15; Reddy Decl. ¶ 9; Marsh Decl. ¶ 7. None of the White House's statements has identified any process by which Plaintiffs could contest their exclusion or any date on which it will end. Jennings Decl. ¶ 15; Reddy Decl. ¶ 9; Marsh Decl. ¶ 7. The exclusions target the settings—including the Oval Office and Air Force One—in which this President most frequently briefs the press and takes questions from journalists. *See* Vigilante Decl. ¶¶ 4–5. Defendants are implementing the President's stated directive to take the ban "as far as you can." ECF No. 32-4 at 53:38–53:58.

### D. The exclusions have deprived Plaintiffs and the public of coverage of the President.

Absent further relief from this Court, the exclusions will continue. The White House has now kept CNN off Air Force One for six consecutive rotations, refused to designate MS NOW as secondary pooler for more than six weeks, and removed POLITICO from two scheduled print-pool assignments. Jennings Decl. ¶ 15; Reddy Decl. ¶ 8; Marsh Decl. ¶¶ 5–6. CNN is next scheduled to serve as the designated television network pooler on November 5, 10, 15, 20, 25, and 30, 2026; MS NOW would serve in the secondary television network pool if Defendants allowed it to; and POLITICO remains in the print-pool rotation and is scheduled to serve as the print pooler

on November 13. Jennings Decl. ¶ 15; Reddy Decl. ¶ 9; Marsh Decl. ¶ 7. Defendants' words and conduct make clear that they intend to frustrate Plaintiffs' pool assignments.

The harm is immediate and compounding. Defendants have excluded and continue to exclude Plaintiffs from the very settings in which the press interacts with President Trump most frequently, and where he fields the overwhelming majority of questions. *See supra*, at 8–9.

Plaintiffs have structured their Washington operations around their pool obligations. Jennings Decl. ¶ 8; Marsh Decl. ¶ 3. CNN continues to bear an average of $2,500,000 in annually recurring expenses, including 20% of the pool's shared costs, yet it is barred from performing the very duties its investment supports. Jennings Decl. ¶¶ 8, 17. MS NOW's journalists cannot cover presidential events that only pool members may attend, Reddy Decl. ¶¶ 10–11, and POLITICO cannot perform the print-pool duties it has carried out for years, Marsh Decl. ¶¶ 10–11. Each pool rotation CNN is prevented from performing harms not only CNN but the other four members of the primary television network pool, 14 subscribers, the more than 1,000 local stations that receive the pool feed through CNN, and the public. Jennings Decl. ¶ 17.

These losses cannot be repaired after the fact. A question Plaintiffs' reporters cannot ask in a space such as the Oval Office is a question the public never hears answered; a trip aboard Air Force One they cannot take is one they cannot cover. Jennings Decl. ¶¶ 16, 19; Reddy Decl. ¶¶ 10–11; Marsh Decl. ¶¶ 10–11. The President has told other news organizations what awaits them if their coverage displeases him. ECF No. 32-3. Every news organization that covers the White House now does so knowing that its ability to fulfill its pool responsibilities may depend on the President's view of its reporting. And each day the exclusions remain in effect, the public is deprived of sources of independent reporting from the places where this President most often speaks to journalists and, through them, to the country. Jennings Decl. ¶¶ 17, 19; Reddy Decl.

¶ 11; Marsh Decl. ¶¶ 10–11.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable injury in the absence of such relief; and (3) that the balance of the equities and (4) the public interest favor an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, Plaintiffs have readily satisfied all four elements: Defendants' conduct is unconstitutional; Plaintiffs will continue to suffer irreparable injury through the loss of their constitutional freedoms for as long as Defendants are permitted to punish them through targeted exclusions from the Oval Office and Air Force One; and the balance of equities and public interest overwhelmingly favor Plaintiffs.

## ARGUMENT

### I. Plaintiffs are likely to establish that excluding them from the Oval Office, Air Force One, and other pool events is unconstitutional.

The "first and most important factor" is "likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). Plaintiffs are likely to succeed on the merits because Defendants' implementation of the President's ban through exclusions from the Oval Office and Air Force One imposes viewpoint-discriminatory and unreasonable restrictions on their access to a forum designed to facilitate activity protected by the First Amendment, retaliates against their protected newsgathering and speech, and denies them due process—just as this Court held with respect to a total ban from the White House grounds. ECF No. 50 at 8–20.

#### A. The exclusions unconstitutionally deny access to nonpublic fora.

Defendants' intentional exclusion of Plaintiffs from spaces open to the press pool violates the First Amendment by restricting access to and the use of a nonpublic forum through impermissible means for impermissible reasons. A "nonpublic forum" is "government property"

that the government has opened to speech for selected speakers. *Ateba*, 133 F.4th at 121–22. Government restrictions on access to a nonpublic forum may not discriminate based on viewpoint and must be reasonable in light of the forum's purposes. Defendants' barring of Plaintiffs from the Oval Office and Air Force One—which, on this extensive record, are nonpublic fora when opened to the pool for newsgathering and reporting—brazenly discriminates against them based on their viewpoint and thus should be enjoined.

**1. The Oval Office and Air Force One are nonpublic fora where viewpoint discrimination is impermissible.**

*Ateba* squarely provides the governing test: When the government chooses to open a location to reporters in limited circumstances—that is, when it "provides selective access for individual speakers"—it "creates a 'nonpublic forum'" in which restrictions must be "viewpoint neutral and reasonable." 133 F.4th at 121–23 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). A space can qualify as a nonpublic forum even if it was not specifically opened "for purposes of providing a forum for expressive activity," so long as "[private expressive] activity occurs." *Cornelius*, 473 U.S. at 805. And the default rule is that all public property that is not a public forum is a nonpublic forum. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79 (1992). The D.C. Circuit has therefore had "no trouble" concluding that the press areas at the White House are a nonpublic forum because they "enabl[e] select journalists to attend briefings by the Press Secretary and to gather information about the administration." *Ateba*, 133 F.4th at 122–23; *see Mahoney*, 2026 WL 2836881, at *6 (reiterating that First Amendment protects access to "White House press facilities").

The Oval Office and Air Force One, when opened to the press pool, are no different from other White House press areas that the D.C. Circuit expressly has recognized are nonpublic fora—

"the briefing room, the press offices, and certain other locations in and around the White House that are open to correspondents." *Ateba*, 133 F.4th at 117. Just like those locations, the Oval Office and Air Force One have been opened by the government for "private speech between private parties." *Associated Press*, 2025 WL 1649265, at *5 (Rao, J., concurring). The journalists admitted to the Oval Office and Air Force One as members of the pool do not simply observe what the President says. These are fora for vibrant expressive exchanges that are entitled to full First Amendment protection. Journalists communicate directly with the President, other officials, their fellow journalists, and the public from those spaces. Jennings Decl. ¶ 5. Print and wire poolers file pool reports for immediate distribution to hundreds of news organizations; television poolers file dispatches and distribute information gathered by the White House press corps; and pool videographers make split-second decisions about what video to capture as events unfold. *Id.*; Reddy Decl. ¶ 6; Marsh Decl. ¶ 3. That private "expressive activity" is just like the activity that makes other press areas in and around the White House nonpublic fora. *Ateba*, 133 F.4th at 122.

The record here also leaves no doubt that the Oval Office and Air Force One, when opened to the press pool, "enabl[e] select journalists to attend briefings" and "gather information about the administration." *Ateba*, 133 F.4th at 122. That has been true across administrations. In the first year of the Biden administration, for example, the Press Secretary or her deputy briefed reporters aboard Air Force One approximately 46 times.[8] But it is especially true of President Trump, who has made the Oval Office and Air Force One essential spaces for journalists to gather and report news about the presidency. In 2025, the President appeared in the Brady Briefing Room only

---

[8] Martha Joynt Kumar, White House Transition Project, *Presidential Interactions with Reporters During Their First Full Year* (2022), https://www.whitehousetransitionproject.org/wp-content/uploads/2022/02/WHTP2021-46E-Presidential-Interchanges-with-Reporters-at-One-Full-year.pdf.

twice and took roughly 51 questions there. Vigilante Decl. ¶ 4. He held 95 press events in the Oval Office over the same period, where he fielded no fewer than 1,991 questions, and he made himself available aboard Air Force One or on the tarmac 70 times, fielding no fewer than 1,186 more. *Id.* The same pattern has persisted this year. Through September 2026, the President has held 43 press events in the Oval Office, where he fielded at least 741 questions, and has made himself available aboard Air Force One or on the tarmac 51 times, fielding no fewer than 865 more. *Id.* Compared to the Brady Briefing Room, approximately 97% of the nearly 5,000 questions the President has entertained from reporters in his second term were in the Oval Office or in connection with his travel on Air Force One. *Id.* ¶ 5.

The analysis here should thus be straightforward. There is an "'enduring and vital tradition of public entree' (through the press as agents) to the presidential activities covered by press pools." *Cable News Network, Inc. v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1244 (N.D. Ga. 1981); *see Associated Press*, 780 F. Supp. 3d at 46 (relying on history of viewpoint-neutral access to the floor of Congress when holding that Oval Office and Air Force One are nonpublic fora during press-pool events); *see also Mahoney*, 2026 WL 2836881, at *7 (applying "relatively probing review" based on historical practice). The President's own practices have made access to the Oval Office and Air Force One as part of the press pool as pivotal to reporting on him and his administration as access to spaces like the Brady Briefing Room. Indeed, the fact that the White House must make extraordinary efforts to make space for and accommodate select reporters on Air Force One and in the Oval Office so they can gather and report the news proves the point: These are fora protected by the First Amendment. The reality that reporters' ability to gather information and report on the President currently centers on these spaces underscores that they "fit the definition of a nonpublic First Amendment forum." *Ateba*, 133 F.4th at 122–23. All of that "expressive

activity occurring on federal property," *Cornelius*, 473 U.S. at 805, means the Oval Office and Air Force One are nonpublic fora during press-pool events—no different from other spaces that the D.C. Circuit has concluded are nonpublic fora. *Ateba*, 133 F.4th at 122–23.

Judge McFadden reached the same conclusion in a comprehensive decision after an evidentiary hearing. As he aptly observed, "[w]hether the press pool travels on Air Force One, goes to a Mar-a-Lago press briefing, or attends a press-pool-only event elsewhere, the Government has chosen to open the doors of nonpublic spaces for some journalists." *Associated Press*, 780 F. Supp. 3d at 54. He also correctly rejected the argument that "Oval Office press pool events are analytically distinct from the other press pool environments." *Id.* There is simply "no principled basis for exempting the press's activities in any White House 'press area' from the requirement of viewpoint neutrality"—"[w]hen the White House Press Pool convenes in the Oval Office, just as when the broader press corps convenes in another White House location, it does so to engage in newsgathering." *Associated Press*, 2025 WL 1649265, at *18 (Pillard, J., dissenting).

The D.C. Circuit's split stay decision in *Associated Press* is not binding on this Court and does not support a contrary result. That "nonprecedential" interim order drew a persuasive dissent from Judge Pillard, who criticized the majority's departures from Supreme Court and D.C. Circuit precedent, and led Judge Walker to express "reservations" about the stay panel's tentative conclusions. *Associated Press v. Budowich*, 2025 WL 2047025, at *2 (D.C. Cir. July 22, 2025) (Walker, J., concurring in denial of reconsideration en banc). The stay decision's carve-out of the Oval Office and Air Force One from traditional forum analysis runs headlong into precedent that "the default category in forum analysis is the nonpublic forum, which includes 'all remaining public property' that does not qualify as a traditional, designated, or limited public forum." *Associated Press*, 2025 WL 1649265, at *18 (Pillard, J., dissenting) (quoting *Krishna*

*Consciousness*, 505 U.S. at 678–79); *see Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (nonpublic forums include any government-controlled space where private expressive activity occurs even if the space "is not by tradition or designation a forum for public communication"); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (same). Nor has the stay order aged well, as the assumptions that underlie the decision from the early months of the Trump administration have been disproven by the White House's use of those fora as primary locations in which the President briefs and engages with the press. Neither of the stay panel's two main justifications for straying from traditional forum analysis holds up legally or factually.

First, the stay panel concluded that press-pool events in the Oval Office and aboard Air Force One do "not involve the type of communicative activities that transform a restricted government space into a nonpublic forum" because "newsgathering is not itself a communicative activity." *Associated Press*, 2025 WL 1649265, at *7. But that reasoning conflicts with *Ateba*, which concluded that the White House press areas are a nonpublic forum precisely because journalists "gather information about the administration" in those locations. 133 F.4th at 122. And it also conflicts with the reality of newsgathering and reporting at these press-pool events.

When performing their pool duties, including in the Oval Office, aboard Air Force One, and on the tarmac before and after the President travels on Air Force One, journalists are not mere passive recipients of information "favorable to or spoon-fed by" the government. *New York Times Co. v. Dep't of Defense*, 824 F. Supp. 3d 27, 49 (D.D.C. 2026). They are fulfilling their constitutionally recognized role as "surrogates for the public"[9] by, among other things, asking

[9] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980) (plurality opinion); Alexander Bickel, *The Morality of Consent* 85 (1975) ("The reporter's access *is* the public's access . . . . That right is the reporter's by virtue of the proxy which the freedom of the press clause of the First Amendment gives to the press in behalf of the public.").

questions of the President and other White House officials, making decisions about what and how to film and photograph events, gathering information both on and off the record, and gleaning key context and other editorial information for their reporting. Journalists ask the President and other officials searching questions in these spaces about a wide range of topics—often on issues and topics the White House would rather avoid. Vigilante Decl. Exs. A–E. And journalists communicate directly from the spaces that the President has chosen to use as de facto briefing rooms by filing dispatches and transmitting video footage live as newsworthy events unfold. Jennings Decl. ¶ 5. News organizations and the public receive and react to that reporting in real time. *Id*. "[T]he press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981). And the contemporaneous newsgathering and reporting that journalists have for decades conducted in fora like the Oval Office and Air Force One—which has enabled pool reporters to document events ranging from President Kennedy's assassination to President Bush's response to the terrorist attacks on September 11 to President Trump's real-time narration of the events of the day—cannot simply "occur anywhere," contrary to the stay panel's unsupported surmise. *Associated Press*, 2025 WL 1649265, at *8.

Second, the stay panel's supposition, made early in the second Trump administration, that the Oval Office lacks a "nexus between the forum and the protected speech" because "journalists generally are not speaking with the President or other officials" has proven to be factually inaccurate. *Associated Press*, 2025 WL 1649265, at *8. President Trump has made the Oval Office and presidential travel the principal settings for his exchanges with reporters. In 2025 and through September 2026, he fielded at least 4,783 questions at 259 events in the Oval Office, aboard Air Force One, and on the tarmac, compared with approximately 147 questions at six Brady

Briefing Room appearances. Vigilante Decl. ¶ 5. Approximately 97% of the questions fielded by President Trump were asked in those settings. *Id.* CNN's Kaitlan Collins, for example, has frequently communicated with the President and asked follow-up questions in the Oval Office, in the press cabin of Air Force One, and on the tarmac, about a wide range of topics including the government shutdown, victims of Jeffrey Epstein, the blockade of the Strait of Hormuz, and the ongoing wars in Ukraine and Iran. Vigilante Decl. Exs. A–E. These exchanges can become testy because the President is confronted with questions and issues he does not want to talk about—the core constitutional function of a free press. *See id.*

Applying the standard required by *Ateba*, areas that are held open to some for expressive activities are nonpublic fora. That standard compels the conclusion that—particularly as President Trump uses them—the Oval Office and Air Force One, just like other White House press areas, fit that category easily. The record as it exists now establishes a very clear nexus between how the President treats those spaces as his preferred fora for engaging with the press on the issues of the day and the press pool members' expressive activities in those spaces.

#### 2. Excluding Plaintiffs from the Oval Office and Air Force One based on viewpoint is unconstitutional.

The First Amendment requires that any restrictions on access to a nonpublic forum must be viewpoint neutral and reasonable in light of the forum's purposes. *Mansky*, 585 U.S. at 11. Defendants' decision to exclude CNN, MS NOW, and POLITICO from the Oval Office and Air Force One and to prevent them from carrying out their pool responsibilities satisfies neither of these requirements.

This Court has recognized that, when the government grants access to a particular forum to some, it may not deny access to others based on viewpoint. ECF No. 50 at 20–21. That prohibition on viewpoint discrimination has deep roots in our constitutional tradition. *Cornelius*,

473 U.S. at 806; *Mahoney*, 2026 WL 2836881, at *6. Indeed, viewpoint discrimination is "'poison'" to a free and open society, whether it infects a nonpublic forum or a government program. *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023); *see, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213–14 (2013); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 586–87 (1998).

All the evidence this Court relied on in entering its preliminary injunction makes clear that Defendants have excluded Plaintiffs from the Oval Office and Air Force One, and interfered with their ability to perform their pool responsibilities, because of the content and perceived viewpoint of Plaintiffs' news coverage. ECF No. 50 at 2–7. This Court's conclusion that "it is likely that Plaintiffs were selected by President Trump for revocation of their access to the White House press area because he believes their coverage of him and his administration is generally inaccurate and biased" applies here equally. ECF No. 50 at 21.

Defendants have only doubled down since this Court issued its preliminary injunction. On October 14, the day after this Court's order, Defendants declared that the "Fake News has no place demanding a spot in the President's Oval Office" because the "lies they smear are a disservice to the American public and tear at the very fabric of our Democracy." Boutrous Decl. Ex. E. And less than a week later, they issued a public statement stating that "[n]o person and no journalist has a constitutional right to access to the President's Oval Office, Air Force One, or other sensitive and private facilities" when they "lie, fabricate, and ignore the truth." Boutrous Decl. Ex. G. The record leaves no doubt that President Trump expressly targeted Plaintiffs based on "particular views" expressed in their reporting. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Simply put, that is unlawful viewpoint discrimination." ECF No. 50 at 21.

Defendants' continued exclusion of Plaintiffs from the Oval Office and Air Force One is

also unreasonable in light of the purposes served by opening those spaces to the press. *See Mansky*, 585 U.S. at 13. To be reasonable, a restriction must have a "sensible basis for distinguishing what may come in from what must stay out." *Id.* at 16. The government gets considerable leeway in deciding how to manage tightly controlled spaces like the Oval Office and Air Force One based on limited space and security considerations. But "control[ling] access to White House press facilities through standardless discretion," as Defendants have attempted to do here, is impermissible. *Mahoney*, 2026 WL 2836881, at *6. The space limitations only underscore why the White House for decades has relied on a rotating press pool to cover the President in settings that cannot accommodate the full press corps, including the Oval Office, Air Force One, and the tarmac before and after travel on Air Force One. Jennings Decl. ¶ 4; Reddy Decl. ¶ 5. Excluding Plaintiffs from the Oval Office and Air Force One during their assigned pool rotations—and thus, at times, leaving events without television pool coverage entirely—undermines the very purpose of opening up the White House, the Oval Office, and Air Force One to the press in the first place: to facilitate independent newsgathering and reporting about the presidency for the benefit of the public. *Cable News Network*, 518 F. Supp. at 1244.

Having made the Oval Office and Air Force One central spaces for presidential briefings and contemporaneous newsgathering and reporting, Defendants cannot exclude pool reporters because they dislike the content of their coverage. The continued exclusion of Plaintiffs both punishes disfavored viewpoints and frustrates the purpose of press-pool access to those spaces. The First Amendment does not permit excluding Plaintiffs from nonpublic fora for those reasons.

**B. The exclusion retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment.**

Regardless of whether the Oval Office and Air Force One are nonpublic fora under the First Amendment, Defendants' actions unconstitutionally retaliate against Plaintiffs for their

protected journalism. This Court correctly held that the President's ban on Plaintiffs likely constituted unlawful retaliation. ECF No. 50 at 12–20. The same reasoning applies here. Plaintiffs are likely to establish (1) they engaged in protected newsgathering and reporting, (2) their exclusion from press-pool events is an adverse, objectively chilling sanction, and (3) their exclusion is, in the President's words, the "result of" Plaintiffs' speech. ECF No. 32-3; *see Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

First, Defendants have never disputed that Plaintiffs "'engage[d] in conduct protected by the First Amendment.'" ECF No. 50 at 13 (quoting ECF No. 43 at 18). Nor could they. Plaintiffs' reporting on the President and his administration's activities "in the conduct of 'governmental affairs'" is "entitled to the strongest form of First Amendment protection." *United States v. Trump*, 88 F.4th 990, 1022 (D.C. Cir. 2023). Plaintiffs' journalism is protected by the Speech and Press Clauses of the First Amendment even when government officials assert that the content of their reporting is "false" or "biased": "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012). Allowing the government the power to punish speech based on "the interest in truthful discourse . . . would give government a broad censorial power unprecedented . . . in our constitutional tradition" that "the First Amendment cannot permit." *Id.* Because "erroneous statement is inevitable in free debate," even speech that the government labels false "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 271–72 (1964) (ellipsis omitted). And "it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024); *accord Nat'l Pub. Radio, Inc. v. Trump*, 827 F. Supp. 3d 48, 88 (D.D.C. 2026).

Second, Defendants' retaliatory exclusion of Plaintiffs from pool events "would deter a reasonable reporter or news organization from publishing stories to which [the President] objects." ECF No. 50 at 13; *see Aref*, 833 F.3d at 258. The Supreme Court and D.C. Circuit have recognized that "even an act of retaliation as trivial as failing to hold a birthday party for a public employee" can support a First Amendment retaliation claim. *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990)). Here, barring CNN, MS NOW, and POLITICO from fulfilling their pool responsibilities severely harms their ability to fulfill their journalistic missions to report on the President, including by depriving their reporters of the ability to ask questions and observe official events firsthand. Jennings Decl. ¶¶ 16–17; Reddy Decl. ¶¶ 10–11; Marsh Decl. ¶¶ 10–11; *see Karem v. Trump*, 404 F. Supp. 3d 203, 216 (D.D.C. 2019) (noting impact on journalists when they are deprived of the "ability to observe events firsthand and to ask questions of White House officials"). The President, again, has made press-pool events, including in the Oval Office and in connection with his travel aboard Air Force One, primary locations where he interacts with reporters. *See supra*, at 8–9, 24. Every time Plaintiffs are excluded when they otherwise would have been granted access, Plaintiffs forever lose a chance to cover the President. Jennings Decl. ¶¶ 17, 19; Reddy Decl. ¶¶ 10–11; Marsh Decl. ¶ 11. That sanction would weigh heavily on any journalist—as the President expressly hoped when vowing to take the ban "as far as you can" until Plaintiffs "straighten themselves out." ECF No. 32-4 at 53:38–53:58.

The chilling effect of this sanction is particularly pronounced given Plaintiffs' investments in their ability to perform pool functions. As noted, CNN invests an average of approximately $2.5 million per year in its ability to serve as designated television network pooler—recurring financial and operational commitments to provide crews, equipment, staffing, and travel. Jennings

Decl. ¶ 8. These substantial long-term investments support CNN's ability to report on the President, and the four other members of the primary television network pool, CNN's affiliates, and the public all depend on CNN to perform its assigned rotations as designated television network pooler and provide them with live video and audio of presidential events. *Id.* ¶¶ 8, 16–17. Defendants' actions undermine the value of the investments Plaintiffs have made in reasonable reliance on their continued ability to perform their pool functions. *Cf. O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714–15 (1996) (removal "from an official list of contractors authorized to perform public services" can support First Amendment retaliation claim). That is objectively chilling by any measure.

Moreover, Defendants' actions to bar Plaintiffs from fulfilling their pool responsibilities harm not only Plaintiffs but also the many others who depend on their pool coverage. For example, the significant expenses required to provide coverage for the primary television network pool require the pool's five members to share costs. Jennings Decl. ¶ 18. Barring one of those cost-sharing participants from fulfilling its pool duties forces the other pool networks either to go without pool coverage on the punished participant's designated days, or shoulder additional costs and make operational changes to fill in for that punished pooler. *Id.* Punishing one participant in the pool thus enables the government to attempt to coerce more favorable coverage from all participants, increasing the chilling effect of its actions on Plaintiffs and other journalists and news organizations. *See, e.g.*, *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (finding "it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired").

The *Associated Press* stay decision is not precedential and is unpersuasive on this element. The majority failed to engage with the D.C. Circuit's governing standard for what counts as an

adverse action for purposes of a retaliation claim—never mentioning that the standard is whether the action would "deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258. The majority suggested that a materially adverse action must be "one that deprives a person of certain property rights or infringes a liberty interest." *Associated Press*, 2025 WL 1649265, at *11 (Rao, J., concurring). Even if that were the correct standard, Plaintiffs meet it. *See infra*, at 36–39. But the majority erred at a more fundamental level in conflating the due-process analysis with First Amendment retaliation. As the Supreme Court has explained, "even an act of retaliation as trivial as failing to hold a birthday party for a public employee" can be unconstitutional when intended to "punish" the exercise of "free speech rights"—and not even the most festive employee has a liberty or property interest in a birthday party. *Rutan*, 497 U.S. at 76 n.8 (quotation marks omitted). Plus, Plaintiffs have provided record evidence here (which was not before the D.C. Circuit in *Associated Press*) establishing that the President has in fact used the Oval Office and Air Force One as primary spaces where he interacts with the press—further establishing the serious consequences of retaliating against journalists by excluding them from press-pool events. *See supra*, at 8–9, 23–24.

Finally, there can be no doubt that Defendants' actions to exclude Plaintiffs were caused by Plaintiffs' protected speech and other protected activity. This Court already found a likely "causal link between the exercise of [Plaintiffs'] First Amendment rights and the revocation of their hard passes and exclusion from the White House press area," rejecting Defendants' pretextual national security explanations. ECF No. 50 at 15–20. The same reasoning applies here, as all the evidence—in particular, the President's own repeated criticism of Plaintiffs' journalism and the close timing between that criticism and the actions challenged here—demonstrates that Defendants excluded Plaintiffs from pool events because the President disapproves of Plaintiffs' coverage.

Defendants' public statements since this Court's preliminary-injunction ruling have only strengthened Plaintiffs' position on causation. On October 14, the White House declared that the "Fake News has no place demanding a spot in the President's Oval Office" because the "lies they smear are a disservice to the American public and tear at the very fabric of our Democracy." Boutrous Decl. Ex. E. Two days later, the White House barred CNN from fulfilling its pool duties on Air Force One. Jennings Decl. ¶ 12. And the White House never even responded when counsel for CNN wrote on October 19 to counsel for Defendants demanding that the White House abandon any policy of excluding CNN from the Oval Office and Air Force One. The White House instead issued a public statement questioning Plaintiffs' "right to access to the President's Oval Office, Air Force One, or other sensitive and private facilities," and suggesting they "lie, fabricate, and ignore the truth" and "write . . . fiction." Boutrous Decl. Exs. F–G. These statements expressly link Defendants' actions to their disapproval of the content of Plaintiffs' reporting.

Defendants' actions to prevent Plaintiffs from fulfilling their press-pool duties, including in the Oval Office and on Air Force One, are textbook First Amendment retaliation: adverse action prompted by and designed to punish protected expression with the goal of chilling Plaintiffs' speech and the speech of others. Regardless of the form that retaliation takes, the First Amendment bars government officials from seeking to "punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). This Court should enjoin Defendants' continued efforts to penalize Plaintiffs.

**C. The exclusions violate the Due Process Clause.**

This Court twice has held that Plaintiffs are likely to prevail on their claim that Defendants revoked their hard passes without the process the Fifth Amendment requires. ECF No. 24 at 2–4; ECF No. 50 at 8–12. Judge McFadden had no need to reach the due-process issues in *Associated Press* because he decided that the exclusions likely violated the First Amendment. 780 F. Supp.

3d at 59. This Court may do the same. But if it reaches the issue, Defendants' exclusion of Plaintiffs and their reporters from the Oval Office and Air Force One, as well as their interference with Plaintiffs' ability to perform their press-pool duties, violates the Due Process Clause because Defendants failed to provide fair notice of the conduct that would subject Plaintiffs to this punishment or the magnitude of this sanction, *see* ECF No. 50 at 10, and they deprived Plaintiffs of their liberty and property interests without any opportunity to be heard.

**1. The exclusion interferes with Plaintiffs' protected liberty and property interests.**

Defendants "interfered with" Plaintiffs' protected "liberty or property interest[s]"—triggering the Due Process Clause's fair-notice and hearing requirements. ECF No. 50 at 8 (quoting *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)). Plaintiffs' protected interests here fall into two categories: (1) Plaintiffs' liberty interest in reporting from the Oval Office and Air Force One, and (2) Plaintiffs' protected property interest in their continued ability to perform their pool duties, which require access to presidential events designated for pool coverage.

First, Plaintiffs' ability to report from the Oval Office and Air Force One when those spaces are opened to the press is a protected liberty interest. "Freedom of speech" and of the press "always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 780 (1978); *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 243 (1936). And the specific liberty interest here is squarely protected by *Sherrill* and its progeny. Given the important interests of "newsmen," the "publications for which they write," and "the public at large," journalists have a protected liberty interest in accessing spaces that the White House "has voluntarily decided to establish . . . for correspondents who need to report therefrom"—spaces "made publicly available as a source of

information for newsmen." *Sherrill*, 569 F.2d at 129. The Oval Office and Air Force One satisfy those criteria when opened to journalists as primary places to interact with the President and report on his administration. *See supra*, at 8–9.

The Due Process Clause safeguards this liberty interest—and demands fair notice and an opportunity to be heard—regardless of whether the government's actions independently violate the First Amendment. When the government "directly impinge[s] upon interests in free speech or free press," the Supreme Court has held that "opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 575 n.14 (1972); *see Keeffe v. Library of Congress*, 777 F.2d 1573, 1582 (D.C. Cir. 1985) (holding that plaintiff was denied "constitutionally mandated fair notice" under the Due Process Clause of restriction on speech that complied with the First Amendment). The "forum analysis" for the Oval Office and Air Force One, whatever its result, "does not negate" the liberty interest; "[e]ven if the government properly limits protected speech, a citizen may still be entitled to *some* process . . . to challenge that limitation." *Barton v. City of Ann Arbor*, 2024 WL 4193751, at *8 (E.D. Mich. Sept. 13, 2024) (citing *Roth*, 408 U.S. at 575 n.14).

Second, and independently, Plaintiffs have protected property interests in performing their press-pool responsibilities. "'[P]roperty' interests subject to procedural due process protection are not limited by a few rigid, technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). An "interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings"—including "rules and understandings, promulgated and fostered by [government] officials"—that support the "claim of entitlement to the benefit." *Id.* at 601–02; *see Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (reiterating that a protected

property interest arises when a person has "'a legitimate claim of entitlement'" grounded in "'existing rules or understandings that stem from an independent source'"). In addition to statutes and formal rules, an institution's "unwritten 'common law'" may create protectible property interests. *Perry*, 408 U.S. at 602. One such example comes from *Sherrill* itself, which suggested that a journalist's entitlement to a White House press pass access may constitute a protected property interest. 569 F.2d at 131 n.22. The D.C. Circuit explained that, even absent a constitutional entitlement or "positive federal law," the "consistent, positive action of government officials" could create a "justifiable expectation" that a press pass would be denied only on grounds of presidential security. *Id.* Given the First Amendment values implicated by that entitlement, the court observed, "it would be difficult not to infer constitutional recognition of this interest." *Id.*

Plaintiffs are likely to establish that they have a protected property interest in fulfilling their pool responsibilities that goes beyond their entitlement to White House press passes. CNN, for example, has an entitlement to serve as designated primary television network pooler that rests on "consistent, positive action by government officials," sustained over four and a half decades. *Sherrill*, 569 F.2d at 131 n.22. For 45 years, CNN has been a member of the primary television network pool. Jennings Decl. ¶ 7. The White House has honored CNN's scheduled rotations—including by admitting CNN's journalists to the Oval Office, Air Force One, and other presidential events designated for pool coverage—as a matter of settled, mutually understood practice. *Id.* In reliance on that practice, CNN has made substantial investments, bearing 20% of the pool's shared costs, installing and maintaining fiber-optic cable throughout the White House press facilities, paying the full cost of its own crews, equipment, staffing, and travel, and structuring its Washington operations around its pool obligations. *Id.* ¶ 8. MS NOW and POLITICO also have protected property interests in performing their scheduled assignments in the secondary television

pool and the print pool, as the White House has consistently recognized and facilitated those pool assignments. Reddy Decl. ¶¶ 7, 9; Marsh Decl. ¶¶ 2–4, 7.

These "mutually explicit understandings" with the government mean that Plaintiffs reasonably expected to continue fulfilling their pool duties. *Perry*, 408 U.S. at 601. For decades, the White House has recognized the primary television network pooler designated based on the five-network rotation in its daily guidance and press schedule, coordinated logistics with the designated network, and admitted the designated crew to Air Force One and other presidential events. Jennings Decl. ¶ 6. The White House bills pool members for the seats their journalists occupy aboard Air Force One, and it works with the pool to address security-related issues—agreeing, for example, on a method for securely broadcasting live the President's remarks before the departure of Marine One. *Id.* There is "no indication in the record" that the government "ha[d] ever denied" the access required for a designated pooler to fulfill its responsibilities, *Sherrill*, 569 F.2d at 131 n.22; *see Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (emphasizing that suspending a hard pass would be an "'unpredictable break[] with prior' policy and practice"), apart from the exclusion of the Associated Press that is pending decision on appeal from a stayed preliminary injunction, *Associated Press*, 780 F. Supp. 3d 32. Indeed, Defendants themselves have recognized a "place in the press pool" as distinct—an identifiable status they now have attempted to deprive Plaintiffs of without fair notice or an opportunity to be heard. ECF No. 32-7 at 2.

In sum, Plaintiffs have protected liberty and property interests in their ability to access the Oval Office and Air Force One during press events, fulfill their primary and secondary pool functions, and attend other presidential events designated for pool coverage.

**2. Defendants failed to provide due process.**

Defendants continue to "interfere[ ] with" Plaintiffs' protected liberty and property interests without "constitutionally sufficient" process. *Thompson*, 490 U.S. at 460. This Court

has twice held that Defendants likely failed to afford Plaintiffs fair notice of (1) the conduct that would subject them to punishment, and (2) the magnitude of the sanction the White House would impose. ECF No. 50 at 10–12; ECF No. 24 at 3–4; *see Karem*, 960 F.3d at 665. As this Court has explained, there is "simply nothing in the record before President Trump's September 18 social media post . . . that could have served either purpose." ECF No. 50 at 10. That same reasoning applies straightforwardly to Defendants' actions here, which have further failed to provide an "opportunity to present [Plaintiffs'] objections" prior to excluding Plaintiffs from the Oval Office and Air Force One and preventing them from fulfilling their designated pool duties. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

First, Defendants failed to provide fair notice of the conduct that would subject them to exclusion from the Oval Office, Air Force One, and other press-pool events. The President's social media posts and statements calling Plaintiffs' reporting biased or inaccurate do not amount to "'explicit and meaningful standards' that come close to satisfying *Karem*." ECF No. 50 at 11. Such "content-based criteria" also cannot satisfy the Due Process Clause's requirement of "meaningful standard[s]" because the First Amendment prohibits such content discrimination. *Sherrill*, 569 F.2d at 129–31.

The White House's October 14 statement that the "Fake News has no place . . . in the Oval Office" and its October 20 statement that Plaintiffs could be excluded from the Oval Office and Air Force One because they purportedly "lie, fabricate, and ignore the truth" do nothing to remedy the lack of fair notice. Boutrous Decl. Exs. E, G. Those statements come *after* the conduct for which Plaintiffs are being punished and cannot provide the pre-conduct fair notice that due process requires. ECF No. 24 at 3; *see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). And similar to the President's earlier statements criticizing Plaintiffs' reporting, the October 14

and 20 statements do not set forth a meaningful standard and discriminate based on content. *See Sherrill*, 569 F.2d at 129–31.

Second, Defendants failed to provide any pre-conduct "notice of the sanction" they now have imposed. ECF No. 50 at 12. Defendants never gave Plaintiffs any warning that their conduct would result in their being denied access to the Oval Office, Air Force One, or other press-pool events before Defendants began excluding them in late September. *E.g.*, Jennings Decl. ¶ 15 (CNN was excluded from traveling aboard Air Force One as the designated television network pooler on September 21, September 26, October 1, October 16, October 21, and October 26); Marsh Decl. ¶ 5 (POLITICO was barred from serving as print pooler for the President's October 5 trip to Nebraska). Nor did Defendants provide notice before any of the exclusions that followed—leaving CNN, for example, to learn of its exclusion only from the White House Office of Communication's daily guidance and press schedule emails or from the pool chair. Jennings Decl. ¶¶ 12–14. Plaintiffs therefore lacked fair notice of "the magnitude of the sanction" Defendants imposed. *Karem*, 960 F.3d at 665.

Third, Defendants did not provide the pre-deprivation opportunity to be heard that the Due Process Clause requires. *See Mullane*, 339 U.S. at 314. Defendants began excluding Plaintiffs from pool events on September 21, when they barred CNN from performing its duties as the designated television network pooler for the President's trip to New York City and staffing the in-town pool at the White House. Jennings Decl. ¶¶ 12–15. Since then, Defendants have continued to exclude Plaintiffs. Defendants have not even formally announced or explained their policy of exclusion—much less provided Plaintiffs an "avenue for a response" before a neutral decisionmaker with respect to the deprivation of access to the Oval Office, Air Force One, and their ability to fulfill their pool functions. *Trump v. Cook*, 609 U.S. 528, 557 (2026); *see Propert*

*v. District of Columbia*, 948 F.2d 1327, 1333 (D.C. Cir. 1991) (due process requires a "meaningful opportunity to present [their] case before a neutral decisionmaker").

Each of these deficiencies independently violated Plaintiffs' due-process rights. ECF No. 50 at 10; *see Karem*, 960 F.3d at 665. Plaintiffs are likely to succeed in establishing that Defendants' continued actions to exclude them and prevent them from fulfilling their pool responsibilities violated the Due Process Clause.

## II. Plaintiffs will suffer irreparable injury absent a preliminary injunction.

Absent a preliminary injunction, Plaintiffs will continue to suffer irreparable harm from continued exclusions from the Oval Office and Air Force One, and Defendants' interference with their ability to fulfill their press-pool responsibilities.

For starters, Plaintiffs are suffering irreparable harm to their constitutional rights. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). That principle has special force for "[t]he loss of First Amendment freedoms." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam)); *see Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020) (explaining that "chilling of First Amendment expression" is "irreparable harm"). The deprivation of liberty and property interests without due process of law likewise is an irreparable injury. *Karem*, 960 F.3d at 667–68; *see Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (due-process violations generally cause irreparable harm). And "there is a presumed availability of federal equitable relief against threatened invasions of constitutional interests." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (quotation marks omitted). So plaintiffs who "have shown that they are likely to succeed on their constitutional claim" also successfully show

"that they are likely to suffer irreparable harm without preliminary injunctive relief," *Taylor v. Trump*, 823 F. Supp. 3d 17, 40 (D.D.C. 2026) (emphasis omitted), as this Court reiterated when enjoining the President's ban of Plaintiffs from the White House grounds, ECF No. 50 at 21–22.

Defendants' continued exclusions also will cause "certain," "great," and "irreparable" harm, *Taylor*, 823 F. Supp. 3d at 39 (quotation marks omitted), to Plaintiffs' ability to gather and report news from the settings in which this President primarily engages with the press. Since the ban was announced, Defendants have barred CNN from Air Force One on each of the six occasions it was scheduled to travel as the designated television network pooler, preventing CNN from fulfilling duties that it invests approximately $2.5 million on average each year to perform. Jennings Decl. ¶¶ 8, 15. MS NOW, which served as secondary television pooler roughly every two to three weeks in the seven months preceding the ban, has not been designated to serve once since. Reddy Decl. ¶¶ 5, 8. And POLITICO was stripped of two scheduled print-pool assignments the day before it was to travel with the President. Marsh Decl. ¶¶ 5–6. A question Plaintiffs' reporters are not in the room to ask is a question that goes unanswered, and an event they cannot attend "cannot be covered after the fact." ECF No. 32-18 ¶ 9; *see also* Reddy Decl. ¶ 11; Marsh Decl. ¶ 11. Given the pace of news at the White House, even a brief loss of access is "an eon in today's news business." *Karem*, 960 F.3d at 665.

## III. The balance of equities and public interest favor a preliminary injunction.

The "balance of equities" and "public interest" factors "'merge'" because Defendants are governmental officials. *Karem*, 960 F.3d at 668 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, these factors weigh decisively in favor of a preliminary injunction against Defendants' de facto policy of banning Plaintiffs from the Oval Office and Air Force One even when they have pool responsibilities in their respective rotations.

There is "'always a strong public interest in the exercise of free speech rights otherwise

abridged by an unconstitutional' government action." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). The public interest also favors preliminary injunctive relief here because "public awareness and understanding of the President's behavior facilitates his effectiveness as President" and permits "a determination by the public of the adequacy of the President's performance." *Cable News Network*, 518 F. Supp. at 1244; *see New York Times Co. v. Dep't of Defense*, 824 F. Supp. 3d at 53 (observing that the "constitutional interests at stake" in access to the government for reporting "are hard to overstate"). The public interest in ensuring Plaintiffs' ability to perform their pool functions, including in the Oval Office and in connection with the President's travel on Air Force One, extends far beyond the audiences of the three excluded organizations. The pool supplies independent coverage from settings that cannot accommodate the full press corps, and CNN serves as a proxy for all media when serving as primary television network pooler, providing coverage to the other four networks and more than 1,000 local affiliate stations. Jennings Decl. ¶¶ 4, 17. Excluding CNN therefore disrupts reporting on which audiences nationwide depend and has already left presidential events without television pool coverage altogether. *Id.* ¶¶ 15, 17.

On the other side of the ledger, Defendants have no legitimate interest in enforcing the ban because "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668 (quoting *Gordon*, 721 F.3d at 653); *see Taylor*, 823 F. Supp. 3d at 41. Defendants have never publicly sought to justify their exclusions of Plaintiffs from the Oval Office and Air Force One, or their continued interference with the performance of Plaintiffs' pool duties. And this Court has thoroughly dismantled Defendants' attempt to invoke national security, ECF No. 50 at 23–24, which is equally unsupported in this context.

## IV. The Court should waive any bond requirement or require a nominal bond.

The Court should exercise its discretion "to dispense with any security requirement

whatsoever." *Associated Press*, 780 F. Supp. 3d at 60 (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)). The Court has "'wide discretion'" not to require a bond. *Am. First Legal Found. v. Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024). No security requirement is necessary because there is no risk that a preliminary injunction will cause "'material damage.'" *Fed. Prescription Serv.*, 636 F.2d at 759. This Court should dispense with a bond or again require a nominal bond. ECF No. 50 at 25.

## CONCLUSION

This Court should preliminarily enjoin Defendants (save the President) and those acting in concert with them from discriminating or retaliating against Plaintiffs in their respective pool rotations and interfering with the access to the Oval Office and Air Force One that Plaintiffs had before September 18, 2026.

Dated: November 4, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
PFuster@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459
CSSullivan@gibsondunn.com

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
CMui@gibsondunn.com

*Counsel for Plaintiffs*

**Admitted Pro Hac Vice*