**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC., MS NOW Cable, LLC, POLITICO LLC, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 1:26-cv-03287-TJK

**BRIEF OF PROPOSED AMICUS CURIAE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS IN SUPPORT OF PLAINTIFFS' MOTION FOR A FURTHER PRELIMINARY INJUNCTION**

Bruce D. Brown (DC Bar No. 457317)
*Counsel of Record*
Lisa Zycherman (DC Bar No. 495277)
Gabriel Rottman (DC Bar No. 992728)
Marietta Catsambas (DC Bar No. 1617526)
Annie Seminara (*of counsel*)
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Email: bruce.brown@rcfp.org

*Counsel for Proposed Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..... ii

TABLE OF AUTHORITIES ..... iv

INTEREST OF AMICUS CURIAE ..... vii

INTRODUCTION ..... 1

ARGUMENT ..... 1

I. For over a century, press access to the White House has played an essential role in informing the public about the office of the presidency. ..... 1

II. Viewpoint discrimination is unconstitutional in nonpublic fora, which includes the Oval Office and Air Force One when they are opened to the press. ..... 5

CONCLUSION ..... 8

CERTIFICATE OF COMPLIANCE ..... 10

# TABLE OF AUTHORITIES

**Cases**

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025) .......... 5, 7

*Associated Press v. Budowich*,
No. 25-5109, 2025 WL 2047025 (D.C. Cir. July 22, 2025).......... 8

*Associated Press v. Budowich*,
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025),
*reconsideration en banc denied*, No. 25-5109,
2025 WL 2047025 (D.C. Cir. July 22, 2025) .......... 7, 8

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025),
*cert. denied*, 146 S. Ct. 822 (2025) .......... 6

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008) .......... 6

*Cable News Network, Inc. v. Am. Broad. Cos.*,
518 F. Supp. 1238 (N.D. Ga. 1981) .......... 4, 5

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985).......... 6, 8

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018).......... 6

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980).......... 4

**Other Authorities**

*60th Anniversary of the First Live Televised Presidential News Conference*,
GovInfo (Jan. 25, 2021),
https://perma.cc/X89J-SNQP.......... 2

Andrew Glass, *First Televised News Conference, Jan. 19, 1955*,
Politico (Jan. 19, 2016),
https://bit.ly/4BSZQ3Q.......... 2

Br. of Amici Curiae Reps. Comm. for Freedom of the Press & 23 Media Orgs., *N.Y. Times Co. v. Dep't of Defense*, No. 25-04218-PLF (D.D.C Jan. 15, 2026), ECF No. 17-1 ........ vii

Br. of Amici Curiae Reps. Comm. for Freedom of the Press & 77 Media Orgs., *Cable News Network, Inc. v. Trump*, No. 1:26-cv-03287-TJK (D.D.C. Sept. 30, 2026), ECF No. 40-1 ........ vii

Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Comm. to Protect Journalists, *Radio Free Europe/Radio Liberty, Inc. v. Lake*, No. 1:25-cv-00799-RCL (D.D.C. Mar. 28, 2025), ECF No. 17-1 ........ vii

Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Indep. NPR Member Stations, *Nat'l Pub. Radio, Inc. v. Trump*, No. 1:25-cv-01674-RDM (D.D.C. June 20, 2025), ECF No. 26-1 ........ vii, viii

Br. of Amici Curiae Reps. Comm. for Freedom of the Press, Comm. to Protect Journalists, PEN Am., Press Freedom Ctr. at the Nat'l Press Club, & Soc'y of Pro. Journalists, *Widakuswara v. Lake*, Nos. 25-5144, 25-5145, 25-5150, 25-5151 (D.C. Cir. July 28, 2025) ........ viii

Br. of Amici Curiae Reps. Comm. for Freedom of the Press, White House Correspondents' Ass'n & 46 News & Media Orgs., *Associated Press v. Budowich*, No. 25-5109 (D.C. Cir. Oct. 6, 2025) ........ vii

Br. of Amici Curiae Reps. Comm. for Freedom of the Press, White House Correspondents' Ass'n, & 49 Media Orgs., *Cable News Network, Inc. v. Trump*, No. 1:26-cv-03287-TJK (D.D.C. Sept. 23, 2026), ECF No. 18-1 ........ vii

Br. of Reps. Comm. for Freedom of the Press as Amicus Curiae, *Associated Press v. Budowich*, No. 1:25-cv-00532-TNM (D.D.C. Feb. 24, 2025), ECF No. 17-1 ........ vii

*Covering the White House*, White House Correspondents' Ass'n, https://perma.cc/9XTQ-XBGE (archived Sept. 20, 2026) ........ 2, 3

Erik Wemple & Michael D. Shear, *What Is the White House TV Pool?*, N.Y. Times (Sept. 21, 2026), https://bit.ly/4iuoWwI ........ 2

*Guide to the White House Beat*, White House Correspondents' Ass'n, https://perma.cc/ZF7Z-GPXX (archived Feb. 20, 2025) ........ 4

James A. Jacobs, *The President, the Press, and Proximity*, White House Historical Ass'n (Mar. 1, 2015), https://perma.cc/4RTE-536E ........ 1, 2, 3

Jim Rutenberg, *Behind the War Between White House and Fox*, N.Y. Times (Oct. 22, 2009), https://bit.ly/3CZoRk2 ........ 5

Laurie Kellman, *The Relationship Between the White House and Its Press Corps Is Time-Tested — and Can Be Contentious*, Associated Press (Feb. 12, 2025), https://bit.ly/42XdfbX ........ 4

Merriman Smith, *Roosevelt Dies of Stroke at Little White House*, UPI Archives (Apr. 12, 1945), https://bit.ly/3UEKT4w ........ 2

Susan Page, *Sid Davis, Journalist Who Covered JFK's Assassination, LBJ's Swearing-In Dies*, Spokesman-Rev. (Oct. 25, 2025), https://perma.cc/3EUX-CA2J ........ 3

*The Presidency: Quiet*, Time (Dec. 4, 1939), https://bit.ly/4iunXhq ........ 2

*The White House and President's Park*, Nat'l Park Serv., https://perma.cc/FV5G-Y9ZA (archived Nov. 6, 2026) ........ 5

*VC-25 – Air Force One*, U.S. Air Force (Feb. 2021), https://perma.cc/Y7RL-VALA ........ 6

Yasmeen Serhan & Raneem Alozzi, *9/11, 25 Years On: The Reuters Reporter Who Was With George W. Bush That Morning*, Reuters (Sept. 11, 2026), https://bit.ly/48CSHXK ........ 3

## INTEREST OF AMICUS CURIAE

Proposed amicus Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media. Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today provides pro bono legal representation, amicus curiae support, and other resources to protect the legal rights of journalists. The Reporters Committee regularly appears as amicus in this and other federal and state courts on First Amendment issues of importance to journalists. *See* Br. of Amici Curiae Reps. Comm. for Freedom of the Press & 77 Media Orgs., *Cable News Network, Inc. v. Trump*, No. 1:26-cv-03287-TJK (D.D.C. Sept. 30, 2026), ECF No. 40-1; Br. of Amici Curiae Reps. Comm. for Freedom of the Press, White House Correspondents' Ass'n, & 49 Media Orgs., *Cable News Network, Inc. v. Trump*, No. 1:26-cv-03287-TJK (D.D.C. Sept. 23, 2026), ECF No. 18-1; Br. of Amici Curiae Reps. Comm. for Freedom of the Press & 23 Media Orgs., *N.Y. Times Co. v. Dep't of Defense*, No. 25-04218-PLF (D.D.C Jan. 15, 2026), ECF No. 17-1; Br. of Reps. Comm. for Freedom of the Press as Amicus Curiae, *Associated Press v. Budowich*, No. 1:25-cv-00532-TNM (D.D.C. Feb. 24, 2025), ECF No. 17-1; Br. of Amici Curiae Reps. Comm. for Freedom of the Press, White House Correspondents' Ass'n & 46 News & Media Orgs., *Associated Press v. Budowich*, No. 25-5109 (D.C. Cir. Oct. 6, 2025); Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Comm. to Protect Journalists, *Radio Free Europe/Radio Liberty, Inc. v. Lake*, No. 1:25-cv-00799-RCL (D.D.C. Mar. 28, 2025), ECF No. 17-1; Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Indep. NPR Member Stations, *Nat'l Pub. Radio, Inc. v. Trump*, No. 1:25-cv-01674-RDM (D.D.C. June 20, 2025), ECF

No. 26-1; Br. of Amici Curiae Reps. Comm. for Freedom of the Press, Comm. to Protect Journalists, PEN Am., Press Freedom Ctr. at the Nat'l Press Club, & Soc'y of Pro. Journalists, *Widakuswara v. Lake* (and related appeals), Nos. 25-5144, 25-5145, 25-5150, 25-5151 (D.C. Cir. July 28, 2025).

The proposed brief highlights the history and importance of press access to spaces in the White House where the president interacts with the news media along with the appropriate nonpublic forum analysis applicable to those press spaces, which include the Oval Office and Air Force One when they have been opened up for press access.

No party or party's counsel authored this brief in whole or in part or made a monetary contribution intended to fund its preparation or submission. No person or entity other than the Reporters Committee made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

The Reporters Committee previously filed two amicus briefs in this matter – one with the White House Correspondents' Association and joined by 49 other media organizations in support of Plaintiffs' Motion for a Temporary Restraining Order (ECF No. 18-1), and a second, joined by 77 media organizations, in support of Plaintiffs' first Motion for a Preliminary Injunction (ECF No. 40-1). This Court granted both motions. (ECF Nos. 24, 49–50). The Reporters Committee incorporates by reference the arguments in those briefs and writes for a third time to address Plaintiffs' new claims set forth in the Amended Complaint (ECF No. 54) and Plaintiffs' new Motion for Preliminary Injunction (ECF No. 55).

## ARGUMENT

### I. For over a century, press access to the White House has played an essential role in informing the public about the office of the presidency.

The press has historically had access to many fora within the White House while covering the president and the executive branch. Before there was a dedicated press briefing room, reporters had access to spaces like "a Second Floor corridor table" during the McKinley administration, where they received regular press briefings from the president's secretary. James A. Jacobs, *The President, the Press, and Proximity*, White House Historical Ass'n (Mar. 1, 2015), https://perma.cc/4RTE-536E. As the news media's national footprint grew, so did reporters' access to the White House. A designated press room was first established during President Theodore Roosevelt's administration, when "newspaper circulation increased significantly across the country." *Id.* This room allowed for greater press "proximity" to President Roosevelt and his staff, which "established an unprecedented level of access and conveyed his acknowledgment of the emerging press-president relationship." *Id.*

Early twentieth century administrations continued to give the press access to larger, better-equipped spaces where reporters could work while not attending presidential addresses and press briefings, which usually occurred outside the press room, including in the Oval Office and the Indian Treaty Room. *Id.* In 1955, President Eisenhower permitted "TV and newsreel cameramen to record his news conference[s] on sound film for the first time in history" from the Indian Treaty Room. *Id.*; *see also* Andrew Glass, *First Televised News Conference, Jan. 19, 1955*, Politico (Jan. 19, 2016), https://bit.ly/4BSZQ3Q. In 1961, President Kennedy gave the first press conference broadcast live on television from the State Department auditorium. *60th Anniversary of the First Live Televised Presidential News Conference*, GovInfo (Jan. 25, 2021), https://perma.cc/X89J-SNQP.

The pool system for rotating reporters covering the president was established during President Eisenhower's administration. *See* Erik Wemple & Michael D. Shear, *What Is the White House TV Pool?*, N.Y. Times (Sept. 21, 2026), https://bit.ly/4iuoWwI ("The White House press pool was created . . . to solve a practical problem: When the president makes news on the road or at the White House, which of the hundreds of White House correspondents get to be there?"). Even before the formal pool was created, reporters had "been accompanying presidents on their personal travel since Franklin Roosevelt's era." *Covering the White House*, White House Correspondents' Ass'n, https://perma.cc/9XTQ-XBGE (archived Sept. 20, 2026). Indeed, President Roosevelt once "held a press conference at the roadside while sitting at the wheel of his car." *The Presidency: Quiet*, Time (Dec. 4, 1939), https://bit.ly/4iunXhq. Reporters traveling with President Roosevelt were in Warm Springs, Georgia, in April 1945 when he died suddenly. Merriman Smith, *Roosevelt Dies of Stroke at Little White House*, UPI Archives (Apr. 12, 1945), https://bit.ly/3UEKT4w.

During the Kennedy administration, "[e]xpanded jet travel more frequently took the president and members of his staff on the road, with correspondents in tow to report on the travel and associated conferences outside of Washington." Jacobs, *supra*. Members of the press pool were present in the parade motorcade when President Kennedy was assassinated on November 22, 1963. Susan Page, *Sid Davis, Journalist Who Covered JFK's Assassination, LBJ's Swearing-In Dies*, Spokesman-Rev. (Oct. 25, 2025), https://perma.cc/3EUX-CA2J. Hours later, Lyndon B. Johnson took the oath of office before some of the very same reporters as he was sworn in as president aboard Air Force One. *Id.* Reporters were similarly present when, in 1981 at the Washington Hilton, "after a speech to trade unions, an attempt was made on [President] Ronald Reagan's life." *Covering the White House*, *supra*.

Today, the James S. Brady Press Briefing Room, named after the Reagan aide who was badly wounded alongside the 40th president, hosts press briefings, conferences, and broadcasts and includes workspace for the White House Press Corps. Jacobs, *supra.*

In the twenty-first century, President George W. Bush was accompanied by members of the White House press pool on the morning of September 11, 2001. *Covering the White House*, *supra*; Yasmeen Serhan & Raneem Alozzi, *9/11, 25 Years On: The Reuters Reporter Who Was With George W. Bush That Morning*, Reuters (Sept. 11, 2026), https://bit.ly/48CSHXK. One Reuters reporter "was with Bush as he went jogging around [a] golf course in Florida" and another "shouted out a question about the attacks" after the president's chief of staff whispered in his ear that America was "under attack" while the president was reading to children at a school. Serhan & Alozzi, *supra.*

Since its inception, press pool coverage of the presidency has followed the same basic logic: while the president, press, and public all benefit from "the fullest press coverage of White

House and presidential activities possible under the circumstances," on occasion "space limitations or other considerations require limiting the number of media representatives who may cover a given event." *Cable News Network, Inc. v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1239 (N.D. Ga. 1981). Under those circumstances, a smaller group of outlets serves "as eyes and ears for the others who can't get in," Laurie Kellman, *The Relationship Between the White House and Its Press Corps Is Time-Tested — and Can Be Contentious*, Associated Press (Feb. 12, 2025), https://bit.ly/42XdfbX, and ultimately as "surrogates for the public," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion). As the plaintiff news organizations point out, physical access to the press pool spaces is particularly important, as President Trump has held far more press events in the Oval Office and Air Force One than in other press areas. *See* ECF No. 55-1 at 8–9.

Presidents, of course, have routinely criticized news media coverage they find unfair, lacking balance, or seemingly stingy with positive coverage. To insulate journalists from retaliation, as a matter of longstanding policy, "[t]he White House d[id] not pick the members of the press pool that goes in to the Oval Office" and other limited-access spaces; instead, to preserve the pool's function as an independent chronicler of the presidency, "[t]he pool makeup [was] decided by the members of the press corps themselves." Kellman, *supra*; *see also Guide to the White House Beat*, White House Correspondents' Ass'n, https://perma.cc/ZF7Z-GPXX (archived Feb. 20, 2025) (noting that pool seats on Air Force One were allocated by the White House Correspondents' Association).

When the Reagan administration, for instance, sought to exclude all television journalists from the pool, the networks mounted a legal challenge to their disparate treatment – and won an injunction reversing the decision. *See Cable News Network*, 518 F. Supp. at 1245–46. And

when the Obama administration attempted to bar Fox News from a pool interview with a White House adviser – on the theory that Fox was "not a news network" – uniform backlash from Fox's peer organizations swiftly prompted the administration to change course. Jim Rutenberg, *Behind the War Between White House and Fox*, N.Y. Times (Oct. 22, 2009), https://bit.ly/3CZoRk2.

From the Eisenhower years onward, the White House press pool has been insulated from viewpoint-based tampering. Never, to amicus's knowledge, has an administration successfully asserted the right to eject a news outlet from the pool on the basis of a president's distaste for its coverage or editorial viewpoint. And to permit such retaliation would be incompatible with the pool's function: to provide the "public insight . . . necessary for a determination by the public of the adequacy of the President's performance," *Cable News Network*, 518 F. Supp. at 1244.

## II. Viewpoint discrimination is unconstitutional in nonpublic fora, which includes the Oval Office and Air Force One when they are opened to the press.

The administration violates the Constitution when it keeps one White House press area open to journalists but seeks to control newsgathering in another press area, such as the Oval Office and Air Force One, by excluding reporters based on their viewpoint. No limiting principle exists that can pass constitutional muster which would permit an administration to act in this way. As this Court has previously held, "under the First Amendment, if the Government opens its doors to some journalists – be it to the Oval Office, the East Room, or elsewhere – it cannot then shut those doors to other journalists because of their viewpoints." *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 39 (D.D.C. 2025).

The White House and Air Force One are government property, and the president and his staff are public servants. *See The White House and President's Park*, Nat'l Park Serv., https://perma.cc/FV5G-Y9ZA (archived Nov. 6, 2026) ("The White House is owned by the American people and stewarded by the National Park Service. It is more than the President's

residence; it is a site for protests and national discourse about what it means to be American.”); *VC-25 – Air Force One*, U.S. Air Force (Feb. 2021), https://perma.cc/Y7RL-VALA. Every government space inside or outside of the White House that is open to the press must be made available regardless of any journalist’s or outlet’s perceived viewpoint. That is because courts consider any “government property ‘that is not by tradition or designation a forum for public communication’” where the government “provides ‘selective access for individual speakers’” to be a nonpublic forum. *Ateba v. Leavitt*, 133 F.4th 114, 121–22 (D.C. Cir. 2025), *cert. denied*, 146 S. Ct. 822 (2025) (first quoting *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018); then quoting *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008)). Under the First Amendment, the government cannot impose restrictions on speech in nonpublic fora unless those restrictions are “reasonable” and “viewpoint neutral.” *Id.* at 119–23.

That is precisely why the D.C. Circuit has recognized that “the White House Press Area is a nonpublic forum” for First Amendment purposes, meaning that “access to the White House Press Area ‘can be restricted as long as the restrictions are’ viewpoint neutral and reasonable.” *Id.* at 122–23 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). In *Ateba*, the White House Press Area was described as consisting of “the briefing room, the press offices, and certain other locations in and around the White House that are open to correspondents . . . where journalists attend press briefings, interview White House officials, and report on the day-to-day activities of the administration.” *Id.* at 117.

The D.C. Circuit panel in *Ateba* correctly refrained from differentiating between government spaces like the Brady Press Briefing Room, the Oval Office, and other areas open to the press pool when conducting its nonpublic forum analysis. *Id.* But in a June 6, 2025 opinion staying the district court’s April 8, 2025 preliminary injunction in *Associated Press v. Budowich*,

a D.C. Circuit motion panel, in an unpublished, nonprecedential ruling, determined that the Oval Office and Air Force One are not nonpublic fora, concluding instead that they are "not any type of for[a]." No. 25-5109, 2025 WL 1649265, at *4 (D.C. Cir. June 6, 2025), *reconsideration en banc denied*, No. 25-5109, 2025 WL 2047025 (D.C. Cir. July 22, 2025).

In *Budowich*, the president expelled the AP from the press pool, the Oval Office, Air Force One, and events in the White House's East Room "unless it revised its Stylebook to refer to the Gulf of America, which President Trump had recently renamed from the Gulf of Mexico." *Id.* at *2. After the AP sued, the district court, finding that the pool and the affected spaces qualified as nonpublic fora, enjoined the administration from denying the AP, based on its viewpoint, access to the pool and to limited-access events, the latter of which journalists with a hard pass may attend with permission, such as press briefings held in the East Room. *Budowich*, 780 F. Supp. 3d at 49–55.

In granting a stay of the district court's preliminary injunction, the D.C. Circuit motion panel wrote that, "[w]here, as here, a small group of journalists is permitted to attend events in restricted White House spaces like the Oval Office, the primary activity is observational newsgathering." According to the panel, that type of "newsgathering is not itself a communicative activity[,]" and therefore an insufficient nexus existed between the AP's alleged "communicative activities" and the Oval Office. *Budowich*, 2025 WL 1649265, at *7–8. The panel's nonbinding conclusion was that "[a]llowing a handful of selected journalists into the President's personal office cannot transform it into the Brady Briefing Room." *Id.* at *9. This erroneous analysis flies in the face of the long history, outlined *supra*, of the Oval Office functioning in many instances not as the president's "personal office," as the panel saw it, but rather in the same manner as the Brady room – that is, as a nonpublic forum for press briefings.

Judge Cornelia Pillard laid out the correct forum analysis in her dissent: "The White House Press Pool is a forum even when it convenes outside the White House, such as on Air Force One or at Mar-a-Lago" because "[t]here is no principled basis for exempting the press's activities in any White House 'press area' from the requirement of viewpoint neutrality. When the White House Press Pool convenes in the Oval Office, just as when the broader press corps convenes in another White House location, it does so to engage in newsgathering. To that end, Pool members communicate text and photos to editors and the broader public, all of which is nongovernmental 'expressive activity occurring on federal property.'" *Id.* at *18 (Pillard, J., dissenting) (quoting *Cornelius*, 473 U.S. at 805).

Unlike the published opinion in *Ateba*, however, the stay panel decision in *Budowich* is an "unpublished . . . nonprecedential order that did not purport to resolve the appeal's merits . . . [and is unable] to bind future panels." *Associated Press v. Budowich*, No. 25-5109, 2025 WL 2047025, at *2 (D.C. Cir. July 22, 2025). This Court, therefore, should not defer to that ruling's forum analysis, or any of its holdings, and should instead follow established, binding precedent in this circuit in finding that anything less than a reasonable, viewpoint-neutral pool selection process in all of the White House press spaces, including the Oval Office and Air Force One, violates the Constitution.

**CONCLUSION**

For the foregoing reasons, amicus urges the Court to grant Plaintiffs' Motion for a Further Preliminary Injunction.

Dated: November 6, 2026

Respectfully submitted,

/s/ *Bruce D. Brown*
Bruce D. Brown (DC Bar No. 457317)
*Counsel of Record*
Lisa Zycherman (DC Bar No. 495277)
Gabriel Rottman (DC Bar No. 992728)
Marietta Catsambas (DC Bar No. 1617526)
Annie Seminara (*of counsel*)
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Email: bruce.brown@rcfp.org

*Counsel for Proposed Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief complies with the type-volume limit of LCvR 7(o)(4) because it is 25 or fewer pages.

This amicus curiae brief complies with the typeface and type-style requirements of LCvR 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman in size 12 font.

Dated: November 6, 2026

Respectfully submitted,

*/s/ Bruce D. Brown*
Bruce D. Brown (DC Bar No. 457317)
*Counsel of Record for Proposed Amicus Curiae*