**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CABLE NEWS NETWORK, INC., et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants*.

Civil Action No. 1:26-cv-3287

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A FURTHER PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 3

I. Press Access to the White House, Particularly Intimate Spaces such as the Oval Office and Air Force One, Have Traditionally Been at the Discretion of the President .......... 3

II. Plaintiffs Previously Requested Access Restored to the Oval Office, Air Force One, and the East Wing .......... 8

LEGAL STANDARD .......... 9

ARGUMENT .......... 9

I. Plaintiffs' Second Motion Is Procedurally Barred .......... 10

II. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims .......... 12

A. Plaintiffs Are Unlikely to Succeed on Their Viewpoint Discrimination Claim .......... 13

1. The Government has a compelling interest in limiting access to restricted areas only to journalists satisfying minimum standards of professionalism. .......... 16

2. The Government has a compelling interest in national security. .......... 17

B. Plaintiffs Are Unlikely to Prevail on Their Retaliation Theory .......... 18

C. Plaintiffs Are Unlikely to Prevail on Their Due Process Claim .......... 21

III. Plaintiffs Cannot Show They Will Suffer Irreparable Harm .......... 24

IV. The Public Interest and Balance of the Equities Favor The Government .......... 25

V. Any Remedy Should Be Stayed Pending Any Appeal Authorized .......... 29

CONCLUSION .......... 30

CERTIFICATE OF SERVICE .......... 32

# TABLE OF AUTHORITIES

## Cases

*Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024) ........ 24

*Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*,
901 F.3d 356 (D.C. Cir. 2018) ........ 13

*Anthropic PBC v. U.S. Dep't of War*,
No. 26-1049, 2026 WL 1042493 (D.C. Cir. Apr. 8, 2026) ........ 25, 26

*Arctic Energy Servs., LLC v. Neal*,
No. 1:18-cv-00108-PAB-KLM, 2018 WL 3159765 (D. Colo. June 28, 2018) ........ 11, 12

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ........ 19

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ........ 14

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025) ........ 21, 23, 24

*Associated Press v. Budowich*,
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ........ *passim*

*Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025) ........ 16

*Balt. Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) ........ *passim*

*Banks v. York*,
515 F. Supp. 2d 89 (D.D.C. 2007) ........ 19

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ........ 29

*Conn. Bd. of Pardons v. Dumschat*,
452 U.S. 458 (1981) ........ 22

*Crocker v. Piedmont Aviation, Inc.*,
49 F.3d 735 (D.C. Cir. 1995) ........ 10

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*,
331 F.3d 918 (D.C. Cir. 2003) .......... 22, 26

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) .......... 17, 26

*Eaton v. Meneley*,
379 F.3d 949 (10th Cir. 2004) .......... 24

*F.W. Kerr Chem. Co. v. Crandall Assoc., Inc.*,
815 F.2d 426 (6th Cir. 1987) .......... 11

*Gateway City Church v. Newsom*,
141 S. Ct. 1460 .......... 12

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) .......... 24

*Greer v. Spock*,
424 U.S. 828 (1976) .......... 14

*Haig v. Agee*,
453 U.S. 280 (1981) .......... 26

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) .......... 22

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .......... 19

*Hudson v. Am. Fed'n of Gov't Emps.*,
No. 1:17-cv-1867, 2019 WL 3533602 (D.D.C. Aug. 2, 2019) .......... 10

*Int'l Bus. Machines Corp. v. Johnson*,
No. 7:09-cv-4826, 2009 WL 2356430 (S.D.N.Y. July 30, 2009) .......... 12

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) .......... 17

*LaShawn A. v. Barry*,
87 F.3d 1389 (D.C. Cir. 1996) .......... 10

*Mahoney v. U.S. Capitol Police Bd.*,
No. 24-5207, 2026 WL 2836881 (D.C. Cir. Sept. 22, 2026) .......... 15, 16

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) .......... 9

*Messenger v. Anderson*,
225 U.S. 436 (1912) .......... 10

*Minnesota Voters All. v. Mansky*,
585 U.S. 1 (2018) .......... 14

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) .......... 20

*N.A.A.C.P. v. N.A.A.C.P. Legal Def. & Educ. Fund, Inc.*,
753 F.2d 131 (D.C. Cir. 1985) .......... 11

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*,
No. 26A203, 2026 WL 2564318 (U.S. Aug. 31, 2026) .......... 18

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .......... 10

*New York Times Co. v. U.S. Dep't of Def.*,
No. 26-5113, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026) .......... 26

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 9, 30

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) .......... 13

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022) .......... 13, 14

*Reed v. Goertz*,
598 U.S. 230 (2023) .......... 21

*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) .......... 25

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) .......... 22

*Sherley v. Sebelius*,
689 F.3d 776 (D.C. Cir. 2012) .......... 10

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) .......... *passim*

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
No. 1:21-cv-1946, 2021 WL 4935539 (D.D.C. Sept. 22, 2021) .......... 10

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) ... 20

*Town of Castle Rock, Colo. v. Gonzales*,
545 U.S. 748 (2005) ... 22

*Trump v. Boyle*,
No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) ... 12

*Trump v. Hawaii*,
585 U.S. 667 (2018) ... 26

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936) ... 26

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) ... 15, 16

*Washington Legal Clinic for the Homeless v. Barry*,
107 F.3d 32 (D.C. Cir. 1997) ... 22

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ... 9

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ... 25

*Zemel v. Rusk*,
381 U.S. 1 (1965) ... 22

**Statutes**

3 U.S.C. § 102 ... 3

**Rules**

Fed. R. Civ. Proc. 65(d) ... 29

**Other Authorities**

Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* (1982) ... 4

Harold Holzer, *The Presidents vs. The Press: The Endless Battle Between the White House and the Media—from the Founding Fathers to Fake News* (2020) ... 3, 4

Kathleen Dalton, *Theodore Roosevelt: A Strenuous Life* (2002) ... 4

## INTRODUCTION

Access to the White House is a privilege, not a right. The President, and Presidents before him, have extended that privilege to select journalists to cover small events in spaces that cannot accommodate every journalist that may wish to attend, such as the Oval Office and Air Force One, to amplify his intended messages and reach his preferred audiences. And in making these invitations, the President has traditionally considered whatever factors he deemed appropriate when deciding who should receive an exclusive interview, an off-the-record tip, or other privileged access to people, information, and spaces.

Plaintiffs CNN, MSNOW, and Politico have sometimes received these invitations by dint of being in the press pool. Now they do not. And as recognized by the D.C. Circuit in *Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ("*AP*"), it is entirely within the President's discretion to choose whether to invite these journalists to spaces such as the Oval Office and Air Force One. Plaintiffs' request for a preliminary injunction is foreclosed as a matter of law.

As a threshold matter, Plaintiffs' request for a further preliminary injunction is barred by equity and the law of the case. Plaintiffs previously moved for a preliminary injunction, which included a request for the relief they now seek. After recognizing that *AP* stay decision barred their claims, they withdrew their request for this relief halfway through the litigation of that motion. While this Court ultimately enjoined Defendants from denying Plaintiffs hard passes, on the theory that the *press areas* of the White House complex constitute a nonpublic forum and Plaintiffs had a liberty interest protected under the Fifth Amendment to access those areas of the White House complex, this Court at oral argument carefully distinguished a journalist's access to a hard pass generally and the separate access to restricted areas of the White House complex, such as the Oval

Office and Air Force One. Plaintiffs do not claim that this new motion is based on any new information that they lacked at the time they filed their previous motion. They are therefore precluded from relitigating their previous request now.

More fundamentally, Plaintiffs' request for relief is squarely foreclosed by D.C. Circuit's stay opinion in *AP*. They are therefore unlikely to succeed on the merits. The Government may control reporters' access to restricted presidential areas, such as the Oval Office, even for viewpoint-discriminatory reasons. *AP*, 2025 WL 1649265. That distinction is particularly relevant, because here—unlike in their previous papers—Plaintiffs seek more than just their hard-passes: they demand full access to all areas of the White House, including those that under *AP* the D.C. Circuit has held that the President may consider viewpoint in addressing. There is no basis for expanding this Court's previous order, especially not in a way that would conflict with an on-point D.C. Circuit panel decision.

Second, the President's actions were not retaliatory in violation of the First Amendment. As the D.C. Circuit further recognized in *AP*, "[t]he White House's decision to exclude [reporters] from limited-access presidential events is not the type of action that counts as materially adverse for purposes of a retaliation claim." 2025 WL 1649265, at *10. More broadly, the mere denial of special access is not an adverse action that would objectively chill a reasonable reporter, as the Fourth Circuit has squarely held, *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), and the Government would have taken the same action anyway, notwithstanding Plaintiffs' speech criticizing the President. Indeed, the President has not revoked access to other outlets that have equally criticized the President.

Third, Plaintiffs are unlikely to prevail on their due process claims because, even if they have a constitutional right to access some parts of the White House, there is no due process right

to access the Oval Office and other restricted areas. Even if there were, Plaintiffs have received adequate notice of the relevant conduct beforehand and have now had the opportunity of post-deprivation process, including the chance to contest the President's factual findings. They have declined to participate in that process and forfeited any argument that they need additional time to justify their conduct.

On the remaining factors, Plaintiffs cannot make the requisite showing of irreparable harm and both the public interest and balance of the equities favor the Government. That is especially so where, as here, they have delayed seeking extraordinary equitable relief and indeed expressly disavowed their previous requests for the same relief sought here.

The Court should therefore deny Plaintiffs' motion for a further preliminary injunction.

## BACKGROUND

### I. Press Access to the White House, Particularly Intimate Spaces such as the Oval Office and Air Force One, Have Traditionally Been at the Discretion of the President

The White House is the official residence and workplace of the President. 3 U.S.C. § 102. Presidents have had a relationship with the press since the beginning. They have long decided which journalists should receive privileged access, which has varied substantially from administration to administration. For example, President Washington hand-picked which reporters would print his Farewell Address based on political considerations. *See* Harold Holzer, *The Presidents vs. The Press: The Endless Battle Between the White House and the Media—from the Founding Fathers to Fake News* 16 (2020) (explaining that President Washington selected a paper "never stained with the ribaldry and violence of party recriminations" (quotation marks omitted)). President Jefferson "encouraged the establishment of a new gazette ... that would remain reliably favorable to his administration"; its "reward would be first access to official news." *Id.* at 39.

In the early Twentieth Century, President Theodore Roosevelt began a practice of regularly inviting reporters into the Oval Office for off-the-record press conferences while he received his "regular midday shave." *Id.* at 93. He "picked and chose those he would allow to attend these sessions; he used the conference as an occasion for reward and punishment, screening out the reporters who were the least likely to be sympathetic to his policies." Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* 3 (1982). Indeed, President Roosevelt warned reporters that if they were to "violate a confidence or publish news that the President thought ought not to be published," then "he should be punished by having legitimate news withheld from him." Holzer, *supra*, at 100 (quotation marks omitted). As another historian recounts, "He expected confidential interviews to remain secret," and "[r]eporters who betrayed his trust were banished by the President to the Ananias Club, named after the biblical liar." Kathleen Dalton, *Theodore Roosevelt: A Strenuous Life* 212 (2002). "Once consigned to the Ananias Club a reporter could no longer obtain White House news in person." *Id.* To take another example, "when Jesse Carmichael of the *Boston Herald* printed a story about the Roosevelt children chasing a Thanksgiving turkey all over the White House lawn and grabbing its feathers," President Roosevelt "banned the reporter and his newspaper from the White House." *Id.*

Decades later, President Kennedy sought to "court star correspondents" and thus gave certain reporters "special access" and "advance notice of administration announcements." Holzer, *supra*, at 213. President Johnson "tried to use personal interviews as a means of reward and punishment." Blaire Atherton French, *The Presidential Press Conference: Its History and Role in the American Political System* 18 (1982).

Today, thousands of journalists cover the President of the United States, including more than 1,300 who do so with such frequency that they have credentials permitting them to enter the

White House press facilities on demand. In addition to providing access to dedicated press facilities, the White House sometimes selectively admits small groups of journalists into more restricted areas. Depending on the President's obligations on any given day, these areas may include the Oval Office, Air Force One, and Mar-a-Lago. Given space and security constraints, only a miniscule fraction of the White House press corps (13 journalists on Air Force One or 21 journalists in the Oval Office) may be admitted into these locations at any one time. This smaller group of journalists is traditionally referred to as the "pool."

Before February 25, 2025, the pool's composition was determined by the White House Correspondents' Association. Under that system, the AP had two guaranteed, permanent spots in the pool—one for a reporter and one for a photographer. Guaranteed spaces were also available for reporters from Reuters and Bloomberg, as well as for photographers from Reuters, AFP, and the New York Times. No other media organization in the country—including brand-name publications like the Washington Post, the Wall Street Journal, USA Today, Politico, etc.—enjoyed such guaranteed access. Instead, their reporters rotated in and out of the pool on an ad hoc basis. On February 25, 2025, the Press Secretary announced that on a prospective basis, the Government—not the White House Correspondents' Association—would now choose which hard pass holders gained access to the press pool.

Against this background, on Friday, September 18, 2026, the President issued a statement:

> I am proud to announce that, effective immediately, I am banning Fake News CNN, MSNOW (who recently changed their name from MSNBC due to lack of viewership and credibility!), and Politico (The recipients of an illegal and ridiculous $8 Million Dollar subscription, an All Time Record, directly from the United States Government, under Crooked Joe Biden, in order to keep them "alive." Seems like corruption to me!), from the White House as a result of their constant "reporting" FAKE NEWS! Media Outlets shouldn't be able to constantly write or report FICTION and LIES when they're covering the President of the United States, the Trump Administration, or the United States of America. Other Fake News Media

> Outlets to follow. Thank you for your attention to this matter! President DONALD J. TRUMP

Compl. ¶ 37. On Monday, September 21, 2026, the President further explained that:

> The White House is not instituting an assault on the Free Press, something which I cherish. It is instituting an assault on the FAKE NEWS, something that has grown like Cancer in our beloved United States of America. It is corrupt, purposeful, pervasive, fully coordinated, and totally out of control. It is a threat to our National Security, and must be stopped, NOW! Thank you for your attention to this matter. President DONALD J. TRUMP

ECF No. 15-1 at 2. Later that day, Plaintiffs filed suit. Compl. In response, the President released another statement explaining, in part:

> Fake News people and publications that only write negatively, and who violate our National Security by writing false and defamatory stories with unknown "sources," shouldn't be allowed access to the most important Office anywhere in the World. It is called the Oval Office, and it should be treated with Decorum, Respect, and Dignity, not defiled by Third Rate Clowns, who purposefully distort, twist, and degrade with everything they write or publish. Virtually every story about me, or anything having to do with me, is negative, wrong and, in many cases, DANGEROUS for our Country!

ECF No. 15-2 at 2. On September 22, 2026, the White House issued letters to Plaintiffs providing "notice that the President has made the determination to revoke hard passes for members of your organization." Letters at 1. These letters explained that Plaintiffs "exhibited behavior in violation of the standards of professionalism and decorum expected of those given access to the White House Complex, including by trafficking in verifiable falsehoods about national security and other issues, and publishing sensitive or classified information." Letters at 1. Yet "[h]ard pass credentials are reserved for those who abide by standards of professional conduct, demonstrate a level of trustworthiness commensurate with the privilege of unfettered access to the White House Complex, and perform their duties in a way that does not interfere with the White House's daily operations." Letters at 1.

The letters also set out the factual basis for this preliminary decision. Each letter identified with specificity a "non-exhaustive list of reporting incidents, including those that have threatened national security and/or spread falsehoods." Letters at 1. For example, "CNN disclosed 'top-secret' construction details related to the East Wing bunker[.]" ECF No. 16-1 at 1; Wilson Decl. ¶ 22. "MS NOW reported on an alleged leak investigation," which, "if it existed, would be nonpublic sensitive law enforcement information." ECF No. 16-2 at 1; Wilson Decl. ¶ 24. "Politico published a document detailing funding for the White House ballroom containing intricate descriptions of how the Secret Service would invest in security improvements." ECF No. 16-3 at 1; Wilson Decl. ¶ 23. The letters elaborated that the "[p]ublication of sensitive security information, and misinformation about national security information, diverts White House resources and those of the national security team in particular, which must evaluate whether the leaked information is classified, the source of any leak, and the security implications of any such disclosure." Letters at 1-2. In the President's view, "[t]he spread of misinformation, especially relating to national security, is a threat that undermines the President's ability to safeguard the national security." Letters at 1-2.

The President gave each Plaintiff the opportunity "to contest this initial decision or the factual basis set forth" in each letter. Letters at 2. Plaintiffs could submit any response by 5:00 pm on Friday, September 25, 2026. Letters at 2. Otherwise, "this initial decision will be final." Letters at 2. The White House indicated it would "consider that response and any other materials you would like to submit." Letters at 2. At 5:00pm on September 25, 2026, Plaintiffs' deadline to respond to the White House letters lapsed. No Plaintiff chose to respond. Accordingly, the President's decision became final.

## II. Plaintiffs Previously Requested Access Restored to the Oval Office, Air Force One, and the East Wing

On September 21, 2026, Plaintiffs sought a TRO. ECF No. 2. This TRO implicitly asked the Court to grant them access to the Oval Office, Air Force One, and other portions of the White House outside of the designated Press Area. *See* ECF No. 8 (proposed order to enjoin "Defendants, save the President" to "restore the access that Plaintiffs and their reporters had to the White House prior to September 18, 2026, including by … issuing directives to their subordinates to *ensure all access that previously existed is restored*") (emphasis added). Indeed, in the TRO hearing, Plaintiffs' counsel emphasized harm from their ban in relation to pool events. *See* TRO Tr. at 7:7-8 ("CNN was supposed to be the television pool for the trip Monday and for the week and for the trip to the UN."). Counsel stated that the "pool is super important," that "CNN was pulled at the last minute," and that "it's just urgent that we get a temporary restraining order, we are hoping, today." Tr. at 30:12-16. Nevertheless, this Court entered a TRO restoring only hard pass access.

On September 28, 2026, Plaintiffs moved to convert the TRO into a preliminary injunction. In their briefing and requested relief, they were more explicit in asking this Court to rule that banning access to the Oval Office, Air Force One, and similar areas was unconstitutional. For example, in justifying their alleged irreparable harm, Plaintiffs argued that the ban "causes further irreparable harm downstream by disrupting CNN's ability to fulfill its primary television network pool duties[.]" ECF 32-1 at 38-39. And in characterizing the relief requested, they asked the Court to order "that Defendants afford Plaintiffs the same access to the White House and the President that they had before September 18, 2026, including the restoration of all hard passes revoked on or about that date." ECF 32-1 at 41. Plaintiffs' explicit inclusion of hard passes as merely a subset of the requested relief underscores that they argued for the Court to restore pool access—*i.e.*, Oval Office, Air Force One, and the like—as well.

Plaintiffs also equated the Oval Office and Air Force One with the press area in arguing against the ban. Plaintiffs repeated throughout their briefing that, in their view, the Oval Office and Air Force One are equivalent to the press area because "the Oval Office and Air Force One are this administration's go-to forum for press briefings." ECF No. 44 at 25. Indeed, when Defendants argued that the Court should expressly exclude the Oval Office and Air Force One from any injunction, Plaintiffs did not agree that this would be excluded from the scope of their request. *See, e.g.* ECF No. 44 at 24. Yet at oral argument, Plaintiffs walked back their request for relief as to the Oval Office and Air Force One, narrowing their request to "convert[ing] its TRO into a preliminary injunction that restores plaintiffs' hard passes and the access that comes with it." PI Tr. at 3:5-7; *see also* PI Tr. at 16:2-5 (confirming scope of relief requested).

On October 13, the Court entered a preliminary injunction restoring only Plaintiffs' hard passes. ECF No. 49. Defendants appealed the order the following day. ECF No. 51.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

This Court should deny Plaintiffs' motion for a further injunction because (I) Plaintiffs are procedurally barred from relitigating this issue; (II) they are unlikely to succeed on the merits of

their constitutional claims, which are precluded by *AP*; (III) they cannot show irreparable harm, especially where they have delayed in bringing this motion; and (IV) the public interest and balance of the equities strongly cut in favor of the Government, where Plaintiffs seek access to the most sensitive and highly controlled areas of the White House.

## I. Plaintiffs' Second Motion Is Procedurally Barred

"The law does not reward those who sleep on their rights." *Hudson v. Am. Fed'n of Gov't Emps.*, No. 1:17-cv-1867, 2019 WL 3533602, at *1 (D.D.C. Aug. 2, 2019). Plaintiffs have twice previously sought extraordinary and emergency injunctive relief that included the relief sought here. They have twice not received it—once after withdrawing that request at argument. Plaintiffs' motion is therefore barred under general equity principles, including law-of-the-case and estoppel.

First, Plaintiffs are barred viewing their request under law-of-the-case and estoppel. The law-of-the-case doctrine ensures that "the same issue presented a second time in the same case in the same court should lead to the same result." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996); *see also Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) (including "necessary implication" of previous opinion). "Under the law-of-the-case doctrine, courts are loathe to reconsider issues already decided in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Strait Shipbrokers Pte. Ltd. v. Blinken*, No. 1:21-cv-1946, 2021 WL 4935539, at *3 (D.D.C. Sept. 22, 2021) (quotations omitted). Under the related doctrine of judicial estoppel, "courts generally to refuse to reopen what has been decided," *Messenger v. Anderson,* 225 U.S. 436, 444 (1912); *see also New Hampshire v. Maine*, 532 U.S. 742, 749-55 (2001) (describing principles of judicial estoppel).

Here, Plaintiffs' "argument before us in the preliminary-injunction review was the same as now." *Sherley v. Sebelius*, 689 F.3d 776, 781 (D.C. Cir. 2012). Plaintiffs, twice now, have

requested this Court to grant pool access. At the TRO stage, Plaintiffs asked for the "access that previously existed" be restored, ECF No. 8, and argued at the hearing that the "pool is super important," that "CNN was pulled at the last minute," and that "it's just urgent that we get a temporary restraining order, we are hoping, today." TRO Tr. at 30:12-16. And during the first PI briefing, Plaintiffs relied upon their exclusion from the press pool for irreparable harm, ECF No. 32-1 at 38-39, asked for the "same access" they had before the ban, ECF No. 32-1 at 41, equated the Oval Office and Air Force One with the Press Area, ECF No. 44 at 25, and opposed Defendants request to narrow the scope of the injunction to exclude restoring access to the Oval Office and Air Force One. ECF No. 44 at 24. This is seeking press pool and related access. Indeed, in *AP*, faced with a similar demand, the D.C. Circuit correctly identified that a request for "restored eligibility for press pool events" was a request for access to the "Oval Office, Air Force One, Mar-a-Lago, and the East Room." *AP*, 2025 WL 1649265 at *5. Ultimately, both motions explicitly included the relief requested here and both times this Court declined to grant that relief. There is no new information or new claims that would justify giving Plaintiffs yet a third bite at the apple.

It is a basic tenant that "equity aids the vigilant." *N.A.A.C.P. v. N.A.A.C.P. Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985). Accordingly, "[p]arties should not be allowed to harass their adversaries and the courts with a barrage of successive motions for extraordinary, preliminary injunctive relief[.]" *F.W. Kerr Chem. Co. v. Crandall Assoc., Inc.*, 815 F.2d 426, 429 (6th Cir. 1987). Specifically, "plaintiff[s'] failure to consolidate [their] requests for injunctive relief has resulted in an unnecessary expenditure of the Court's and the parties' resources." *Arctic Energy Servs., LLC v. Neal*, No. 1:18-cv-00108-PAB-KLM, 2018 WL 3159765, at *3 (D. Colo. June 28, 2018). "Given that plaintiff[s'] second motion for a preliminary injunction seeks substantially the same relief as [their] first motion… plaintiff[s] should have made every

effort to raise [these] claims at the first preliminary injunction hearing." *Id.* The Court should "not allow [plaintiffs] to litigate this matter through piecemeal, seriatim motions requesting the same relief, especially when the information that is the basis for the successive motion was in [plaintiffs'] possession at the time of the filing of its first motion for preliminary injunction." *Int'l Bus. Machines Corp. v. Johnson*, No. 7:09-cv-4826, 2009 WL 2356430, at *2 (S.D.N.Y. July 30, 2009). This is "vexatious and does a great disservice to the interests of … the Court in the orderly conduct of this litigation." *Id.*

**II. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims**

More fundamentally, this Court must deny Plaintiffs' motion for a further preliminary injunction because Plaintiffs' theory is foreclosed by the D.C. Circuit's stay opinion in *AP*. That decision "squarely control[s]" this case, given that interlocutory orders necessarily "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025); *accord, e.g.*, *Gateway City Church v. Newsom*, 141 S. Ct. 1460 (failure to grant interlocutory relief pending appeal "erroneous" where "outcome is clearly dictated" by earlier interim order).

Plaintiffs raise a First Amendment viewpoint discrimination claim, a First Amendment retaliation claim, and a Due Process claim. But as the D.C. Circuit has recognized, the Government may control reporters' access to restricted presidential areas, such as the Oval Office, even for viewpoint-discriminatory reasons. *AP*, 2025 WL 1649265. These restricted areas are not traditional nonpublic fora. Nor do Plaintiffs have any liberty or property interest in accessing the Oval Office or similar locations. Indeed, no court has ever recognized such an interest, which would go far beyond the rulings of *Karem* and *Sherrill*. Plaintiffs are therefore unlikely to succeed on the merits of their claims.

**A. Plaintiffs Are Unlikely to Succeed on Their Viewpoint Discrimination Claim**

Plaintiff's viewpoint discriminations claims are foreclosed by *AP.* The D.C. Circuit held in its stay opinion that "restricted presidential spaces are not First Amendment fora opened for private speech and discussion" and thus "[t]he White House therefore retains discretion to determine, including on the basis of viewpoint, which journalists will be admitted" to at least these areas. *Id.* at *1. Accordingly, it stayed "a preliminary injunction prohibiting White House officials from denying, on the basis of viewpoint, access to press events held in the Oval Office, on Air Force One, and at the President's home in Mar-a-Lago." *Id.* There is simply no daylight between *AP* and Plaintiffs' current motion for a preliminary injunction: Plaintiffs cannot prevail on the merits of their viewpoint discrimination claim because the spaces accessed by the press pool are not fora at all, and communicative expression does not occur in these fora.

That decision also makes sense. First, the D.C. Circuit was correct that forum analysis, and the First Amendment protections that apply to fora, do not apply to these particular spaces because access "do[es] not involve the type of communicative activities that transform a restricted government space into a nonpublic forum." *Id.* at *7. Forum doctrine concerns restrictions on communicative activity, not "activities that, even if generally protected by the First Amendment, are not communicative." *Price v. Garland*, 45 F.4th 1059, 1070 (D.C. Cir. 2022); *see also* A*m. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 364 (D.C. Cir. 2018) ("Our analysis of *a restriction on speech* on government property begins with the forum doctrine." (emphasis added)). In other words, courts use forum analysis to determine the level of First Amendment scrutiny applicable to limitations on private speech that, while delivered on (or by means of) public property, is not itself part of a government actor's own expressive presentation to the public. *See, e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45-46 (1983). But this motion is about restrictions on physical access—not speech. And courts "should

not 'extend[] the public forum doctrine in a mechanical way to contexts that meaningfully differ from those in which the doctrine has traditionally been applied.'" *Price*, 45 F.4th at 1068. Forum doctrine does not logically apply to secure presidential spaces like the Oval Office—spaces not intended for private expressive communication and where it is undisputed that the President may bar all expressive activities.

Even if forum analysis were relevant to restrictions on non-expressive activity in ordinary cases, there would still be no basis for analyzing the presidential spaces at issue here—including Air Force One, the Oval Office, and the East Wing—under the rules that apply to parks and sidewalks. "Generally speaking," the Supreme Court has recognized "three types" of forums for private speech: "traditional public forums, designated public forums, and nonpublic forums." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). Some "government properties," however, are "not fora at all" and thus are not subject to forum analysis. *See Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677-78 (1998). In those contexts, "[t]he fact that other civilian speakers" have "sometimes been invited to appear" on government property does not "of itself serve to convert" a location into a forum, nor does it categorically "confer" a First Amendment right to engage in expression in that location. *Greer v. Spock*, 424 U.S. 828, 838 n.10 (1976).

The D.C. Circuit relied on the same reasoning to conclude that these areas of the White House complex are not even "fora" at all. *AP*, 2025 WL 1649265. "Since Roman times, a forum has been emblematic of a space for citizens to participate in public discussion and dialogue, to exchange ideas, and to engage in political debate." *Id.* at *8. But a press conference is not comparable to the Roman Forum; the White House has no obligation to call on reporters, *id.* at *6, or to "engage in political debate." *See id.* at *8. "When a small number of press observe presidential events, they are not using the Oval Office as the location or means of communication";

"when the White House opens events in the Oval Office to a select group of journalists for observational newsgathering, the journalists generally are not speaking with the President or other officials, nor are they engaged in dialogue with each other." *Id.*

The D.C. Circuit was also correct to hold that, in these spaces, the President could discriminate based on viewpoint. The D.C. Circuit rightly acknowledged that there are more journalists who wish to interview the President than he can accommodate: "[i]n deciding which journalists to speak with, the President may of course take into account their viewpoint." *Id.* at *6; *accord Ehrlich*, 437 F.3d at 413 (upholding State Governor's press directive that "no one in the Executive Department or Agencies" should speak with two named reporters because the "Governor's Press Office feels that currently both are failing to objectively report on any issue dealing with" that administration). As a result, the court concluded that at least for certain spaces, "the White House may consider journalists' viewpoints when deciding whether to grant access." *AP,* 2025 WL 1649265 at *4. "Opening" the "White House" to some journalists should not "transform these spaces into nonpublic fora to which access must be granted on a viewpoint neutral basis." *Id.* at *10.

Plaintiffs invoke *Mahoney v. U.S. Capitol Police Bd.*, No. 24-5207, 2026 WL 2836881 (D.C. Cir. Sept. 22, 2026). But there, the D.C. Circuit recognized that "[s]ome government property is not a forum at all, because it serves purposes incompatible with private communicative activity." *Id.* at *3 n.2. The White House is just such a place. *Cf. AP,* 2025 WL 1649265 at *8. At the White House, it is the United States "speaking on its own behalf," and as such, "the First Amendment strictures that attend the various types of government-established forums do not apply." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015). The fact that Plaintiffs witness or "take part in" the "propagation" of the White House's messaging

does not "transform the government's role into that of a mere forum-provider." *Id.* at 217. In contrast, in *Mahoney*, the Eastern Steps of the Capitol were used to organize and sponsor protests with the public. 2026 WL 2836881 at *2. Here, the White House is not creating a forum for any speaker: it is the only speaker.

*AP* directly controls for the areas at issue there, such as the Oval Office, and thus squarely forecloses Plaintiffs' attempt to expand their requested relief beyond restoration of their hard passes. That should be the end of this Court's inquiry. Yet even under *Sherrill*, Defendants' decision to deny Plaintiffs continued access to White House grounds complies with the First Amendment, because Defendants have at least two "compelling reasons[,]" *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977), namely, enforcing minimum standards of professionalism for journalists and protecting classified information. Letters at 1.

**1. The Government has a compelling interest in limiting access to restricted areas only to journalists satisfying minimum standards of professionalism.**

First, Defendants may lawfully deny Plaintiffs access to certain restricted areas because the President has concluded they fail to satisfy the minimum requirements of professionalism. Indeed, the D.C. Circuit has acknowledged that the White House can set standards governing qualifications for journalistic access. *Ateba v. Leavitt*, 133 F.4th 114, 127 (D.C. Cir. 2025). Nothing about *Sherrill* is inconsistent with the President's judgment that reporters who publish classified and sensitive information fail to meet the *Sherrill* standard. Nor does *Sherrill* prevent the President from concluding that bona fide journalists would identify sources instead of relying on anonymous sources, commit to factual accuracy, and provide the White House an opportunity to comment, rather than "perform their duties in a way that … interfere[s] with the White House's daily operations." Letters at 1; *cf. Sherrill*, 569 F.2d at 128-130 (five times limiting ruling to "bona fide

journalists”). At a bare minimum, it is a significant violation of decorum to publish classified and sensitive national security information.

To be sure, the D.C. Circuit in *Sherrill* and *Karem* has held that advanced notice of prohibited conduct and of the consequences of noncompliance are required before a hard pass can be revoked. *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020). Defendants submit those holdings should be overruled, but in any event, the White House has satisfied those requirements by providing an explanation of the relevant standards, both generally and with respect to Plaintiffs conduct specifically. Here, the President’s letters set out with specificity what is required and how Plaintiffs have failed to adhere to these standards. Letters at 1. The letters identify specific examples of Plaintiffs’ conduct that he determined fell below these standards. Letters at 1-2. The letters also provide Plaintiffs with an opportunity to respond to these concerns and submit materials for the President’s reconsideration.

Significantly, Plaintiffs declined to submit any response to these concerns. They do not defend their conduct. At the very least, the White House has a compelling interest in excluding reporters who fail to meet minimum journalistic standards, have been notified of their failures, and do not contest these determinations.

**2. The Government has a compelling interest in national security.**

Second, the President has a compelling interest in protecting national security information. Indeed, the Supreme Court has recognized that the Constitution vests the President with the “authority to classify and control access to information bearing on national security.” *Dep’t of Navy v. Egan*, 484 U.S. 518, 527 (1988). Ultimately, the responsibility and “authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief.” *Id.*

Here, the President has determined that Plaintiffs have reported classified or sensitive information bearing on national security. Letters at 1-2. Indeed, multiple examples concern reports about the White House complex currently under construction. ECF No. 16-1 at 1; ECF No. 16-3 at 1; *cf. Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*, No. 26A203, 2026 WL 2564318, at *3 (U.S. Aug. 31, 2026) (weighing increased "risk of foreign actors 'gathering intelligence on' the project" (citing JA)). Such reporting directly raises national security concerns. Brown Decl. ¶¶ 11, 15. Indeed, "[t]he release of such information is exactly the type of release that can cause harm to the national security." Wilson Decl. ¶ 22. Furthermore, such reporting incidents also divert resources of national security and other personnel. Brown Decl. ¶ 15. The "[p]ublication of sensitive security information" and even "misinformation about national security information" requires Defendants to "evaluate whether the leaked information is classified, the source of any leak, and the security implications of any such disclosure." Letters at 1-2; Wilson Decl. ¶¶ 7-8. The President therefore has a compelling interest in excluding from White House grounds organizations that pose such a risk to national security. Brown Decl. ¶ 12; Wilson Decl. ¶ 20. Defendants "believe that the President's determination to revoke credentials for news outlets and reporters that have caused such interference with government functions would be effective in reducing the amount of information that is published that undermines national security." Wilson Decl. ¶ 21. That alone is a compelling interest.

But this Court need not even reach that issue because under *AP*, the President may restrict access to the areas at issue here even for viewpoint discriminatory reasons.

**B. Plaintiffs Are Unlikely to Prevail on Their Retaliation Theory**

Plaintiffs' retaliation theory is also squarely foreclosed by the D.C. Circuit's *AP* decision. As that court explained, the "White House's decision to exclude the AP from limited-access presidential events is not the type of action that counts as materially adverse for purposes of a

retaliation claim." *AP*, 2025 WL 1649265, at *10. Rather, reporters have "no First Amendment right to privileged access within the press pool or to events in such restricted spaces as the Oval Office." *Id.* at *12. The D.C. Circuit concluded that reporters' "exclusion from small group press events does not rise to the level of First Amendment retaliation." *Id.* That controls this motion.

The D.C. Circuit's opinion fits neatly into prior retaliation caselaw. To properly make out a retaliation claim under the First Amendment, a plaintiff must demonstrate that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)). Here, even granting that Plaintiffs engage in conduct protected by the First Amendment, Plaintiffs cannot satisfy the second or third elements—namely, deterrence and causation.

First, deterrence. Only "material" adverse actions will "give rise to an actionable" claim of retaliation. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The White House's decision not to grant the Plaintiffs special access to the President's personal spaces does not rise to that level, particularly given "the relationship between speaker and [alleged] retaliator and the nature of the government action in question." *Id*. at 478. Instead, choosing whom to invite into highly secure presidential spaces is "more akin to a decision about how the President wields the bully pulpit." *AP*, 2025 WL 1649265, at *11. Granting some journalists better access than others does not constitute First Amendment retaliation because such decisions form part of the "pervasive and everyday relationship between government officials and the press[.]" *Ehrlich*, 437 F.3d at 418;

*see id.* at 418-19 (rejecting First Amendment retaliation claims in light of "the journalist's accepted role in the 'rough and tumble' political arena").

The Fourth Circuit's opinion in *Ehrlich* is instructive. *Ehrlich* considered an Executive-wide policy prohibiting all those government employees from speaking with two named reporters; the court ultimately "conclude[d] that the adverse impact of such conduct is objectively *de minimis*." 437 F.3d at 419. Nor did the reporters themselves say they were in any way chilled in their reporting. *Id.* at 419 & n.1. The policy at issue in *Ehrlich* is much stronger medicine than the policy challenged here, which applies only to privileged access to restricted areas of the White House. Nor do Plaintiffs allege that they have been chilled in their speech criticizing the President.

The D.C. Circuit correctly explained that "The White House's choice of who to allow into the Oval Office is simply not like a decision about a government benefit or license." 2025 WL 1649265, at *11. Further, "[c]hoosing who may observe or possibly speak with the President in these spaces is not the type of action that supports a retaliation claim." *Id.* It is perfectly acceptable for the White House to "reward journalists with advantages like interviews with the President and the opportunity to ask questions at press events." *Id.* "These pervasive practices simply do not give rise to a retaliation claim, regardless of how valuable the access may be." *Id.* Even if Plaintiffs have received some of these discretionary benefits in the past, reporters "cannot adversely possess a seat in the Oval Office, no matter how long its tradition of access." *Id.*

Second, as for causation, the Government can prevail if it can show that it "would have reached the same decision … even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Here, "[t]he record … adequately supports the conclusion" that the Government would have taken the same action based on a neutral "justification alone." *TikTok Inc. v. Garland*, 604 U.S. 56, 79 (2025). The President determined

that Plaintiffs have failed to maintain minimum professional journalistic standards by publishing classified and national security information. Letters at 1. This is an adequate, alternative ground to support the Government's actions here. Plaintiffs therefore cannot bear their burden of showing that the Government would not have taken adverse action against them, but-for their protected speech.

Plaintiffs' retaliation theory is therefore squarely foreclosed by the D.C. Circuit's *AP* opinion. It also separately fails because Defendants would have taken the same action anyway for non-retaliatory reasons.

**C. Plaintiffs Are Unlikely to Prevail on Their Due Process Claim**

Plaintiffs are unlikely to succeed on their due process claim, because they lack any constitutionally protected liberty or property interest in accessing the Oval Office, Air Force One, and similarly restricted areas and because they have received adequate process. Indeed, not even the district court in *AP* recognized any protectable constitutional interest claimed here. As Judge McFadden explained, plaintiffs' Fifth Amendment claim "implicates a potentially significant expansion of the due process rights *Sherrill* afforded to journalists when applying for hard passes." 780 F. Supp. 3d 32, 59 (D.D.C. 2025) (citing *Sherrill*, 569 F.2d at 130). Further, "the Court doubts that *Sherrill*'s written notice-and-appeal rights for permanent hard passes map neatly onto potential daily decisions about admittance into the Oval Office and limited access events." *Id.* That is correct.

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). Plaintiffs' Fifth Amendment claim is meritless because the Plaintiffs do not have a protected liberty interest in newsgathering from the Oval Office, Air Force One, or other highly restricted presidential spaces. Their Fifth Amendment claim therefore fails at the

threshold. *See, e.g.*, *Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018) (no due process claim absent protected liberty or property interest).

The First Amendment "does not 'mandate a right of access to government information or sources of information within the government's control.'" *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 934 (D.C. Cir. 2003) (plurality opinion) (alteration omitted) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978)). It is therefore well established that no one, journalist or otherwise, has a constitutional right of access to the White House. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965). To the extent that the Plaintiffs are suggesting that there is a general Fifth Amendment right to access *all* government spaces for the purposes of newsgathering, they are mistaken. Indeed, the Supreme Court has repeatedly made clear "that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005); *cf. Washington Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 37–38 (D.C. Cir. 1997) (explaining that "discretion" in "allocating" scarce resource "precludes a finding of an entitlement"); *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981) ("The ground for a constitutional claim, if any, must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency.").

Under the law of this Circuit, there is one relevant exception: the Court has ruled that a journalist has a liberty interest in accessing "press facilities" that are "perceived as being open to all bona fide Washington-based journalists[.]" *Sherrill*, 569 F.2d at 129 (footnote omitted). The fact that *Sherrill* stands alone is further evidence that it was wrongly decided. Even so, *Sherrill* was explicit that this principle did not extend to discretionary access to information made available only to a small fraction of the press corps: "It would certainly be unreasonable to suggest that

because the President allows interviews with some bona fide journalists, he must give this opportunity to all." *Id*. at 129.

This case does not fall within the *Sherrill* holding, as it does not concern restrictions on access or information otherwise available to all bona fide journalists. To the contrary, this case involves the President extending a discretionary invitation, to a small number of reporters, to receive access to the Oval Office and other highly restricted spaces. That is functionally the same as giving "briefings with selected journalists," *Sherrill*, 569 F.2d at 129, the scenario that *Sherrill* went out of its way to distinguish from general media access to the White House. The Constitution does not entitle the Plaintiffs to guaranteed status in such spaces. Even if there is a right to a hard pass or to access press briefing facilities, there is no comparable right or tradition of accessing the Oval Office, Air Force One, or other restricted areas of the White House complex. *AP,* 2025 WL 1649265, at *11 ("[T]he AP cannot adversely possess a seat in the Oval Office, no matter how long its tradition of access."). That alone should end the inquiry.

To hold otherwise would impose unworkable process requirements, confirming that no due process right should attach to press pool access. If process were required, whenever a media outlet is not selected to join a limited media availability in the Oval Office or aboard Air Force One, it would be entitled to a pre-deprivation notice, an opportunity to respond, and a final written statement of reasons—with judicial review presumably available on the back end in each case. Such a system would be utterly unworkable given the hundreds of credentialed White House journalists who are necessarily excluded from all Oval Office events.

This court has previously viewed the extension of due process to press pool access with skepticism. In *AP,* Judge McFadden suggested *Sherrill* would not map onto the request for relief here. At the very least, such a "thorny question is not well-suited to an emergency injunction." 780

F. Supp. 3d at 59. Nor, as here, did AP's proposed order "include *Sherrill*-like due process requirements." *Id.* at 59 n.8. Finally, even if Plaintiffs could show they had a constitutionally protected interest, they have been afforded any process due, for the reasons the Government has previously explained.

Plaintiffs are therefore unlikely to prevail on their due process claim.

### III. Plaintiffs Cannot Show They Will Suffer Irreparable Harm

Plaintiffs cannot make the requisite showing of irreparable harm. To do so, they must clear a high bar and show harm that "is both certain and great." *Alpine Secs. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1332 (D.C. Cir. 2024). In particular, "untimely filings may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong." *Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011). Here, plaintiffs have sat on their rights. They have twice before disavowed any claim for the relief sought here—first when moving for a temporary restraining order and then when moving for their first preliminary injunction.

More broadly, Plaintiffs may continue to publish whatever content or editorials they wish. Plaintiffs may continue to show footage from the White House; as they are well aware, media outlets already agree to pool such footage given the impracticality of having duplicative camera sets around the White House. And the White House's website broadcasts much of the President's remarks. Even if Plaintiffs could show that their lack of access to White House grounds limited their ability to convey their preferred message, it is at most a de minimis harm and certainly not irreparable. *Ehrlich*. 437 F.3d at 419. Furthermore, the "law recognizes that the nature of political debate is rough and tumble." *Eaton v. Meneley,* 379 F.3d 949, 956 (10th Cir. 2004). "It would be inconsistent with the journalist's accepted role in the 'rough and tumble' political arena to accept that a reporter of ordinary firmness can be chilled by a politician's refusal to comment or answer

questions on account of the reporter's previous reporting." *Ehrlich*, 437 F.3d at 419. Any such harm is not irreparable.

Plaintiffs' ability to show irreparable harm is also undercut by their refusal to engage with the process provided by the White House. The President afforded each Plaintiff with notice and an opportunity to respond in writing by September 25, but Plaintiffs did not respond. They did not request any extension. They did not defend their conduct. In other words, Plaintiffs received process and refused to participate, thus minimizing their claims of a procedural injury.

Nor have Plaintiffs shown irreparable harm from "disrupting CNN's ability to fulfill its primary television network pool duties[.]" Mot. for PI at 38-39. Plaintiffs simply do not have any constitutional right or interest in participating in the primary network pool and can only gesture at constitutional interests in attending criminal trials. *Id.* (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)). Plaintiffs do not, and cannot, explain how the right to attend trial is equivalent to a private network participating in pool duties. That is true when the entire point of a pool is that all participants receive the information provided equally. To the extent those other outlets are harmed, they are not parties and their harm is self-inflicted; to the extent CNN alleges any harm, they are no worse off than other outlets. Even to the extent they are concerned that this may limit their viewership relative to other outlets, such harm would ultimately be "financial in nature" and thus not irreparable. *Anthropic PBC v. U.S. Dep't of War*, No. 26-1049, 2026 WL 1042493, at *3 (D.C. Cir. Apr. 8, 2026); *see also Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("It is also well settled that economic loss does not, in and of itself, constitute irreparable harm."). Nor, as explained above, do they have any right to pool access under *AP*.

## IV. The Public Interest and Balance of the Equities Favor The Government

The public interests in protecting classified and sensitive national security information strongly outweigh any countervailing interests Plaintiffs can identify. "It is 'obvious and

unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (identifying President's interest in maintaining "[s]ecrecy" over classified "information" and preventing its "premature disclosure"). More specifically, the Supreme "Court has recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business." *Egan*, 484 U.S. at 527 (collecting cases).

The D.C. Circuit recently recognized these harms in upholding a government policy limiting media access at the Pentagon, because it "furthers important national security interests." *New York Times Co. v. U.S. Dep't of Def.*, No. 26-5113, 2026 WL 1179440, at *2 (D.C. Cir. Apr. 27, 2026) ("*NYT*"). There, the Court accepted a government "declaration explaining that prior to the 2025 PFAC Policy, journalists obtained 'sensitive or classified' information 'often monthly, and sometimes multiple times per month,' including information concerning 'operational plans' and 'intelligence assessments.'" *Id.* at *2 (quoting declaration). The court further accepted that "[u]nescorted access to the Pentagon was … 'a significant contributing factor' to that pattern because it enabled reporters to 'observe activity patterns' and identify potential sources of sensitive information." *Id.* (quoting declaration). On this basis, the court found that the Government had "supported its claim that this aspect of its policy furthers important national security interests." *Id.* at *2 (citing *Haig*, 453 U.S. at 307); *see also* Wilson Decl. ¶¶ 9-20.

Here, Defendants' letters and declarations similarly set forth the harms to national security. Letters at 1-2; Brown Decl.; Wilson Decl. This court should "not lightly override the [Government's] judgments on matters involving national security." *Anthropic*, 2026 WL 1042493, at *3 (citing *Trump v. Hawaii*, 585 U.S. 667, 704 (2018)); *see also Ctr. for Nat'l Sec. Stud.*, 331

F.3d at 927 ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."). That is especially true where that judgment was made by the President himself. Defendants recognize that *Sherrill* rejected the proposition that concerns about the physical security of the President outside a Secret Service process could justify termination of a press pass. 569 F.2d at 130. Defendants, however, argue this precedent is wrongly decided and should be overruled because there is no such due process or First Amendment right attaching to these credentials. *Sherrill* also did not address threats to national security outside the physical security of the White House complex. Nor did *Sherrill* concern access determinations made personally by the President concerning reporters and outlets that had previously been afforded access to the White House and abused this privilege. And in all events, *Sherrill* did not apply with respect to access to the President's plane and primary office.

In this Court's opinion granting a temporary restraining order, the Court noted that the stories relied upon by the White House in justifying removing the individual reporter's hard passes were not published by the affected reporters. ECF No. 24 at 7. But that is of no moment. As a threshold matter, the policy identified and excluded news networks, not individual reporters, and so any analysis should turn on whether the President appropriately determined that such outlets should no longer be afforded continued access. Further, as a factual matter, the President determined that Plaintiffs news networks had published stories that adversely affect national security, including publishing possibly classified or sensitive information. Wilson Decl. ¶¶ 21-24. In doing so, these outlets each demonstrated their willingness to publish information that undermines national security. *Id.* Restricting access to the White House removes one avenue for these outlets to obtain such harmful information.

The Court also stated that Defendants did not identify how the reporting identified in the letters damaged national security. ECF No. 24 at 6-7. Not so. The Director for Defense Intelligence, Counterintelligence, Law Enforcement & Security explained generally that publication of purported national security information can "signal intentions to adversaries, create potentially catastrophic consequences for sensitive mission coordination, and undermine critical national security objectives" as well as "distract United States government personnel from their official duties by considering whether and how to respond, undermine the national security strategy of the United States by misleading and influencing the public and adversaries out of alignment with the national security strategy, and create complicated decision-making relating to adjustment or response to such information." Brown Decl. ¶ 15. The letters reiterated this point. Letters at 1-3. And Defendants provided a declaration that tied at least one story published by each outlet to a specific national security concern. Wilson Decl. ¶¶ 22-24.

Nor do Defendants need to show that the reporters or outlets actually published classified information. As each letter explained, the stories reported by each outlet diverted "White House resources and those of the national security team in particular, which must evaluate whether the leaked information is classified, the source of any leak, and the security implications of any such disclosure." Letters at 1. And their "spread of misinformation, especially relating to national security, is a threat that undermines the President's ability to safeguard the national security." *Id.* Nor would it be appropriate, administrable, or constitutionally necessary for the President to prove beyond a reasonable doubt or by a preponderance of the evidence that specific information harmed national security before limiting access to the White House complex.

On the other side of the ledger, Plaintiffs seek only to maintain continued access to White House grounds to marginally improve their existing coverage of national affairs. Significantly,

Plaintiffs may still publish whatever content they choose, including any opinions or editorials criticizing the President or his policies. Rather, Plaintiffs argue that they require immediate continued physical access to White House grounds so that they can have "the ability to observe events firsthand and to ask questions of White House officials." Mot. for PI. at 38. But as the *NYT* litigation illustrates, it can be this very access that gives rise to the publication of classified or sensitive national security information. Wilson Decl. ¶¶ 16, 20. Furthermore, Plaintiffs had a process open to them to contest the President's factual findings and declined to participate. The President has also continued to engage with members of the media, including Plaintiffs.

The public interest and balance of the equities therefore counsel against issuing a preliminary injunction requiring the President to grant Plaintiffs continued access to White House grounds, over his personal judgment of national security considerations. Such an extraordinary injunction would raise serious separation of powers concerns and set this Court on "a collision course" with the President. *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004). These concerns are heightened in Plaintiffs' latest request for court-mandated access to the most secure areas in our Government, namely, the Oval Office and Air Force One. Plaintiffs' equities are also at the lowest where, as here, they have sat on their rights, expressly disavowed the relief now requested, and seek access foreclosed by D.C. Circuit precedent.

## V. Any Remedy Should Be Stayed Pending Any Appeal Authorized

At the very least, this Court should narrowly tailor any remedy and stay the order pending appeal. To start, Plaintiffs' proposed order is impermissibly overbroad. Fed. R. Civ. Proc. 65(d). The first and second paragraphs broadly prohibits Defendants from excluding Plaintiffs from restricted areas of the White House without acknowledging any permissible exceptions. ECF No. 55-22 at 1. The second paragraph is further vague because "the access to the Oval Office, Air Force One, and press-pool events that they had before September 18, 2026" is insufficiently

defined. ECF No. 55-22 at 2. At most, this Court should hold the motion for a further preliminary injunction in abeyance pending the D.C. Circuit's resolution of *AP*. The panel's merits opinion—which may issue any day now—will likely dictate the legal framework governing this motion.

Finally, if for any reason this Court should grant any part of Plaintiffs' motion for a preliminary injunction, the Court should stay any injunction pending any appeal authorized by the Solicitor General. For the same reasons Plaintiffs' motion fails, Defendants also satisfy the *Nken*, 556 U.S. 418, standard for a stay pending appeal.

## CONCLUSION

This Court should deny Plaintiffs' motion for a preliminary injunction. If it grants Plaintiffs' motion, it should stay the injunction pending any authorized appeal.

Dated: November 18 2026

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director

JOSEPH E. BORSON
Assistant Branch Director

/S/*Michael K. Velchik*

MICHAEL K. VELCHIK (DC Bar 187249)
Senior Counsel, Civil Division
United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
Phone: (202) 860-8388
E-mail: michael.velchik@usdoj.gov

MICHAEL BRUNS
Trial Attorney

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on November 18, 2026.

/s/Michael K. Velchik
MICHAEL K. VELCHIK