**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CABLE NEWS NETWORK, INC., MS NOW CABLE, LLC, POLITICO LLC, ET AL.,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>DONALD J. TRUMP, ET AL.,<br><br>*Defendants*. | Case No. 1:26-cv-03287-TJK |

# REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A FURTHER PRELIMINARY INJUNCTION

Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Plaintiffs Cable News Network, Inc., MS NOW Cable, LLC, POLITICO LLC, Akayla Gardner, Cheyenne Haslett, and Betsy Klein*

**Admitted Pro Hac Vice*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. Plaintiffs are not barred from seeking relief from Defendants' targeted exclusions .......... 3

II. Plaintiffs are likely to establish that excluding them from the Oval Office, Air Force One, and other pool events violates the Constitution .......... 5

A. The exclusion policy unconstitutionally restricts access to nonpublic fora .......... 5

B. The exclusion policy retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment .......... 13

C. The exclusion policy violates the Due Process Clause .......... 17

III. Plaintiffs will suffer irreparable injury absent a preliminary injunction .......... 20

IV. The balance of equities and public interest favor a preliminary injunction .......... 22

V. This Court should reject Defendants' efforts to forestall immediate relief from the ongoing constitutional violations .......... 24

CONCLUSION .......... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025)....25

*Ahmed v. Blinken*,
759 F. Supp. 3d 1 (D.D.C. 2024)....6

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)....13, 14

*Associated Press v. Budowich*,
2025 WL 1649265 (D.C. Cir. June 6, 2025)....1, 7, 8, 10, 16, 19

*Associated Press v. Budowich*,
2025 WL 2047025 (D.C. Cir. July 22, 2025)....6, 7, 16

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025)....7, 16, 19, 20

**Ateba v. Leavitt*,
133 F.4th 114 (D.C. Cir. 2025)....7, 8, 10, 11

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006)....10, 16

*Bennie v. Munn*,
822 F.3d 392 (8th Cir. 2016)....14

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)....11

*Counterman v. Colorado*,
600 U.S. 66 (2023)....15

*Davidson v. Chestnut*,
193 F.3d 144 (2d Cir. 1999)....14

*First Choice Women's Resource Centers, Inc. v. Davenport*,
608 U.S. 174 (2026)....21

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)....24

*Frederick Douglass Found., Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023)....7

*Greer v. Spock*,
424 U.S. 828 (1976)....9, 10

*Grosjean v. American Press Co.*,
297 U.S. 233 (1936)....................12, 22

*Houston Community College Sys. v. Wilson*,
595 U.S. 468 (2022)....................15

*Iancu v. Brunetti*,
588 U.S. 388 (2019)....................11

**Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992)....................7, 10

*Jenner & Block LLP v. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025)....................14

*KalshiEX LLC v. CFTC*,
119 F.4th 58 (D.C. Cir. 2024)....................6

**Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)....................11, 22

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022)....................13

*Mahoney v. U.S. Capitol Police Bd.*,
192 F.4th 469 (D.C. Cir. 2026)....................5, 11, 15

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)....................14

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)....................20

**Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018)....................8, 11

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)....................15

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
827 F. Supp. 3d 93 (D.D.C. 2026)....................5

*New York Times Co. v. Dep't of Defense*,
2026 WL 1179440 (D.C. Cir. Apr. 27, 2026)....................23, 24

*New York Times Co. v. United States*,
403 U.S. 713 (1971)....................12

*Perry v. Sindermann*,
408 U.S. 593 (1972)....................18

**Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022)....................9

*Rutan v. Republican Party of Ill.*,
497 U.S. 62 (1990) .......... 14

**Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) .......... 18, 19, 22

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023) .......... 11

*Suarez Corp. Indus. v. McGraw*,
202 F.3d 676 (4th Cir. 2000) .......... 14

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) .......... 24

*Trump v. Boyle*,
606 U.S. 989 (2025) .......... 6

*In re United States*,
2026 WL 3399358 (4th Cir. Nov. 10, 2026) .......... 13, 17, 23

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
576 U.S. 200 (2015) .......... 10

*Wannall v. Honeywell, Inc.*,
775 F.3d 425 (D.C. Cir. 2014) .......... 18

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .......... 23

**Constitutional Provisions**

U.S. Const. Amend. I .......... 2

U.S. Const. Amend. V .......... 17

**Rules**

Fed. R. Civ. P. 65(d)(1) .......... 24

D.C. Cir. R. 36(e)(2) .......... 6

**INTRODUCTION**

After this Court enjoined Defendants to restore Plaintiffs' White House hard-pass credentials, Defendants were undeterred. Still determined to fulfill the President's desire to punish CNN, MS NOW, and POLITICO for news coverage of his administration that he perceives as too "negativ[e]," ECF No. 32-6, Defendants continued to take the President's unconstitutional ban on the free press "as far as [they] can," ECF No. 32-4 at 53:38–53:58. They have implemented a new policy that bars Plaintiffs from the Oval Office, Air Force One, and other press-pool events—one motivated by the same viewpoint-discriminatory and retaliatory reasons that were behind the President's original total ban on Plaintiffs. This policy violates the First and Fifth Amendments and, if not preliminarily enjoined, will continue to inflict irreparable constitutional and other concrete harms.

Defendants start with two equally defective attempts to avoid arguing the merits. First, they object that Plaintiffs are procedurally barred from challenging the White House's new policy because the parties supposedly already litigated it. But Defendants instituted a new policy of targeted exclusions *after* this Court enjoined Defendants to restore Plaintiffs' hard-pass credentials. The Court itself made clear that the constitutionality of a policy or practice of barring Plaintiffs from the Oval Office and Air Force One was not previously before it. ECF No. 29 at 22:18–25. Plaintiffs sought this relief as soon as they could take aim at Defendants' moving target—they did not seek, and could not have sought, this relief before. Second, Defendants rely on the nonprecedential stay order in *Associated Press v. Budowich*, 2025 WL 1649265 (D.C. Cir. June 6, 2025), which is nonbinding and wrong.

Those preliminary feints aside, Defendants have almost nothing to say. They cannot square the nonbinding stay concurrence in *Associated Press* with *published* decisions from both the Supreme Court and the D.C. Circuit making clear that the government creates a nonpublic forum

when it provides selective access to certain speakers. Nor do Defendants even mention the significant factual record supporting Plaintiffs' motion that eliminates key assumptions underlying the stay concurrence—including evidence that the Oval Office and Air Force One are President Trump's go-to fora for briefing and interacting with the press. They instead trot back out the same purported interests in "professionalism" and national security that have already failed in this litigation. As before, those interests lack record support, are transparently pretextual, and could not justify viewpoint discrimination or the exercise of unbridled discretion. Defendants also argue that exclusions from press-pool events are not sufficiently material adverse actions to state a First Amendment retaliation claim—even though Defendants imposed that punishment on Plaintiffs precisely because they intend it to have a chilling effect. On due process, they disregard Plaintiffs' protected property interest arising from their investments in pool participation and offer unpersuasive distinctions for shrinking the liberty interest in newsgathering. And Defendants cannot deny they deprived Plaintiffs of those interests by imposing these targeted exclusions with no advance notice of the standard they would apply or the penalty. A likelihood of success on just one claim would justify a preliminary injunction. Plaintiffs are likely to prevail on all three.

The remaining factors all support enjoining Defendants from continuing to retaliate and discriminate against Plaintiffs for the content of their reporting by precluding them from fully performing their pool duties and denying them access to the Oval Office and Air Force One. Such constitutional harms are irreparable. The public interest always favors enjoining constitutional violations. And there is nothing on Defendants' side of the ledger. The Court should grant a further preliminary injunction to protect Plaintiffs' constitutional rights from further violations based on their protected newsgathering and reporting.

# ARGUMENT

## I. Plaintiffs are not barred from seeking relief from Defendants' targeted exclusions.

Defendants argue that this Court already denied prior requests for access to the Oval Office and Air Force One. But they cannot rewrite the past. Plaintiffs did not challenge (and could not have challenged) Defendants' current policy of excluding them only from the Oval Office and Air Force One at the outset of the case because that policy did not yet exist. Plaintiffs' original complaint and motion for a temporary restraining order challenged the President's total "ban," which revoked Plaintiffs' hard passes and inflicted many associated harms, including the inability to fulfill their pool duties. ECF No. 2-1 at 15. As the Court recognized, Plaintiffs' original application asked only for "the immediate reinstatement of their hard passes." ECF No. 24 at 1.

The Oval Office and Air Force One came up at all only because *Defendants* sought to argue the constitutionality of a different, hypothetical policy of excluding Plaintiffs from those fora alone. ECF No. 16 at 17. But as this Court explained at the hearing, the temporary restraining order Plaintiffs requested would "only . . . restore the[ir] hard passes." ECF No. 29 at 22:18–21. The Court added that "whether the President decides, as you say, to exclude people from some further sort of smaller part of the White House based on that authority you mentioned, that's a different thing. I see that as just not implicated by the relief being sought here." *Id.* at 22:21–25. The Court later ordered Defendants to "immediately return, reinstate, and restore the White House 'hard pass' press credentials held by employees of CNN, MS NOW, and POLITICO that were revoked on or about September 18, 2026." ECF No. 24 at 8.

Plaintiffs then moved for a preliminary injunction, asking this Court to "extend its ruling from a temporary restraining order to a preliminary injunction" against enforcement of the President's ban. ECF No. 32-1 at 22. Again, *Defendants* invoked access to the Oval Office and Air Force One—while also acknowledging this Court's earlier statement that such exclusions are

"a different thing." ECF No. 43 at 14–15, 23–24. In reply, Plaintiffs explained that Defendants "get ahead of themselves" because, "[t]o resolve Plaintiffs' motion, this Court need address only the constitutionality of the President's total ban of Plaintiffs from the White House—the same course the Court took in resolving Plaintiffs' motion for a temporary restraining order." ECF No. 44 at 24. Because Defendants had "not announced nor provided notice of any formal policy of restricting Plaintiffs' access to any particular area," Plaintiffs "reserve[d] all rights to seek further relief if and when appropriate," including by demonstrating "on a complete factual record" that any new or further access restrictions violate the Constitution. *Id.* at 24–25.

After this Court entered its preliminary injunction on October 13, Defendants moved to implement just such a policy of targeted exclusions that restricted Plaintiffs from certain fora. The White House declared the next day that "[t]he Fake News has no place demanding a spot in the President's Oval Office." ECF No. 55-17. Five days later, CNN sent a letter to Defendants demanding that they abandon any unstated policy of excluding CNN from the Oval Office and Air Force One. ECF No. 55-18. The White House never responded. Instead, it issued a statement on October 20, declaring that "[n]o person and no journalist has a constitutional right to access to the President's Oval Office, Air Force One, or other sensitive and private facilities." ECF No. 55-19.

Those new developments made clear that the facts had changed and Plaintiffs faced a new policy excluding them from the Oval Office and Air Force One. Plaintiffs moved swiftly to challenge Defendants' latest act of retribution and viewpoint discrimination. On October 28, Plaintiffs amended their complaint to allege claims based on Defendants' targeted exclusions of them from the Oval Office and Air Force One. ECF No. 54. A week later, Plaintiffs moved for a further preliminary injunction after additional exclusions and refusals to designate Plaintiffs consistent with their pool rotations substantiated the existence of a new policy to exclude CNN,

MS NOW, and POLITICO from those spaces. ECF No. 55; *see* ECF No. 55-2 ¶¶ 11–15; ECF No. 55-10 ¶ 8; ECF No. 55-11 ¶¶ 5–6. The White House did not even prohibit CNN from fulfilling its designated pool assignment in the Oval Office until November 5—the day after Plaintiffs moved for a further preliminary injunction. ECF No. 57 ¶ 3. In short, Plaintiffs sought relief as soon as the record made clear that Defendants had imposed a new policy of targeted exclusions.

Defendants admit as much. Though they describe (at 11) this motion as a "third bite at the apple," they acknowledge that "here—*unlike in their previous papers*—Plaintiffs seek more than just their hard-passes." Opp. 2 (emphasis added). Exactly right. The parties litigated the policy Defendants originally imposed. After this Court enjoined the ban, Defendants moved the goal posts. Plaintiffs gathered facts and sought new relief once the record established that Defendants had imposed a new policy barring them "from the Oval Office, Air Force One, or any other location or event opened to the White House press pool." ECF No. 55-22 at 1. Law of the case, waiver, and estoppel do not bar successive motions that arise from such "'change[s] in circumstances.'" *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, 827 F. Supp. 3d 93, 104 n.3 (D.D.C. 2026).

## II. Plaintiffs are likely to establish that excluding them from the Oval Office, Air Force One, and other pool events violates the Constitution.

### A. The exclusion policy unconstitutionally restricts access to nonpublic fora.

Defendants do not contest (at 15) that their exclusion of Plaintiffs from the Oval Office and Air Force One discriminates based on viewpoint. Defendants also do not dispute that they have claimed "standardless discretion" to deny access, which is a per se unreasonable restriction on access to a nonpublic forum. *Mahoney v. U.S. Capitol Police Bd.*, 192 F.4th 469, 482 (D.C. Cir. 2026). Defendants instead (1) assert that the Oval Office and Air Force One are Constitution-free zones, and (2) rehash the same purported interests this Court already determined did not excuse Defendants' viewpoint discrimination or unconstitutional retaliation against Plaintiffs for the

content of their news coverage of the President. Neither argument saves Defendants' policy.

**1. The First Amendment prohibits viewpoint discrimination in the Oval Office and on Air Force One.**

Defendants are wrong to argue that the First Amendment ceases to apply as soon as the President steps into the Oval Office or boards Air Force One.

To start, Defendants misunderstand basic rules of precedent. They argue that "this Court *must* deny" the motion because "Plaintiffs' theory is *foreclosed* by the D.C. Circuit's stay opinion" in *Associated Press*. Opp. 12 (emphases added). But that unpublished stay order has "no precedential value" and is not binding on this Court. D.C. Cir. R. 36(e)(2); *see Ahmed v. Blinken*, 759 F. Supp. 3d 1, 10 n.4 (D.D.C. 2024). As Judge Walker explained, "the emergency panel's unpublished stay is a nonprecedential order that did not purport to resolve the appeal's merits." *Associated Press v. Budowich*, 2025 WL 2047025, at *2 (D.C. Cir. July 22, 2025) (Walker, J., concurring in denial of reconsideration en banc). That is why he and Judge Pan voted to deny reconsideration despite "reservations" about the reasoning in the concurrence. *Id.* at *1–2.

Defendants conflate (at 12) the unpublished stay order in *Associated Press* with Supreme Court orders on interim relief, such as injunctions and stays pending appeal. The Supreme Court does not issue unpublished orders and has instructed that its published decisions on interim relief, while not "conclusive as to the merits," "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 606 U.S. 989, 989 (2025). Defendants' reliance on *Boyle* only underscores the distinction between precedential and nonprecedential stay orders. Although the D.C. Circuit at times publishes its orders on requests for interim relief, *e.g.*, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024), it did not do so in *Associated Press*. The stay order is not binding precedent. Defendants overreach in repeatedly treating it as if it were.

The *Associated Press* stay order is wrong on the merits. Judge Rao's concurrence "cannot

be squared with longstanding First Amendment precedent, multiple generations of White House practice and tradition, or any sensible understanding of the role of a free press in our constitutional democracy." 2025 WL 1649265, at *14 (Pillard, J., dissenting); *see* 2025 WL 2047025, at *1 (opinion of Walker, J.) (noting the district court had "analyzed this case with force and eloquence through the lens of viewpoint discrimination and retaliation"). Viewpoint discrimination is "'poison'" the First Amendment abhors. *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023). This prohibition against viewpoint discrimination applies to "all remaining public property" that is opened to individual speakers but does not qualify as a traditional or limited public forum. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–79 (1992). When the government "provides 'selective access for individual speakers,'" it "creates a 'nonpublic forum'" where viewpoint discrimination is unlawful. *Ateba v. Leavitt*, 133 F.4th 114, 117, 122 (D.C. Cir. 2025). That is true for the Oval Office and Air Force One.

Defendants do not even try to reconcile their argument against applying forum analysis to the Oval Office and Air Force One with *Ateba*—which is, unlike the *Associated Press* stay order, binding precedent. When the government opens those locations to the press pool so journalists can ask questions and gather the news, the locations are no different from other White House press areas that the D.C. Circuit has had "no trouble" concluding are nonpublic fora—like "the briefing room, the press offices, and certain other locations in and around the White House that are open to correspondents." *Ateba*, 133 F.4th at 117, 123. Judge McFadden persuasively explained that the Oval Office and Air Force One are not "analytically distinct" from other press spaces because, "[w]hether the press pool travels on Air Force One, goes to a Mar-a-Lago press briefing, or attends a press-pool-only event elsewhere, the Government has chosen to open the doors of nonpublic spaces for some journalists." *Associated Press v. Budowich*, 780 F. Supp. 3d 32, 54 (D.D.C. 2025).

The evidence before this Court—which Defendants do not even mention—also refutes the main factual premises of the stay order in *Associated Press*. Defendants parrot the stay order in proclaiming that access to the Oval Office and Air Force One "do[es] not involve the type of communicative activities that transform a restricted government space into a nonpublic forum." Opp. 13 (quoting *Associated Press*, 2025 WL 1649265, at *7 (Rao, J., concurring)). But the record disproves that assertion. Plaintiffs and other reporters ask questions of the President and other White House officials, make editorial decisions about what and how to film and photograph, gather information, and communicate to the public through dispatches and video footage in real time as events unfold. ECF Nos. 55-5 to 55-9; ECF No. 55-2 ¶ 5. Other news organizations and the public receive and react to that reporting in real time. ECF No. 55-2 ¶ 5. These communicative activities through which journalists "gather information about the administration" are precisely what make the Oval Office and Air Force One nonpublic fora like other spaces used for similar purposes. *Ateba*, 133 F.4th at 122. When the government selectively opens those spaces to allow those communicative activities, viewpoint discrimination is prohibited. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018) (polling place is a nonpublic forum "at least on Election Day").

Defendants simply ignore the record when they say—citing no evidence—that "journalists generally are not speaking with the President or other officials" or "engaged in dialogue with each other" in the Oval Office and on Air Force One. Opp. 15 (quoting *Associated Press*, 2025 WL 1649265, at *8 (Rao, J., concurring)). Plaintiffs have submitted extensive evidence, including videos, establishing that President Trump *most often* speaks with journalists in the Oval Office and in connection with his travel on Air Force One. ECF No. 55-12 ¶¶ 12–26. From the start of his second term through September 2026, he fielded at least 4,783 questions at 259 events in the Oval Office, aboard Air Force One, and on the tarmac, compared with approximately 147 questions at

six Brady Briefing Room appearances. ECF No. 55-3 ¶ 5. Approximately 97% of the questions fielded by President Trump throughout his second term were asked in those spaces. *Id.* And while communicating with journalists in those spaces, he has discussed—and reporters have reported on—some of the most pressing topics of the day, including the government shutdown, victims of Jeffrey Epstein, the blockade of the Strait of Hormuz, and the ongoing wars in Ukraine and Iran. ECF Nos. 55-5 to 55-9. This evidence all postdates the *Associated Press* stay decision, which came early in the President's second term.

The record also undermines Defendants' reliance (at 13–14) on *Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022), which reiterated that the First Amendment protects "[g]athering information about government officials in a form that can readily be disseminated to others." *Id.* at 1070–71. That is exactly what Plaintiffs do when newsgathering and reporting in the Oval Office and aboard Air Force One. That activity "serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" *Id.* at 1071. *Price* distinguished such newsgathering activity from simply creating recordings in public places and suggested that "[f]orum analysis may well apply to live streaming, which is communicative activity, albeit to people who are not necessarily located in the forum in which the streaming is conducted." *Id.* at 1070, 1071 n.***. *Price* underscores that the Oval Office and Air Force One, when opened for pool events, are nonpublic fora because Plaintiffs' reporters communicate with the President and transmit real-time coverage of the event. ECF No. 55-2 ¶ 5; ECF No. 55-10 ¶ 6.

Defendants come up empty in search of precedent for their argument (at 13) that the Oval Office and Air Force One are "not fora at all." In *Greer v. Spock*, 424 U.S. 828 (1976), the Supreme Court held that the First Amendment allowed the government to prohibit political campaign speech on a military base because the government had not "discriminated in any way

among candidates for public office based upon the candidates' supposed political views." *Id.* at 838. Defendants misquote (at 14) *Greer* as holding that selective access for some speakers does not turn a location into a nonpublic forum when the Court instead held that selective access "did not of itself serve to convert Fort Dix into a *public* forum." 424 U.S. at 838 n.10 (emphasis added). Selective access to government property is the essential criterion of a *nonpublic* forum. *Ateba*, 133 F.4th at 122. And in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), the Supreme Court held that government-issued license plates were not a nonpublic forum because the plates were government speech. *Id.* at 216. *Walker* distinguished license plates from fora "that private parties, and not only the government, use[ ]" to "communicate." *Id.* at 218. That distinction applies here: Plaintiffs are private parties who use the Oval Office and Air Force One to engage in vital and constitutionally protected communicative activity. Defendants cannot explain why the Oval Office and Air Force One do *not* fall into "the default category in forum analysis": "the nonpublic forum, which includes 'all remaining public property' that does not qualify as a traditional, designated, or limited public forum." *Associated Press*, 2025 WL 1649265, at *18 (Pillard, J., dissenting) (quoting *Krishna Consciousness*, 505 U.S. at 678–79).

Finally, Defendants misplace (at 15) reliance on *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006), which involved an official's directive to staff not to grant special one-on-one access to two reporters. *Id.* at 413. Defendants ignore reality when they insist that opening up the Oval Office and Air Force One as President Trump's primary presidential briefing rooms resembles a public official's choice of whom to grant interviews. Like the ban, this policy of exclusion "cuts far deeper into an individual reporter's ability to do her job." ECF No. 50 at 15.

**2. Defendants' attempts to justify their unreasonable and viewpoint-discriminatory exclusions of Plaintiffs are meritless.**

Defendants again argue (at 16–18) that a purported desire to enforce "minimum standards

of professionalism" and protect "national security" can justify viewpoint discrimination. But a "finding of viewpoint bias end[s] the matter" and establishes a per se First Amendment violation. *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). "Control over access to a nonpublic forum" can be exercised *only* when the restrictions imposed "are reasonable in light of the purpose served by the forum *and* are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (emphasis added); *see Mansky*, 585 U.S. at 12 (restrictions must not be "'an effort to suppress expression merely because public officials oppose the speaker's view'"). A restriction on access to or use of a nonpublic forum must satisfy both those requirements. Defendants satisfy neither. Indeed, they do not even contest that Plaintiffs' exclusion from the Oval Office and Air Force One (like the President's ban) discriminates based on viewpoint and unreasonably wields "standardless discretion" to deny access. *Mahoney*, 192 F.4th at 482; *see* ECF No. 50 at 21. No reason the government could offer would be sufficient to justify such a policy.

Even if compelling interests could justify viewpoint discrimination, both interests that Defendants invoke fall far short as a matter of law. This Court correctly observed that "it seems unlikely that the maintenance of professionalism, on its own, would amount to a compelling interest." ECF No. 50 at 21 n.8. An interest must be "sufficiently coherent" and capable of "measure[ment]" to be compelling. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 214 (2023). Defendants' "unarticulated standards of professionalism" are so amorphous that they do not even provide fair notice, *Karem v. Trump*, 960 F.3d 656, 666 (D.C. Cir. 2020), let alone establish a compelling interest. Unbridled discretion to determine what is and is not "professional" on the part of a journalist or news outlet is per se unreasonable; it is hardly a "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16; *see Ateba*, 133 F.4th at 124–25.

The same goes for Defendants' amorphous interest in "national security," which cannot be a shield for viewpoint discrimination either. The First Amendment protects reporting on national security. *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam). Because "[o]nly a free and unrestrained press can effectively expose deception in government," the First Amendment protects journalists' ability to seek out and publish non-public information about the government. *Id.* at 717 (Black, J., concurring). Defendants conflate (at 18) threats to national security with reporting *about* matters of national security. A desire to suppress reporting "which seem[s] to criticize or exhibit [the government] in an unfavorable light, however truly," on matters of national security is illegitimate under the First Amendment. *Grosjean v. American Press Co.*, 297 U.S. 233, 245 (1936).

Defendants' resort to national-security concerns is pretextual in any event. As this Court already explained, "Plaintiffs were selected by President Trump for revocation of their access" because "he believes their coverage of him and his administration is generally inaccurate and biased," not "to vindicate any other purportedly 'compelling governmental interest,'" "including maintaining professional standards for journalists or protecting national security." ECF No. 50 at 21. The Court rejected Defendants' reliance on post hoc letters sent to Plaintiffs that "conflate[d] concerns about otherwise protected speech . . . with national security concerns." *Id.* at 17–18. And it rejected Defendants' reliance on a declaration submitted by the Defense Department's press secretary, concluding that it "says little to nothing" about "White House press practices or operations." *Id.* at 18. Defendants do not even bother to try to supplement the record; they rely again on the very same letters and declarations that this Court already found to be deficient—and that in any case were offered in purported justification for a different, now-enjoined policy. So now, as then, there is "no evidence" that Defendants imposed restrictions on Plaintiffs for either

professionalism or national-security reasons, and "the phrase 'national security'" was just "another way for [President Trump] to describe Plaintiffs' alleged inaccuracies and unfairness in their reporting about topics like his achievements or electoral success." *Id.* at 17.

In short, if professionalism and national security were genuine interests, Defendants "would not have had to scramble to make their case with unsigned letters and a declarant who does not even work" at the White House. ECF No. 50 at 19–20. And they would have something more to offer now. There is no doubt that Defendants' purported interests were "'invented *post hoc* in response to litigation.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022). "When a free press reports on the operations of government, it will often be the case that reporting exposes matters that the government might wish undisclosed, either to save itself from embarrassment or because it simply prefers to have its actions unexamined." *In re United States*, 2026 WL 3399358, at *7 (4th Cir. Nov. 10, 2026) (Wilkinson, J.). But that impulse never justifies viewpoint discrimination. President Trump treats the Oval Office and Air Force One as his de facto press briefing rooms. The First Amendment applies with full force in these nonpublic fora.

**B. The exclusion policy retaliates against Plaintiffs for newsgathering and reporting protected by the First Amendment.**

Plaintiffs also are likely to succeed on their retaliation claim regardless of the forum status of the Oval Office and Air Force One because (1) Defendants do not contest (at 19) that Plaintiffs engaged in protected newsgathering and reporting; (2) Defendants inflicted a punishment—exclusion from press-pool events and the undermining of Plaintiffs' significant investments in their ability to perform their pool functions—that would chill reporters and news organizations of ordinary firmness from engaging in coverage of the administration the President might perceive as too negative; and (3) Defendants' punishment was caused by Plaintiffs' protected speech. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Defendants again seek refuge in the nonbinding

*Associated Press* stay opinion without ever reconciling it with contrary binding precedent.

First, Defendants contest (at 18–19) whether exclusion from press-pool events is the type of punishment that may support a retaliation claim. But they ignore the Supreme Court's instruction that "even an act of retaliation as trivial as failing to hold a birthday party for a public employee" can be unconstitutional when intended to "punish" the exercise of "free speech rights"—a rule that the *Associated Press* stay concurrence overlooked. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990) (quotation marks omitted). Simply put, the "bar is not a high one." *Jenner & Block LLP v. Dep't of Just.*, 784 F. Supp. 3d 76, 95 n.7 (D.D.C. 2025). Because the President uses the Oval Office and Air Force One as primary spaces where he briefs and takes questions from journalists, excluding journalists from those spaces is a materially adverse action. Mot. 34; *see Davidson v. Chestnut*, 193 F.3d 144, 150–51 (2d Cir. 1999) (per curiam) (explaining that the adverse-action inquiry is "factual in nature"); *accord Bennie v. Munn*, 822 F.3d 392, 398 (8th Cir. 2016); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

Defendants (like the *Associated Press* stay concurrence) also disregard the governing D.C. Circuit standard—whether the punishment is "'sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again.'" *Aref*, 833 F.3d at 258. Although Defendants note (at 20) that Plaintiffs have not alleged they have been subjectively chilled from covering the President in ways he dislikes, they do not dispute that the governing standard is "'objective.'" *Media Matters for Am. v. Paxton*, 138 F.4th 563, 581 (D.C. Cir. 2025). Plaintiffs explained in detail, supported by unrebutted declarations, how being barred from performing their pool responsibilities severely harms their ability to fulfill their journalistic missions by depriving their reporters of the ability to ask questions and observe official events firsthand; how this sanction is particularly chilling because it undermines the value of Plaintiffs' investments in their ability to

perform pool functions; and how that chilling effect is further exacerbated because preventing Plaintiffs from fulfilling their pool duties also hurts other journalists and news organizations. Mot. 32–33. Defendants contest none of these facts and tellingly never dispute that these severe consequences would chill a reporter or news organization of ordinary firmness. Nor do Defendants contend with Plaintiffs' long history of participation in the television and print pools, Mot. 9–11; stripping away Plaintiffs' longstanding access would obviously "chill" future speech and reporting. *Counterman v. Colorado*, 600 U.S. 66, 75 (2023); *see also Mahoney*, 192 F.4th at 482 ("long history and tradition" of access "compel a relatively probing review").

Defendants assert that excluding journalists from the Oval Office and Air Force One is no more punitive than the pervasive practice of granting some journalists more favorable access and cannot support a retaliation claim. Defendants point (at 19) to *Houston Community College System v. Wilson*, 595 U.S. 468 (2022), for the proposition that only "material" adverse actions can support a retaliation claim. *Id.* at 477. But *Wilson* involved a purely verbal censure of an elected official by his peers and noted that some "verbal reprimands or censures" *could* "give rise to a First Amendment retaliation claim." *Id.* at 478–79, 482. In concluding that the censure there did not violate the First Amendment, the Supreme Court stressed that the case did "not involve expulsion, exclusion, or any other form of punishment." *Id.* at 482. That, of course, is not true here. The President has not merely criticized Plaintiffs' journalism (which he is free to do). He has excluded Plaintiffs from press-pool events to punish them for the viewpoint of their journalism and to deter others from publishing coverage of him that he dislikes. While the First Amendment protects the right of government officials to criticize others, *id.* at 478, it prohibits government officials from seeking to "punish or suppress disfavored expression" through concrete measures beyond an official's own speech, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

Defendants also argue (at 20) that the exclusion of Plaintiffs from press-pool events in certain locations is a less severe sanction than the policy in *Ehrlich* that prohibited government employees from speaking with two named reporters. 437 F.3d at 413. But this Court correctly rejected Defendants' attempt to analogize the White House's total ban on Plaintiffs to the policy in *Ehrlich* because excluding journalists from spaces "open to many of their competitors" and restricting their ability to "observe happenings there firsthand, immediately report on those activities, and try to engage with government officials" is a significantly more serious sanction than a "government official's decision to decline to speak to a reporter." ECF No. 50 at 15. The same is true with respect to excluding Plaintiffs from the Oval Office and Air Force One—the primary spaces where the press interacts with President Trump.

In the same vein, Defendants repeat (at 20) the assertion that exclusion from the press pool is no different from "reward[ing] journalists with advantages like interviews with the President and the opportunity to ask questions at press events." *Associated Press*, 2025 WL 1649265, at *11 (Rao, J., concurring). But the categorical, viewpoint-based exclusion of Plaintiffs from press-pool events in certain spaces is a stark departure from the ordinary rough-and-tumble relationship between officials and the press. The exclusion here is *not* like denying an interview or refusing to answer a journalist's question at a press conference. In *Associated Press*, Judge McFadden rightly rejected the interview analogy after an evidentiary hearing, finding that pool events involve "a gaggle of reporters, all vying for space and information"; reporters are often "just there to witness what is said and what the reaction is"; it is "commonplace for the President to invite journalists into the Oval Office without speaking to them"; and the event "would happen whether any particular outlet had a reporter there or not." 780 F. Supp. 3d at 32, 53; *see Associated Press*, 2025 WL 2047025, at *1 (opinion of Walker, J.) (noting that the government had not "presented

evidence when analogizing an Oval Office media event to a one-on-one interview"). Excluding Plaintiffs from spaces like the Oval Office and Air Force One when they are slated to perform their pool responsibilities prevents Plaintiffs and their reporters from doing their jobs and from covering those official events altogether. This punishment is thus sufficiently material to support a retaliation claim.

Second, Defendants hardly contest causation, claiming (at 21) only that Plaintiffs' publication of classified and national-security information supposedly caused their exclusion from press-pool events. Defendants ignore their repeated statements expressly linking this punishment to the President's dislike of how Plaintiffs cover him and his administration. Mot. 35. This Court already correctly found a likely causal link between Defendants' actions and Plaintiffs' exercise of their First Amendment rights and rejected Defendants' post hoc, pretextual national-security explanations. *See supra*, at 12–13. Defendants have provided no additional evidence in support of their story and have not given this Court any reason to doubt its earlier findings on causation.

"[T]he First Amendment is First" because it "captures both who we are as a people and what we aspire to become." *In re United States*, 2026 WL 3399358, at *6. Defendants' policy runs roughshod over that fundamental principle. By excluding Plaintiffs from press-pool events and preventing them from fulfilling their pool responsibilities as punishment for Plaintiffs' purportedly "negative" coverage, Defendants are imposing a serious penalty that would chill a reporter of ordinary firmness. Plaintiffs are likely to succeed on their retaliation claim.

**C. The exclusion policy violates the Due Process Clause.**

Plaintiffs are also likely to succeed in showing that Defendants have barred them from the Oval Office and Air Force One and prevented them from fulfilling their pool duties without constitutionally adequate process. Defendants do not make any new argument that Plaintiffs received fair notice of the standard of conduct or the magnitude of potential punishment, relying

solely on the claims in their earlier briefing that this Court correctly rejected. Opp. 24; *see* ECF No. 50 at 9–12. Instead, Defendants focus (at 21–23) entirely on whether Plaintiffs have made the threshold showing that they have been deprived of protected liberty or property interests.

First, Defendants ignore Plaintiffs' argument that they have a protected property interest in fulfilling their pool duties. As Plaintiffs explained, "consistent, positive action of government officials" led Plaintiffs to reasonably rely on their continued ability to do so. Mot. 38 (quoting *Sherrill v. Knight*, 569 F.2d 124, 131 n.22 (D.C. Cir. 1977)). Defendants do not dispute that Plaintiffs for decades had "mutually explicit understandings" with White House officials that Plaintiffs would not be prohibited from fulfilling their press-pool duties, or that CNN has invested millions of dollars in the labor and infrastructure necessary to fulfill its pool responsibilities. *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *see* Mot. 36–39. Defendants just ignore the governing standard from *Perry* for what counts as a property interest and disregard Plaintiffs' evidence that the longstanding, mutually explicit expectations here gave rise to one. Because Defendants failed to respond to Plaintiffs' argument that they have a protected property interest, this Court "may treat the unaddressed argument[ ] as conceded." *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014). If this Court agrees that Plaintiffs have a protected property interest, the Court need go no further to conclude that the deprivation of that interest violates the Due Process Clause for the same reasons as the total ban from the White House. ECF No. 50 at 10–12.

Second, Defendants focus all their fire on the existence of a liberty interest under *Sherrill*. But *Sherrill* did not limit its holding to any particular set of spaces. Rather, its liberty interest, which is grounded in the "freedom of the press," encompasses journalists' ability to access spaces that have been "made publicly available as a source of information for newsmen." 569 F.2d at 129. Given the unrebutted facts about how the President uses these spaces, journalists need to

report on pool events from those spaces, which are made publicly available to members of the pool as a source of information. *See supra*, at 7–9.

Defendants stress (at 22) that the Oval Office and Air Force One are opened "only to a small fraction of the press corps" at any given time. But *Sherrill* does not limit its protected liberty interest to those areas capable of holding all 1,300 hard-pass holders at the same time. 569 F.2d at 129; *see* Opp. 4. For example, the Brady Briefing Room holds only a small fraction (49) of the 1,300 hard-pass holders. *See Associated Press*, 780 F. Supp. 3d at 39. Yet no one doubts that *Sherrill* protects journalists' access to the Brady Briefing Room. *See Associated Press*, 2025 WL 1649265, at *6 (Rao, J., concurring); Opp. 23. In context, *Sherrill*'s language about being "open" to bona fide journalists refers to spaces that historically any journalist was "*eligible*" to access without regard to viewpoint—even if as a practical reality not every eligible journalist could physically fit into that space at the same time. 569 F.2d at 129–30 (emphasis added). Those space constraints are, after all, why the press established and invested in pools to begin with. Plaintiffs' liberty interest in accessing spaces the White House opens to the press as part of their respective pools does not depend on the size of the space or whether the government calls the space "secure."

Defendants invoke (at 22–23) *Sherrill*'s statement that it would be "unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all." 569 F.2d at 129. But that is not Plaintiffs' argument. And in any event, that is simply another way of saying that the President can choose the journalists to whom he speaks. Again, press-pool events are events "any hard pass holder" is eligible to attend and are not analogous to one-on-one interviews. *Associated Press*, 780 F. Supp. 3d at 55 (quoting the government's lawyer); *see supra*, at 16–17. Defendants may have discretion to decide whether to hold such a press briefing or other press-pool event in the first place. They have no discretion

categorically to exclude an eligible journalist from fulfilling a pool rotation.

Defendants protest (at 23) that it would be "unworkable" to provide due process whenever a media outlet is not selected to join a limited-space pool event. But Plaintiffs are not challenging a one-off failure to be "selected." Plaintiffs are challenging Defendants' policy and practice of categorically excluding Plaintiffs and their reporters from all pool events in the Oval Office and in connection with travel on Air Force One—pool events they would otherwise attend and cover. Mot. 18. Plaintiffs' position is that they cannot be *barred* without due process from covering pool events and fulfilling the pool duties for which they have made substantial investments.

Finally, Defendants fault (at 24) Plaintiffs for failing to include "*Sherrill*-like due process requirements" in their proposed order. *Associated Press*, 780 F. Supp. 3d at 59 n.8. But as this Court has concluded, the core due-process failure here was the lack of pre-conduct fair notice of what would subject Plaintiffs to punishment and the magnitude of the sanction that would be imposed. ECF No. 50 at 10–12. Because no post-conduct process can cure that fundamental failure, additional procedures are beside the point.

## III. Plaintiffs will suffer irreparable injury absent a preliminary injunction.

Defendants continue to ignore bedrock precedent on the irreparable nature of constitutional harms, continue to discount the concrete harms that Plaintiffs suffer each time they are excluded, and add a charge of delay that the record refutes.

To start, Defendants refuse to address the well-settled principle that constitutional violations are irreparable. Mot. 42–43; *see* Opp. 24–25. As this Court explained in its preliminary-injunction order, "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." ECF No. 50 at 21 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). That principle applies to rights protected by both the First Amendment and the Due Process Clause. *Id.* at 22. So "[w]hen constitutional harm

is the basis for irreparable harm, the likelihood of success on the merits overlaps heavily with the irreparable harm inquiry." *Id.* at 21–22. Plaintiffs thus are likely to suffer irreparable harm without an injunction for the same reasons that they are likely to prevail on the merits.

Defendants' attempts to undermine the practical harms to Plaintiffs are not only irrelevant but also unpersuasive. First, they argue (at 24) that Plaintiffs "may continue to publish whatever content or editorials they wish." That observation misses the point. A plaintiff need not prove an inability to speak at all to secure relief against targeted exclusions that violate the First Amendment and Due Process Clause. *First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174, 197 (2026) ("A government that takes three limbs but spares the last imposes an injury all the same."). Second, Defendants minimize (at 24) any harm from the exclusions because "media outlets already agree to pool" footage from the White House. But the exclusions that Plaintiffs challenge undisputedly impair the ability of the pool to function. ECF No. 55-2 ¶¶ 17–18. In any event, pooled footage is a substitute "only in the way that a secondhand account is a substitute for being present." ECF No. 32-18 ¶ 9. A question that CNN's, MS NOW's, and POLITICO's reporters are not in the room to ask is a question that goes unanswered and that "cannot be covered after the fact." ECF No. 32-18 ¶ 9; *see also* ECF No. 55-10 ¶ 11; ECF No. 55-11 ¶ 11.

Defendants also insist (at 25) that Plaintiffs' "refusal to engage" with the sham "process" that Defendants manufactured after the ban for purposes of this litigation undercuts their injuries. For one thing, the September 22 letters concerned "hard passes" and said nothing about depriving Plaintiffs of access to the Oval Office or Air Force One during their scheduled pool rotations. ECF Nos. 16-1 to 16-3. For another, this Court has held that Defendants' post-deprivation process did "not pass muster under *Karem*." ECF No. 50 at 12 n.7. Defendants provided no notice, no standard, and no opportunity to be heard before implementing a policy of excluding Plaintiffs from

the Oval Office and Air Force One. ECF No. 55-2 ¶ 15; ECF No. 55-10 ¶ 9; ECF No. 55-11 ¶ 7.

Defendants lastly are wrong to argue (at 24) that Plaintiffs "sat on their rights" and "twice before disavowed" this relief. Plaintiffs diligently documented exclusions that began after the filing of the initial motion for a preliminary injunction, wrote to Defendants after the Court ordered the restoration of their hard passes to seek clarity on any unannounced policy of excluding them, and amended their complaint and sought further relief only when Defendants' actions made clear they were implementing a new policy of targeted exclusions. *See supra*, at 3–5.

**IV. The balance of equities and public interest favor a preliminary injunction.**

This Court has twice held that the balance of equities and public interest favor enjoining Defendants' retaliatory and viewpoint-discriminatory actions against Plaintiffs for their reporting. ECF No. 24 at 5–7; ECF No. 50 at 22–24. Defendants offer nothing that would justify a different conclusion now. They cannot dispute that "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668 (quotation marks omitted). Nor can they dispute that, each of the six times they barred CNN from Air Force One, no primary television network pooler accompanied the President—a loss borne by the other four networks, more than 1,000 local affiliates, and the public. ECF No. 55-2 ¶¶ 15–19. Defendants offer no persuasive reason why the public interest would favor allowing their constitutional violations to persist.

First, Defendants dismiss (at 25) harms to the other outlets because they "are not parties." But harm to nonparties is exactly what the public-interest factor measures. The "public at large" shares a vital interest in ensuring that journalists are not "arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129–30. That "abiding interest" in protecting Plaintiffs' ability to cover the President exists because of "the importance of the free press, which 'stands as one of the great interpreters between the government and the people.'" ECF No. 50 at 23 (quoting *Grosjean*, 297 U.S. at 250). Without a preliminary injunction, "the ability of journalists to report

on events of large importance and governmental behavior of dubious legality and integrity could not help but be hampered." *In re United States*, 2026 WL 3399358, at *7.

Second, Defendants repeat (at 25–29) the national-security arguments this Court has already rejected when finding "just about no evidence in the record to explain or justify the 'ban' from a national security perspective." ECF No. 50 at 23. The Supreme Court has warned that "national-security concerns must not become a talisman used to ward off inconvenient claims." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017). But disregarding that caution and this Court's prior rulings, Defendants submit no new evidence, falling back on the same letters and the same declaration from a Department of Defense press secretary who "makes essentially no representations about . . . White House press practices or operations, which is unsurprising given that she does not work there." ECF No. 50 at 24. Defendants still "do not even bother to identify what specific information" was "allegedly classified or sensitive." *Id.* They even disclaim (at 28) any need to show that Plaintiffs "actually published classified information." And although Defendants represent (at 27) that a decision on national security "was made by the President himself," the White House's own explanations for the pool exclusions concern the content of Plaintiffs' coverage: "The Fake News has no place demanding a spot in the President's Oval Office." ECF No. 55-17; *see also* ECF No. 55-19. There is "practically nothing national security-related in the record . . . to which the Court can defer" as to exclusions from the Oval Office and Air Force One, just like for the ban from the White House grounds. ECF No. 50 at 24.

Third, Defendants again misdescribe (at 26) the stay ruling in *New York Times Co. v. Department of Defense*, 2026 WL 1179440 (D.C. Cir. Apr. 27, 2026). That decision granted "very limited relief" that did not disturb an injunction prohibiting enforcement of an unconstitutional policy that "restrict[ed] Pentagon access" for credentialed journalists on the basis of their perceived

editorial viewpoint. *Id.* at *2. The majority partially stayed a compliance order solely as to one aspect of an "[i]nterim" policy that required credentialed journalists to be accompanied by an official escort while in the Pentagon after concluding that the escort requirement likely fell outside the scope of the district court's original injunction. *Id.* at *3. The district court later found that the declarations that the Department of Defense had filed for the first time in the D.C. Circuit in support of its stay motion did not support its post hoc reliance on national security. *New York Times Co. v. Dep't of Defense*, No. 26-cv-1690 (D.D.C. June 30, 2026), ECF No. 17 at 26–29 (finding the Department's "suspicious[ly]" "tim[ed]" invocation of national-security concerns "facially dubious" and "refuted" by contrary evidence).

Fourth, Defendants are wrong to protest (at 29) that the requested relief raises separation-of-powers concerns. Plaintiffs seek no relief against the President. Relief against subordinates is the ordinary way federal courts enforce the Constitution against administrations—as this Court has twice done here. ECF No. 24 at 8; ECF No. 50 at 25–26; *see Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). The injunction Plaintiffs seek would forbid only excluding them from press-pool events because of the content of their reporting.

## V. This Court should reject Defendants' efforts to forestall immediate relief from the ongoing constitutional violations.

This Court should reject Defendants' makeweight objections to the scope of the requested injunction. They invoke Rule 65(d), which requires an injunction to "state its terms specifically" and to describe the restrained acts "in reasonable detail." Fed. R. Civ. P. 65(d)(1)(B)–(C); *see* Opp. 29. But Defendants do not dispute the clarity of the term protecting access to the Oval Office, Air Force One, and other White House spaces only when "opened to the White House press pool" *and* "when the Plaintiff news organization is scheduled to serve in its respective pool rotation."

ECF No. 55-22 at 1. Nor do they dispute the clarity of the term preventing them from interfering with Plaintiffs' "scheduled rotations" in their respective pools "on the basis of the content or viewpoint of Plaintiffs' reporting." *Id.* at 2. Instead, they argue only that enjoining them from depriving Plaintiffs of "the access to the Oval Office, Air Force One, and press-pool events that they had before September 18, 2026," is vague. Opp. 29 (quoting ECF No. 55-22 at 2). Yet that provision prohibits only interference with the clear baseline of access that existed as of September 18 to those spaces. And although Defendants protest the proposed injunction omits "permissible exceptions," Opp. 29, they never explain what exceptions would permit them to exclude Plaintiffs for the perceived viewpoint of their reporting when a space is otherwise open to the press pool.

This Court also should reject Defendants' invitation (at 30) to hold the motion in abeyance pending a decision from the merits panel in *Associated Press*. That decision could come down tomorrow, in a month, or in a year. Meanwhile, Plaintiffs will continue to suffer irreparable injury from Defendants' unconstitutional barring of them from the Oval Office, Air Force One, and other presidential events opened to the White House press pool. *See supra*, at 20–21. Holding a request for emergency relief in abeyance would be a constructive denial of the motion with "'the practical effect of refusing an injunction.'" *A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) (per curiam).

Finally, this Court should reject the perfunctory request for a stay for the same reasons the Court should grant Plaintiffs' motion for a preliminary injunction, as this Court has already explained. ECF No. 50 at 26 n.10.

## CONCLUSION

This Court should preliminarily enjoin Defendants (save the President) and those acting in concert with them from discriminating or retaliating against Plaintiffs in their pool rotations and interfering with the access to the Oval Office and Air Force One that Plaintiffs had before September 18, 2026. The Court should dispense with any bond, which Defendants do not request.

Dated: November 25, 2026

Respectfully submitted,

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr. (D.C. Bar No. 420440)
Katie Townsend (D.C. Bar No. 1026115)
Patrick J. Fuster (CA Bar No. 326789)*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
TBoutrous@gibsondunn.com
KTownsend@gibsondunn.com
PFuster@gibsondunn.com

Connor S. Sullivan (D.C. Bar No. D00506)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2459
CSSullivan@gibsondunn.com

Connor P. Mui (D.C. Bar No. 90009004)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
CMui@gibsondunn.com

*Counsel for Plaintiffs*

**Admitted Pro Hac Vice*